WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock, Esq. (MB 3001)
Melanie Gray (admitted *pro hac vice*)
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax (212) 310-8007

-and-

David R. Berz, Esq. (DB 4517)
David A. Hickerson, Esq.
Peter M. Friedman, Esq. (admitted *pro hac vice*)
1501 K Street, NW Suite 100
Washington, DC 20005
Tel: (202) 682-7000
Fax: (202) 857-0939

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
                                       :
In re                                  :    Chapter 11
                                       :    Case No. 01-16034 (AJG)
ENRON CORP., et al.,                   :
                                       :    Jointly Administered
                   Debtors.            :
-------------------------------------------------------x
                                       :
MIZUHO CORPORATE BANK, LTD., et al.,   :    Adv. Pro. No. 03-2288
                                       :
                   Plaintiffs,         :
                                       :
         v.                            :
                                       :
ENRON CORP., et al.                    :
                   Defendants.         :
-------------------------------------------------------x
```

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
## PURSUANT TO FED. R. BANKR. P. 7012(B)(6) TO DISMISS PLAINTIFFS'
## COMPLAINT TO ESTABLISH CONSTRUCTIVE TRUST

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ........................................................................1
SUMMARY OF PLAINTIFFS' CLAIMS ........................................................6
ARGUMENT.........................................................................................7
SUMMARY OF ARGUMENT.....................................................................7
APPLICABLE LEGAL STANDARD .............................................................8

    A.    PLAINTIFFS' COMPLAINT MUST BE DISMISSED BECAUSE
        THEY LACK STANDING ........................................................9

    B.    PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE
        THEY FAIL TO ALLEGE THE NECESSARY ELEMENTS OF
        A CONSTRUCTIVE TRUST ...................................................17

    C.    PLAINTIFFS' COMPLAINT MUST BE DISMISSED BECAUSE
        ITS GENERAL ALLEGATIONS OF FRAUD ARE
        INSUFFICIENT TO IMPOSE A CONSTRUCTIVE TRUST,
        AND A CONSTRUCTIVE TRUST IN THESE
        CIRCUMSTANCES WOULD BE INEQUITABLE TO THE
        OTHER CREDITORS OF ENRON'S ESTATE .....................................22

    D.    PLAINTIFFS' CONSTRUCTIVE TRUST CLAIM SHOULD BE
        DISMISSED BECAUSE CONSTRUCTIVE TRUSTS ARE NOT
        AVAILABLE IN BANKRUPTCY CASES, OR,
        ALTERNATIVELY, FORM ONLY THE BASIS FOR
        ASSERTING UNSECURED CLAIMS AGAINST ENRON'S
        ESTATE ........................................................................25

        1.    Constructive Trusts Are Not Available In Title 11 Cases. ...........25

        2.    A Constructive Trust, Even If Cognizable In A Bankruptcy
            Case, Is Only An Unsecured Claim Against The Estate .............27

    E.    PLAINTIFFS' RIGHTS ARE GOVERNED BY CONTRACT,
        AND BECAUSE PLAINTIFFS HAVE AN ADEQUATE LEGAL
        REMEDY THEIR CLAIMS SEEKING EQUITABLE
        REMEDIES MUST BE DISMISSED .....................................29

CONCLUSION....................................................................................31

# TABLE OF AUTHORITIES
## FEDERAL CASES

*Beekman Paper Co. v. St. Theresa Properties, Inc. (In re St. Theresa Properties, Inc.)*, 152 B.R. 852 (Bankr. S.D.N.Y. 1993) ................................21

*Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.*, 601 F. Supp. 770 (S.D.N.Y. 1985) ......................................................................21

*Berger, Shapiro & Davis, P.A. v. Haeling (In re Foos)*, 183 B.R. 149 (Bankr. N.D. Ill. 1995) ..............................................................27

*Briggs v. Goodyear Tire & Rubber Co.*, 79 F. Supp. 2d 228 (W.D.N.Y. 1999) ........................................................................................31

*Buckingham v. McLean*, 54 U.S. (13 How.) 151 (1851) ......................................26

*CRS Steam, Inc. v. Engineering Resources, Inc. (In re CRS Steam, Inc.)*, 225 B.R. 833 (Bankr. D. Mass. 1998) ................................................27, 28, 29

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991) ......................................................................30

*Connecticut General Life Insurance Co. v. Universal Life Insurance Co.*, 838 F.2d 612 (1st Cir. 1988) ........................................................20

*Cunningham v. Brown*, 265 U.S. 1 (1924) ..........................................................22

*Daly v. Radulesco (In re Carrozzella & Richardson)*, 247 B.R. 595 (B.A.P. 2d Cir. 2000) ................................................................18

*Dampskibsselskabet AF 1912 Aktieselskab v. Black & Geddes, Inc. (In re Black & Geddes)*, 35 B.R. 830 (Bankr. S.D.N.Y. 1984) ..............................23

*In re Dow Corning Corp.*, 192 B.R. 428 (Bankr. E.D. Mich. 1996) ....................26

*Fibre Form Corp. v. Slamin (In re Nova Tool & Engineering, Inc.)*, 228 B.R. 678 (Bankr. N.D. Ind. 1998) ................................................26

*Giddatex S.r.L. v. Campaniello Imports, Ltd.*, 49 F. Supp. 2d 298 (S.D.N.Y. 1999) ......................................................................29

*John Hancock Life Insurance Co. v. Wilson*, 254 F.3d 48 (2d Cir. 2001)............16

*Kunkel v. Ries (In re Morkan)*, 199 B.R. 940 (Bankr. D. Minn. 1996) ................26

*LFD Operating, Inc. v. Ames Department Stores, Inc. (in re Ames Department Stores, Inc.)*, 274 B.R. 600 (Bankr. S.D.N.Y. 2002) .............25, 28

*In re Lemons & Associates*, 67 B.R. 198 (Bankr. D. Nev. 1986) .........................23

*M.E. Check Cashing Corp. v. Rubin (In re U.S.N, Co.)*, 32 B.R. 675 (Bankr. S.D.N.Y. 1983) .................................................................................9

*MacDraw, Inc. v. CIT Group Equip., Finance, Inc.*, 157 F.3d 956 (2d Cir. 1998) ........................................................................................................30

*Majutama v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp.)*, 142 B.R. 633 (Bankr. S.D.N.Y. 1992) (citation omitted) ......................................................................................................21

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ........................28

*In re Netia Hldgs. S.A.*, 278 B.R. 344 (Bankr. S.D.N.Y. 2002) ...........................29

*In re Okura & Co. (America), Inc.*, 249 B.R. 596 (Bankr. S.D.N.Y. 2000)..........10

*PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) .....................................9

*Poss v. Morris (In re Morris)*, 260 F.3d 654 (6th Cir. 2001) ..........................26, 27

*RTC Mortgage Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192 (S.D.N.Y. 2001) ........................................................................................................28

*Schuyler v. Littlefield*, 232 U.S. 707 (1914) ........................................................18

*Securities and Exchange Commission v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002)......................................................................................22

*Sonnenschein v. Reliance Insurance Co.*, 353 F.2d 935 (2d Cir. 1965)...............17

*In re Southern Industrial Banking Corp.*, 66 B.R. 349 (Bankr. E.D. Tenn. 1986) ........................................................................................................22

*Tekinsight.com, Inc. v. Stylesite Marketing, Inc. (In re Stylesite Marketing, Inc.)*, 253 B.R. 503 (Bankr. S.D.N.Y. 2000) ........................................... *Passim*

*Torres v. Eastlick (In re North American Coin & Currency, Ltd)*, 767 F.2d 1573 (9th Cir. 1985) .....................................................................................27

*In re United Imports, Inc.*, 203 B.R. 162 (Bankr. D. Neb. 1996) .........................26

*United States v. Durham*, 86 F.3d 70 (5th Cir. 1996)............................................22

*United States v. Peoples Benefit Life Insurance Co.*, 271 F.3d 411 (2d Cir. 2001)............................................................................................17

*U.S. v. Ribadeniera*, 920 F. Supp. 553 (S.D.N.Y. 1996)........................................29

*Van Brunt v. Rauschenberg*, 799 F. Supp. 1467 (S.D.N.Y. 1992)........................21

*XL/Datacomp, Inc. v. Wilson (In re Omegas Grp., Inc.)*, 16 F.3d 1443 (6th Cir. 1994)...........................................................................................17, 26

*Yak v. Bank Brussels Lambert*, 252 F.3d 127 (2d Cir. 2001)..................................2

*York v. Association of the Bar of the City of New York*, 286 F.3d 122 (2d. Cir. 2002)..............................................................................................2, 8

## STATE CASES

*American Express Bank, Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613 (1st Dep't 1990)...........................................................................................10

*Credit Francais International S.A. v. Sociedad Financiera de Comercio, C.A.,* 490 N.Y.S.2d 670 (N.Y. Sup. Ct. 1985)........................................ *Passim*

*Oursler v. Women's Interart Ctr., Inc.*, 566 N.Y.S.2d 295 (1st Dep't 1991)........21

## DOCKETED CASES

*Compania Financiera Ecuatoriana de Desarollo, S.A. v. Chase Manhattan Bank*, No. 97 CIV. 5724 (S.D.N.Y Feb. 18, 1998)........................2

*Connecticut Resources Recovery Authority v. Enron Corp. (In re Enron Corp.)*, No. 02-2727A , 2003 WL. 1571719 (Bankr. S.D.N.Y. March 28, 2002)...........................................................................................18, 19

*PlasmaNet, Inc. v. Phase2Media Inc., (In re Phase2Media, Inc.)*, 2002 Bankr. LEXIS 1457 ..................................................................................25

## FEDERAL STATUTES

11 U.S.C. § 101(5) ...................................................................................................28

11 U.S.C. § 503...........................................................................................................26

11 U.S.C. § 510(b) .....................................................................................................20

# PRELIMINARY STATEMENT

Defendants Enron Corp. ("Enron") and Hansen Investments Co. ("Hansen") and 4138198 Canada, Inc., (formerly known and herein referred to as Compagnie Papiers Stadacona ("CPS")), which are non-debtor direct and indirect subsidiaries of Enron, move to dismiss the Complaint filed by Mizuho Corporate Bank, Ltd. ("Mizuho") and Banco Bilbao Vizcaya Argentaria S.A. ("Bilbao" and collectively with Mizuho, "Plaintiffs"), for the reasons set forth below.

Plaintiff Mizuho is a Japanese bank and Plaintiff Bilbao is a Spanish bank. They allege they are currently individual members of a bank group (the "Bank Group") that indirectly lent money to Hansen on or about June 22, 2001. Plaintiffs' Compl. at ¶¶ 8-9. The Bank Group has additional members not parties to this suit, including the Chase Manhattan Bank ("Chase"). Chase is the properly designated and appointed Administrative Agent and Collateral Agent for the Bank Group. Plaintiffs' claims arise out of a series of pre-petition transactions (the "Loan Transaction") entered into by the Bank Group, Flagstaff, Hansen and Enron.

## BACKGROUND

The series of transactions underlying Plaintiffs' Complaint have been referred to in the press and elsewhere as the "Slapshot Transaction." Through this structured financial transaction, the Bank Group members generated fees and interest revenues and Defendants realized certain Canadian tax savings through the use of same-day loans and a series of promissory notes and credit guarantees. In this adversary proceeding, Plaintiffs are attempting to substantially unwind this structured finance transaction in order to remove significant assets from Enron's chapter 11 estate. While

the Court must construe the Complaint in the light most favorable to Plaintiffs for purposes of this Motion, see e.g., York v. Ass'n of the Bar of the City of New York, 286 F.3d 122, 125 (2d. Cir. 2002), Defendants provide the following description of the underlying transactions.[1]

### The Parties

Plaintiffs' claims arise out of a pre-petition transaction (the "Loan Transaction") between four separate but related parties:

(i)   Enron;

(ii)   the Bank Group;

(iii)   Flagstaff, a wholly owned-subsidiary of Chase; and

(iv)   Hansen, a wholly-owned subsidiary of CPS.

The initial members of the Bank Group were: Chase, J.P. Morgan Securities Inc., The Royal Bank of Scotland, The Bank of Tokyo-Mitsubishi, Ltd., and The Industrial Bank of Japan, Limited. See Flagstaff Loan Agreement Appendix at 2-5 (hereinafter "FLA") (Attached as Exhibit A hereto).[2]   Plaintiffs acquired their interest in the Bank Group from the original members.

---

[1] Solely for the purposes of this Motion to Dismiss, Defendants do not dispute Plaintiffs' factual allegations because even assuming those allegations are correct, the Complaint still must be dismissed.  In the event the Complaint is not dismissed, however, Defendants expressly reserve the right to further respond or object to the factual and legal allegations in the Complaint.

[2] On a motion to dismiss, a court can consider documents referenced in, and integral to, a plaintiff's complaint even if documents are not attached to complaint or incorporated by reference therein.  Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001); see Compania Financiera Ecuatoriana de Desarollo, S.A. v. Chase Manhattan Bank, No. 97 CIV. 5724 1998 WL 74299 at * 1 (S.D.N.Y. Feb. 19, 1998) (On motion to dismiss court may consider "documents the plaintiff either had in its possession or had knowledge of and upon which it relied in bringing suit.")  Plaintiffs refer to the Flagstaff Loan

Each member of the Bank Group irrevocably designated Chase as its agent to act on its behalf to declare an event of default, declare the loan immediately due and payable, and commence actions to foreclose against any collateral given as security for the loan transaction pursuant to the terms of the Flagstaff Loan Agreement. FLA § 7. Likewise, Flagstaff designated Chase as its "attorney-in-fact with full authority in the stead and place of" Flagstaff with respect to the Pledged Collateral. Id. at §9.06.

### The Agreements

The Loan Transaction involved a series of related agreements, all executed on June 22, 2001. The Loan Transaction agreements relevant to Plaintiffs' claims are as follows:

(i)    the Credit and Security Agreement between Flagstaff and the Bank Group (the "Flagstaff Loan Agreement") (attached hereto as Exh. A);

(ii)    the Credit Agreement between Hansen, Flagstaff, and Chase (the "Hansen Loan Agreement") (attached hereto as Exh. B);

(iii)    the Warrant Agreement between Hansen and Flagstaff (attached hereto as Exh. C);

(iv)    the Put Option Agreement between Enron and Flagstaff (attached hereto as Exh. D); and

(v)    the ISDA Master Agreement (the "Swap Agreement") between Enron and Flagstaff (attached hereto as Exh. E).

Compl. at ¶ 20; see FLA § 9.01.

---

Agreement and the other documents discussed in this section in their Complaint at ¶¶ 9, 11, 13, 16-17, and attached them as exhibits to their Motion for Preliminary Injunction in this adversary proceeding filed on April 2, 2003 (Docket No. 6).

*The Flagstaff Loan Agreement*

The original members of the Bank Group loaned $375 million to Flagstaff as part of the Flagstaff Loan Agreement.  The Bank Group received rights in specified collateral (the "Pledged Collateral") comprising, in part, Flagstaff's rights in: (i) the Hansen Loan Agreement, (ii) the Warrant Agreement, (iii) the Put Option Agreement, (iv) the Swap Agreement, and (v) Flagstaff's rights to receive payments or property that may become due under any of those agreements.  Compl. at ¶ 13; see FLA § 9.01.

*The Hansen Loan Agreement*

Upon receipt of the $375 million loan from the Bank Group, Flagstaff then loaned approximately $1.4 billion to Hansen pursuant to the Hansen Loan Agreement.  The Hansen Loan Agreement provides that although the principal amount of the loan could be repaid at any time, Hansen was still obligated to Flagstaff in an amount (the "Make Whole Amount") equal to all past and future interest that would have been owed to Flagstaff if it had been repaid according to its repayment schedule.  Compl. at ¶¶ 12-13.  Hansen repaid the $1.4 billion principal amount of the Hansen Loan Agreement on June 22, 2001, thus leaving the Make Whole Amount outstanding under the Hansen Loan Agreement.  According to the Complaint, the Make Whole Amount is approximately $360 million.  Id. at ¶ 12.

*The Warrant Agreement*

In addition to Hansen's obligation to Flagstaff under the Flagstaff Loan Agreement, Hansen also executed a Warrant Agreement in favor of Flagstaff.  In the Warrant Agreement, Hansen granted Flagstaff the right (the "Warrant Rights") to compel Hansen to issue its preferred class B stock shares in an amount equal to the Make Whole

Amount.  Compl. at ¶ 16.  Flagstaff could only compel Hansen to issue those shares upon an Event of Default in the Loan Transaction.  Warrant Agreement at § 4.

*The Put Option Agreement and the Swap Agreement*

In conjunction with the Warrant Agreement, Flagstaff and Enron entered into the Put Option Agreement and the Swap Agreement.  The Put Option Agreement gave Flagstaff the right to require Enron to buy the Warrant Rights for their fair market value.  Compl. at ¶ 16; see Put Option Agreement §§ 2-4.  However, Flagstaff could only compel Enron to buy the Warrant Rights upon a default under the Loan Transaction.  Put Option Agreement §§ 2-4.  In the Swap Agreement, Enron and Flagstaff agreed that if Flagstaff exercised its rights under the Put Option Agreement, Enron would pay the Make Whole Amount to Flagstaff and Flagstaff would pay the fair market value of the Warrant Rights to Enron.  Compl. at ¶ 17.

**Flagstaff's Exercise of the Put Option**

On November 30, 2001, Flagstaff declared a default under the Loan Transaction and exercised its rights under the Put Option Agreement to require Enron to purchase the Warrant Rights.  Compl. at ¶ 22.  On that same day, Flagstaff provided Enron with an executed assignment of the Warrant Rights.  Plaintiffs assert that the transfer of the Put Option from Flagstaff to Enron was a fraudulent conveyance because Flagstaff was insolvent at the time of the transfer, or became insolvent as a result of the transfer.[3]

---

[3] Although Plaintiffs previously expressed doubts about the contractual effectiveness of Flagstaff's November 30, 2001 assignment of the Warrant Rights in their motion for relief from the automatic stay, they do not challenge the effectiveness of that assignment in this adversary proceeding.

# SUMMARY OF PLAINTIFFS' CLAIMS

On March 28, 2003, Plaintiffs commenced this adversary proceeding against Defendants. Plaintiffs assert three causes of action, all seeking the equitable remedy of constructive trust. In Count I of the Complaint, Plaintiffs seek a constructive trust over Flagstaff's right to receive the Make Whole Amount. Compl. at ¶¶ 34-36. Plaintiffs' claim rests upon on its allegation that Enron would be unjustly enriched by retaining the Make Whole Amount because the Bank Group agreed to enter into the Loan Transaction based on representations contained in Enron's publicly filed Form 10-K for the year ending December 31, 2000, and Enron's Form 10-Q for the first quarter of 2001. Compl. at ¶ 25.

In Count II of the Complaint, Plaintiffs seek a constructive trust over Flagstaff's right to recover the Make Whole Amount, alleging that Flagstaff's exercise of the Put Option to Enron pursuant to the Put Option Agreement was a fraudulent conveyance, on the grounds that Flagstaff did not receive reasonably equivalent value for the exercise of its Put Option. Compl. at ¶¶ 39-45. Specifically, Plaintiffs allege that "[i]n transferring the right to recover the Make Whole Amount to Enron, Flagstaff received only the right to file a Proof of Claim against Enron in the amount of $360 million" and that "[t]he right to file a Proof of Claim against Enron for $360 million does not constitute fair or equivalent value for the transfer of the Make Whole Amount." Id. at ¶¶ 38-39.[4]

---

[4] On October 10, 2002, Flagstaff filed Proofs of Claim Numbers 11152 and 11155 (attached as Exhibits F and G), setting forth liquidated and unliquidated unsecured claims against Enron arising from the Loan Transaction.

In Count III, Plaintiffs allege Defendants were unjustly enriched as a result of the Loan Transaction, and they seek as compensation a constructive trust over a wide array of property, including Hansen's and CPS' assets, Enron's direct or indirect equity interest in CPS, and "such other assets as are appropriate to prevent unjust enrichment and to compensate Plaintiffs." Compl. at ¶ 52.

## ARGUMENT

## SUMMARY OF ARGUMENT

Plaintiffs' Complaint must be dismissed because as individual members of the Bank Group, Plaintiffs lack standing to sue Defendants. Under New York law, an individual member of a bank group lacks standing to sue the borrower when the lending agreement provides for collective action through an appointed agent. Here, the Flagstaff Loan Agreement appointed Chase as the Administrative and Collateral Agent to represent each and all lenders – including Plaintiffs – in causes of action in the event of a default. Section 9.06 of the Flagstaff Loan Agreement bars Plaintiffs from maintaining this cause of action, because it provides that Flagstaff irrevocably and exclusively appointed the Collateral Agent (Chase) as its attorney-in-fact to take any action and "to file any claims" against Defendants to recover the Pledged Collateral, bars Plaintiffs from maintaining this cause of action.

Even if Plaintiffs had standing, no constructive trust is available to them. Plaintiffs have not, and cannot, allege several of the required elements of a constructive trust claim. Plaintiffs have not alleged an identifiable, traceable *res* consisting of property they transferred to Enron over which a constructive trust might be imposed. Plaintiffs merely allege a derivative interest in certain contractually created rights in favor

of the Administrative and Collateral Agent Chase.  Moreover, Plaintiffs are not entitled to

a constructive trust because they fail to allege the existence of a confidential or fiduciary

relationship between the parties, and do not adequately allege Enron's estate will be

unjustly enriched in the absence of a constructive trust, both of which are requisite

elements of a constructive trust under New York law.  Plaintiffs Complaint must also be

dismissed because they seek to enforce contractual rights against Defendants, and it is

axiomatic that a party seeking to enforce a contract cannot obtain the equitable remedy of

a constructive trust.

Finally, this Court should rule, as other courts have, that constructive

trusts are unavailable in chapter 11 cases, because they are contrary to the priority

scheme set by Congress in the Bankruptcy Code.  Plaintiffs have not alleged any facts

that would justify having their claims paid in advance of all other creditors.  Plaintiffs are

entitled to no more than their share of claims that Flagstaff, as an unsecured creditor, has

against Enron's estate.

## APPLICABLE LEGAL STANDARD

Assuming the allegations of the Complaint to be true, Plaintiffs fail to

state a claim upon which relief may be granted.  See York v. Ass'n of the Bar of New

York, 286 F.3d 122, 125 (2d. Cir. 2002) (motion to dismiss must be granted where the

plaintiff's facts, even if assumed true do not "confer a judicially cognizable right of

action.").  As one court held in dismissing a claim for constructive trust:

> As in any pleading, a complaint asserting a constructive
> trust must set forth those facts which, if proved, would
> entitle the pleader to the relief sought …. Thus a
> complaint must set forth sufficient information to outline
> the elements of the claim or to permit the inference that
> these elements exist.  The court may accept conclusory

> statements regarding the legal effect of the facts set forth
> by the pleader, but only if those conclusions reasonably
> follow from the facts alleged. Moreover, if the facts
> alleged create no more than a suspicion that plaintiffs
> might be able to state a cognizable claim, the court may
> dismiss the complaint.

M.E. Check Cashing Corp. v. Rubin (In re U.S.N, Co.), 32 B.R. 675, 677 (Bankr.

S.D.N.Y. 1983) (citations omitted).

## ARGUMENT

### A. PLAINTIFFS' COMPLAINT MUST BE DISMISSED BECAUSE THEY LACK STANDING.

Plaintiffs allege they were harmed when an Event of Default occurred

under the Flagstaff Loan Agreement, and seek direct remedies for that default. Their

effort, however, is specifically barred by the Flagstaff Loan Agreement, which governs

the relations not only between the parties to this lawsuit, but also among a number of

absent parties. Because Plaintiffs contracted away any rights they might have had upon

an Event of Default to bring this suit individually, and expressly gave that right to Chase

as Collateral Agent, their Complaint must be dismissed.

New York law, which governs the Flagstaff Loan Agreement, provides

that where the parties' intent is clear from the unambiguous terms of an agreement,

"'interpretation is a matter of law,' and a claim turning on that interpretation may thus be

determined by summary judgment or by dismissal." PaineWebber, Inc. v. Bybyk, 81

F.3d 1193, 1199 (2d Cir. 1996) (citing American Express Bank, Ltd. v. Uniroyal, Inc.,

562 N.Y.S.2d 613, 614 (1st Dep't 1990)). The plain terms of the Flagstaff Loan

Agreement demonstrate that the parties gave Chase (i) the right to sue Flagstaff on behalf

of individual lenders as Administrative Agent; and (ii) as Collateral Agent and Flagstaff's

designee, the right to sue Defendants to foreclose on the Pledged Collateral.

In understanding these dual roles, it is critical to note that Flagstaff, as the direct lender to Hansen, holds an unsecured interest in the Pledged Collateral (see Exhs. F and G), while members of the Bank Group hold their secured interest against Flagstaff's rights, and not directly against Hansen or Enron. As such, Plaintiffs' action constitutes an impermissible attempt to "end-run" the express terms they agreed to in the Flagstaff Loan Agreement. As the leading New York case held in reviewing a similarly structured credit agreement, where it is "apparent that the parties contemplated there would be collective action taken by the [Administrative] Agent on behalf of all members of the consortium . . . . It would, indeed, be chaotic if each participating bank were to take separate action," and therefore an individual plaintiff bank lacked standing to sue the borrower. Credit Francais Int'l S.A. v. Sociedad Financiera de Comercio, C.A., 490 N.Y.S.2d 670, 682 (N.Y. Sup. Ct. 1985). Because the Credit Francais court found the plaintiff there lacked standing, it dismissed plaintiff's claim. See also In re Okura & Co. (America), Inc., 249 B.R. 596, 603 (Bankr. S.D.N.Y. 2000) (where clear from terms of lending agreement that a single entity has right to enforce obligations against a debtor, individual lender could not sue debtor).

Credit Francais sets forth the governing standing analysis for when an individual bank group member can sue a borrower under New York law, and that court's reasoning in dismissing that plaintiff's complaint dictates the same result here. Credit Francais holds that standing is governed by the terms of the relevant lending agreement. 490 N.Y.S.2d at 684 ("the rights, duties and obligations of the participants [to a transaction] are governed by the contract between them"). In Credit Francais, the court looked to the express terms of the lending agreement and found that the plaintiff, an

individual member of a bank lending group, lacked standing. The court relied on a specific provision in the relevant lending agreement under which the members of that bank group irrevocably appointed an "Agent" to act on their behalf in the "event of an acceleration" with regard to the borrower, who was the defendant in that case. 490 N.Y.S.2d at 681.

Here, the plain language of section 9.06 of the Flagstaff Loan Agreement highlights Plaintiffs' lack of standing even more explicitly than the relevant contract clause in  Credit Francais.  Section 9.06 of the Flagstaff Loan Agreement directly addresses what action may be taken after an Event of Default.  Section 9.06 appointed Chase as Flagstaff's "attorney-in-fact" in the event of a default relating to the Pledged Collateral and granted Chase:

> [F]ull authority in the place and stead of the Borrower [Flagstaff] and in the name of the Borrower or otherwise, upon the occurrence and during the continuance of a Event of Default, to take any action and to execute any instrument that the Collateral Agent, in its reasonable judgment, deems necessary or appropriate to accomplish the purposes of this Agreement, including, without limitation, to make demand on Hansen, Enron, the Swap Counterparty or any other Borrower Obligor [i.e., the Defendants here] all amounts due under each Assigned Agreement to which the Borrower is a party, to receive, endorse and collect all instruments made payable to the Borrower representing any payment or other distribution in respect of the Pledge Collateral or any part thereof and to give full discharge for the same, and to file any claims or take any action or institute any proceedings that the Collateral Agent, in its reasonable judgment, may deem necessary for the collection of any of the Pledged Collateral or otherwise to enforce compliance with the terms and conditions of each Assigned Agreement or the rights of the Collateral Agent with respect to any of the Pledged Collateral.

FLA §9.06 (emphasis added); see also id. at §9.10(a) (upon an Event of Default, Collateral Agent granted all rights and remedies under UCC and New York law in the Pledged Collateral).

On its face, section 9.06 clearly contemplates Chase suing on behalf of Flagstaff or any other entity that might have an interest in the Pledged Collateral. Section 9.06 gives Chase the exclusive right to act in anyone's name in pursing the Pledged Collateral, including the individual members of the Bank Group. See FLA §9.06 (granting Collateral Agent "[F]ull authority in the place and stead of the Borrower [Flagstaff] and in the name of the Borrower or otherwise"). This language expressly forecloses any individual lenders – such as Plaintiffs – from bringing a cause of action in their own name. In light of the plain language of section 9.06, the holding in Credit Francais that a "Plaintiff bank, as an individual member of that consortium, has no standing to bring an action solely on its own behalf, contrary to the terms and the spirit of the [lending agreement] to which it subscribed" applies fully here. 490 N.Y.S.2d at 684. Thus, as in Credit Francais, the Court should dismiss Plaintiffs' Complaint because only Chase has standing to bring these claims.

In a previous filing with this Court Plaintiffs have argued that they have standing to bring this cause of action. See Reply to Objections of the Debtors And Official Committee To Motion For Order Granting Relief From Automatic Stay ("Reply Brief"). In that filing, Plaintiffs pointed to three provisions of the Flagstaff Loan Agreement they claimed granted them standing to bring this lawsuit, individually, as named plaintiffs. Reply Brief at 3 (citing FLA §§ 7, 11.02, 2.05). However, none of these sections contemplates or even mentions a direct right of action by an individual

Bank Group member against these Defendants, and none limits Chase's power as Collateral Agent under §9.06.

Article VII of the Flagstaff Loan Agreement, the first section cited by Plaintiffs, states:

> The Administrative Agent, the Collateral Agent and the Lenders shall have, in addition, to all other rights or remedies under this Agreement or otherwise, all other rights and remedies provided under the UCC of each applicable jurisdiction and other applicable laws, which rights shall be cumulative.

Section 11.02, the second section cited by Plaintiffs, states in relevant part:

> No failure or delay by the Administrative Agent, the Collateral Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have under applicable law.

These sections simply do not speak to who enforces any rights and remedies and do not grant Plaintiffs standing to sue.

A virtually identical provision existed in the agreement at issue in Credit Francais. The Credit Francais provision stated:

> The failure or delay of the Agent, the Manager or the Depositors to Require performance or to enforce their rights under any provision of this Agreement . . . shall not affect their right to require performance and to enforce their rights with respect to such provision . . . the rights granted to the Agent, the Manager or the Depositors hereunder . . . and any rights available to them at law or equity shall be cumulative and may be exercised in part or whole from time to time."

490 N.Y.S. 2d at 682. The <u>Credit Francais</u> court explicitly stated that this type of provision:

> deals with cumulative rights and waiver, and the whole purpose and purport of the paragraph is to specify that the failure or delay by the Agent or Depositors in enforcing their rights is not to be considered a waiver of their rights to require performance as against the Borrower. The fact that the rights granted in that paragraph are declared to be cumulative merely assures the parties that the election of one remedy does not preclude another. There is nothing that in paragraph which would justify any departure from the over-all scheme which is, with certain specified exceptions, to have the Agent act for the benefit of the entire consortium, rather than having each of the nine member banks competing and conflicting with one another.

490 N.Y.S.2d at 682. Thus, the court rejected precisely the interpretation urged by Plaintiffs in this case, <u>i.e.</u> that this type of provision allowed an individual plaintiff to maintain an action in the absence of the authorized agent. This holding applies equally here, and establishes that, as matter of New York law, the provisions of the Flagstaff Loan Agreement cited by Plaintiffs do not provide them standing to bring this lawsuit.

The other provisions relied upon by Plaintiffs were sections 2.05(b) and (d). These provisions are equally inapposite to the question whether Plaintiffs have standing to sue Defendants. Section 2.05(d) provides that "[a]ny Lender may request that the Loan made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such lenders a promissory note payable to the order of such Lender." Far from supporting Plaintiffs' standing argument, this provision serves to underscore that when an individual Bank Group member was given the right to act

independently and individually, the Flagstaff Loan Agreement expressly provides so.

See Credit Francais, 490 N.Y.S.2d at 683. [5]

Plaintiffs' discussion in its Reply Brief regarding principles of agency law and the cases cited therein are also inapposite. Here, all parties to the Loan Transaction agreed at the outset who could proceed against Defendants. That agreement is memorialized in section 9.06 of the Flagstaff Loan Agreement, which designates Chase (the "Collateral Agent") to pursue claims against the Pledged Collateral, which it has done via its unsecured Proofs of Claim (see Exh. F & G). This contractual undertaking by all parties is plainly enforceable. Even though a principal can act on its own behalf after appointing an agent with respect to the same subject matter, that is not the issue here. Here the issue is the legal obligations among the group of principals, all of who agreed to act only through a single agent, and that agreement is not a question of agency but of contract.

Similarly, Plaintiffs' argument that Defendants somehow "acknowledged the rights of individual members of the Bank Group to assert claims against them" is meritless. Reply Brief at 4. Plaintiffs cite to a stipulation between JPMorgan Chase Bank and Enron permitting Chase to file consolidated proofs of claim as agent for various transactions, including Flagstaff, but "[w]ithout precluding the right of any Prepetition Lender to file an independent proof of claim relating to any Prepetition Credit Agreement or otherwise." This stipulation preserves whatever existing individual rights any

---

[5] Section 2.05(b) provides that each bank group member shall maintain accounts evidencing the "indebtedness of the Borrower to such" bank group member. This adds nothing to Plaintiffs' standing argument as it does not address enforcement of rights against the Pledged Collateral. Moreover, Plaintiffs' argument that this is *prima facie* evidence of indebtedness by Defendants (see Reply Brief at 3) is misplaced. Under the Flagstaff Loan Agreement, the "Borrower" is defined as Flagstaff. FLA at §1.01.

prepetition lender may have had under any of the number of various Prepetition Credit Agreements Enron entered into with Chase as Administrative Agent. The stipulation does not, and could not, alter those rights, or create or acknowledge rights for any prepetition lender to proceed individually against Enron or the other Defendants, where, as here, none existed.[6]

In sum, the Flagstaff Loan Agreement, which binds the Plaintiffs, unambiguously vests in Chase the exclusive right to pursue actions against the Pledged Collateral. This Court should interpret that agreement "to give effect to the parties' intent as expressed by the plain language of the provision," see John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 58 (2d Cir. 2001), and find that Plaintiffs lack standing to bring this suit, and dismiss the Complaint with prejudice.

---

[6] The argument previously put forth by Plaintiffs that Defendants cannot assert this standing argument is incorrect. Plaintiffs' Reply at 9. Under the integrated series of agreements comprising the Loan Transaction, Defendants have a clear interest in the predictability and certainty of knowing which entity is authorized to bring suit. As the Credit Francais court further explained, if an individual bank is permitted to sue, "the other banks would be required, as a matter of self-protection, to bring their own lawsuits, confronting the defendant with disparate and mutually antagonistic claims and making impossible an orderly approach. . . members of the consortium, like the famous Three Musketeers, must stand 'all for one, and one for all.'" 490 N.Y.S.2d at 683-684. Thus, Defendants are not asserting Chase's interest for Chase's benefit, but their own interest on their own behalf.

Moreover, the Flagstaff Loan Agreement is not an isolated agreement, rather, it is one of many agreements signed on the same day that together make up the Loan transaction. In these circumstances, courts have hold that the series of agreements and "integrated," so that one agreement must be viewed in its place as part of the whole. Here, the provisions of the FLA were part and parcel of Enron's agreement to participate in the Loan transaction, including the limitation that only the collateral agent could bring suit to pursue the Pledged Collateral.

### B. PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE THEY FAIL TO ALLEGE THE NECESSARY ELEMENTS OF A CONSTRUCTIVE TRUST.

#### 1. Plaintiffs Cannot Trace Their Property To Any *Res* Over Which They Seek A Constructive Trust.

All of Plaintiffs' claims seek constructive trusts. They must all be dismissed because they do not adequately allege the fundamental "tracing" element required for imposition of a constructive trust. Plaintiffs fail to allege this central requirement because they cannot trace their own property to property in Defendants' hands over which they seek a constructive trust. This so-called tracing requirement is the hallmark that distinguishes a constructive trust from other remedies. The centrality of tracing to a constructive trust claim is heightened in the bankruptcy context where permitting one party to recover operates to the detriment of all other creditors. Sonnenschein v. Reliance Ins. Co., 353 F.2d 935, 936-37 (2d Cir. 1965); see also XL/Datacomp, Inc. v. Wilson (In re Omegas Grp., Inc.), 16 F.3d 1443, 1452 (6th Cir. 1994) ("constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor").

Plaintiffs' failure to allege it can trace the "*res*," or establish that it seeks to recover its own property from Defendants' hands, requires that their Complaint be dismissed. See United States v. Peoples Benefit Life Ins. Co., 271 F.3d 411, 416 n.4 (2d Cir. 2001) ("[I]t is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer."); Connecticut Resources Recovery Auth. v. Enron Corp. (In re Enron Corp.), No. 02-2727A , 2003 WL 1571719 at *5 (Bankr. S.D.N.Y. Mar. 27, 2003)

("CRRA") (noting on motion to dismiss that a party must establish the common law tracing requirements before a constructive trust can be imposed). Indeed, "an alleged beneficiary of a trust must trace his property to a particular trust *res*." Daly v. Radulesco (In re Carrozzella & Richardson), 247 B.R. 595, 600 (B.A.P. 2d Cir. 2000) (citation omitted); see Schuyler v. Littlefield, 232 U.S. 707, 713 (1914) ("If [a party seeking to impose a constructive trust is] unable to carry the burden of identifying the fund as representing the proceeds of their [property], their claim must fail."). [7]

In this case, Plaintiffs acquired their contractual rights after the inception of the Flagstaff Loan Agreement. They were not original members of the Bank Group. Thus, they do not and cannot allege their property is traceable to any property in the Defendants' hands. Schedule 2.01 of the Loan Agreement sets forth each of the four lenders to Flagstaff (and ultimately the borrower, Hansen), and the amount of their commitments ($93.750 million each)). Neither Plaintiff appears on Schedule 2.01, nor does either Plaintiff allege anywhere in the Complaint that they were an original lender whose money went directly to Hansen or into Enron's estate. Therefore, to the extent either or both Plaintiff acquired their interests in Flagstaff's property after the original loan was made on June 22, 2001, Plaintiffs' property was paid to someone else and Enron's estate received no benefit from the Plaintiffs. As such, Plaintiffs fail to meet

---

[7] Moreover, because Plaintiffs hold a minority of the total outstanding debt owed the Bank Group, but seek a constructive trust over the entire amount of the Pledged Collateral, it is self-evident they seek a constructive trust over property which cannot be traced to their own property, and to which they have neither a legal nor equitable claim. This point underscores and reinforces Defendants' argument as to why Plaintiffs lack standing, and only the Collateral Agent is entitled to any recovery, under any theory, against Defendants under the Loan Transaction. Similarly, that Plaintiffs seek a constructive trust over many different properties is a tacit admission that Mizuho and Bilbao cannot trace their funds to any particular *res* in Defendants' possession.

their burden of alleging that their property can be traced into Enron's hands. See CRRA at *7 (dismissing constructive trust claim where plaintiff could not meet "the burden to plead and prove that there is an identifiable trust res and that it can trace the property from [itself] to [the defendant]").

Moreover, even if these Plaintiffs had been original members of the Bank Group, they do not seek the return of the Bank Group's traceable property. Rather, Plaintiffs seek recovery of their alleged interest in Flagstaff's rights in the Pledged Collateral that Plaintiffs received pursuant to the contracts. It makes little sense to speak of Bank Group members "tracing" the original $375 million they lent to Flagstaff to proceeds of future rights to payment from Enron to Flagstaff, to proceeds arising from the sale of the Warrant Rights or proceeds arising from Plaintiffs' interests in the monetization of the Pledged Collateral. Any money which comes into Enron's estate as a result of monetization of the Pledged Collateral will come as a result of contractually-based rights to purchase Warrants. That property is simply not the same property that was loaned by the Bank Group in the first instance.

Plaintiffs' failure to allege the required tracing allegations is highlighted by its Count III. There, Plaintiffs take a scatter-shot approach in seeking a constructive trust over a wide array of property of Enron and its non-debtor affiliates, including: (i) the assets of Hansen; (ii) the assets of CPS; [8] (iii) the direct or indirect equity interest of

---

[8] Defendants note that under section 5(b)(i) of the Put Option Agreement, Flagstaff agreed if, upon the event of a default, it acquired through legal or equitable proceedings against Hansen any direct or indirect claim against CPS or any of its property, Flagstaff would waive that right against CPS.

Enron in CPS;[9] and (iv) "such other assets are appropriate to prevent unjust enrichment and to compensate Plaintiffs." Compl. at ¶ 52. Count III is a transparent attempt to make an "end-run" around the requirement that there must be an identifiable *res* before a constructive trust may be impressed. Plaintiffs' claim in Count III seeks Enron's equity interest in CPS (which preceded the loan agreement) and the general assets of Hansen and CPS (which they make no attempt to argue can be directly traced to the loan proceeds) and "other assets" in Enron's hands; this claim tacitly concedes they cannot trace their property to the property they seek.

In such circumstances, as a matter of law, Plaintiffs are not entitled to the extraordinary, equitable remedy of a constructive trust that would place Plaintiffs before all other creditors. In United States v. Schwimmer, the Second Circuit refused to impose a constructive trust in favor of a claimant who, despite meeting other requirements of a constructive trust, could not assert "either title to or interest in any specific asset," in the purported constructive trustee's hand. 968 F.2d 1570, 1582 (2d Cir. 1992). The court also held the "beneficiary of a constructive trust does not have an interest superior" to all other claimants in all of the purported constructive trustee's assets "but only in those assets held in constructive trust or traceable to those assets." Id. at 1583. See also Connecticut Gen. Life Ins. Co. v. Universal Life Ins. Co., 838 F.2d 612, 620 (1st Cir. 1988) (point of tracing is to follow the "particular entrusted assets" into debtor's hands, "not simply to identify some assets" of the debtor); Majutama v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp.) 142 B.R. 633, 638 (Bankr.

---

[9] To the extent Plaintiffs contend they can trace their assets to Enron's equity interest in CPS, their claim would effectively be for the purchase of the security of an affiliate of a debtor, and thus equitably subordinated under 11 U.S.C. § 510(b). See Stylesite, 253 B.R. at 510.

S.D.N.Y. 1992) ("There can be no recovery [on constructive trust theory], however, where all that can be shown is enrichment of the [constructive] trustee . . . *to recover, the funds must be traced into the estate and there now be found*.")  (emphasis in original) (citation omitted).  These cases prescribe the result here: Plaintiffs, having failed to adequately allege they can trace the *res* must be treated as a claimholder against the estates, cannot obtain a constructive trust.

        2.        Plaintiffs Have Not Alleged The Existence of A Confidential or <u>Fiduciary Relationship Between The Parties.</u>

Plaintiffs also fail to allege other required elements of a constructive trust under New York law, thus requiring dismissal of the Complaint.  Under New York law, a party seeking to establish a constructive trust has the burden of pleading:  (1) the existence of a fiduciary or confidential relationship; (2) a promise, expressed or implied; (3) a transfer in reliance on that promise; and (4) unjust enrichment.  <u>Beekman Paper Co. v. St. Theresa Props., Inc. (In re St. Theresa Properties, Inc.)</u>, 152 B.R. 852, 857 (Bankr. S.D.N.Y. 1993); <u>Van Brunt v. Rauschenberg</u>, 799 F. Supp. 1467, 1474 (S.D.N.Y. 1992). Plaintiffs have not, and cannot, allege the existence of fiduciary or confidential relationship between themselves and Defendants.   Under New York law, no fiduciary relationship exists (and therefore no trustee/beneficiary relationship can exist) where parties were acting and contracting at arms-length to a business transaction, <u>see</u> <u>Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.</u>, 601 F. Supp. 770, 772 (S.D.N.Y. 1985); <u>see also</u> <u>Oursler v. Women's Interart Ctr., Inc.</u>, 566 N.Y.S.2d 295 (1st

Dep't 1991). Clearly, no fiduciary or confidential relationship existed between the Bank Group Members and Defendants under the Loan Transaction.[10]

**C.  PLAINTIFFS' COMPLAINT MUST BE DISMISSED BECAUSE ITS GENERAL ALLEGATIONS OF FRAUD ARE INSUFFICIENT TO IMPOSE A CONSTRUCTIVE TRUST, AND A CONSTRUCTIVE TRUST IN THESE CIRCUMSTANCES WOULD BE INEQUITABLE TO THE OTHER CREDITORS OF ENRON'S ESTATE.**

Plaintiffs' general allegations of commercial fraud are inadequate as a matter of law to allege a viable constructive trust claim against Enron. The Second Circuit has recently reaffirmed that a constructive trust is not an appropriate remedy where the allegations of fraud against an insolvent entity are of a generalized nature. Securities and Exchange Comm'n v. Credit Bancorp, Ltd., 290 F.3d 80, 88-89 (2d Cir. 2002) (citing Cunningham v. Brown, 265 U.S. 1, 13 (1924)) (disallowing trust claims where receivership fund consisted of money subject to claims of many similarly situated claimants). In Credit Bancorp, the Second Circuit affirmed the district court's imposition of *pro rata* distribution from a receivership instead of imposition of a constructive trust in favor of a particular claimant in order to ensure equitable treatment of all similarly situated creditors whose claims were based in fraud. 290 F.3d at 88-89. The Court reasoned that where multiple or numerous claims are based on a common or similar set of facts, no single creditor is entitled to the sort of preferential and discriminatory treatment sought by the Plaintiffs in this case. See also United States v. Durham, 86 F.3d 70, 73 (5th Cir. 1996); In re Southern Indus. Banking Corp., 66 B.R. 349, 364 (Bankr. E.D. Tenn. 1986) (accepting allegations as true, court could "find *no reason to treat* [one

---

[10] Moreover, for the reasons set forth in Section D, *infra*, Plaintiffs also fail to adequately allege Enron's estate would be unjustly enriched unless Plaintiffs are awarded a constructive trust.

creditor] *any differently from all the other . . . creditors* in this estate and will not impose a constructive trust for" one party's benefit) (emphasis in original) (citation omitted).

Here, Plaintiffs' generalized fraud allegations all relate to Enron's publicly filed Form 10-K for the year ending December 31, 2000 and 10-Q for the first quarter of 2001. Compl. at ¶ 25. There is no allegation of specific conduct by Enron or any Enron employee directed at these Plaintiffs that would differentiate them from any other claimant to funds in Enron's estate that allegedly relied upon the same publicly-filed financial statements. Accordingly, Credit Bancorp bars these Plaintiffs from seeking a constructive trust over the assets of Enron's estate. See also In re Lemons & Assocs., 67 B.R. 198, 214 (Bankr. D. Nev. 1986) (noting that where constructive trust claim based on fraud allegations potentially generally applicable, courts reject constructive trusts in favor of ratable distribution, because "equality is equity.").

Finally, as the United States Bankruptcy Court for the Southern District of New York has recently reiterated, in bankruptcy cases, "in considering whether equity demands the creation of a constructive trust . . . it is necessary to take into account that the contest is not between the transferee of funds and alleged beneficiary of the constructive trust, but between the debtor's other creditors and the putative beneficiary. 'The principle that equality is equity' is the spirit of bankruptcy law." PlasmaNet, Inc. v. Phase2Media Inc., (In re Phase2Media, Inc.), 2002 Bankr. LEXIS 1457, at *33 (Bankr. S.D.N.Y. Dec. 20, 2002) (citing Cunningham v. Brown, 265 U.S. 1, 13 (1924)); see also Dampskibsselskabet AF 1912 Aktieselskab v. Black & Geddes, Inc. (In re Black & Geddes), 35 B.R. 830, 836 (Bankr. S.D.N.Y. 1984) ("Imposition of a constructive trust must include a consideration of the relative equities between a proposed trust beneficiary

and other creditors."). In <u>Phase2Media</u>, the court rejected PlasmaNet's claim for a constructive trust because it found no compelling reason to treat PlasmaNet differently than all other similarly-situated creditors. The court noted that "the funds at issue will either be awarded to PlasmaNet or shared by PlasmaNet and the Debtor's other creditors, <u>who are as innocent as PlasmaNet of any wrongdoing</u>," and chose to preserve the funds for ratable distribution. <u>Phase2Media</u>, at *35 (emphasis added).

Under this doctrine, the preference Plaintiffs seek over all other similarly situated creditors is unjustified, discriminatory and inequitable to Enron's creditors. Flagstaff, which holds the direct interest in the property over which a constructive trust is sought, is only an unsecured creditor of Enron's estate (<u>see</u> Exh. F and G). Plaintiffs nevertheless seek to recover as secured, or even super-secured, creditors through imposition of a constructive trust, despite the fact that they bargained for unsecured creditor status in the event Defendants were unable to perform under the Loan Transaction. This cannot be squared with a consideration of the rights of other creditors of Enron's estate, and no such constructive trust should be imposed.

Moreover, equity also requires taking into account that Plaintiffs were not original members of the Bank Group, and have not alleged they directly lent money to Enron or its affiliates. Given that Plaintiffs' money is not even alleged to have been given to Enron's estate, to elevate them above other creditors of the estates that actually provided financing, goods or services to Enron pre-petition would be inequitable.

The logic of these cases also illustrates why Plaintiffs' allegation that Enron would be "unjustly enriched" by retaining the Pledged Collateral and Make Whole Agreement Amount for distribution to the estates' creditors is meritless. Without unjust

enrichment, there cannot be a constructive trust. See LFD Operating, Inc. v. Ames Dep't Stores, Inc. (in re Ames Dep't Stores, Inc.), 274 B.R. 600, 626 (Bankr. S.D.N.Y. 2002) ("the prevention of unjust enrichment remains the key requirement for a constructive trust") (citations omitted). Even assuming for purposes of this Motion the truth of Plaintiffs' allegations – that it entered into the Loan Transaction and Flagstaff Loan Agreement based on certain publicly filed financial statements – such allegations do not distinguish Plaintiffs from any other creditor who have similar claims against Enron and would receive distributions under a plan of reorganization. Thus, in addition to all of the other infirmities in Plaintiffs' Complaint, they cannot cognizably allege this element of a constructive trust.

**D.   PLAINTIFFS' CONSTRUCTIVE TRUST CLAIM AGAINST ENRON SHOULD BE DISMISSED BECAUSE CONSTRUCTIVE TRUSTS ARE NOT AVAILABLE IN BANKRUPTCY CASES, OR, ALTERNATIVELY, FORM ONLY THE BASIS FOR ASSERTING UNSECURED CLAIMS AGAINST ENRON'S ESTATE.**

Plaintiffs' Complaint presents the question of whether a constructive trust is an appropriate remedy in bankruptcy cases. In In re Ames, this Court recognized the existence of this fundamental issue, but found it unnecessary to answer the question on the facts of that case. 274 B.R. at 630. Enron respectfully requests that the Court now address this issue.

1.    Constructive Trusts Are Not Available In Title 11 Cases.

If a constructive trust were imposed as Plaintiffs seek, the entirety of the Make Whole rights, the warrants, assets of Hansen, CPS, and other assets, totaling in hundreds of millions of dollars would be set aside from Enron's estate for the sole satisfaction of these Plaintiffs. The unavoidable consequence would be diminution of the

estate by an identical amount, thereby lowering the amount available for distribution to all other creditors, regardless of the priority of such claims under the Bankruptcy Code. This would run contrary to the fundamental proposition that "ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws." Torres v. Eastlick (In re North American Coin & Currency, Ltd), 767 F.2d 1573, 1575 (9th Cir. 1985); In re Dow Corning Corp., 192 B.R. 428, 431-32 (Bankr. E.D. Mich. 1996); see also Buckingham v. McLean, 54 U.S. (13 How.) 151, 166 (1851) (describing ratable distribution as "one of the two great objects of the law.").

A constructive trust, with its attendant elevation of an unsecured claimholder into the holder of a super-priority not specifically contemplated by 11 U.S.C. § 503 or 507, is so antithetical to federal bankruptcy interests that some courts refuse to recognize the remedy of a constructive trust in bankruptcy cases at all. See XL/Datacomp. Inc. v. Wilson (In re Omegas Grp., Inc.), 16 F.3d 1443, 1452 (6th Cir. 1994) ("constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor")[11]; Fibre Form Corp. v. Slamin (In re Nova Tool & Eng'g, Inc.), 228 B.R. 678 (Bankr. N.D. Ind. 1998); In re United Imports, Inc., 203 B.R. 162 (Bankr. D. Neb. 1996); Kunkel v. Ries (In re Morkan), 199 B.R. 940, 964-66 (Bankr. D. Minn. 1996). As one court observed:

> Nothing in the bankruptcy code authorizes the super-priority treatment of creditors whose only claim to such treatment is that they would be entitled to the remedy of the imposition of a

---

[11] While In re Omegas has been narrowed by subsequent Sixth Circuit cases, it still applies to cases such as this where no constructive trust has been impressed at the time of filing of the debtor's bankruptcy petition. Poss v. Morris (In re Morris), 260 F.3d 654, 666-67 (6th Cir. 2001).

> constructive trust outside bankruptcy.  As a general rule, bankruptcy courts may not alter the statutory priorities.
>
> Courts that understand the significance of the bankruptcy filing have refused to impose constructive trusts post-bankruptcy.  These courts recognize that the imposition of a constructive trust 'creates a mechanism by which a creditor may attain a position roughly equivalent to a perfected security interest in proceeds without complying with the usual statutory formalities . . . and thus tends to undercut the statutory scheme.'

Berger, Shapiro & Davis, P.A. v. Haeling (In re Foos), 183 B.R. 149, 161 (Bankr. N.D. Ill. 1995) (internal citations omitted).

Similarly, other courts have ruled a constructive trust that did not exist by virtue of a judgment establishing such a trust prior to a debtor's bankruptcy petition cannot be recognized in a bankruptcy case.  See In re Morris, 260 F.3d 654, 666 (6th Cir. 2001) (Bankruptcy Code "does not authorize bankruptcy courts to recognize a constructive trust based on a creditor's claim to one; rather [it] only operates to the extent that state law has impressed property with a constructive trust prior to its entry into bankruptcy."); In re Foos, 183 B.R. at 159.  The Court should adopt the reasoning of these cases and rule that constructive trusts are not available in bankruptcy cases.

> 2. A Constructive Trust, Even If Cognizable In A Bankruptcy Case, Is Only An Unsecured Claim Against The Estate.

Other courts, while not specifically holding a constructive trust *per se* unavailable in bankruptcy, have ruled a claim for a constructive trust can only form the basis of an unsecured claim against the estate within the meaning of Bankruptcy Code section 101(5)(b), and subject to ratable distribution.  See CRS Steam, Inc. v. Eng'g Res., Inc. (In re CRS Steam, Inc.), 225 B.R. 833, 842 (Bankr. D. Mass. 1998); see also Tekinsight.com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.), 253 B.R. 503

(Bankr. S.D.N.Y. 2000).[12]  This Court has previously termed CRS Steam "[t]he leading case on the issue of equitable remedies and the definition of 'claim' under § 101(5) of the Bankruptcy Code."  In re Ames, 274 B.R. at 630. See In re Netia Hldgs. S.A., 278 B.R. 344, 356 (Bankr. S.D.N.Y. 2002) (recognizing "concern that imposition of a constructive trust is an equitable remedy that can be satisfied by a money judgment, and hence gives rise to no more than a general unsecured claim entitled to ratable distribution from the bankruptcy estate," but deciding case on alternate grounds).  Under this approach, Plaintiffs' allegations of fraud and its fraudulent conveyance claim would entitle Plaintiffs only to assert an unsecured claim for money damages against the estate – or precisely what Flagstaff would be entitled to if its Proofs of Claim are successful.

A claim means a right to payment under Bankruptcy Code, or "a right to an equitable remedy for breach of performance [that] gives rise to a right of payment." 11 U.S.C. § 101(5)(b).  Plaintiffs (as well as the Bank Group through its Collateral Agent) have nothing more than right to payment.  A constructive trust is an equitable remedy for breach of performance, see CRS Steam, Inc., 225 B.R. at 842; see also Stylesite, 253 B.R. at 508; that is satisfiable by a money judgment, and is thus a "claim" against Enron's estate as defined by the Code.  CRS Steam, Inc., 225 B.R. at 842.

An equitable remedy gives rise to a right of payment if payment due the creditor can easily be computed, and a court can "thereby assign a dollar amount to the remedy, treating it like any other claim."  225 B.R. at 841.  That can be done here; the dollar amount sought by Plaintiffs, if successful, is for a sum certain.  See RTC Mortgage

---

[12] CRS Steam and Stylesite were the first decisions to parse the Code's language as to whether a constructive trust is a "claim."  While some cases have recognized constructive trusts in bankruptcy, these cases did not consider the arguments presented here.

Trust 1995-S/N1 v. Sopher, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001) ("Under New York law, a creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance."). Moreover, "although the amount that Plaintiffs may ultimately recover can differ depending on the particular theory" for purposes of defining whether Plaintiffs possess a claim, the existence of a right of payment "fully satisfies the plaintiff's injury." Stylesite, 253 B.R. at 511; CRS Steam, 225 B.R. at 842 (where a right to payment exists "giving the constructive trust beneficiary an unsecured claim is not harsh in the context of bankruptcy. It is much like the treatment accorded a credit seller of goods, who is denied the return of his property and left with only a claim for its price.").

Thus, Plaintiffs' claim for a constructive trust is in reality just a claim for money, and should be treated as such – that is, a claim against Enron's' estates.

### E. PLAINTIFFS' RIGHTS ARE GOVERNED BY CONTRACT, AND BECAUSE PLAINTIFFS HAVE AN ADEQUATE LEGAL REMEDY THEIR CLAIMS SEEKING EQUITABLE REMEDIES MUST BE DISMISSED.

Even assuming Plaintiffs have standing to sue Defendants, and they could establish the required elements of a constructive trust, because they seek enforcement of contractual rights they are barred from obtaining a constructive trust. It is hornbook law that a constructive trust is an equitable remedy that may only be used where a plaintiff lacks an adequate legal remedy. U.S. v. Ribadeniera, 920 F. Supp. 553, 556 (S.D.N.Y. 1996) (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992)). It is also axiomatic that where a valid "written contract between the parties governs the subject matter of their dispute," quasi-contractual claims such as constructive trusts or unjust enrichment are unavailable. Stylesite, 253 B.R. at 507; Giddatex S.r.L. v. Campaniello

<u>Imports, Ltd.</u>, 49 F. Supp. 2d 298, 301 n.4 (S.D.N.Y. 1999) ("The quasi-contractual remedy of unjust enrichment is only available when no express contractual obligation exists.").  As Plaintiffs' own allegations demonstrate, the relationship between the Bank Group, Flagstaff and Defendants is entirely contractual, and Plaintiffs in their Complaint seek protections and rights under the contracts comprising the Loan Transaction.

As Plaintiffs use their alleged contractual rights as the basis of this adversary proceeding, they cannot allege that these contracts are legally invalid.  <u>See</u>, <u>e.g.</u>, Compl. at ¶13 (alleging that Flagstaff's rights under the Hansen Loan Agreement arise under Section 9 of the Flagstaff Loan Agreement, and that Flagstaff's rights are triggered by an "Enron Event" as defined in §7.1 of the Hansen Loan Agreement.). Moreover, even though Plaintiffs claim they were fraudulently induced to enter into the contract, and therefore the contract should be deemed invalid, they ultimately seek to enforce and/or take possession of security interests, warrants, payments and other contractual rights directly springing from these Agreements.  As such, a constructive trust remedy is unavailable.  <u>Stylesite</u>, 253 B.R. at 508 (where contract is not disaffirmed, valid contract bars the imposition of a constructive trust); <u>MacDraw, Inc. v. CIT Group Equip., Fin., Inc.</u>, 157 F.3d 956, 964 (2d Cir. 1998) (where a contract governs the subject matter involved, a claim for unjust enrichment should be dismissed); <u>see Chrysler Capital Corp. v. Century Power Corp.</u>, 778 F. Supp. 1260, 1272  (S.D.N.Y. 1991) ("It is impermissible, however, to seek damages in an action sounding in quasi-contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties."). As one court held in granting a motion to dismiss a constructive trust claim, where the

underlying subject matter is governed by an enforceable contract, the very existence of the contract is fatal to the constructive trust claim. <u>Briggs v. Goodyear Tire & Rubber Co.</u>, 79 F. Supp. 2d 228, 237 (W.D.N.Y. 1999). Accordingly, Plaintiffs' Complaint which seeks recovery of contractual remedies under the guise of the equitable remedy of constructive trust must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice pursuant to Bankruptcy Rule 7012(b).

Dated: June 16, 2003
New York, NY

_____/s/ Melanie Gray_____
Martin J. Bienenstock, Esq. (MB 3001)
Melanie Gray (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

-and-

David R. Berz, Esq. (DB 4517)
David A. Hickerson, Esq.
Peter M. Friedman, Esq. (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1501 K Street, NW Suite 100
Washington, DC 20005
(202) 682-7000

Counsel for Defendants

# Exhibit A



CREDIT AND SECURITY AGREEMENT

dated as of

June 22, 2001

among

FLAGSTAFF CAPITAL CORPORATION,
as Borrower,

The Lenders Party Hereto

and

THE CHASE MANHATTAN BANK,
as Administrative Agent and Collateral Agent

---

J.P. MORGAN SECURITIES INC.,
as Lead Arranger

THE ROYAL BANK OF SCOTLAND,
as Co-Arranger and Syndication Agent

THE BANK OF TOKYO-MITSUBISHI, LTD.,
as Co-Documentation Agent

THE INDUSTRIAL BANK OF JAPAN, LIMITED
NEW YORK BRANCH,
as Co-Documentation Agent

# TABLE OF CONTENTS

## ARTICLE I
### DEFINITIONS

| | | |
|---|---|---|
| SECTION 1.01 | DEFINED TERMS | 1 |
| SECTION 1.02 | COMPUTATION OF TIME PERIODS | 13 |
| SECTION 1.03 | TERMS GENERALLY | 13 |
| SECTION 1.04 | ACCOUNTING TERMS; GAAP | 13 |

## ARTICLE II
### THE CREDITS

| | | |
|---|---|---|
| SECTION 2.01 | LOANS | 14 |
| SECTION 2.02 | LOANS AND BORROWINGS | 14 |
| SECTION 2.03 | REQUESTS FOR BORROWINGS | 14 |
| SECTION 2.04 | FUNDING OF BORROWINGS | 15 |
| SECTION 2.05 | REPAYMENT OF LOANS; EVIDENCE OF DEBT | 15 |
| SECTION 2.06 | PREPAYMENT OF LOANS | 16 |
| SECTION 2.07 | FEES | 17 |
| SECTION 2.08 | INTEREST | 17 |
| SECTION 2.09 | INTEREST RATE DETERMINATION AND PROTECTION | 17 |
| SECTION 2.10 | INCREASED COSTS; CAPITAL ADEQUACY, ETC | 19 |
| SECTION 2.11 | BREAK FUNDING PAYMENTS | 20 |
| SECTION 2.12 | TAXES | 21 |
| SECTION 2.13 | PAYMENTS GENERALLY; PRO RATA TREATMENT; SHARING OF SET-OFFS | 23 |
| SECTION 2.14 | REPLACEMENT OF LENDER; ADDITIONAL RIGHT TO TERMINATE COMMITMENTS | 24 |
| SECTION 2.15 | REIMBURSEMENT OF SUPPLEMENTAL COSTS | 26 |
| SECTION 2.16 | CERTIFICATES OF LENDERS | 26 |

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| SECTION 3.01 | ORGANIZATION; POWERS | 26 |
| SECTION 3.02 | AUTHORIZATION; ENFORCEABILITY | 27 |
| SECTION 3.03 | GOVERNMENTAL APPROVALS; NO CONFLICTS | 27 |
| SECTION 3.04 | NO ACTIVITY; NO SUBSIDIARIES; BUSINESS ACTIVITY | 27 |
| SECTION 3.05 | PROPERTIES | 28 |
| SECTION 3.06 | LITIGATION | 28 |
| SECTION 3.07 | COMPLIANCE WITH LAWS AND AGREEMENTS | 28 |
| SECTION 3.08 | INVESTMENT AND HOLDING COMPANY STATUS | 28 |
| SECTION 3.09 | TAXES | 29 |
| SECTION 3.10 | ERISA | 29 |
| SECTION 3.11 | DISCLOSURE | 29 |
| SECTION 3.12 | PLEDGED COLLATERAL; ASSIGNED AGREEMENTS | 29 |

**ARTICLE IV**
**CONDITIONS**

SECTION 4.01    EFFECTIVE DATE.................................................................29
SECTION 4.02    DETERMINATIONS UNDER SECTION 4.01.....................................32

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

SECTION 5.01    REPORTING REQUIREMENTS ..............................................32
SECTION 5.02    COMPLIANCE WITH LAWS, ETC ..........................................33
SECTION 5.03    PAYMENT OF TAXES, ETC ...............................................34
SECTION 5.04    PRESERVATION OF EXISTENCE, ETC ....................................34
SECTION 5.05    INSPECTION RIGHTS ....................................................34
SECTION 5.06    KEEPING OF BOOKS .....................................................34
SECTION 5.07    PERFORMANCE OF DOCUMENTS ...........................................34
SECTION 5.08    MAINTENANCE OF LICENSES AND PERMITS ..............................34
SECTION 5.09    CLAIMS FOR SUPPLEMENTAL COSTS .....................................35

**ARTICLE VI**
**NEGATIVE COVENANTS**

SECTION 6.01    LIENS, ETC .............................................................35
SECTION 6.02    INDEBTEDNESS..........................................................35
SECTION 6.03    MERGERS, ETC .........................................................36
SECTION 6.04    SALES, ETC., OF ASSETS ..............................................36
SECTION 6.05    INVESTMENTS IN OTHER PERSONS .......................................36
SECTION 6.06    AMENDMENT, ETC., OF OPERATIVE DOCUMENTS .........................36
SECTION 6.07    NEGATIVE PLEDGE ......................................................36
SECTION 6.08    SUBSIDIARIES .........................................................36
SECTION 6.09    NATURE OF ACTIVITIES ................................................36
SECTION 6.10    DISTRIBUTIONS ........................................................36
SECTION 6.11    AFFILIATE TRANSACTIONS ..............................................37
SECTION 6.12    ERISA...................................................................37

**ARTICLE VII**
**EVENTS OF DEFAULT**

**ARTICLE VIII**
**THE ADMINISTRATIVE AGENT; THE COLLATERAL AGENT**

**ARTICLE IX**
**GRANT OF SECURITY INTEREST, PLEDGE AND ASSIGNMENT**

SECTION 9.01    PLEDGE AND ASSIGNMENT ..............................................41
SECTION 9.02    SECURITY FOR OBLIGATIONS ...........................................42
SECTION 9.03    DELIVERY OF PLEDGED COLLATERAL ....................................42
SECTION 9.04    BORROWER REMAINS LIABLE ............................................43
SECTION 9.05    FURTHER ASSURANCES ..................................................43
SECTION 9.06    COLLATERAL AGENT APPOINTED ATTORNEY-IN-FACT ....................44

SECTION 9.07    COLLATERAL AGENT MAY PERFORM ................................................ 44
SECTION 9.08    REASONABLE CARE ........................................................................ 44
SECTION 9.09    RIGHTS, REMEDIES AND OBLIGATIONS ........................................... 44
SECTION 9.10    REMEDIES UPON AN EVENT OF DEFAULT ....................................... 45
SECTION 9.11    CONTINUING ASSIGNMENT AND SECURITY INTEREST; TRANSFER OF LOAN 46

### ARTICLE X
### ADMINISTRATION; SETTLEMENT; COLLECTION

SECTION 10.01    MAINTAINING THE OPERATING ACCOUNT ................................. 47
SECTION 10.02    DEPOSIT OF FUNDS INTO THE OPERATING ACCOUNT .................... 47
SECTION 10.03    INVESTING OF AMOUNTS IN THE OPERATING ACCOUNT .............. 48
SECTION 10.04    TRANSFERS FROM THE ACCOUNTS ........................................... 48

### ARTICLE XI
### MISCELLANEOUS

SECTION 11.01    NOTICES ...................................................................... 51
SECTION 11.02    WAIVERS; AMENDMENTS ................................................ 51
SECTION 11.03    EXPENSES; INDEMNITY; DAMAGE WAIVER ........................... 52
SECTION 11.04    SUCCESSORS AND ASSIGNS ............................................. 54
SECTION 11.05    SURVIVAL; CONTINUED EFFECTIVENESS ............................... 56
SECTION 11.06    COUNTERPARTS; INTEGRATION; EFFECTIVENESS .................... 56
SECTION 11.07    SEVERABILITY ............................................................... 57
SECTION 11.08    RIGHT OF SETOFF .......................................................... 57
SECTION 11.09    GOVERNING LAW; CONSENT TO SERVICE OF PROCESS ........... 57
SECTION 11.10    HEADINGS .................................................................... 58
SECTION 11.11    CONFIDENTIALITY ......................................................... 58
SECTION 11.12    INTEREST RATE LIMITATION ............................................ 58

SCHEDULES:

Schedule 2.01 – Commitments

EXHIBITS:

Exhibit A – Form of Assignment and Acceptance
Exhibit B – Form of Opinion of Borrower's Counsel
Exhibit C – Amortization Schedule

CREDIT AND SECURITY AGREEMENT dated as of June 22, 2001 among FLAGSTAFF CAPITAL CORPORATION, the LENDERS party hereto, and THE CHASE MANHATTAN BANK, as Administrative Agent and as Collateral Agent, THE ROYAL BANK OF SCOTLAND, as syndication agent, and THE BANK OF TOKYO-MITSUBISHI, LTD. and THE INDUSTRIAL BANK OF JAPAN, LIMITED, NEW YORK BRANCH, as co-documentation agents.

The parties hereto agree as follows:

## ARTICLE I
## Definitions

SECTION 1.01    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Account Shortfall" has the meaning set forth in Section 10.04(d)(i).

"Account Shortfall Notice" means has the meaning set forth in Section 10.04(d)(ii).

"Administrative Agent" means Chase, in its capacity as administrative agent for the Lenders hereunder.

"Administrative Agent's Account" means the account number 0010-336-0583 of the Administrative Agent maintained at Chase (ABA No. 113 000 609), or such other account as shall be notified to the Borrower by the Administrative Agent from time to time.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Credit and Security Agreement, as amended, supplemented or otherwise modified from time to time.

"Alternate Base Rate" means, for any day, a rate per annum equal to the highest of:

(a) the Prime Rate in effect on such day;

(b) the sum (adjusted to the nearest ¼ of 1% or, if there is no nearest ¼ of 1%, to the next higher ¼ of 1%) of (i) ½ of one percent per annum plus (ii) the rate obtained by dividing (A) the latest three-week moving average of secondary market morning offering rates in the United States for three-month certificates of deposit of major United States money market banks, such three-week moving average (adjusted to the basis of a year of 360 days) being determined weekly on each Monday (or, if such day is not a Business Day, on the next succeeding Business Day) for the three-week period ending on the previous Friday by Chase on the basis of such rates reported by certificate of deposit dealers to and published by the Federal Reserve Bank of New York or, if such publication shall be suspended or terminated, on the basis of quotations for such rates received by Chase from three New York certificate of deposit dealers of recognized standing selected by Chase, by (B) a percentage equal to 100% minus the average of the daily percentages specified during such three-week period by the Board for determining the maximum reserve requirement (including, but not limited to, any emergency, supplemental or other marginal reserve requirement) for Chase with respect to liabilities consisting of or including (among other liabilities) three-month Dollar non-personal time deposits in the United States, plus (iii) the average during such three-week period of the annual assessment rates estimated by Chase for determining the then current annual assessment payable by Chase to the Federal Deposit Insurance Corporation (or any successor) for insuring Dollar deposits of Chase in the United States; and

(c) the sum of ½ of one percent per annum plus the Federal Funds Effective Rate in effect from time to time.

Any change in the Alternate Base Rate due to a change in the Prime Rate, the rate calculated pursuant to clause (b) of this definition or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate, the rate calculated pursuant to clause (b) of this definition, or the Federal Funds Effective Rate, respectively.

"Applicable Percentage" means, with respect to any Lender, the percentage of the total Commitments or Loans represented by such Lender's Commitment or Loan, as applicable.

"Applicable Rate" means, for any day, with respect to any Eurodollar Loan, 1.125%.

"Assigned Agreements" has the meaning set forth in Section 9.01(a).

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 11.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means Flagstaff Capital Corporation, a Delaware corporation.

"Borrower Obligor" means each of Hansen, Enron, the Swap Counterparty or any other Person to the extent any of the foregoing has an Obligation for the payment of money to the Borrower or makes a payment in respect of any such Obligation.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Break Funding Amount" means amounts payable by the Borrower pursuant to Section 2.11.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank Eurodollar market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Equivalents" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States or any state thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000; and

(d)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above.

"Charges" has the meaning set forth in Section 11.12.

"Chase" means The Chase Manhattan Bank.

"Chase Loan" means loans made by Chase to the Borrower (other than a Loan) for the purpose of funding the loan by the Borrower to Hansen pursuant to the Hansen Credit Agreement.

"Closing Date" means June 22, 2001.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral Agent" means Chase, its capacity as collateral agent for the Lenders hereunder.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans hereunder. The aggregate amount of the Lenders' Commitments is $375,000,000.

"Constituent Documents" means, for any Person, such Person's memorandum, articles or certificate of incorporation, articles or certificate of organization or formation, certificate of limited partnership, bylaws, regulations, partnership agreement, constitution, and other instruments or documents evidencing the incorporation, organization, or formation of such Person.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"CPS" means Compagnie Papiers Stadacona, a Nova Scotia company.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Distribution" any distribution or dividend or return of capital or any other distribution, payment or delivery of property or cash, or the redemption, retirement, purchase or acquisition, directly or indirectly, of any ownership interest now or hereafter outstanding (or any warrants for or options in respect of any such interest) or the setting aside of any funds for any of the foregoing purposes.

"dollars" or "$" refers to lawful money of the United States of America.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 11.02) and the initial Loans are requested to be made pursuant to Section 2.03.

"<u>Enron</u>" means Enron Corp., an Oregon corporation.

"<u>Enron Agreement</u>" means the Enron Agreement dated as of the Closing Date made by Enron in favor of the indemnitees named therein, in the form delivered to the Administrative Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified as permitted hereby.

"<u>Enron Consent</u>" means the Enron Consent dated as of the Closing Date and executed by Enron, acknowledging Enron's consent to the assignment to the Collateral Agent of the Borrower's rights and interest under the Enron Documents (other than Excluded Payments), which consent shall include, without limitation, Enron's acknowledgement that the Collateral Agent can exercise the rights of the Borrower under any of the Enron Documents if an Event of Default has occurred and is continuing.

"<u>Enron Documents</u>" means the Enron Agreement, the Total Return Swap Agreement and the Put Option Agreement.

"<u>Enron Event</u>" has the meaning assigned such term in the Enron Agreement.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>Eurocurrency Liabilities</u>" has the meaning assigned to that term in Regulation D of the Federal Reserve Board, as in effect from time to time.

"<u>Eurodollar</u>", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the LIBO Rate.

"<u>Event of Default</u>" has the meaning assigned to such term in Article VII.

"<u>Excluded Payments</u>" has the meaning assigned such term in the Hansen Credit Agreement.

"<u>Excluded Taxes</u>" has the meaning assigned such term in Section 2.12(a).

"<u>Federal Funds Effective Rate</u>" means, for any day, a fluctuating interest rate per annum equal for such day to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"<u>Final Debt Collection Date</u>" means the date on which the aggregate outstanding principal amount of the Loan shall have been paid in full by the Borrower together with all interest

accrued thereon, and the Borrower shall have paid in full all Supplemental Costs and other amounts payable by the Borrower under this Agreement (but excluding contingent obligations not yet due and payable) accrued through the date of such payment of such principal and interest.

"Flagstaff Account" means the account no. 323 222 366 of the Borrower maintained at Chase (ABA No. 021 000 021), or such other account as shall be notified by the Borrower to the Administrative Agent from time to time.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each state thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"GAAP" means generally accepted accounting principles in the United States of America.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hansen" means Hansen Investments Co., a Nova Scotia company.

"Hansen Acceleration Notice" means the giving of notice, if applicable, or declaring the acceleration of the loans under the Hansen Credit Agreement.

"Hansen Consent" means the Hansen Consent dated as of the Closing Date and executed by Hansen, acknowledging Hansen's consent to the assignment to the Collateral Agent of the Borrower's rights and interest (other than Excluded Payments) under the Hansen Credit Agreement and the other Assigned Agreements to which Hansen is a party, which consent shall include, without limitation, Hansen's acknowledgement that the Collateral Agent can exercise the

rights of the Borrower under the Assigned Agreements to which Hansen is a party if an Event of Default has occurred and is continuing.

"Hansen Credit Agreement" means the Credit Agreement, dated as of the Closing Date, between the Borrower, as lender, and Hansen, as borrower, in the form delivered to the Administrative Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Hansen Event of Default" means the occurrence of an "Event of Default" under the Hansen Credit Agreement

"Hansen Note" means the "Note" issued by Hansen pursuant to the Hansen Credit Agreement.

"Hedging Agreement" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" has the meaning set forth in Section 2.12(a).

"Indemnitee" has the meaning set forth in Section 11.03(b).

"Interest Period" means the period commencing on the Effective Date and ending on the initial Payment Date, and thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the next succeeding Payment Date; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding

Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.

"Interest Rate Swap Agreement" means the ISDA Master Agreement, and the applicable schedule and confirmation thereto, dated as of the Closing Date between the Borrower and the Swap Counterparty pursuant to which the Borrower enters into an interest rate hedging agreement.

"Investment" in any Person means any loan or advance to such Person, any purchase or other acquisition of any capital stock, warrants, rights, options, obligations or other securities of such Person, any capital contribution to such Person or any other investment in such Person, including, without limitation, any arrangement pursuant to which the investor incurs Indebtedness of the types referred to in clauses (f) and (g) of the definition of "Indebtedness" in respect of such Person.

"Lender Affiliate" means, (a) with respect to any Lender, (i) an Affiliate of such Lender or (ii) any entity (whether a corporation, partnership, trust or otherwise) that is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and is administered or managed by a Lender or an Affiliate of such Lender and (b) with respect to any Lender that is a fund which invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Lending Office" means, with respect to any Lender, the office of such Lender specified as its Lending Office opposite its name on Schedule 2.01 or such other office of such Lender as such Lender may from time to time specify to the Borrower.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"LIBO Rate" means, for any Interest Period for each Eurodollar Loan comprising part of the same Borrowing, (a) the rate per annum (rounded upward, if not an integral multiple of 1/100 of 1%, to the nearest 1/100 of 1% per annum) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two Business Days before the first day of the relevant Interest Period for a term comparable to such Interest Period; (b) if for any reason the rate specified in clause (a) of this definition does not so appear on Telerate Page 3750 (or any successor page), the rate per annum (rounded upward, if not an integral multiple of 1/100 of 1%, to the nearest 1/100 of 1% per annum) appearing on Reuters Screen LIBO page (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two Business Days before the first day of such Interest Period for a term comparable to such Interest

Period; provided, however, if more than one rate is specified on Reuters Screen LIBO page (or any successor page), the applicable rate shall be the arithmetic mean of all such rates; and (c) if the rate specified in clause (a) of this definition does not so appear on Telerate Page 3750 (or any successor page) and if no rate specified in clause (b) of this definition so appears on Reuters Screen LIBO page (or any successor page), the interest rate per annum (rounded upward to the nearest whole multiple of 1/16 of 1% per annum if such rate is not such a multiple) equal to the rate per annum at which deposits in Dollars are offered by the principal office of the Reference Bank in London, England to prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period in an amount substantially equal to the amount of the Eurodollar Loan of the Reference Bank comprising part of such Borrowing and for a period equal to such Interest Period. If the LIBO Rate is determined pursuant to clause (c) of this definition, such determination shall be made by the Administrative Agent on the basis of the applicable rate furnished to and received by the Administrative Agent from the Reference Bank two Business Days before the first day of such Interest Period, subject, however, to the provisions of Section 2.09.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, the Hansen Consent, the Enron Consent, Swap Counterparty Consent, the Process Agent Agreement, the Assigned Agreements and any notes issued pursuant to Section 2.05, each in the form delivered to the Administrative Agent on the Closing Date, as each such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby, and all instruments, certifications, or other agreements delivered in connection with the foregoing.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations or condition, financial or otherwise, of the Borrower, (b) the ability of the Borrower to perform any of its Obligations under any Loan Document or (c) the rights of or benefits available to the Administrative Agent, the Collateral Agent or the Lenders under any Loan Document.

"Maturity Date" means June 23, 2006.

"Maximum Rate" has the meaning set forth in Section 11.12.

"Moody's" means Moody's Investors Service, Inc., or any successor that is a national statistical rating organization.

"Multiemployer Plan" of the Borrower means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any of its ERISA Affiliates is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Newman" means Newman Investments Co., a Nova Scotia company.

"Obligation" means, with respect to any Person, any obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in clause (e) of Article VII. Without limiting the generality of the foregoing, the Obligations of the Borrower under the Loan Documents include (a) the obligation to pay principal, interest, costs, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower under any Loan Document and (b) the obligation to reimburse any amount in respect of any of the foregoing that the Administrative Agent, the Collateral Agent or the Lenders may elect to pay or advance on behalf of the Borrower pursuant to the terms of this Agreement.

"Operating Account" means account no. 507953819 maintained at Chase (ABA No. 021 000 021), and is the "Operating Account" established and maintained pursuant to Section 10.01, in the name of the Borrower but under the sole dominion and control of, and exclusive right of withdrawal at the direction of, the Collateral Agent and subject to the terms of this Agreement.

"Operative Documents" means, collectively, the Loan Documents, the Subscription Agreement, the Subscription Payment Assumption Agreement and all other documents, agreements and instruments delivered in connection therewith.

"Other Taxes" has the meaning set forth in Section 2.12(b).

"Participant" has the meaning set forth in Section 11.04(e).

"Payment Date" means each of the dates set forth on Exhibit C in the column labeled "Payment Date."

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Investments" has the meaning set forth in Section 10.03.

"Permitted Liens" has the meaning set forth in Section 6.01.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means a Single Employer Plan or a Multiemployer Plan.

"Pledged Collateral" means has the meaning set forth in Section 9.01.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Chase as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Process Agent" has the meaning set forth in Section 11.09(b).

"Process Agent Agreement" means a letter dated as of the Closing Date from the Process Agent evidencing its obligation to accept service of process pursuant to Section 11.09(b) (or any agreement with any successor Process Agent as provided therein) in the form delivered to the Administrative Agent on the Closing Date, as such letter may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Put Option Agreement" has the meaning assigned such term in the Hansen Credit Agreement.

"Reference Bank" means Chase.

"Register" has the meaning set forth in Section 11.04(c).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Required Lenders" means, at any time, Lenders holding at least 51% of the then aggregate unpaid principal amount of the Loans.

"Responsible Officer" means, as to any Person, the chief executive officer, the president, the chief financial officer, the treasurer, the assistant treasurer, the secretary, the deputy corporate secretary, any assistant secretary or any vice president or other executive officer of such Person. Unless otherwise specified, all references to a "Responsible Officer" herein means a Responsible Officer of the Borrower.

"S&P" means Standard & Poor's Rating Agency Group, a division of McGraw-Hill Companies, Inc., or any successor that is a national statistical rating organization.

"Secured Obligations" has the meaning set forth in Section 9.02.

"Securities" has the meaning set forth in Section 9.01(d).

"Single Employer Plan" of the Borrower means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and no Person other than the Borrower and the ERISA Affiliates or (b) was so

maintained and in respect of which the Borrower or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"Subscription Agreement" has the meaning assigned such term in the Hansen Credit Agreement.

"Subscription Payment Assumption Agreement" has the meaning assigned such term in the Hansen Credit Agreement.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Supplemental Costs" means, without duplication, any and all interest, fees, costs, expenses, indemnities, and other Obligations of the Borrower payable hereunder or under the other Loan Documents (including, without limitation, amounts payable under Sections 2.10 or 2.12 or Section 11.03, interest payable under Section 2.08(b), Break Funding Amounts, and similar items and amounts that are required to be paid by (or any Obligation to pay that has been incurred by) the Borrower under the Loan Documents) other than (a) interest payable pursuant to Section 2.08(a) and (b) the principal amount of the Loans.

"Swap Counterparty" means the party, other than the Borrower, to the Interest Rate Swap Agreement.

"Swap Counterparty Consent" means the Swap Counterparty Consent dated as of the Closing Date and executed by the Swap Counterparty acknowledging the such Swap Counterparty's consent to the assignment to the Collateral Agent of the Borrower's rights and interest under the Interest Rate Swap Agreement, which consent shall include, without limitation, the Swap Counterparty's acknowledgement that the Collateral Agent can exercise the rights of the Borrower under the Interest Rate Swap Agreement if an Event of Default has occurred and is continuing.

"Total Return Swap Agreement" has the meaning assigned such term in the Hansen Credit Agreement.

"Transactions" means the execution, delivery and performance by the Borrower of this Agreement and the other Operative Documents.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the LIBO Rate or the Alternate Base Rate.

"UCC" means the Uniform Commercial Code.

"Warrant" has the meaning assigned such term in the Hansen Credit Agreement.

"Warrant Agreement" has the meaning assigned such term in the Hansen Credit Agreement.

"Welfare Plan" means a welfare plan, as defined in Section 3(1) of ERISA.

SECTION 1.02    Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding". Unless otherwise indicated, all references to a particular time are references to New York City time.

SECTION 1.03    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and

applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## ARTICLE II
## The Credits

SECTION 2.01    Loans.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make on the Effective Date a Loan to the Borrower in an aggregate amount not to exceed such Lender's Commitment.  Any portion of each Lender's Commitment not utilized on the Effective Date shall be permanently cancelled.  Any Loans that are repaid or prepaid may not be reborrowed.  Unless the Loans have been made on or before July 31, 2001, the Commitments shall terminate in full on such date.

SECTION 2.02    Loans and Borrowings.  (a) Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make the Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make its Loan as required.

(b)    Subject to Section 2.09, each Borrowing shall be comprised entirely of Eurodollar Loans.  Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

SECTION 2.03    Requests for Borrowings.  To request the Borrowing, the Borrower shall notify the Administrative Agent of such request by delivery to the Administrative Agent of a written Borrowing Request not later than 11:00 a.m., New York City time, three Business Days before the Effective Date.  Such Borrowing Request shall be irrevocable and shall be in a form approved by the Administrative Agent and signed by the Borrower.  The written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)    the aggregate amount of the requested Borrowing;

(ii)    the Effective Date, which shall be a Business Day;

(iii)    the location and number of the Borrower's account to which funds are to be disbursed.

Subject to Section 2.09, the requested Borrowing shall be a Eurodollar Borrowing, and the Interest Period shall be as set forth on Exhibit C.  Promptly following receipt of the Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04 <u>Funding of Borrowings</u>. (a) Each Lender shall make the Loan to be made by it hereunder on the Effective Date by wire transfer of immediately available funds by 12:00 noon, New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent in New York City and designated by the Borrower in the applicable Borrowing Request.

(b)  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the Alternate Base Rate. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c)  Subject to Section 2.09, at the end of each Interest Period (other than the last Interest Period), the amount of the Loan that remains outstanding shall automatically convert into a Loan of the same Type for the next Interest Period.

SECTION 2.05 <u>Repayment of Loans; Evidence of Debt</u>. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of the Loan in quarterly installments on each Payment Date in the amount corresponding to the applicable Payment Date as set forth in the amortization schedule attached as Exhibit C. The Borrower shall repay on the Maturity Date the principal amount of the Loan that remains outstanding on such date.

(b)  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from the Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)  The Administrative Agent shall maintain accounts in which it shall record (i) the amount of the Loan made by each Lender hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein absent manifest error; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)     Any Lender may request that the Loan made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Loan evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 11.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.06     Prepayment of Loans.

(a)     The Borrower may upon at least three Business Days' notice to the Administrative Agent stating the proposed date, and if such notice is given the Borrower shall, prepay in full the entire outstanding principal amount (and not less) of the aggregate Loans without premium or penalty, together with (i) accrued interest to the date of such prepayment on the principal amount prepaid, and (ii) all Supplemental Costs (including, without limitation, any Break Funding Amount for such prepayment).

(b)     (i) The Borrower shall, upon receipt of any payment from any Borrower Obligor pursuant to any Loan Document, apply 100% thereof as a mandatory prepayment of the principal amount of the Loans, except to the extent Section 10.04 requires application thereof to other Obligations prior to the payment of principal.

(ii)     In addition, any prepayments made under this subsection (b) shall be accompanied by (x) any Supplemental Costs (including, without limitation, any Break Funding Amount for such prepayment) and (y) without duplication an amount sufficient to pay in full all amounts described in Section 10.04(a) or 10.04(b), as the case may be, in connection with such prepayment; provided that, if an Account Shortfall exists at the time of such prepayment, such other amounts as described in clauses (x) and (y) above shall be due and payable by the Borrower only upon receipt from any Borrower Obligor of such additional amounts in respect thereof.

(c)     Upon receipt of notice of any optional or mandatory prepayment, the Administrative Agent shall notify the Borrower by 2:00 p.m. (New York City time) on the next succeeding Business Day of accrued and unpaid interest on the principal amount to be prepaid the applicable Break Funding Amount in connection with such prepayment or other Supplemental Costs to be paid in connection therewith pursuant to Section 10.04(a) or 10.04(b), as the case may be, provided that, if an Account Shortfall exists at the time of such prepayment, such Break

Funding Amount, or other Supplemental Costs shall be due and payable by the Borrower only upon receipt from any Borrower Obligor of amounts in respect thereof.

(d)     Each prepayment shall be accompanied by written notice to each Lender, the Administrative Agent and the Collateral Agent of the provision of Section 2.06(a) or 2.06(b) under which such prepayment is to be made, and identifying the source of the proceeds of such prepayment.

SECTION 2.07     Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

SECTION 2.08     Interest.  (a)     The Loans comprising each Eurodollar Borrowing shall bear interest at the LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate.  All interest under this Section 2.08(a) shall be payable on each Payment Date.

(b)     Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, from the date on which such amount is due until such amount is paid in full, at a rate per annum equal to (i) in the case of overdue principal of any Loan, the sum of 2% per annum plus the rate per annum otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, the sum of 2% per annum plus the rate per annum applicable to ABR Loans as provided in paragraph (a) of this Section.

(c)     Accrued interest on each Loan shall be payable in arrears on each Payment Date for such Loan and on the Maturity Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable in accordance with Article IX and (ii) in the event of any repayment or prepayment of any Loan accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.09     Interest Rate Determination and Protection.  (a) If at any time the LIBO Rate is determined pursuant to clause (c) of the definition thereof, the Reference Bank agrees to furnish to the Administrative Agent timely information for the purpose of determining such LIBO Rate.  If at any time the Alternate Base Rate is determined pursuant to clause (a) or clause (b) of the definition thereof and if Chase is not the Administrative Agent at

such time, Chase agrees to furnish to the Administrative Agent timely information with respect to the determination of such Alternate Base Rate. In cases other than specified in the first two sentences of this Section 2.09(a), the Administrative Agent shall determine the applicable rate of interest.

(b) The Administrative Agent shall give prompt notice to the Borrower and the Lenders of the applicable interest rate determined by the Administrative Agent for purposes of Section 2.08(a), the applicable rate, if any, furnished by the Reference Bank pursuant to clause (c) of the definition herein of LIBO Rate for the purpose of determining the applicable interest rate under Section 2.08(a), and the applicable rate, if any, furnished by Chase pursuant to the penultimate sentence of Section 2.09(a) with respect to the determination of the Alternate Base Rate.

(c) If the Administrative Agent is unable to obtain timely information for determining the LIBO Rate for any Eurodollar Loans,

(i) the Administrative Agent shall forthwith notify the Borrower and the Lenders that the interest rate cannot be determined for such Eurodollar Loans,

(ii) each such Loan will automatically, on the last day of the then existing Interest Period therefor, convert into an ABR Loan (or if such Loan is then an ABR Loan, will continue as an ABR Loan), and

(iii) the obligation of the Lenders to make, or to convert Loans or Borrowings into, or make continuations of Borrowings resulting in, Eurodollar Loans or Eurodollar Borrowings shall be suspended until the Administrative Agent shall notify the Borrower and the Lenders that the circumstances causing such suspension no longer exist.

(d) If, with respect to any Eurodollar Loans, the Required Lenders notify the Administrative Agent that the applicable interest rate for any Interest Period for such Loan will not adequately reflect the cost to such Required Lenders of making, funding or maintaining their respective Eurodollar Loans for such Interest Period, the Administrative Agent shall forthwith so notify the Borrower and the Lenders, whereupon

(i) each such Loan will automatically, on the last day of the then existing Interest Period therefor, convert into an ABR Loan (or, if such Loan is then an ABR Loan, will continue as an ABR Loan), and

(ii) the obligation of the Lenders to make, or to convert Loans or Borrowings into, or to make divisions or combinations of Borrowings resulting in, Eurodollar Loans or Eurodollar Borrowings shall be suspended until the Administrative Agent shall notify the Borrower and the Lenders that the circumstances causing such suspension no longer exist.

(e)     Notwithstanding any other provision of this Agreement, the conversion of any Loan shall not constitute a repayment or reborrowing of any particular Loan but shall be deemed a continuation of such Loan.

SECTION 2.10     Increased Costs; Capital Adequacy, Etc.  (a) If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof or (ii) the compliance with any guideline or request from any governmental authority, central bank or comparable agency (whether or not having the force of law), there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining Eurodollar Loans (other than Break Funding Amounts or increased costs described in Section 2.10(c) below and other than, in respect of payments to be made to any Lender or the Administrative Agent, any such increased costs resulting from taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (as to which Section 2.12 shall govern)), then the Borrower shall from time to time, upon demand by such Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost unless such Lender shall have withdrawn its demand for additional compensation for such increased cost pursuant to Section 2.14(b) or the Borrower is not obligated to pay such amounts pursuant to Section 2.14(a).

(b)     If the Borrower so notifies the Administrative Agent within five Business Days after any Lender notifies the Borrower of any increased cost pursuant to the provisions of Section 2.10(a), the Borrower shall convert all Loans of the Type affected by such increased cost of all Lenders then outstanding into Loans of another Type and, additionally, reimburse such Lender for such increased cost in accordance with Section 2.10(a).

(c)     If any Lender shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its lending office) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency (except to the extent such request or directive arises as a result of the individual creditworthiness of such Lender), has the effect of increasing the amount of capital required or expected to be maintained as a result of its Commitment hereunder, such Lender shall have the right to give prompt written notice and demand for payment thereof to the Borrower with a copy to the Administrative Agent (which notice and demand shall show in reasonable detail the calculation of such additional amounts as shall be required to compensate such Lender for the increased cost to such Lender as a result of such increase in capital and shall certify that such costs are generally being charged by such Lender to other similarly situated borrowers under similar credit facilities), although the failure to give any such notice shall not, unless such notice fails to set forth the information required above, release or diminish any of the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c), and subject to Section 2.14, the Borrower shall pay such additional amounts.

(d)     Each Lender shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its lending office or change the jurisdiction of its lending office, as the case may be, so as to avoid the imposition of any increased costs under this Section 2.10 or to eliminate the amount of any such increased cost which may thereafter accrue; provided that no such selection or change of the jurisdiction for its lending office shall be made if, in the reasonable judgment of such Lender, such selection or change would be disadvantageous to such Lender.

(e)     No Lender shall be entitled to recover increased costs pursuant to Section 2.10, (i) incurred or accruing more than 90 days prior to the date on which such Lender sent to the Borrower a written notice and demand for payment as specified in this Section 2.10, or (ii) to the extent that such increased costs have resulted from the failure of such Lender to have complied with Section 2.10(d).

(f)     If any Lender is required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, and if as a result thereof there is an increase in the cost to such Lender of agreeing to make or making, funding or maintaining Eurodollar Loans, then the Borrower shall from time to time, upon demand by such Lender (with a copy of such demand to the Administrative Agent), unless such Lender withdraws its demand for such additional amounts pursuant to Section 2.14(b) or the Borrower is not obligated to pay such amounts pursuant to Section 2.14(a), pay to the Administrative Agent for the account of such Lender additional amounts, as additional interest hereunder, sufficient to compensate such Lender for such increased cost.

SECTION 2.11     Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the Payment Date applicable thereto (including as a result of an Event of Default), (b) the failure to borrow or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked pursuant to the provisions of this Agreement and is revoked in accordance with such provisions), or (c) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.14, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense (other than taxes which are dealt with in Section 2.12 and loss of anticipated profits) which it may reasonably incur as a result of such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.12    <u>Taxes</u>.

(a)    (i) Any and all payments by the Borrower hereunder to each Indemnitee shall be made, in accordance with Section 2.13, free and clear of and without deduction for all Indemnified Taxes.  "<u>Indemnified Taxes</u>" shall mean any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, other than Excluded Taxes.  "<u>Excluded Taxes</u>" shall mean, in respect of payments to each Lender or the Administrative Agent, (A) all taxes imposed on its net income (and capital and franchise taxes imposed on it in lieu thereof or otherwise applicable as of the date hereof) by the United States or by any state or foreign jurisdiction under the laws of which such Lender or Administrative Agent is organized, domiciled, resident or doing business or any political subdivision thereof or by any jurisdiction in which such Indemnitee holds any interest in connection with this Agreement (including, without limitation, in the case of each Lender, the jurisdiction of such Lender's Lending Office) or any political subdivision thereof, to the extent such taxes arise by reason of such organization, domicile, residence, doing business or holding an interest (*other than* any net income taxes imposed by any jurisdiction with which the Indemnitee's connection arises solely from having executed, delivered or performed obligations or received a payment under, or enforced, this Agreement *other than* (I) to the extent that such net income taxes would be applicable, on the date hereof, and (II) with respect to any entity that becomes a Lender after the date hereof, to the extent that such taxes are imposed at a rate in excess of that at which Indemnified Taxes are imposed on the transferor on the date such entity becomes a Lender, in each case to a payment to be made to any Lender or the Administrative Agent), and (B) any taxes imposed by the United States by means of withholding at source (I) if and to the extent that such taxes shall be in effect and shall be applicable, on the date hereof, and (II) with respect to any entity that becomes a Lender after the date hereof, to the extent that such taxes are imposed at a rate in excess of that at which Indemnified Taxes are imposed on the transferor on the date such entity becomes a Lender, in each case to payment to be made to such Lender or the Administrative Agent.  If the Borrower shall be required by law to deduct any taxes from or in respect of any sum payable hereunder to any Indemnitee, (1) the sum payable shall be increased as may be necessary so that after making all required deductions in respect of Indemnified Taxes (including deductions applicable to additional sums payable under this Section 2.12) such Indemnitee receives an amount equal to the sum it would have received had no such deductions been made, (2) the Borrower shall make or cause to be made such deductions and (3) the Borrower shall pay or cause to be paid the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(ii)    If, upon filing of documentation prescribed by applicable law, any Indemnitee is entitled to an exemption from or reduction of United States withholding tax with respect to payments under this Agreement that would otherwise be subject to United States withholding tax or United States withholding

tax at an increased rate, then, such Indemnitee shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate. If any such Indemnitee fails to meet its obligation under this subsection (ii), the Borrower shall not be required to pay to such Indemnitee any additional amount relating to United States withholding tax (and shall be relieved of any liability with respect thereto) pursuant to Section 2.12(a)(i) and 2.12(c) that would not have been payable but for such failure.

(iii)    Should any Lender or the Administrative Agent ever receive any refund, credit or deduction from any taxing authority to which such Lender or the Administrative Agent would not be entitled but for the payment by the Borrower of Indemnified Taxes or Other Taxes as required by this Section 2.12 (it being understood that the decision as to whether or not to claim, and if claimed, as to the amount of any such refund, credit or deduction shall be made by such Lender or the Administrative Agent in its sole discretion), such Lender or Administrative Agent, as the case may be, thereupon shall repay to the Borrower an amount with respect to such refund, credit or deduction equal to any set reduction in taxes actually obtained by such Lender or the Administrative Agent, as the case may be, and determined by such Lender or the Administrative Agent, as the case may be, to be attributable to such refund, credit or deduction.

(b)    In addition, the Borrower agrees to pay all Other Taxes that arise from any payment made or crediting of amounts hereunder or from the execution, delivery or performance of, or otherwise with respect to, this Agreement. "Other Taxes" shall mean any present or future transfer, ad valorem, registration, title, license, stamp or documentary taxes or any other excise or property taxes, charges or similar levies, and all liabilities with respect thereto.

(c)    The Borrower, to the fullest extent permitted by law, will indemnify each Indemnitee on an after-tax basis for the full amount of Indemnified Taxes or Other Taxes (including, without limitation, Indemnified Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.12) paid by such Indemnitee and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, which arise from any payment made or crediting of amounts under this Agreement or any other Loan Document, or from the execution, delivery or performance of, or otherwise with respect to, any such agreement, except as a result of the gross negligence (which shall in any event include the failure of such Indemnitee to provide to the Borrower any form or certificate that it was required to provide pursuant to subsection (a)(ii) above) or willful misconduct of such Indemnitee, whether or not such Indemnified Taxes or Other Taxes were correctly or legally asserted; provided that, if an Account Shortfall exists at the time of such demand or at the time such payment is due, the Borrower shall pay such demanded amount only upon receipt from any Borrower Obligor of amounts in respect of Supplemental Costs related to such demanded amount, provided that, if an Account Shortfall exists at the time of such demand, such Indemnified Taxes or Other Taxes shall be due and payable by the Borrower only upon receipt from any Borrower Obligor of amounts in respect of Supplemental Costs related thereto. This indemnification shall be made within 30 days

from the date such Indemnitee makes written demand therefor. Upon receipt by the Administrative Agent of written notice from any Governmental Authority that requires the Administrative Agent to withhold Indemnified Taxes, the Administrative Agent shall promptly forward such notice to the Borrower and to Enron, but in any event, within 90 days of receipt thereof, provided, however, that the indemnities provided for in this Section 2.12 shall be reduced only to the extent the failure to give such notice results in amounts payable hereunder to be more than would have been payable had such notice been given within such 90 day period.

(d)     Any Lender claiming any additional amounts payable pursuant to this Section shall use its best efforts (consistent with its internal policy and legal and regulatory restrictions) to select or change the jurisdiction of its lending office if the making of such selection or change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.

(e)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower and each Indemnitee contained in this Section 2.12 shall survive the payment in full of principal of and interest on the Loan made hereunder.

SECTION 2.13     Payments Generally; Pro Rata Treatment; Sharing of Set-offs. (a) The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.10, 2.11 or 2.12, or otherwise) prior to 2:00 p.m., New York City time, on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 270 Park Avenue, New York, New York, except that payments pursuant to Sections 2.10, 2.11, 2.12 and 11.03 (decreased, as to any Lenders, for any taxes withheld in respect of such Lender as contemplated by Section 2.12(a)(ii)) shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day (provided, however, that if such extension would cause payment of interest on or principal of Loans to be made in the next following calendar month, such payment shall be made on the next preceding Business Day), and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in

such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment on such date in full in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders on such due date an amount equal to the amount then due to such Lender. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(b) or 2.13(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.14     Replacement of Lender; Additional Right to Terminate Commitments. In the event that any Lender demands payment pursuant to Section 2.10 or 2.12, the Borrower shall have the right, within 45 days after the date of the giving by such Lender of any notice or demand required or otherwise permitted to be given pursuant to Section 2.10 or 2.12 and if no Event of Default or Default then exists, to either replace such Lender in accordance with the procedure set forth in Section 2.14(a) or terminate such Lender's Commitment in accordance with the procedure set forth in Section 2.14(b).

(a)     If the Borrower determines to replace a Lender pursuant to this Section 2.14, then the Borrower will have the right to replace such Lender with an assignee in accordance with and subject to the restrictions contained in Section 11.04 (including execution of an appropriate Assignment and Acceptance), provided that such assignee (i) shall unconditionally offer in writing (with a copy to the Administrative Agent) to purchase all of such Lender's rights hereunder and interest in the Loans owing to such Lender and the Loan held by such Lender without recourse at the principal amount of such Loan plus interest to the date of such purchase on a date therein specified, and (ii) shall execute and deliver to the Administrative Agent an Assignment and Acceptance, as assignee, pursuant to which such assignee becomes a party hereto with a Commitment equal to that of the Lender being replaced (plus, if such assignee is already a Lender, the amount of its Commitment prior to such replacement); provided further, that no Lender or other Person shall have any obligation to increase its Commitment or otherwise to replace, in whole or in part, any Lender. Upon satisfaction of the requirements set forth in the first sentence of this Section 2.14(a), acceptance of such offer to purchase by the Lender to be replaced, payment to such Lender of the purchase price in immediately available funds, and the payment by the Borrower of all requested costs accruing to the date of purchase which the Borrower is obligated to pay under Section 11.03 and all other amounts owed by the Borrower to such Lender (other than the principal of and interest on the Loans of such Lender accrued to the date of such purchase that are purchased by such assignee), such assignee shall constitute a "Lender" hereunder with a Commitment as so specified and the Lender being so replaced shall no longer constitute a "Lender" hereunder and its Commitment shall be deemed terminated, except that the rights under Sections 2.10, 2.12 and 11.03 of the Lender being so replaced shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Lender" hereunder. If, however, (A) a Lender accepts such an offer and such assignee fails to purchase such rights and interest on such specified date in accordance with the terms of such offer, the Borrower shall continue to be obligated to pay the increased costs and additional amounts due to such Lender pursuant to Sections 2.10 and 2.12 (if a demand or notice for payment of increased costs or additional amounts pursuant to any of such Sections is the basis of the proposed replacement), or (B) the Lender proposed to be replaced fails to accept such purchase offer, the Borrower (if a demand or notice for payment of increased costs or additional amounts pursuant to any of such Sections is the basis of the proposed replacement) shall not be obligated to pay to such Lender such increased costs or additional amounts incurred or accrued from and after the date of such purchase offer, and neither the failure to purchase as set forth in clause (x) of this sentence nor the failure to accept a purchase offer as set forth in clause (y) of this sentence, shall affect any rights the Borrower may have to terminate such Lender's Commitment in accordance with Section 2.14(b).

(b)     In the event that the Borrower determines to terminate a Lender's Commitment pursuant to this Section 2.14, the Borrower shall have the right to terminate such Lender's Commitment and shall give notice to such Lender of the Borrower's election to terminate (a copy of such notice to be sent to the Administrative Agent), and such termination shall become effective on the date specified in such notice (which shall be 15 days after the date of such notice, provided, that if the 15th day after the date of such notice is not a Business Day, the date specified in such notice shall be the first Business Day next succeeding such 15th day) unless such Lender withdraws its demand or notice for increased costs or additional amounts (if such a

demand or notice is the basis for the proposed termination). On the date of the termination of the Commitment of any Lender pursuant to this Section 2.14(b), the Borrower shall pay all amounts owed by the Borrower to such Lender under this Agreement payable to such Lender (including principal of and interest on the Loans owed to such Lender, and amounts specified in such Lender's notice and demand (if any) delivered pursuant to Sections 2.10 or 2.12, as the case may be, with respect to the period prior to such termination) and such Lender shall thereupon cease to be a "Lender" hereunder for all purposes and its Commitment shall be deemed terminated, except that such Lender's rights under Sections 2.10, 2.12 and 11.03 shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Lender" hereunder.

SECTION 2.15    Reimbursement of Supplemental Costs.  Upon demand by the Administrative Agent, or by (with a copy of such demand to be provided to the Administrative Agent) the Collateral Agent, or any Lender, the Borrower shall promptly pay to the Administrative Agent any and all Supplemental Costs owing hereunder; provided that, if an Account Shortfall exists at the time of such demand, the Borrower shall pay such demanded amount only upon receipt from any Borrower Obligor of amounts in respect of the Supplemental Costs related to such demanded amount.  Failure or delay on the part of the Administrative Agent, the Collateral Agent, or a Lender to demand compensation for Supplemental Costs pursuant to this Section 2.15 shall not constitute a waiver of such any such Agent's or Lender's right to demand such Supplemental Costs.

SECTION 2.16    Certificates of Lenders.    Without limitation to the requirements of Section 2.10(c), any Lender demanding or giving notice of Supplemental Costs due to such Lender under this Article II shall, as part of each demand or notice for payment required under this Article II, deliver to the Borrower (with a copy to the Administrative Agent) a certificate setting forth in reasonable detail the amount and basis of the Supplemental Costs payable to such Lender hereunder and such certificate shall be conclusive and binding on the Borrower, absent manifest error.

**ARTICLE III**
**Representations and Warranties**

The Borrower represents and warrants to the Lenders on the Effective Date that:

SECTION 3.01    Organization; Powers.  The Borrower (a) has been duly formed and is validly existing and in good standing as a corporation under the Delaware General Corporation Law with all requisite company power and authority under its Constituent Documents to execute, deliver and perform its obligations under this Agreement, each other Operative Document to which it is a party and to conduct its business as described in its Constituent Documents, and (b) is duly qualified and is authorized to do business and is in good standing in each other jurisdiction in which the conduct of its business requires it to be so qualified or authorized and where the failure to be so qualified or authorized would have a Material Adverse Effect and (c) has all requisite company power and authority to carry on its business as now conducted and as proposed to be conducted.

SECTION 3.02    Authorization; Enforceability.

(a)    The execution, delivery and performance by the Borrower of this Agreement, each other Operative Document to which it is or is to be a party, and the transactions contemplated thereby, are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action of the Borrower, and do not (i) contravene, violate, breach or constitute a default under, the Borrower's Constituent Documents, (ii) violate any law (including, without limitation, the Securities Exchange Act of 1934, as amended), rule, regulation (including, without limitation, Regulations T, U or X of the Board), order, writ, judgment, injunction, decree, determination award, license, permit or consent applicable to it or its assets, (iii) conflict with or result in the breach of, or constitute a default under, any Operative Document to which the Borrower is a party or (iv) except for the Liens created under any Loan Document to which the Borrower is a party, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of the Borrower.

(b)    This Agreement has been, and each other Operative Document to which it is a party when delivered hereunder will have been, duly executed and delivered by the Borrower. This Agreement is, and each other Operative Document to which it is a party when delivered hereunder will be, the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

SECTION 3.03    Governmental Approvals; No Conflicts.  No consent of any other Person and no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other third party is required for (a) the due execution, delivery or performance by the Borrower of this Agreement, any other Operative Document to which it is a party, or for the consummation of the transactions contemplated thereby, (b) the pledge by the Borrower of the Pledged Collateral pursuant hereto, (c) the grant by the Borrower of the Liens granted by it pursuant hereto, (d) the perfection or maintenance of the Liens created hereby (including the first priority nature thereof) or (e) the exercise by the Administrative Agent, the Collateral Agent or any Lender of its respective rights under the Operative Documents or the remedies in respect of the Pledged Collateral pursuant hereto, except (i) in each case for the filings of the Form UCC-1 financing statements referenced in Section 4.01(b)(ii), any continuation statements with respect to such filings, any other filings that may be required under Article 9 of the UCC as in effect in the relevant jurisdiction in connection with the perfection of the security interests in or with the foreclosure on, and disposition of, the Pledged Collateral, and (ii) such consents, authorizations, approvals, actions, notices, and filings as (A) have been obtained, made, taken or given, are in full force and effect and copies of which have been furnished to the Administrative Agent or (B) are not yet required to be obtained, made, taken or given under the terms of the Operative Documents to which the Borrower is a party.

SECTION 3.04    No Activity; No Subsidiaries; Business Activity.  (a) Since the date of its formation, the Borrower has not engaged in any activity, entered into any commitment or incurred any Indebtedness other than that contemplated by its Constituent Documents or by the Operative Documents.  The Borrower has no obligation to declare or pay

any Distributions on its equity (other than Distributions payable in its own equity) pursuant to any contract, instrument, agreement, statute or otherwise.

(b)     The Borrower has no Subsidiaries.

(c)     The Borrower does not own any Securities, other than the Hansen Note and Warrant.

(d)     The chief place of business and chief executive office of the Borrower are located at the address specified for the Borrower in Section 11.01.

(e)     Since the date of its formation, there has been no event with respect to the Borrower that has resulted, or that could reasonably be expected to result, in a Material Adverse Effect.

(f)     The Borrower is not a party to any contract, agreement, indenture, mortgage, deed of trust, lease, or other instrument except for the Operative Documents to which it is a party.

SECTION 3.05     Properties.  The Borrower has good title to, or other valid interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

SECTION 3.06     Litigation.  There is (i) no action, suit, litigation or proceeding pending or, to the best of the Borrower's knowledge, threatened, and (ii), to the best of the Borrower's knowledge, no investigation pending or threatened, before any court, governmental agency or arbitrator that (A) purports to affect the Borrower or, to the best knowledge of the Borrower, any of its assets or properties or (B) purports to affect the legality, validity or enforceability of this Agreement, any other Loan Document or the consummation of the transactions contemplated hereby.

SECTION 3.07     Compliance with Laws and Agreements.  The Borrower is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all Operative Documents binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.08     Investment and Holding Company Status.

(a)     The Borrower is not an "investment company", or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

(b)     The Borrower is not a "holding company" or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a

"holding company" within the meaning of the Public Utility Holding Company Act of 1935, as amended

SECTION 3.09    Taxes. The Borrower has filed, has caused to be filed or has been included in all tax returns (Federal, state, local and foreign) required to be filed by the Borrower and has paid or caused to be paid all taxes due for the periods covered thereby, including interest and penalties, other than any filings or payments the failure of which to file or pay would not result in a Material Adverse Effect.

SECTION 3.10    ERISA The Borrower has never maintained, contributed to or incurred or assumed any legal obligation with respect to any Plan, Multiemployer Plan or Welfare Plan.

SECTION 3.11    Disclosure. No report, financial statement or other written information, exhibit or report furnished by the Borrower to the Lenders or the Administrative Agent pursuant to the requirements of this Agreement or in connection with the negotiation of, or compliance with, this Agreement contained any material misstatement of fact or omitted to state a material fact necessary to make the statements contained therein not misleading.

SECTION 3.12    Pledged Collateral; Assigned Agreements. (a) All of the existing Pledged Collateral is owned legally and beneficially by the Borrower free and clear of all Liens, except for those created or permitted by the Operative Documents. This Agreement and the pledge and/or assignment of the Pledged Collateral pursuant hereto together with the Hansen Consent, the Enron Consent, the Swap Counterparty Consent, the filing of the financing statements referred to in Section 4.01(b)(ii) and the other actions, if any, taken by the Borrower in accordance with Section 9.03, create in favor of the Collateral Agent for its benefit and the benefit of the Lenders and the Administrative Agent valid and perfected security interests in and Liens on such Pledged Collateral, securing the payment of all Obligations of the Borrower purported to be secured thereby. Such security interests, to the extent perfection is governed by the UCC, are first priority.

(b)    None of the Assigned Agreements to which it is a party has been amended or otherwise modified, and each such Assigned Agreement, to the Borrower's knowledge, is in full force and effect. The Borrower is not, and to the best of its knowledge, no other party to any Assigned Agreement is, in default of its obligations under any Assigned Agreement.

## ARTICLE IV
### Conditions

SECTION 4.01    Effective Date. The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 11.02):

(a)    Since the date of the Borrower's formation, nothing shall have occurred that has resulted in a Material Adverse Effect.

(b)     The Administrative Agent shall have received the following documents, each dated as of the date of the Closing Date (other than the documents described in clauses (ii), (iii), and (v)) and duly executed by the respective party or parties thereto, and otherwise in form and substance reasonably satisfactory to the Lenders and the Administrative Agent, and (except for the documents listed in clauses (i), (ii), (iii), (iv)(D) and (v)) in the number of copies necessary to provide the Lenders and the Administrative Agent each with original counterparts of such documents plus three additional original counterparts:

(i)     A copy of each notice by the Borrower required pursuant to Section 10.02.

(ii)     Duly executed copies of proper financing statements (Form UCC-1) with the Borrower as debtor and the Collateral Agent as secured party, covering the Pledged Collateral.

(iii)     Evidence that all other actions to the extent necessary or desirable, in the reasonable judgment of the Collateral Agent, to perfect and protect the Liens created hereby have been taken and evidence that all necessary UCC financing statements have been executed and are in proper form for filing and recordation.

(iv)     An original counterpart of each of the following agreements:

(A)     the Assigned Agreements;

(B)     the Subscription Agreement;

(C)     the Subscription Payment Assumption Agreement;

(D)     the Process Agent Agreement;

(E)     the Swap Counterparty Consent; and

(F)     each other Operative Document.

(v)     A certificate issued by the appropriate Governmental Authority of the jurisdiction of incorporation, organization or formation of the Borrower, certifying that the copies of the currently effective Certificate of Incorporation of the Borrower, and all amendments thereto, are true, correct and complete (dated on, or a recent date prior to the Closing Date), and a certificate issued by the appropriate Governmental Authority that the Borrower is in good standing and has paid all franchise taxes to the date of such certificate.

(vi)     Certificate of the Borrower, signed on behalf of the Borrower by a Responsible Officer of the Borrower (the statements made

in which certificate shall be true and correct on and as of the Closing Date), certifying as to:

(A)     the absence of any amendments to the Constituent Documents of the Borrower since the date of the respective certificate referred to in Section 4.01(b)(v);

(B)     a true and correct copy of the Constituent Documents of the Borrower as in effect on the Closing Date;

(C)     the due incorporation or formation and good standing of the Borrower as a corporation, under the laws of the jurisdiction of its organization, and the absence of any proceeding for the dissolution or liquidation of such Person;

(D)     that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors, executive (or other) committee of the board of directors, managing member or manager, as applicable, of the Borrower authorizing the execution, delivery and performance of the Operative Documents to which it is or is to be a party,

(E)     in the case of the Borrower, that such resolutions have not been revoked, annulled or modified in any manner and are in full force and effect, an

(F)     in the case of the Borrower, the incumbency and specimen signature of each Responsible Officer or an authorized representative of a managing member, as applicable, of the Borrower executing the documents described in clause (D) above, and a certification of another Responsible Office of the Borrower as to the signature of the Responsible Officers signing certificates referred to in this Section 4.01(b)(vi).

(vii)     A favorable opinion of Vinson & Elkins L.L.P., counsel to the Borrower, in substantially the form of Exhibit B hereto.

(c)     All agreements related to, and the capital contributions to and legal structure of, the Borrower and Hansen shall be reasonably satisfactory to the Administrative Agent and the Required Lenders.

(d)     The Administrative Agent shall be satisfied that all conditions precedent to the making of the "Loan" under and as defined in the Hansen Credit Agreement, including without limitation, those set forth in Section 4.01 of the Hansen Credit Agreement have been or will be simultaneously satisfied or waived.

(e)     All fees and reasonable out-of-pocket costs and expenses including, without limitation, reasonable legal fees and out-of-pocket expenses payable to the Lenders, the Administrative Agent, the Swap Counterparty or the Collateral Agent, required to be paid by the

Borrower that have been invoiced and are payable on or before the Effective Date shall have been paid to the extent due.

(f)     The Administrative Agent and the Lenders shall be reasonably satisfied with all legal issues including tax and regulatory matters.

(g)     The Administrative Agent shall have received such other approvals, opinions or documents as the Administrative Agent or the Lenders may reasonably request.

(h)     On the Effective Date the following statements shall be true (and each of the giving of the Borrowing Request and the acceptance by the Borrower of the proceeds of such Loan shall constitute a representation and warranty by the Borrower that on the Effective Date such statements are true):

(i)     The representations and warranties of the Borrower contained in each Operative Document to which it is a party are correct in all material respects in each case by reference to the facts and circumstances then subsisting on and as of the Effective Date, before and immediately after giving effect to such Loan and to the application of the proceeds therefrom, as though made on and as of the Effective Date except to the extent that such representations and warranties relate solely to an earlier date (in which case such representations and warranties shall have been correct in all material respects on and as of such earlier date));

(ii)     No event has occurred and is continuing, or would result from the making of such Loan or from the application of the proceeds therefrom, that constitutes an Event of Default or a Default; and

(iii)     Such Loan is being requested to make a loan by the Borrower to Hansen pursuant to the Hansen Credit Agreement.

SECTION 4.02     Determinations Under Section 4.01.     For purposes of determining compliance with the conditions specified in Section 4.01, the Lenders at such time shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to such Lender unless a Responsible Officer of the Administrative Agent responsible for the transactions contemplated by this Agreement shall have received written notice from such Lender prior to the Effective Date, specifying its objection thereto.

**ARTICLE V**
**Affirmative Covenants**

Until the Final Debt Collection Date, the Borrower will, at all times, unless consented to in writing by the Administrative Agent and the Required Lenders:

SECTION 5.01     Reporting Requirements.     Furnish to the Administrative Agent and, in the case of subsections (a), (d), (e) and (f), the Collateral Agent:

(a)   <u>Default Notice</u>.  As soon as practicable and in any event within five days after a Responsible Officer of the Borrower obtains actual knowledge thereof, a notice setting forth details of any Default or Event of Default and the action that the Borrower has taken and proposes to take with respect thereto.

(b)   <u>Annual Reports</u>.  With respect to each calendar year, as soon as available, but not later than 120 days after the end of each calendar year, a copy of the audited balance sheet of the Borrower as at the end of such year and the related audited statement of income, stockholders' equity and cash flows for such year, setting forth in each case in comparative form the figures for the previous year, and accompanied by the opinion of PricewaterhouseCoopers LLP or of a nationally-recognized independent public accounting firm acceptable to the Administrative Agent, which opinion shall state that such financial statements present fairly the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years.

(c)   <u>Quarterly Reports</u>.  As soon as available, but not later than 60 days after the end of each of the first three calendar quarters of each calendar year, a copy of the unaudited balance sheet of the Borrower as of the end of such quarter and the unaudited related statement of income, stockholders' equity and cash flows for the period commencing on the first day and ending on the last day of such quarter, and certified by a Responsible Officer of the Borrower as fairly presenting, in accordance with GAAP (subject to ordinary, good faith year-end audit adjustments and the absence of footnotes), the financial position and the results of operations of the Borrower.

(d)   <u>Litigation</u>.  Promptly upon a Responsible Officer of the Borrower obtaining knowledge thereof, notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting the Borrower or any Loan Document or Operative Document of the type described in Section 3.06.

(e)   <u>Other Notices</u>.  Promptly upon receipt thereof, copies of any other notices, requests, reports, financial statements and other information and documents received by the Borrower under or pursuant to any other Operative Document (other than those issued or sent by the Administrative Agent, the Collateral Agent or a Lender) and, from time to time upon request by the Administrative Agent, such information and reports required under such other Operative Documents (other than those required to be delivered by the Borrower to the Administrative Agent, the Collateral Agent or a Lender) as the Administrative Agent may reasonably request in writing.

(f)   <u>Other Information</u>.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower in the possession or control of the Borrower promptly after the Administrative Agent's reasonable request in writing therefor.

SECTION 5.02   <u>Compliance with Laws, Etc</u>.  Comply with, and cause its properties to be maintained and used in accordance with, all laws, rules, regulations and orders

applicable to it or its properties, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; provided, however, the Borrower shall have received payment from any Borrower Obligor of the reasonable costs, expenses or other amounts (including reasonable attorney's fees and expenses), if any, the payment of which by the Borrower is necessary for the Borrower to comply with such laws, rules, regulations and orders.

SECTION 5.03    Payment of Taxes, Etc.  Pay and discharge before the same shall become delinquent, (a) all material taxes, assessments and governmental charges or levies imposed upon it or upon its property and (b) all lawful claims that, if unpaid, might by law become a Lien upon its property; provided, however, that the Borrower shall not be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained (in the reasonable judgment of the Borrower), unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors.

SECTION 5.04    Preservation of Existence, Etc.  Preserve and maintain its existence as a corporation, and its rights (charter and statutory) and authority.

SECTION 5.05    Inspection Rights.  Upon reasonable prior written notice, at any reasonable time during normal business hours and not more often than is reasonable under the circumstances, permit the Administrative Agent, the Collateral Agent, or any Lender or any agents or representatives thereof to examine and make copies of and abstracts from the records and books of account of the Borrower, and to discuss the affairs, finances and accounts of the Borrower with any Responsible Officer of the Borrower; provided that the Administrative Agent, the Collateral Agent and the Lenders and any such agents or representatives shall keep confidential all nonpublic information obtained pursuant to Section 11.11.  The Borrower shall assume or pay all reasonable costs and expenses associated with any such examination, discussion or copying.

SECTION 5.06    Keeping of Books.  Keep complete, proper and separate books of record and account, including a record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the operation of the business of the Borrower, all in accordance with GAAP, in each case to the extent necessary to enable the Borrower to comply with the periodic reporting requirements of this Agreement.

SECTION 5.07    Performance of Documents.  Perform and observe in all material respects all of the terms and provisions of each Operative Document to be performed or observed by it, maintain, to the extent it has the capacity to do so; provided, however, that the Borrower shall not be obligated to take any such enforcement action that, in the Borrower's reasonable judgment, may result in the Borrower incurring any non de minimis out-of-pocket expenses if, at such time, the Collateral Agent may take such enforcement action pursuant to the terms of Article IX.

SECTION 5.08    Maintenance of Licenses and Permits.  Maintain all licenses and permits necessary to own its properties and to conduct its activities in accordance with all laws, rules, regulations and orders of ay Governmental Authority applicable to the Borrower or its

properties, except for such failures as would not result in a Material Adverse Effect; provided, however, the Borrower shall have received payment from any Borrower Obligor of the reasonable costs, expenses or other amounts (including reasonable attorney's fees and expenses), if any, the payment of which by the Borrower is necessary for the Borrower to maintain such licenses and permits.

SECTION 5.09    Claims for Supplemental Costs.  Promptly after receipt of notice of or otherwise becoming aware of any Supplemental Costs or any Account Shortfall Notice in respect thereof, make demand on Hansen for payment of such Supplemental Costs (and the Borrower also agrees to take such other reasonable action as is appropriate to cause such amount to be paid in a timely manner).

Notwithstanding the foregoing, the Borrower shall have no obligations under this Article V with respect to any law, rule, regulation, order, license or permit applicable to the Borrower solely by reason of the Borrower's or its Affiliates' ownership of their respective property, unless and until, in each case, the Borrower has received notice of the applicability or otherwise has actual knowledge of such law, rule, regulation, order, license or permit.

## ARTICLE VI
## Negative Covenants

Until the Final Debt Collection Date, the Borrower will not, at any time, unless consented to in writing by the Administrative Agent and the Required Lenders:

SECTION 6.01    Liens, Etc.  Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties of any character (including, without limitation, the Pledged Collateral) whether now owned or hereafter acquired, or sign or file, under the UCC of any jurisdiction, a financing statement that names the Borrower as debtor, excluding, however, from the operation of the foregoing restrictions the following (such exclusions collectively being "Permitted Liens"):  (a) bankers' rights of set-off for uncollected items and routine fees and expenses arising in the ordinary course of business, (b) Liens for taxes and other governmental charges and assessments (and other Liens imposed by law) not yet delinquent or being contested in good faith and by proper proceedings and as to which appropriate reserves (in the reasonable judgment of the Borrower) are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors, (c) restrictions on transfers of Securities under applicable laws, (d) restrictions on the transfer or assignment of rights under the terms of the Assigned Agreements, (e) any rights of set-off expressly provided for in the Assigned Agreements, and (f) Liens created by or permitted under any Operative Document.

SECTION 6.02    Indebtedness.  Create, incur, assume or suffer to exist, any Indebtedness other than (a) Indebtedness arising under the Operative Documents or the Chase Loan, or (b) immaterial Indebtedness incurred in connection with the maintenance of the existence of the Borrower and in the ordinary course of its activities permitted under this Agreement.

SECTION 6.03    Mergers, Etc. Enter into any transaction of consolidation or merger with or into any other Person or wind up, liquidate or dissolve its affairs.

SECTION 6.04    Sales, Etc., of Assets. Enter into any partnership, joint venture or sale-leaseback transaction, or purchase or otherwise acquire (in one or a series of related transactions) all or any portion of the property of any Person or sell, lease, transfer, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, directly or indirectly (or agree to any of the foregoing at any future time), all or any material portion of its property (including, without limitation, the Pledged Collateral) except (a) Permitted Investments in the ordinary course of business, and (b) as permitted under any other provision of the Operative Documents.

SECTION 6.05    Investments in Other Persons. Make or hold any Investment in any Person except for (a) Permitted Investments made in accordance with Section 10.03, (b) the Hansen Note, and (c) the Warrant (and the ownership of shares upon exercise of such Warrants).

SECTION 6.06    Amendment, Etc., of Operative Documents. Cancel or terminate any Operative Document or consent to or accept any cancellation or termination thereof, amend, modify or change in any manner any term or condition of any Operative Document or its Constituent Documents or give any consent, waiver or approval thereunder, waive any default under or any breach of any term or condition of any Operative Document, or agree in any manner to any other amendment, modification or change of any term or condition of any Operative Document, other than (i) any amendment, supplement, cancellation, termination, consent, approval, waiver or modification consented to or waived in connection with Sections 9.09(e) or 11.02 hereof or (ii) any such amendment, supplement, consent, approval, change, waiver or modification that is ministerial or immaterial or non-substantive in nature, not adverse to the Lenders and has been consented to by the Administrative Agent and Enron.

SECTION 6.07    Negative Pledge. Enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets other than (a) any such agreement in favor of the Collateral Agent, the Administrative Agent and the Lenders and (b) as permitted by any Operative Document.

SECTION 6.08    Subsidiaries. Establish, create, acquire or permit to exist any Subsidiary.

SECTION 6.09    Nature of Activities. Engage in any activity other than the management and protection of its rights under the Operative Documents to which it is a party and such other activities as are incidentally related thereto or as otherwise required or expressly contemplated in the Operative Documents to which it is a party or the Chase Loan.

SECTION 6.10    Distributions. Declare or pay any Distributions.

SECTION 6.11     <u>Affiliate Transactions</u>.  Enter into any transaction or series of related transactions, with any of its Affiliates or Enron or any of its Affiliates, other than the transactions contemplated by the Operative Documents to which it is a party or the Chase Loan.

SECTION 6.12     <u>ERISA</u>.  Adopt, maintain, contribute to or incur or assume any legal obligation with respect to any Plan, Multiemployer Plan or Welfare Plan.

Anything herein to the contrary notwithstanding, the parties hereto agree that the execution, delivery and performance of the Operative Documents will not contravene the provisions of this Article VI.

## ARTICLE VII
## <u>Events of Default</u>

If any of the following events ("<u>Events of Default</u>") shall occur:

(a)     the Borrower shall fail to pay (i) any principal on the Loans when the same becomes due and payable, (ii) any interest on the Loans for more than five days after the same becomes due and payable, or (iii) any other amount payable by it under this Agreement or under any other Loan Document for more than 15 days after the same becomes due and payable;

(b)     any written representation or warranty made or deemed made by the Borrower under or in connection with any Loan Document or any other certificate or report made by or on behalf of the Borrower hereunder shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing;

(c)     the Borrower shall fail to perform or observe any term, covenant or agreement contained herein (other than obligations governed by Section (a) of this Article VII) after notice from the Administrative Agent or any Lender that any such failure shall constitute an Event of Default if such failure shall remain unremedied for fifteen days after written notice thereof shall have been given to the Borrower by the Administrative Agent or any Lender;

(d)     the Borrower shall fail to perform any other term, covenant or agreement contained in any other Loan Document on its part to be performed or observed if such failure shall remain unremedied for 30 days after written notice thereof shall have been given to the Borrower by the Administrative Agent or any Lender;

(e)     the Borrower shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of 60 days or any of the actions sought in such

proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property) shall occur; or the Borrower shall take any action to authorize any of the actions set forth above in this subsection (e);

(f)     any judgment or order for the payment of money in excess of $50,000 (or the equivalent in any foreign currency) shall be rendered against the Borrower and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order and such proceedings shall not have been stayed within 30 days or (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(g)     any material provision of any Assigned Agreement after delivery thereof pursuant to Section 4.01 shall for any reason, except to the extent permitted by the terms thereof, cease, in any material respect, to be valid and binding on or enforceable against the Borrower;

(h)     the Collateral Agent shall, at any time after the date of the making of the Loan, not have a valid and perfected first priority security interest in the Pledged Collateral (other than as a result of the action or inaction of the Collateral Agent or as a result of Permitted Liens);

(i)     the Borrower shall for any reason dissolve or its directors or its stockholder(s) shall have consented to the dissolution of the Borrower;

(j)     an Enron Event shall have occurred and be continuing or any "Event of Default" under the Hansen Credit Agreement shall have occurred and be continuing; or

(k)     Chase (or an Affiliate of Chase) shall cease to hold all of the issued and outstanding capital stock of the Borrower;

then, and in every such event (other than an event with respect to the Borrower described in clause (e) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (e) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. The Administrative Agent, the Collateral Agent and the Lenders shall have, in addition to all other rights and remedies under this Agreement or otherwise, all other rights and remedies provided under the UCC of each applicable jurisdiction and other applicable laws, which rights shall be cumulative.

# ARTICLE VIII
## The Administrative Agent; The Collateral Agent

Each of the Lenders hereby irrevocably appoints Chase as Administrative Agent and Collateral Agent and authorizes the Administrative Agent and the Collateral Agent, respectively, to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Administrative Agent or Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent or the Collateral Agent, as applicable, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or other Affiliate thereof as if it were not the Administrative Agent or the Collateral Agent, as applicable.

Neither the Administrative Agent nor the Collateral Agent shall have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) neither the Administrative Agent nor the Collateral Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither the Administrative Agent nor the Collateral Agent shall have any duty to take any discretionary action or exercise discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent or the Collateral Agent, as applicable, is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.09(e) or 11.02), and (c) except as expressly set forth herein, neither the Administrative Agent nor the Collateral Agent shall have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower that is communicated to or obtained by the bank serving as Administrative Agent or Collateral Agent or any of its Affiliates in any capacity. Neither the Administrative Agent nor the Collateral Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.09(e) or 11.02) or in the absence of its own gross negligence or wilful misconduct. Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent or the Collateral Agent, as applicable, by the Borrower or a Lender, and neither the Administrative Agent nor the Collateral Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Each of the Administrative Agent and the Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each of the Administrative Agent and the Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. Each of the Administrative Agent and the Collateral Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each of the Administrative Agent and the Collateral Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent or the Collateral Agent, as applicable. The Administrative Agent, the Collateral Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent, the Collateral Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent or the Collateral Agent, as applicable.

Subject to the appointment and acceptance of a successor Administrative Agent or Collateral Agent as provided in this paragraph, each of the Administrative Agent and the Collateral Agent may resign at any time by giving 15 Business Days' prior written notice to the Lenders the Borrower and Enron. Such resignation shall be effective upon the appointment of a successor Administrative Agent or Collateral Agent, as applicable, as provided below. Upon any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor which successor shall be a commercial bank or trust company reasonably acceptable to the Borrower and Enron. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within such 15 Business Day period, then the retiring Administrative Agent or retiring Collateral Agent, as applicable with the consent of the Borrower and Enron (which consent may not be unreasonably withheld), may, on behalf of the Lenders, appoint a successor Administrative Agent or Collateral Agent, in each case which agent shall be a Lender with an office in New York, New York, or an Affiliate of any such Lender, who shall serve as the Administrative Agent or Collateral Agent, as applicable, until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent, as applicable, as provided above. Upon the acceptance of its appointment as Administrative Agent or Collateral Agent, as applicable, hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring agent, and the retiring agent shall be discharged from its duties and obligations hereunder. The annual fees payable by the Borrower to a successor Administrative Agent or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's or Collateral Agent's resignation hereunder, the provisions of this Article and Section 11.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in

respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent or Collateral Agent, as applicable.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

None of the Lenders identified on the cover page or signature pages or in the preamble of this Agreement as a "co-arranger," "syndication agent" or "co-documentation agent" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such. Without limiting the foregoing, none of the Lenders so identified as a "co-arranger," "syndication agent" or "co-documentation agent" shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

## ARTICLE IX
## Grant of Security Interest, Pledge and Assignment

SECTION 9.01     Pledge and Assignment.    The Borrower hereby irrevocably pledges, transfers and assigns to the Collateral Agent for its benefit and the benefit of the Lenders, the Swap Counterparty and the Administrative Agent, and grants to the Collateral Agent for its benefit and the benefit of the Lenders, the Swap Counterparty and the Administrative Agent, a security interest in, all right, title and interest of the Borrower (whether now owned or hereafter acquired) in, to and under the following (collectively, the "Pledged Collateral"):

(a)     the Hansen Credit Agreement, the Hansen Note, the Enron Agreement, the Warrant Agreement, the Put Option Agreement, the Total Return Swap Agreement, and the Interest Rate Swap Agreement (collectively, the "Assigned Agreements"), including, without limitation, whether now existing or hereafter acquired or arising, (i) all rights of the Borrower to receive monies and other property due and to become due to the Borrower under or pursuant to any of the Assigned Agreements, (ii) all claims of the Borrower for damages arising out of or for breach of or default under the Assigned Agreements, (iii) all rights of the Borrower to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Assigned Agreements, (iv) all rights of the Borrower to perform thereunder and to compel performance and otherwise exercise all rights and/or remedies thereunder (including, without limitation, the right to request that any action be taken by Hansen under the Hansen Credit Agreement and the right to deliver a Hansen Acceleration Notice) and (v) all general intangibles related thereto;

(b)     the Operating Account and all funds held therein, and all interest, dividends, cash, instruments and other property from time to time received, receivable or

otherwise distributed in respect of or in exchange for any or all funds from time to time in the Operating Account;

(c)     all Permitted Investments from time to time in the Operating Account and all certificates and instruments, if any, from time to time representing or evidencing the Permitted Investments, and all interest, earnings and proceeds in respect thereof;

(d)     all promissory notes issued to or held by the Borrower and other instruments whether now owned or hereafter acquired by the Borrower, including the Warrant (collectively, the "Securities");

(e)     all other personal property of the Borrower (other than the Flagstaff Account, amounts on deposit therein and proceeds thereof which account, amounts and proceeds shall not constitute and are expressly excluded from the Pledged Collateral), whether now owned or existing or hereafter acquired or arising, or in which the Borrower may have an interest, and wheresoever located, whether or not of a type that may be subjected to a security interest under the UCC; and

(f)     to the extent not covered by clauses (a) through (e) above, all proceeds of any or all of the foregoing.

Notwithstanding the foregoing or anything to the contrary contained in this Agreement, any and all Excluded Payments (and all rights and remedies with respect thereto) are hereby expressly excluded from the Pledged Collateral, no security interest is granted therein and the Collateral Agent agrees to transfer promptly (whether or not (i) the provisions of Section 10.04(d) are then applicable or (ii) a Default or an Event of Default shall have occurred and be continuing) to the Flagstaff Account an amount (including from funds in the Operating Account) equal to any and all Excluded Payments received by it under the Hansen Credit Agreement or Enron Documents, as instructed by the Administrative Agent.

SECTION 9.02     Security for Obligations.  The Pledged Collateral secures the payment of all Obligations of the Borrower now or hereafter existing or incurred under, arising out of or in connection with this Agreement, whether for principal, interest, fees, expenses, indemnities or otherwise (all such obligations of the Borrower being the "Secured Obligations").

SECTION 9.03     Delivery of Pledged Collateral.

(a)     All instruments and certificates representing or evidencing the Pledged Collateral shall be delivered to and held by or on behalf of the Collateral Agent on behalf of itself, the Administrative Agent, the Swap Counterparty and the Lenders pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank and undated, all in form and substance reasonably satisfactory to the Collateral Agent.

(b)     The Collateral Agent shall have the right, at any time in its reasonable discretion after the occurrence and during the continuance of an Event of Default and without notice to the Borrower, to transfer to or to register in the name of the Collateral Agent or any of

its nominees any or all of such Pledged Collateral, subject to the rights specified in Section 9.01(a). Promptly after any such transfer or registration, the Collateral Agent shall give notice thereof to the Borrower, but the failure to give such notice shall not affect any of the rights or remedies of the Collateral Agent hereunder. The Collateral Agent shall have the right at any time to exchange instruments or certificates representing or evidencing such Pledged Collateral for instruments or certificates of smaller or larger denominations, subject to the terms thereof.

SECTION 9.04    Borrower Remains Liable.  Anything herein to the contrary notwithstanding, (a) the Borrower shall remain liable under the Assigned Agreements to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Collateral Agent of any of the rights hereunder shall not release the Borrower from any of its duties or obligations under the Assigned Agreements, and (c) neither the Collateral Agent nor the Administrative Agent nor any of the Lenders shall have any obligation or liability under the Assigned Agreements by reason of this Agreement, nor shall any such Person be obligated to perform any of the obligations or duties of the Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder, except as otherwise provided in Section 9.08 hereof.

SECTION 9.05    Further Assurances.

(a)    The Borrower agrees that at any time and from time to time, at the expense of the Borrower, the Borrower will promptly execute and deliver all further instruments and documents, and take all further action that the Collateral Agent may reasonably request, in order to perfect and protect any assignment and security interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral. Without limiting the generality of the foregoing, the Borrower will upon the reasonable request of the Collateral Agent, (i) execute and deliver to the Collateral Agent such financing or continuation statements or amendments thereto, and such other instruments or notices, as may be reasonably necessary, or as the Collateral Agent may reasonably request, in order to perfect and preserve the security interests granted or purported to be granted hereby and (ii) deliver to the Collateral Agent promptly upon receipt thereof all instruments representing or evidencing any of the Pledged Collateral duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to the Collateral Agent.

(b)    The Borrower hereby authorizes the Collateral Agent to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Pledged Collateral without the signature of the Borrower where permitted by law.

(c)    The Borrower will not, without the prior written consent of the Collateral Agent (after having given the Collateral Agent not less than 30 days' prior written notice thereof and after having executed and delivered to the Collateral Agent such further instruments and documents in connection therewith as may be requested by the Collateral Agent pursuant to this Section 9.05) change its name, move or transfer from the location specified in Section 11.01 hereof (or any subsequent location) its principal place of business or chief executive office, or the location of the Borrower's books and records with respect to the Pledged Collateral.

SECTION 9.06     Collateral Agent Appointed Attorney-in-Fact.     The Borrower hereby irrevocably appoints the Collateral Agent as the Borrower's attorney-in-fact, with full authority in the place and stead of the Borrower and in the name of the Borrower or otherwise, upon the occurrence and during the continuance of an Event of Default, to take any action and to execute any instrument that the Collateral Agent, in its reasonable judgment, deems necessary or appropriate to accomplish the purposes of this Agreement, including, without limitation, to make demand on Hansen, Enron, the Swap Counterparty or any other Borrower Obligor all amounts due under each Assigned Agreement to which the Borrower is a party, to receive, endorse and collect all instruments made payable to the Borrower representing any payment or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same, and to file any claims or take any action or institute any proceedings that the Collateral Agent, in its reasonable judgment, may deem necessary for the collection of any of the Pledged Collateral or otherwise to enforce compliance with the terms and conditions of each Assigned Agreement or the rights of the Collateral Agent with respect to any of the Pledged Collateral.

SECTION 9.07     Collateral Agent May Perform.     If the Borrower fails to perform any agreement contained herein after being requested in writing so to perform (it being understood that no such request need be given after the occurrence and continuance of an Event of Default, the Collateral Agent may itself perform, or cause performance of, such agreement, and the expenses of the Collateral Agent incurred in connection therewith shall be payable by the Borrower under Section 11.03. The Collateral Agent agrees to provide notice to the Borrower of any action taken hereunder, provided that the failure to give such notice shall not affect the validity of such action.

SECTION 9.08     Reasonable Care.     The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Pledged Collateral and shall not impose any duty upon it to exercise any such powers. The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if the Pledged Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property, it being understood that none of the Collateral Agent, the Administrative Agent or the Lenders shall have any responsibility for taking any necessary steps to preserve rights against any parties with respect to any Pledged Collateral other than, with respect to the Administrative Agent and the Collateral Agent, (a) the safe custody of any Pledged Collateral in its possession, (b) the filing of continuation statements on Form UCC-3 or UCC-4, as applicable, in each jurisdiction, and with the filing offices, in which financing statements on Form UCC-1 are filed as contemplated by Section 4.01(b)(ii), in each case within six months prior to the fifth anniversary of the filing of any such Form UCC-1 statements, (c) the accounting for monies actually received by it hereunder and (d) the application of monies in accordance with this Agreement.

SECTION 9.09     Rights, Remedies and Obligations.

(a)     The Borrower agrees, and has irrevocably instructed each other party to each of the Assigned Agreements to which it is a party that all payments due or to become due to

the Borrower under or in connection with such Assigned Agreement (other than Excluded Payments) shall be made directly to the Operating Account.

(b)     All payments received by the Borrower under or in connection with the Assigned Agreements contrary to the provisions of this Agreement shall be received in trust for the benefit of the Collateral Agent on behalf of itself, the Lenders, the Swap Counterparty and the Administrative Agent in accordance with their respective interests therein, shall be segregated from other funds of the Borrower, and shall forthwith be paid over to the Collateral Agent in the same form as so received (with any necessary endorsement).

(c)     The Collateral Agent shall have the exclusive right (other than with respect to the instructions to be provided by the Administrative Agent regarding the amount and disposition of Excluded Payments received in the Operating Account and otherwise with respect to Excluded Payments) to direct the disbursement or other disposition, pursuant to the terms hereof, of funds deposited to or otherwise held in the Operating Account from time to time.

(d)     The Borrower agrees that it will not, without the prior written consent of the Collateral Agent, the Administrative Agent and the Required Lenders, file or join in the filing of a petition for the commencement of proceedings under the federal bankruptcy laws with respect to Hansen or the Borrower.

(e)     Without the prior written consent of the Required Lenders, of the Collateral Agent, the Administrative Agent, the Borrower shall not (i) terminate any Assigned Agreement or consent to or accept any cancellation or termination thereof, (ii) waive any condition precedent, default under or breach of any Assigned Agreement, (iii) subject the Borrower to any additional obligations under the Hansen Credit Agreement, (iv) consent to reduce the obligations of Hansen under the Hansen Credit Agreement, other than as expressly provided for in the Operative Documents, (v) release Enron from, or consent to the assignment by Enron of obligations under, any of the Enron Documents, or reduce any of Enron's obligations thereunder, or (vi) otherwise impair in any material respect the value, interest or rights of the Borrower in the Pledged Collateral.

(f)     Subject to the provisions of this Agreement (including Section 9.09(e)), regardless of whether any Event of Default shall have occurred and be continuing, the Borrower shall retain, together with the Collateral Agent, all rights of the Borrower under the Operative Documents to grant any consent, waiver, approval or extension thereunder or take any other discretionary action thereunder, including without limitation with respect to any action required by Hansen under the Hansen Credit Agreement; provided that in the event that the Collateral Agent takes any such action with respect to the Hansen Credit Agreement, the Borrower shall not be entitled to take any such action contrary to the Collateral Agent's action.

SECTION 9.10     Remedies upon an Event of Default.     If any Event of Default shall have occurred and be continuing:

(a)     The Collateral Agent may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights

and remedies of a secured party under the UCC in effect in the State of New York at that time (whether or not the UCC applies to the Pledged Collateral at issue) to the fullest extent permitted under applicable law, and the Collateral Agent may also, without notice to the extent permitted by law except as specified below, sell the Pledged Collateral or any part thereof in one or more parcels at public or private sale, or at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Collateral Agent may deem commercially reasonable in accordance with applicable laws; provided, however, that the Collateral Agent will accept a deed in lieu of foreclosure with respect to all of the Pledged Collateral (and expressly excluding any Excluded Payments) if requested by the Borrower. The Borrower agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Collateral Agent shall not be obligated to make any sale of Pledged Collateral or any part thereof regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     Any cash held by the Collateral Agent as Pledged Collateral and all cash proceeds received by the Collateral Agent in respect of any sale of, collection from, or other realization upon, all or any part of the Pledged Collateral shall be paid promptly after receipt thereof (and after payment of any amounts payable to the Collateral Agent pursuant to Section 11.03 hereof) in whole or in part by the Collateral Agent pursuant to Section 10.04(b).

(c)     Subject to the other provisions of this Agreement, all rights of the Borrower to deliver any notices under or exercise any voting rights or other discretionary or consensual rights under any Assigned Agreement or to deliver instructions with respect to the investment of amounts held in the Operating Account that it would otherwise be entitled to exercise shall cease, and all such rights shall thereupon become vested in the Collateral Agent who shall thereupon have the sole right to exercise such voting and other consensual rights and to direct such investments until such time as the Secured Obligations have been paid in full; provided that upon the occurrence of a Hansen Event of Default and prior to foreclosure on the Pledged Collateral pursuant to this Section 9.10, the Borrower shall continue to be entitled to give a Hansen Acceleration Notice as provided in Article VII of the Hansen Credit Agreement, in the manner and with the effect provided therein and to enforce the Operative Documents. Notwithstanding the foregoing provisions, unless and until an Event of Default shall have occurred and be continuing, the Borrower may perform its obligations under the Assigned Agreements and may take any other actions in respect of such Assigned Agreements in any lawful manner not inconsistent with the provisions of this Agreement or any Assigned Agreement.

SECTION 9.11     Continuing Assignment and Security Interest; Transfer of Loan.  This Agreement shall create a continuing security interest in the Pledged Collateral and shall (a) remain in full force and effect until the payment in full of the Secured Obligations on the Final Debt Collection Date, (b) be binding upon the Borrower and its successors and assigns, and (c) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent, the Administrative Agent, the Swap Counterparty and the Lenders and their respective successors, transferees and assigns.  Without limiting the generality of the

foregoing clause (iii), any Lender may assign any of its interest in its Loan to any other Person to the extent permitted by Article X, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Lender herein or otherwise. Upon the payment in full of the Secured Obligations on the Final Debt Collection Date, the Borrower shall be entitled to the return, upon its request and at its expense, of such of the Pledged Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof and the Collateral Agent will execute and deliver such instruments, including UCC termination statements, as the Borrower may reasonably request to confirm the release and discharge of the Lien hereunder. In connection with the Put Assignment (as defined in the Put Option Agreement), the Collateral Agent is hereby authorized (without further consent of the Lenders) to release Liens on the Warrant and the Warrant Rights (as defined in the Put Option Agreement) upon receipt of the Purchase Price (as defined in the Put Option Agreement).

## ARTICLE X
### Administration; Settlement; Collection

SECTION 10.01    Maintaining the Operating Account. Until the payment in full of the Secured Obligations:

(a)    The Borrower will establish and maintain the Operating Account only with Chase, subject to the dominion and control of the Collateral Agent.

(b)    It shall be a term and condition of the Operating Account, that notwithstanding any provision to the contrary in any other agreement relating to the Operating Account, (i) the Operating Account shall be subject to the dominion and control of the Collateral Agent and (ii) all amounts (including interest on Permitted Investments held in the Operating Account) to be paid or released from the Operating Account to or for the account of, or withdrawn by or for the account of, the Borrower or any other Person shall be paid, released or withdrawn in accordance with Section 9.01 or 10.04 hereof concerning transfers and payments or in Section 9.10 concerning payments after an Event of Default has occurred and is continuing. The Operating Account shall be subject to applicable laws, and applicable regulations of any competent banking or governmental authority, as may now or hereafter be in effect.

SECTION 10.02    Deposit of Funds into the Operating Account.

(a)    On or prior to the date hereof, the Borrower shall give to Hansen, Enron and the Swap Counterparty written notice (such notice to be in form and substance satisfactory to the Collateral Agent) irrevocably instructing Hansen, Enron and the Swap Counterparty that all payments due from any such Person to the Borrower (other than Excluded Payments) shall be deposited directly into the Operating Account. A written notice actually provided by the Borrower to Hansen, Enron, and the Swap Counterparty will constitute compliance with this Section 10.02(a) by the Borrower.

(b)    The Borrower shall promptly notify the Collateral Agent and the Administrative Agent (if other than the Collateral Agent) of any such deposit made pursuant to this Section 10.02 and to provide to the Collateral Agent and the Administrative Agent (if other

than the Collateral Agent) quarterly reports of holdings and transactions in the Operating Account.

SECTION 10.03    Investing of Amounts in the Operating Account.    If requested by the Borrower, the Collateral Agent shall, subject to the provisions set forth in Section 10.04 concerning transfers and payments and in Section 9.10 concerning Events of Default, from time to time (a) invest amounts on deposit in the Operating Account in such Cash Equivalents in the name of the Collateral Agent or as to which all actions required by Section 9.05 shall have been taken as the Borrower may select pursuant to written instructions received from time to time from a Responsible Officer of the Borrower or other Person designated in writing by the Borrower or, in the absence of such direction, in accordance with its customary practice, and (b) to the extent practicable, to invest interest and other earnings paid on the Cash Equivalents referred to in clause (a) above, and reinvest other proceeds of any such Cash Equivalents, in each case in such Cash Equivalents in the name of the Collateral Agent or as to which all actions required by Section 9.05 shall have been taken as the Borrower may select pursuant to written instructions received from time to time from a Responsible Officer of the Borrower or other Person designated in writing by the Borrower (the Cash Equivalents referred to in clauses (a) and (b) above being the "Permitted Investments"); provided, however, that the Collateral Agent may liquidate any Permitted Investment prior to its maturity if the proceeds of such liquidation or conversion are necessary for any payment required to be made by the Collateral Agent in accordance with the provisions of Section 10.04 or 9.10 hereof. Interest and proceeds that are not invested or reinvested as provided above shall be deposited and held in the Operating Account. The Collateral Agent shall, to the extent reasonably practicable, dispose of investments in the Operating Account in a manner to minimize any loss on such investments, but in no event shall the Collateral Agent be liable for any losses incurred as the result of any sale or disposition of Permitted Investments, and the Borrower hereby releases the Collateral Agent from any liability arising out of, or in connection with, any investment or liquidation or conversion made by it hereunder, except where such liability arises from the Collateral Agent's gross negligence or willful misconduct.    The Borrower hereby acknowledges that the Collateral Agent has full dominion and control of the Operating Account.

SECTION 10.04    Transfers from the Accounts.

(a)    Transfers in Respect of Periodic Payments from the Operating Account. To the extent funds are available in the Operating Account and subject to clause (b) and (d) below, the Collateral Agent shall (i) on each Payment Date (or, to the extent such funds are not available on such date, as soon as practicable on any Business Day thereafter to the extent funds are then available) and (ii) from time to time as necessary, transfer and pay to the parties or accounts specified below the amounts indicated below from funds then held in the Operating Account, such transfers and payments to be made free and clear of any Lien hereunder:

(1)    First, to the Administrative Agent, an amount equal to those Supplemental Costs that are then due and payable to the Administrative Agent, the Collateral Agent and the Lenders, respectively, for their ratable account in accordance with their respective interests therein; provided that, if an Account Shortfall would exist at the time of such payment, such Supplemental Costs shall

be due and payable by the Borrower only upon receipt from any Borrower Obligor of amounts in respect of Supplemental Costs related thereto;

(2)  <u>Second</u>, to the Administrative Agent for the ratable account of the following Persons, in accordance with their respective interests therein: (A) for the account of the Swap Counterparty, the amount, if any, due and owing to the Swap Counterparty pursuant to the Interest Rate Swap Agreement, and (B) for the account of the Lenders, the amount equal to the aggregate amount of accrued and unpaid interest then due and payable hereunder;

(3)  <u>Third</u>, to the Administrative Agent for the account of the Lenders, in accordance with their Applicable Percentages, that portion of the outstanding principal amount of the Loan due and payable pursuant to Section 2.05(a);

(4)  <u>Fourth</u>, to the Administrative Agent for the account of the Lenders, in accordance with their Applicable Percentages, that portion of the outstanding principal amount of the Loan due and payable as a prepayment pursuant to Section 2.06(a) or Section 2.06(b)(i); and

(5)  <u>Fifth</u>, to the Borrower, the balance of such funds for deposit into the Flagstaff Account.

(b)  <u>Transfers from the Operating Accounts in Respect of Application of Proceeds of Pledged Collateral Pursuant to Section 9.10(b)</u>.  Subject to Section 10.04(d) hereof, upon receipt by the Collateral Agent of any proceeds of Pledged Collateral upon and after the exercise of remedies pursuant to Section 9.10(b), the Collateral Agent shall transfer and pay, promptly upon receipt thereof, to the parties specified below the amounts indicated below for such parties, solely from, and to the extent of, such funds received, such transfers and payments to be made free and clear of any Lien hereunder:

(1)  <u>First</u>, to the Administrative Agent, an amount equal to those Supplemental Costs of that are then due and payable to the Administrative Agent, the Collateral Agent and the Lenders, respectively, for their ratable account in accordance with their respective interests therein;

(2)  <u>Second</u>, to the Administrative Agent for the ratable account of the following Persons, in accordance with their respective interests therein: (A) for the account of the Swap Counterparty, the amount, if any, due and owing to the Swap Counterparty pursuant to the Interest Rate Swap Agreement, and (B) for the account of the Lenders, the amount equal to the aggregate amount of accrued and unpaid interest then due and payable hereunder;

(3)  <u>Third</u>, to the Administrative Agent for the account of the Lenders in accordance with their Applicable Percentages, an amount equal to the lesser of (x) the balance of such funds and (y) the aggregate outstanding principal amount of the Loan; and

(4)    Fourth, to the Borrower, the balance, if any, of such funds for deposit into the Flagstaff Account.

(c)    Conflicting Requests Regarding Transfers from the Operating Account.  In the event that the Collateral Agent receives a request from more than one party to direct the transfer of amounts from the Operating Account pursuant to this Section 10.04, the Collateral Agent shall (subject to Article VIII) transfer amounts set forth in Section 10.04(a) and Section 10.04(b), as applicable in the order and priority set forth in Section 10.04(a) and Section 10.04(b), as applicable.

(d)    General Provisions Applicable to All Transfers.  (i)  If at any time the amount of funds on deposit in the Operating Account is insufficient to make a payment in respect of Supplemental Costs then due and payable in full, there shall exist an "Account Shortfall" equal to the amount of such shortfall in such requested payment.

(ii)    In the event of an Account Shortfall the Collateral Agent shall, within one Business Day of its determination of such Account Shortfall, give notice (an "Account Shortfall Notice") to each Lender, the Borrower and the Administrative Agent specifying the amount and nature of such Account Shortfall and setting out the amount specified or requested.

(iii)    Upon the Collateral Agent's receipt of a notice from the Administrative Agent or any Lender in respect of Supplemental Costs then due and payable, or its own determination of an amount then due and payable to it, the Collateral Agent shall, within one Business Day of receipt of such notice from the Administrative Agent, any Lender, or its own determination, as the case may be, provide copies of such notices or notice of such determination, as the case may be, to the Borrower, Enron, and if applicable, the Administrative Agent.  In the case of the Collateral Agent's, the Administrative Agent's or any Lender's determination of an amount then due and payable to it, the notice of such determination shall set forth in reasonable detail the basis therefor and such notice shall be conclusive absent manifest error.

Notwithstanding anything to the contrary set forth in this Section 10.04 at any time any Responsible Officer of the Collateral Agent has or obtains actual knowledge (whether as a result of notice or otherwise) of (1) the occurrence and continuance of an Event of Default under Article VII or (2) the acceleration of the maturity of the Loan pursuant to Article VII and until such time as the Collateral Agent receives notice from the Administrative Agent that such Event of Default no longer continues or that such acceleration has been rescinded, the Collateral Agent shall apply funds held in the Operating Accounts pursuant to Section 9.10(b) hereof, as directed by the Administrative Agent; provided, however, that upon the occurrence and during the continuance of any Event of Default other than of any type set forth in clause (a) of Article VII, the Collateral Agent shall continue to direct the transfer of funds from the Operating Account in accordance with the other provisions of this Section 10.04 (including transfers to the Flagstaff

Account), if and so long as at the time of, and after giving effect to, such transfer no Event of Default shall have occurred and be continuing, or would occur, under clause (a) of Article VII. The Administrative Agent shall promptly notify the Collateral Agent if any Event of Default ceases to exist or is waived.

## ARTICLE XI
### Miscellaneous

SECTION 11.01    Notices.    Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing (including telecopier communication) and shall be delivered by hand or overnight courier service, mailed or sent by telecopy, as follows:

(a)    if to the Borrower, to it at its address at Flagstaff Capital Corporation, 270 Park Avenue, 35th Floor, New York, New York 10017, Attention: Lisa Lee, facsimile no. (212) 270-2676; with copies to The Chase Manhattan Bank, 1 Chase Manhattan Plaza, 8th Floor, New York, New York, 10081, facsimile no. (212) 552-2261 Attention: Mr. Muniram Appanna; with copies to Enron Corp., 1400 Smith Street, Houston, Texas 77002, Attention: Deputy Treasurer, Corporate Finance, facsimile no. (713) 646-3422;

(b)    if to the Administrative Agent, at The Chase Manhattan Bank, 1 Chase Manhattan Plaza, 8th Floor, New York, New York, 10081, facsimile no. (212) 552-2261. Attention: Mr. Muniram Appanna;

(c)    if to the Collateral Agent, The Chase Manhattan Bank, Capital Markets Fiduciary Services, 450 West 33rd Street, 15th Floor, New York, New York 10001-2697, Attention: Valerie Dunbar, phone no. (212) 946-3007, facsimile no. (212) 946-8177 or 8178;

(d)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by written notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be effective, if mailed, two Business Days after deposit in the mails; if sent by overnight courier, one Business Day after delivery to the courier company; and if sent by telecopier, when received by the receiving telecopier equipment respectively.

SECTION 11.02    Waivers; Amendments.    (a) No failure or delay by the Administrative Agent, the Collateral Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have under applicable law. No amendment or waiver of any provision of this Agreement or consent to

any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. Without limiting the generality of the foregoing, the making of the Loans shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, the Collateral Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2.13(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, or (v) change any of the provisions of this Section 11.02, Section 9.09(e) or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender; provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder without the prior written consent of the Administrative Agent or the Collateral Agent, as the case may be.

SECTION 11.03     Expenses; Indemnity; Damage Waiver.  (a) The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and their respective Affiliates, including the reasonable fees and out-of-pocket expenses of counsel for the Administrative Agent and for the Collateral Agent, in connection with the syndication of the credit facilities provided for herein and in the other Operative Documents, the preparation and administration of this Agreement and the other Operative Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or any Lender, including the reasonable fees and out-of-pocket expenses of any counsel for the Administrative Agent, the Collateral Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this (A) Agreement, including its rights under this Section 11.03, or in connection with the Loans made hereunder or in connection with any Loan Document, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans and (B) the preservation of, or the sale (other than any registration under the securities laws with respect thereto) of, collection from, or other realization upon, any of the Pledged Collateral.

(b)     The Borrower shall, to the extent permitted by law and subject to the last two sentences of this Section 11.03(b), indemnify the Administrative Agent, the Collateral Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees and out-of-pocket expenses of any counsel for any Indemnitee (excluding taxes which are dealt with in Section 2.12), incurred by or asserted against any Indemnitee (other than by another Indemnitee) arising out of, in connection with, or as a result of any investigation, litigation, or proceeding, whether or not such Indemnitee is a party thereto, arising out of, related to or in connection with (i) the execution or delivery of this Agreement, any other Loan Document the Operative Documents, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions, or (ii) any Loan or the use of the proceeds therefrom, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence, willful misconduct, bad faith of, or breach of contract by such Indemnitee. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, EXCEPT AS SET FORTH IN THE NEXT SUCCEEDING SENTENCE, THE BORROWER SHALL NOT BE LIABLE FOR, AND SHALL NOT BE OBLIGATED TO INDEMNIFY ANY INDEMNITEE FOR, LOSSES CONSTITUTING TREBLE, EXEMPLARY, OR PUNITIVE DAMAGES. IF (A) AN INDEMNITEE HAS BECOME LIABLE TO A THIRD PARTY (THAT IS NOT ANOTHER INDEMNITEE) FOR LOSSES CONSTITUTING DAMAGES SPECIFIED IN THE PRECEDING SENTENCE, AND (B) SUCH INDEMNITEE WOULD BE ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT BUT FOR THE LIMITATION SET FORTH IN THE PRECEDING SENTENCE, THEN SUCH INDEMNITEE SHALL NONETHELESS BE ENTITLED TO INDEMNIFICATION FOR SUCH LOSSES INCURRED TO SUCH THIRD PARTY.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or the Collateral Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent in its capacity as such.

(d)     Except as set forth in the next succeeding sentence and to the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any breach by such Indemnitee of this Agreement, any Operative Document, the Transactions or the use of the proceeds thereof. If the Borrower becomes liable to a third party for amounts constituting special, indirect, consequential or punitive damages as a result of a breach of an obligation hereunder by an Indemnitee, the Borrower shall be entitled to a claim and to recover (and does not waive its rights to claim and recover) such amounts from such Indemnitee to the extent such Indemnitee would be liable to the Borrower for such amounts but for the limitation of the preceding sentence.

(e)     All amounts due under this Section shall be payable promptly after written demand therefore; provided that if an Account Shortfall exists at the time of any demand for payment under this Section 11.03, the Borrower shall pay such demanded amount only upon receipt from any Borrower Obligor of amounts in respect of Supplemental Costs related to such demanded amount.

SECTION 11.04     Successors and Assigns.     (a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that (i) except in the case of an assignment to a Lender or a Lender Affiliate, each of the Borrower and the Administrative Agent must give their prior written consent to such assignment (which consent shall not be unreasonably withheld), (ii) except in the case of an assignment to a Lender or a Lender Affiliate or an assignment of the entire remaining amount of the assigning Lender's Commitment, the amount of the Commitment of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $10,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, (iii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, (iv) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500, and (v) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and provided further that any consent of the Borrower otherwise required under this paragraph shall not be required if an Event of Default has occurred and is continuing.   Subject to acceptance and recording thereof pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 2.12 and 11.03).   Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (e) of this Section.

(c)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York City a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)     Any Lender may, without the consent of the Borrower, the Administrative Agent or the Collateral Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the Collateral Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 11.02(b) that affects such Participant. Subject to paragraph (f) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 2.12 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13(c) as though it were a Lender.

(f)     A Participant shall not be entitled to receive any greater payment under Section 2.10 or 2.12 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.12 unless the Borrower is

notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.12(a)(ii) as though it were a Lender.

(g)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Board, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)    Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 11.04, disclose to the assignee or Participant or proposed assignee or Participant any information relating to the Borrower or any of its Affiliates furnished to such Lender by or on behalf of the Borrower or any of its Affiliates; provided, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to comply with Section 11.11.

SECTION 11.05    Survival; Continued Effectiveness.

(a)    All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.10, 2.11, 2.12 and 11.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, and the termination of the Commitments or the termination of this Agreement or any provision hereof.

(b)    The Borrower's obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment by the Borrower in satisfaction of any of the obligations of the Borrower under this Agreement is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of the Borrower, or otherwise, all as though such payment had not been made.

SECTION 11.06    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and

understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Each Lender acknowledges that upon execution and delivery of the Enron Agreement by Enron, such Lender has accepted the benefits thereof. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 11.07   Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 11.08   Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. Each Lender agrees to promptly notify the Borrower after any such set-off and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such set off and application.

SECTION 11.09   Governing Law; Consent to Service of Process.  (a)  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    The Borrower hereby irrevocably appoints Corporation Service Company with offices on the date hereof at 2 World Trade Center, Suite 8746, New York, NY 10048 (or any successor appointed by the Borrower, provided that such successor shall be located in New York City and engaged in the business of acting as a Process Agent and shall be a company of national recognition, and provided further that notice of such successor Process Agent shall be promptly given to the Collateral Agent and the Administrative Agent by the Borrower, the "Process Agent") as its designee, appointee and agent to receive, accept and acknowledge on its behalf and its property service of copies of the summons and complaint and any other process that may be served in any action or proceeding under paragraph (b) of this Section. Such service may be made by delivering a copy of such process to the Borrower in care of the Process Agent at the Process Agent's address, and the Borrower hereby authorizes and directs the Process Agent to accept such service on its behalf.

(c)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 11.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 11.10     Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 11.11     Confidentiality. Each Lender agrees that it will use reasonable efforts not to disclose without the prior consent of the Borrower (other than to such Lender's Affiliates in the ordinary course of business in connection with any Operative Document, the administration thereof or any transaction contemplated hereby, employees, auditors or counsel or to another Lender if the disclosing Lender or the disclosing Lender's holding or parent company in its sole discretion determines that any such party should have access to such information) any information with respect to the Borrower or its Subsidiaries which is furnished pursuant to this Agreement or any other Operative Document and which is designated by the Borrower to the Lenders in writing as confidential, provided that any Lender may disclose any such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere), (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Lender, and (e) to the prospective transferee in connection with any contemplated transfer of any of the Notes or any interest therein by such Lender, provided, that such prospective transferee executes an agreement with the Borrower containing provisions substantially identical to those contained in this Section.

SECTION 11.12     Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender. Any excess shall be cancelled automatically and, if theretofore paid, shall be at the option of the Administrative Agent or such Lender, as the case may be, be applied on the principal amount of the obligations owed to the Administrative Agent or such Lender, as the case may be, by the Borrower or refunded by the Administrative Agent or such Lender, as the case may be, to the Borrower.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

FLAGSTAFF CAPITAL CORPORATION, as Borrower

By _____
Bruce Hendrick
President

THE CHASE MANHATTAN BANK,
individually and as Administrative Agent,
and as Collateral Agent

By ⸻⸻⸻⸻⸻⸻⸻
    Robert W. Traband
    Vice President

THE ROYAL BANK OF SCOTLAND plc,

By _Ph Dundee_ _____

Name:

Title:         PATRICIA J. DUNDEE
               SENIOR VICE PRESIDENT

THE INDUSTRIAL BANK OF JAPAN,
LIMITED
NEW YORK BRANCH

By _____
     Name: Michael N. Oakes
     Title: Senior Vice President - Houston Office

THE BANK OF TOKYO-MITSUBISHI,
LTD., HOUSTON AGENCY

By _John W. McGhee_____

Name: John W. McGhee
Title: Vice President and Manager

[FORM OF]

ASSIGNMENT AND ACCEPTANCE

Reference is made to the Credit Agreement dated as of June 22, 2001 (as amended and in effect on the date hereof, the "Credit Agreement"), among Flagstaff Capital Corporation, the Lenders named therein and The Chase Manhattan Bank, as Administrative Agent and as Collateral Agent for the Lenders. Terms defined in the Credit Agreement are used herein with the same meanings.

The Assignor named on the reverse hereof hereby sells and assigns, without recourse, to the Assignee named on the reverse hereof, and the Assignee hereby purchases and assumes, without recourse, from the Assignor, effective as of the Assignment Date set forth on the reverse hereof, the interests set forth on the reverse hereof (the "Assigned Interest") in the Assignor's rights and obligations under the Credit Agreement, including, without limitation, the interests set forth on the reverse hereof in the Commitment of the Assignor on the Assignment Date Loans owing to the Assignor which are outstanding on the Assignment Date, but excluding accrued interest and fees to and excluding the Assignment Date. The Assignee hereby acknowledges receipt of a copy of the Credit Agreement. From and after the Assignment Date (i) the Assignee shall be a party to and be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, have the rights and obligations of a Lender thereunder and (ii) the Assignor shall, to the extent of the Assigned Interest, relinquish its rights and be released from its obligations under the Credit Agreement.

This Assignment and Acceptance is being delivered to the Administrative Agent together with (i) if the Assignee is a Foreign Lender, any documentation required to be delivered by the Assignee pursuant to Section 2.12(a)(ii) of the Credit Agreement, duly completed and executed by the Assignee, and (ii) if the Assignee is not already a Lender under the Credit Agreement, an Administrative Questionnaire in the form supplied by the Administrative Agent, duly completed by the Assignee. The [Assignee/Assignor] shall pay the fee payable to the Administrative Agent pursuant to Section 11.04(b) of the Credit Agreement.

This Assignment and Acceptance shall be governed by and construed in accordance with the laws of the State of New York.

Date of Assignment:

Legal Name of Assignor:

Legal Name of Assignee:

Assignee's Address for Notices:

Effective Date of Assignment

("Assignment Date"):

| Facility | Principal Assigned | Amount | Percentage Assigned of Facility/Commitment (set forth, to at least 8 decimals, as a percentage of the Facility and the aggregate Commitments of all Lenders thereunder) |
|---|---|---|---|
| Commitment Assigned: | $ | | % |
| Loans: | | | |

The terms set forth above and on the reverse side hereof are hereby agreed to:

[Name of Assignor], as Assignor

By:_____
    Name:
    Title:

[Name of Assignee], as Assignee

By: _____
    Name:
    Title:

The undersigned hereby consent to the within assignment:

Flagstaff Capital Corporation

The Chase Manhattan Bank,
as Administrative Agent,

By: _____

    Name:

    Title:

By: _____

    Name:

    Title:

## OPINION OF COUNSEL FOR THE BORROWER

Each of the Addressees Listed in
the Attached Schedule I

Ladies and Gentlemen:

We have acted as counsel for Flagstaff Capital Corporation, a Delaware corporation (the "Company"), in connection with the transactions contemplated by the Credit and Security Agreement (the "Flagstaff Credit Agreement") of even date herewith among the Company, as borrower, the financial institutions named as lenders therein, and The Chase Manhattan Bank, as administrative agent and collateral agent. This opinion is being rendered pursuant to Section 4.01(b)(vii)(A) of the Flagstaff Credit Agreement. Capitalized terms used herein and not otherwise defined herein shall have the same meanings herein as ascribed thereto in the Flagstaff Credit Agreement. Other terms that are defined in the Uniform Commercial Code as in effect in the State of New York (the "NY UCC") have the same meaning when used herein unless otherwise indicated by the context in which such terms are so used.

In rendering the opinions set forth below, we have reviewed the documents set forth on Schedule II attached hereto and such other records, certificates and documents as we have deemed relevant for the purposes of such opinions. The term "Transaction Documents" shall mean (a) the Flagstaff Credit Agreement, (b) the Interest Rate Swap Agreement with Chase as the Swap Counterparty, (c) the Put Option Agreement, (d) the Total Return Swap Agreement, (e) the Account Agreement (as defined in Schedule II attached hereto), and (f) the Financing Statements (as defined in Schedule II attached hereto).

As to any facts material to our opinion, we have made no independent investigation of such facts and have relied, to the extent that we deem such reliance proper, upon certificates of public officials and officers or other representatives of the Company and on the representations and warranties set forth in the Transaction Documents.

In rendering the opinions expressed below, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity to authentic original documents of all documents submitted to us as copies. In addition we have assumed that the Transaction Documents have been duly executed and delivered by each party thereto (other than the Company) and constitute valid, binding and enforceable obligations of such parties (other than the Company) and that the laws of any jurisdiction other than the jurisdictions that are the subject of this opinion do not affect the terms of the Transaction Documents.

Based upon the foregoing, and subject to the assumptions, qualifications, exceptions and limitations set forth herein, it is our opinion that:

1. The Company has been duly organized, is validly existing and is in good standing under the laws of the State of Delaware. The Company is duly qualified to do business and is in good standing as a foreign corporation under the laws in the State of New York.

2. The Company has the corporate power and authority to execute, deliver and perform all of its obligations under each of the Transaction Documents to which it is a party. The execution and delivery of each of the Transaction Documents and the consummation by the Company of the transactions contemplated thereby have been duly authorized by all requisite corporate action on the part of the Company.

3. Each of the Transaction Documents has been duly executed and delivered by the Company and constitutes the valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

4. The execution and delivery by the Company of each of the Transaction Documents do not, and the performance by the Company of its obligations thereunder will not, (a) conflict with the Company's articles of incorporation or by-laws, (b) result in any violation by the Company of any Applicable Law (as defined below), (c) breach or result in a default under any agreement or instrument listed in the Officer's Certificate attached hereto as Exhibit A (the "Officer's Certificate"), (d) result in any violation of any order, writ, judgment or decree known to us or (e) to our knowledge, result in the creation or imposition of any lien on any properties of the Company, other than as may be contemplated by the Transaction Documents.

"Applicable Laws" means those laws, rules and regulations of the State of New York and the United States of America and the rules and regulations adopted thereunder, which, in our experience, are normally applicable to transactions of the type contemplated by the Transaction Documents. Furthermore, the term "Applicable Laws" does not include, and we express no opinion with regard to (a) any New York or federal law, rule or regulation relating to (i) pollution or protection of the environment, (ii) zoning, land use, building or construction, (iii) occupational, safety and health or other similar matters or (iv) labor, employee rights and benefits, including the Employment Retirement Income Security Act of 1974, as amended, (b) the regulation of utilities, (c) antitrust laws, (d) tax laws, rules or regulations, (e) state or federal securities laws and (f) foreign corrupt practices and statutes.

5. No Governmental Approval (as defined below) which has not been obtained or taken and is not in full force and effect, is required to authorize or is required in connection with the execution, delivery or performance of any of the Transaction Documents by the Company except the filing of the Financing Statements with the Department of State of the State of New York and the Office of the New York City Register for New York County, New York.

"Governmental Approvals" means any consent, approval, license, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to any Applicable Laws (as defined in paragraph 4 above).

6.    To our knowledge, the Company is not a party to any pending or overtly threatened in writing action or proceeding that (a) may adversely affect the transactions contemplated by the Transaction Documents or (b) if determined adversely, involve a reasonable possibility of materially and adversely affecting the business, condition or operations of the Company.

7.    The provisions of the Flagstaff Credit Agreement are effective to create in favor of the Collateral Agent to secure the Obligations of the Company, a valid security interest in all of the Company's right, title and interest in and to that portion of the collateral accurately and adequately described therein to the extent that such collateral is property in which a security interest may be created under Article 9 of the NY UCC (the "Article 9 Collateral").

8.    The Financing Statements are in proper form for filing under the NY UCC. To the extent that the filing of a financing statement can be effective to perfect a security interest in the Article 9 Collateral under the NY UCC, the security interest in favor of the Collateral Agent in that portion of the Article 9 Collateral accurately and adequately described in the Financing Statements will be perfected upon the filing of the Financing Statements with the Department of State of the State of New York and with the Office of the New York City Register for New York County, New York.

9.    With respect to that portion of the Article 9 Collateral consisting of the Operating Account, the provisions of the Account Agreement are effective to perfect the security interest of the Collateral Agent therein by "control" (within the meaning of Section 8-106 of the NY UCC) under New York law.

10.    With respect to that portion of the Article 9 Collateral consisting of the Finco Note, upon the Collateral Agent taking possession in the State of New York of the Finco Note, which shall be endorsed to the Collateral Agent or in blank by a duly authorized officer of the Company, the security interest of the Collateral Agent therein is a perfected security interest under the New York UCC.

11.    The Company is neither an "investment company" nor a company "controlled" by an "investment company", as such terms are used in the Investment Company Act of 1940, as amended.

12.    The Company is not a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company" within the meaning of the Public Utility Company Act of 1935, as amended.

In rendering the foregoing opinions, we have also assumed, with your permission, and without independent investigation on our part, the following:

A.     With respect to our opinion set forth in paragraph 9 above, we have assumed that Chase as securities intermediary will comply with its obligations under the Account Agreement and shall at all times (i) act as a "securities intermediary" (within the meaning of the NY UCC in maintaining the Operating Account, (ii) hold and maintain the Operating Account as a "securities account" (within the meaning of Article 8 of the NY UCC), (iii) identify the Collateral Agent in its records as the entitlement holder of the Operating Account and of all securities entitlements held therein, (iv) treat any asset with respect to which a security entitlement is purported to be created in the Operating Account, to the extent that a security intermediary's express agreement to such treatment is required under Section 8-102 (a)(9)(C) of the NY UCC) as a financial asset under Article 8 of the NY UCC, (v) comply with all entitlement orders of the Collateral Agent in connection with all security entitlements in the Securities Accounts (without further consent of the entitlement holder), (vi) not identify in its records any person as entitlement holder with respect to any Securities Account (or any security entitlement therein) other than the person specified as entitlement holder with respect thereto in the Account Agreement and (vii) not agree to comply with entitlement orders of any person or entity with respect to the Operating Account (or any security entitlement therein), except the person or entity authorized in the Account Agreement to give entitlement orders with respect thereto.  Additionally, we have assumed that the Operating Account will at all times be maintained at an office of Chase located in the State of New York and the agreement between the Company and Chase pertaining to the Operating Account specifies that it is governed by the law of the State of New York.

B.     With respect to our opinions set forth in paragraphs 7 through 10 above, we have assumed that the Company has rights in the properties in which it is purporting to grant a security interest within the meaning of Section 9-203 of the NY UCC.

C     With respect to our opinion set forth in paragraphs 7 through 10 above, we have assumed that the Collateral Agent has acquired its interests in the Article 9 Collateral for value within the meaning of Section 9-203 of the NY UCC.

D.     With respect to our opinion set forth in paragraph 8 above, we have assumed that the Company is located in the State of New York, within the meaning of Section 9-103 of the NY UCC.

E.     With respect to our opinions set forth in paragraph 10 above, we have assumed that the Finco Note will at all times be held by the Collateral Agent in the State of New York.

The opinions set forth above are subject to the following qualifications and exceptions:

(a)     With respect to our opinion set forth in paragraph 1 above, we have relied solely on the certificate of good standing, dated June 18, 2001, of the Secretary of State of the State of Delaware, the certificate of authority, dated June 15, 2001, of the Department of State of the

State of New York and, with respect to the period from that date to the date of this opinion letter, a certificate of an officer of the Company.

(b)     With respect to our opinion set forth in paragraph 3 above, we express no opinion with respect to the validity or enforceability of the following provisions to the extent that they are contained in the Transaction Documents: (i) provisions releasing, exculpating or exempting a party from, or requiring indemnification or contribution of a party for, liability for its own negligence or to the extent that the same are inconsistent with the public policy underlying any law, rule or regulation; (ii) provisions restricting access to courts or purporting to affect the jurisdiction or venue of courts (other than the courts of the State of New York with respect to Transaction Documents governed by the laws of the State of New York); (iii) provisions setting out methods or procedures for service of process; (iv) provisions purporting to waive, subordinate or not give effect to rights to notice, demands, legal defenses or other rights or benefits that cannot be waived, subordinated or rendered ineffective under applicable law; (v) provisions relating to powers of attorney, severability or set-offs; and (vi) provisions providing that decisions by a party are conclusive or may be made in its sole discretion.

(c)     The enforceability of each Transaction Document and the provisions thereof may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium or other laws now or hereinafter in effect relating to or affecting enforcement of creditors' rights generally and by general principles of equity (including without limitation, concepts of materiality, reasonableness, good faith and fair dealing), regardless of whether such enforcement is considered in a proceeding in equity or at law.

(d)     Certain of the remedial provisions with respect to the Article 9 Collateral (including waivers with respect to the exercise of remedies against the Article 9 Collateral) contained in the Flagstaff Credit Agreement may be unenforceable in whole or in part, but the inclusion of such provisions does not affect the validity of Flagstaff Credit Agreement, taken as a whole, and the Flagstaff Credit Agreement, taken as a whole, together with Applicable Law, contain adequate provisions for the practical realization of the benefits intended to be provided thereby

(e)     In rendering the opinion expressed in paragraph 4 above concerning the absence of a breach of contract, we have made no examination of, and express no opinion with respect to, any financial, accounting or similar covenant or provision contained in any agreement or instrument listed in the Officer's Certificate.

(f)     With respect to our opinions set forth in paragraphs 6, 4(d) and 4(e) above, we have not undertaken any independent examination of facts or the records of any court, tribunal or other body, but have based our opinions in sole reliance upon a certificate of an officer of the Company and upon matters of which attorneys in our Firm who have devoted substantial time to this matter have actual knowledge.

(g)     In the case of property which becomes Article 9 Collateral after the date hereof, our opinion in paragraph 7 above, as to the creation and validity of the security interests therein

described, is subject to the effect of Section 552 of the Federal Bankruptcy Code, which limits the extent to which property acquired by a debtor after the commencement of a case under the Federal Bankruptcy Code may be subject to such security interest arising from a security agreement entered into by the debtor before the commencement of such case.

(h)     With respect to our opinion in paragraphs 7 and 9 above, we express no opinion as to Article 9 Collateral to which (pursuant to Section 9-104 of the NY) Chapter 9 of the NY UCC is not applicable or which is subject to a state statute or a statute or treaty of the United States which provides for a certificate of title or national or international registration. We also note that in the case of any exercise of the remedies under any Transaction Document to sell or offer for sale any securities, the exercise of such remedies may be subject to compliance with applicable state and federal securities laws.

(i)     With respect to our opinions set forth in paragraphs 7 through 10 above, we express no opinion as to the priority of any security interest.

(j)     With respect to our opinions set forth in paragraphs 7 through 10, the creation and perfection of the Collateral Agent's security interest in proceeds is limited to the extent set forth in Section 9-306 of the NY UCC.

(k)     We call to your attention that the NY UCC generally requires the filing of continuation statements within a specified period prior to the expiration of a specified period from the date of the original filings in order to maintain the effectiveness of the filings. Additionally, within a specified period after any debtor changes its name, identity, corporate structure or location, the NY UCC generally requires the filing of new appropriate financing statements indicating the new name, identity, corporate structure or location of such entity in order to maintain the effectiveness of the original filings.

(l)     In rendering the opinion set forth in paragraph 9 above, we call to your attention that security entitlements and rights of entitlement holders are governed by Part 5 of Article 8 of the NY UCC and our opinion in paragraph 9 above is subject to such Part 5. In rendering such opinions, we express no opinion as to any specific financial asset in the Operating Account. In addition, with respect to security entitlements in Permitted Investments, our opinion does not apply to the extent that Article 8 of the NY UCC is preempted by applicable federal law or regulation, and we express no opinion with respect to the requirements or effect of federal book entry securities regulations as to U.S. treasury securities or other investments which may from time to time be included in the Article 9 Collateral.

We express no opinion as to the laws of any jurisdiction other than: (i) the laws of the State of New York; (ii) the General Corporation Law of the State of Delaware; (iii) the federal laws of the United States of America; (iv) with respect to the security interest perfection opinions set forth in paragraphs 8 through 10 above, Articles 8 and 9 of NY UCC; and (v) based solely on the certificates of public officials previously identified, the laws of the State of Delaware with respect to our opinion with respect to the Company's qualification to do business and good standing as a corporation in the State of Delaware.

The opinions expressed herein are as of the date hereof only, and we assume no obligation to update or supplement such opinions to reflect any fact or circumstance that may hereafter come to our attention or any change in law that may hereafter occur or become effective. Without limiting the foregoing, we note that, as of July 1, 2001, a revised version of Article 9 of the Uniform Commercial Code (together with revised versions of certain related provisions of the other Articles of the Uniform Commercial Code and of other of relevant statutes) becomes effective in many States. We express no opinion as the effect of the revised version of Article 9 (and of such related provisions of the other Articles of the Uniform Commercial Code and of such other relevant statutes) on the opinions rendered herein, which are rendered under the version of the Uniform Commercial Code as currently in effect.

This opinion letter is given solely for your benefit in connection with the transactions contemplated by the Transaction Documents and may not be relied upon by any person other than you or for any other purpose without our prior written consent. This opinion letter may not be furnished, without our prior consent, to any person other than you.

Very truly yours,

VINSON & ELKINS L.L.P.

## AMORTIZATION SCHEDULE

| Payment Date | Amortization |
|---|---|
| 9/24/01 | $ 16,611,279 |
| 12/24/01 | 16,338,109 |
| 3/22/02 | 16,043,908 |
| 6/24/02 | 17,394,192 |
| 9/23/02 | 17,108,147 |
| 12/23/02 | 17,372,810 |
| 3/24/03 | 17,641,567 |
| 6/23/03 | 17,914,482 |
| 9/22/03 | 18,191,619 |
| 12/22/03 | 18,473,044 |
| 3/22/04 | 18,758,822 |
| 6/22/04 | 19,258,350 |
| 9/22/04 | 19,559,551 |
| 12/22/04 | 19,649,533 |
| 3/22/05 | 19,734,242 |
| 6/22/05 | 20,481,425 |
| 9/22/05 | 20,801,754 |
| 12/22/05 | 20,897,451 |
| 3/22/06 | 20,987,540 |
| 6/22/06 | 21,782,175 |

# COMMITMENTS

| Lender: | Commitment: |
|---|---|
| The Chase Manhattan Bank | $93,750,000 |
| The Royal Bank of Scotland plc | $93,750,000 |
| The Industrial Bank of Japan, Limited New York Branch | $93,750,000 |
| The Bank of Tokyo-Mitsubishi, Ltd., Houston Agency | $93,750,000 |

## SCHEDULE I
### to
## OPINION OF VINSON & ELKINS L.L.P.

## ADDRESSEES

The Chase Manhattan Bank, as Administrative Agent under the Finco Credit Agreement

The Chase Manhattan Bank, as Administrative Agent (as defined in the Flagstaff Credit Agreement)

The Chase Manhattan Bank, as Collateral Agent (as defined in the Flagstaff Credit Agreement)

Each Lender now or hereafter party to the Flagstaff Credit Agreement

The Swap Counterparty (as defined in the Flagstaff Credit Agreement)

Enron Corp.

# SCHEDULE II
## to
## OPINION OF VINSON & ELKINS L.L.P.

### DOCUMENTS REVIEWED

We have reviewed executed copies of the following documents (each of which is identified by its defined term designation as found in the Flagstaff Credit Agreement or this opinion), each of which is dated as of even date herewith:

1. the Flagstaff Credit Agreement;

2. the Interest Rate Swap Agreement with Chase as the Swap Counterparty;

3. the Hansen Consent;

4. the Enron Consent;

5. the Swap Counterparty Consent;

6. the Hansen Credit Agreement and the Hansen Note delivered pursuant thereto;

7. the Enron Agreement;

8. the Warrant;

9. the Put Option Agreement;

10. the Total Return Swap Agreement;

11. the financing statements (the "Financing Statements") naming the Company as debtor and the Collateral Agent as the secured party, which financing statements are related to the Pledged Collateral and are to be filed (one each) with the Department of State of the State of New York and with the New York City Register's Office for New York County, New York;

12. the Subscription Agreement;

13. the Subscription Payment Assumption Agreement; and

14. the Account Agreement by and between the Company and The Chase Manhattan Bank, acting in its capacities as entitlement holder and securities intermediary (the "Account Agreement") relating to the security interest granted in the Operating Account.

# Exhibit
# B



CREDIT AGREEMENT

dated as of

June 22, 2001

among

HANSEN INVESTMENTS CO.,
as Borrower,

FLAGSTAFF CAPITAL CORPORATION,
as Lender

and

THE CHASE MANHATTAN BANK,
as Administrative Agent

TABLE OF CONTENTS

## ARTICLE I
## DEFINITIONS

SECTION 1.01  DEFINED TERMS..................................................................................1
SECTION 1.02  COMPUTATION OF TIME PERIODS...................................................6
SECTION 1.03  TERMS GENERALLY ............................................................................6
SECTION 1.04  ACCOUNTING TERMS; GAAP .............................................................6

## ARTICLE II
## THE CREDITS

SECTION 2.01  LOANS ...................................................................................................6
SECTION 2.02  REQUESTS FOR A BORROWING .........................................................7
SECTION 2.03  FUNDING OF BORROWINGS ...............................................................7
SECTION 2.04  REPAYMENT OF LOANS; EVIDENCE OF DEBT ...............................7
SECTION 2.05  PREPAYMENT OF LOANS ...................................................................8
SECTION 2.06  INTEREST ..............................................................................................8
SECTION 2.07  INCREASED COSTS; CAPITAL ADEQUACY, ETC............................9
SECTION 2.08  TAXES...................................................................................................10
SECTION 2.09  PAYMENTS GENERALLY...................................................................12
SECTION 2.10  REIMBURSEMENT OF SUPPLEMENTAL COSTS ...........................13
SECTION 2.11  CERTIFICATE OF THE LENDER .......................................................13
SECTION 2.12  PAYMENTS TO THE OPERATING ACCOUNT ................................14
SECTION 2.13  CURRENCY OF PAYMENT .................................................................14

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

SECTION 3.01  ORGANIZATION; POWERS ..................................................................14
SECTION 3.02  AUTHORIZATION; ENFORCEABILITY. ..........................................14
SECTION 3.03  CONSENTS AND APPROVALS; NO CONFLICTS ............................15
SECTION 3.04  NO ACTIVITY; NO SUBSIDIARIES; BUSINESS ACTIVITY .............15
SECTION 3.05  PROPERTIES .......................................................................................16
SECTION 3.06  LITIGATION ........................................................................................16
SECTION 3.07  COMPLIANCE WITH LAWS AND AGREEMENTS ...........................16
SECTION 3.08  INVESTMENT AND HOLDING COMPANY STATUS. ......................16
SECTION 3.09  TAXES...................................................................................................16
SECTION 3.10  DISCLOSURE ......................................................................................16
SECTION 3.11  SOLVENCY ..........................................................................................17
SECTION 3.12  NO OTHER OBLIGATIONS ................................................................17

## ARTICLE IV
## CONDITIONS

SECTION 4.01  EFFECTIVE DATE.................................................................................17

SECTION 4.02               DETERMINATIONS UNDER SECTION 4.01 ...............................................20

## ARTICLE V
## AFFIRMATIVE COVENANTS

SECTION 5.01    REPORTING REQUIREMENTS...................................................20
SECTION 5.02    COMPLIANCE WITH LAWS, ETC ..........................................21
SECTION 5.03    PAYMENT OF TAXES, ETC ..................................................21
SECTION 5.04    PRESERVATION OF EXISTENCE, ETC ....................................22
SECTION 5.05    INSPECTION RIGHTS ..........................................................22
SECTION 5.06    KEEPING OF BOOKS............................................................22
SECTION 5.07    MAINTENANCE OF LICENSES AND PERMITS..........................22
SECTION 5.08    CLAIMS FOR SUPPLEMENTAL COSTS AND MAKE-WHOLE AMOUNT ...........22
SECTION 5.09    TANGIBLE NET WORTH .....................................................22

## ARTICLE VI
## NEGATIVE COVENANTS

SECTION 6.01    LIENS, ETC....................................................................22
SECTION 6.02    INDEBTEDNESS.................................................................23
SECTION 6.03    MERGERS, ETC ...............................................................23
SECTION 6.04    SALES, ETC., OF ASSETS ..................................................23
SECTION 6.05    INVESTMENTS IN OTHER PERSONS ......................................23
SECTION 6.06    AMENDMENT, ETC., OF OPERATIVE DOCUMENTS................23
SECTION 6.07    NEGATIVE PLEDGE...........................................................24
SECTION 6.08    SUBSIDIARIES.................................................................24
SECTION 6.09    NATURE OF ACTIVITIES....................................................24
SECTION 6.10    DISTRIBUTIONS; SECURITIES.............................................24
SECTION 6.11    AFFILIATE TRANSACTIONS ...............................................24
SECTION 6.12    BANKRUPTCY..................................................................24
SECTION 6.13    PREPAYMENTS ................................................................24

## ARTICLE VII
## EVENTS OF DEFAULT

## ARTICLE VIII
## THE ADMINISTRATIVE AGENT

## ARTICLE IX
## ADMINISTRATION; SETTLEMENT; COLLECTION

SECTION 9.01    THE OPERATING ACCOUNT .................................................28
SECTION 9.02    DEPOSIT OF FUNDS INTO THE OPERATING ACCOUNT .............29
SECTION 9.03    INVESTING OF AMOUNTS IN THE OPERATING ACCOUNT............29
SECTION 9.04    DEPOSIT CONSTITUTES PAYMENT ........................................29
SECTION 9.05    RETURN OF EXCESS FUNDS................................................29

## ARTICLE X
## MISCELLANEOUS

SECTION 10.01    NOTICES..................................................................................29
SECTION 10.02    WAIVERS; AMENDMENTS .........................................................30
SECTION 10.03    EXPENSES; INDEMNITY; DAMAGE WAIVER ...............................30
SECTION 10.04    SUCCESSORS AND ASSIGNS......................................................32
SECTION 10.05    SURVIVAL; CONTINUED EFFECTIVENESS ...................................33
SECTION 10.06    COUNTERPARTS; INTEGRATION; EFFECTIVENESS .......................33
SECTION 10.07    SEVERABILITY ........................................................................34
SECTION 10.08    RIGHT OF SETOFF ...................................................................34
SECTION 10.09    GOVERNING LAW; CONSENT TO SERVICE OF PROCESS ...............34
SECTION 10.10    HEADINGS..............................................................................35
SECTION 10.11    CONFIDENTIALITY...................................................................35
SECTION 10.12    INTEREST RATE LIMITATION ....................................................36

EXHIBITS:

Exhibit A –    Form of Promissory Note
Exhibit B-1 –    Form of Opinion of Blake, Cassels & Graydon LLP, Counsel for the Borrower
Exhibit B-2 –    Form of Opinion of McInnes Cooper, Counsel to the Borrower
Exhibit B-3 –    Form of Opinion of Bracewell & Patterson, L.L.P., Counsel to Enron
Exhibit B-4 –    Form of Opinion of James V. Derrick, Jr.
Exhibit C –    Compliance Certificate

CREDIT AGREEMENT dated as of June 22, 2001 among HANSEN INVESTMENTS CO., FLAGSTAFF CAPITAL CORPORATION, and THE CHASE MANHATTAN BANK, as Administrative Agent.

The parties hereto agree as follows:

# ARTICLE I
## Definitions

SECTION 1.01    Defined Terms.    Capitalized terms used herein and not otherwise defined herein shall have the meanings given such terms in the Flagstaff Credit Agreement. As used in this Agreement, the following terms have the meanings specified below:

"Administrative Agent" means Chase, in its capacity as administrative agent for the Lender hereunder.

"Advance" has the meaning set forth in Section 2.06(f).

"Agreement" means this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Borrower" means Hansen Investments Co., a company formed under the Nova Scotia Companies Act.

"Borrower Obligor" means CPS or any other Person to the extent any of the foregoing has an Obligation for the payment of money to the Borrower or makes a payment in respect of any such Obligation.

"Borrowing" means the making of a Loan hereunder.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.02.

"Canadian Dollars" means the lawful currency of Canada.

"Charges" has the meaning set forth in Section 10.12.

"Chase" means The Chase Manhattan Bank.

"Closing Date" means June 22, 2001.

"Commitment" means the commitment of the Lender to make a Loan pursuant to Section 2.01 to the Borrower on the Effective Date in an amount not to exceed $1,414,504,347.

"Cost of Funds Adjustment Amount" means, with respect to each Interest Period, the amount, if any, by which the Actual Cost of Funds exceeds the Base Amount for such period. For the purpose of this definition, (a) "Actual Cost of Funds" means the amount of

interest actually accrued for such Interest Period pursuant to Section 2.08(a) of the Flagstaff Credit Agreement, and (b) "Base Amount" means the amount of interest and fees that would have accrued for such Interest Period pursuant to Section 2.08(a) of the Flagstaff Credit Agreement if the "Loans" under and pursuant to the Flagstaff Credit Agreement were "Eurodollar" Loans.

"CPS Intercompany Note" means the Note dated as of the Closing Date issued by CPS to the Borrower, in the form delivered to the Administrative Agent on the Closing Date, as such note may be amended, supplemented, or otherwise modified as permitted hereby.

"Currency Due" has the meaning set forth in Section 10.03(f).

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Designated Party" shall have the meaning set forth in the Enron Agreement.

"dollars" or "United States Dollars" or "$" refers to lawful money of the United States of America.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 10.02) and the initial Loan is requested to be made pursuant to Section 2.02.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Payments" means (a) any indemnification payments under the Operative Documents payable to Persons other than the Flagstaff Administrative Agent, the Flagstaff Collateral Agent, the Flagstaff Lenders, the Lender or the Swap Counterparty, (b) that portion of the interest payable to the Borrower pursuant to the CPS Intercompany Note in excess of the interest payable by Borrower under this Agreement, provided that the interest payable under this Agreement has actually been paid, (c) interest on the foregoing paid pursuant to the terms of the applicable Operative Document as a result of any late payment thereof by the applicable obligor, and (d) the principal portion of the Loan.

"Excluded Taxes" has the meaning set forth in Section 2.08(a).

"Final Debt Collection Date" means the date on which the aggregate outstanding principal amount of the Loan shall have been paid in full by the Borrower together with all interest accrued thereon, and the Borrower shall have paid in full all Supplemental Costs and other amounts payable by the Borrower under this Agreement (but excluding contingent obligations not yet due and payable) accrued through the date of such payment of such principal and interest.

"Flagstaff" means Flagstaff Capital Corporation, a Delaware corporation.

"Flagstaff Administrative Agent" means the administrative agent under the Flagstaff Credit Agreement.

"Flagstaff Collateral Agent" means the collateral agent under the Flagstaff Credit Agreement.

"Flagstaff Credit Agreement" means the Credit Agreement, dated as of the Closing Date, among Flagstaff Capital Corporation, as borrower, the Flagstaff Administrative Agent, the Flagstaff Collateral Agent, and the lenders named therein.

"Flagstaff Lenders" means the "Lenders" under and as defined in the Flagstaff Credit Agreement.

"Flagstaff Loan" means the "Loans" (collectively) as defined in and made pursuant to the Flagstaff Credit Agreement.

"Indemnified Taxes" has the meaning set forth in Section 2.08(a).

"Indemnitee" has the meaning set forth in Section 10.03(b).

"Interest Period" means the period commencing on the Effective Date and ending on the initial Payment Date, and thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the next succeeding Payment Date; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.

"Lender" means Flagstaff Capital Corporation, a Delaware corporation.

"Loan" means the loan made by the Lender to the Borrower pursuant to this Agreement.

"Loan Documents" means this Agreement, the Note, the Process Agent Agreement, the Enron Agreement, the Warrant Agreement, the Put Option Agreement, and the Total Return Swap Agreement each in the form delivered to the Administrative Agent on the Closing Date, as each such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby, and all instruments, certifications, or other agreements delivered in connection with the foregoing.

"Make-Whole Amount" means, on the date that any voluntary or involuntary prepayment of principal under the Note becomes due other than the Maturity Date, an amount equal to the sum of (a) the accrued and unpaid interest due on or before the date of any such

voluntary or involuntary payment in accordance with the provisions of Section 2.06(a), plus (b) the present value of all payments of interest under the Note that would have been payable on such principal so prepaid after such date if such voluntary or involuntary prepayment of principal had been paid on the Maturity Date, rather than on the date of prepayment (using a discount rate equal to the rate of interest under the Note), provided that the Make-Whole Amount may in no event be less than zero.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, or condition, financial or otherwise, of the Borrower, (b) the ability of the Borrower to perform any of its Obligations under any Loan Document or (c) the rights of or benefits available to the Administrative Agent or the Lender under any Loan Document.

"Maturity Date" means June 23, 2006.

"Maximum Rate" has the meaning set forth in Section 10.12.

"Note" means a promissory note of the Borrower payable to the Lender, in substantially the form of Exhibit A, evidencing the indebtedness of the Borrower to the Lender resulting from the Loan made by the Lender.

"Obligation" means, with respect to any Person, any obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in clause (e) of Article VII. Without limiting the generality of the foregoing, the Obligations of the Borrower under the Loan Documents include (a) the obligation to pay principal, interest, costs, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower under any Loan Document and (b) the obligation to reimburse any amount in respect of any of the foregoing that the Administrative Agent or the Lender, in any of such Person's sole discretion, may elect to pay or advance on behalf of the Borrower pursuant to the terms of any Loan Document.

"Operative Documents" means, collectively, the Loan Documents, the Flagstaff Credit Agreement, the Subscription Agreement, the Subscription Payment Assumption Agreement, the CPS Intercompany Note and all other documents, agreements and instruments delivered in connection therewith.

"Other Taxes" has the meaning set forth in Section 2.08(b).

"Permitted Liens" has the meaning set forth in Section 6.01.

"Process Agent" has the meaning set forth in Section 10.09(b).

"Process Agent Agreement" means a letter dated as of the Closing Date from the Process Agent evidencing its obligation to accept service of process pursuant to Section 10.09(b)

(or any agreement with any successor Process Agent as provided therein) in the form delivered to the Administrative Agent on the Closing Date, as such letter may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Put Option Agreement" means the Put Option Agreement dated as of the Closing Date between the Lender and Enron.

"Responsible Officer" means, as to any Person, the chief executive officer, the president, the chief financial officer, the treasurer, the assistant treasurer, the secretary, the deputy corporate secretary, any assistant secretary or any vice president or other executive officer of such Person. Unless otherwise specified, all references to a "Responsible Officer" herein means a Responsible Officer of the Borrower.

"Subscription Agreement" means the Share Subscription Agreement dated as of the Closing Date between the Borrower and Newman.

"Subscription Payment Assumption Agreement" means the Subscription Payment Assumption Agreement dated as of the Closing Date among the Borrower, Newman and the Lender.

"Supplemental Costs" means, without duplication, any and all interest, fees, costs, expenses, indemnities, and other Obligations of the Borrower payable hereunder or under the other Loan Documents (including, without limitation, amounts payable under Sections 2.07 or 2.08 or Section 10.03, Cost of Funds Adjustment Amounts payable under Section 2.06(b), interest payable under Section 2.06(c), and all "Supplemental Costs" (as defined in the Flagstaff Credit Agreement) payable by Flagstaff pursuant to the Flagstaff Credit Agreement, expenses and similar items and amounts that are required to be paid by (or any Obligation to pay that has been incurred by) the Borrower under the Loan Documents) other than (a) interest payable pursuant to Section 2.06(a), (b) the principal amount of the Loan, and (c) any Make-Whole Amount payable hereunder.

"Tangible Net Worth" means, as of any date of determination thereof, the net worth of the Borrower, as determined in accordance with GAAP without giving effect to any increase or decrease in net worth as a result of accumulated other comprehensive income (or loss), less the sum of the book value of all assets of the Borrower that would be treated as intangibles under GAAP, including, without limitation, goodwill, research and development costs, trademarks, tradenames, copyrights, patents and unamortized debt discount expenses.

"Total Return Swap Agreement" means the ISDA Master Agreement, and schedule and confirmation thereto, dated as of the Closing Date between Enron and the Lender.

"Transactions" means the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents.

"Warrant" means the warrant issued pursuant to the Warrant Agreement.

"Warrant Agreement" means the Warrant Agreement dated as of the Closing Date between the Borrower and the Lender.

SECTION 1.02    Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding". Unless otherwise indicated, all references to a particular time are references to New York City time.

SECTION 1.03    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until  such notice shall have been withdrawn or such provision  amended in accordance herewith.

**ARTICLE II**
**The Credits**

SECTION 2.01    Loans.  Subject to the terms and conditions set forth herein, the Lender agrees to make on the Effective Date a Loan to the Borrower in an aggregate amount not to exceed the Lender's Commitment.  Any portion of the Lender's Commitment not utilized

on the Effective Date shall be permanently cancelled. Any portion of the Loan that is repaid or prepaid may not be reborrowed. Unless the Loan has been made on or before July 31, 2001, the Commitment shall terminate in full on such date.

SECTION 2.02     Requests for a Borrowing. To request the Borrowing, the Borrower shall notify the Administrative Agent of such request by delivery to the Administrative Agent of a written Borrowing Request not later than 11:00 a.m., New York City time, three Business Days before the Effective Date. Such Borrowing Request shall be irrevocable and shall be in a form approved by the Administrative Agent and signed by the Borrower. Each such written Borrowing Request shall specify the following information:

       (a)    the aggregate amount of the requested Borrowing;

       (b)    the Effective Date, which shall be a Business Day; and

       (c)    the location and number of the Borrower's account to which funds are to be disbursed.

Promptly following receipt of the Borrowing Request in accordance with this Section, the Administrative Agent shall advise the Lender of the details thereof and of the amount of the Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.03     Funding of Borrowings. The Lender shall make the Loan to be made by it hereunder on the Effective Date by wire transfer of immediately available funds, to an account of the Borrower maintained with the Administrative Agent in New York City and designated by the Borrower in the Borrowing Request.

SECTION 2.04     Repayment of Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Lender on the Maturity Date the principal amount of the Loan that remains outstanding on such date.

(b)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of the Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lender.

(c)     The entries made in the accounts maintained pursuant to paragraph (b) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein absent manifest error, provided that the failure of the Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loan in accordance with the terms of this Agreement.

(d)     The Loan made hereunder shall be evidenced by the Note.  The Borrower shall prepare, execute and deliver to the Lender the Note.

SECTION 2.05      Prepayment of Loans.

(a)     The Borrower may upon at least three Business Days' notice to the Administrative Agent stating the proposed date, and if such notice is given the Borrower shall, prepay in full the entire outstanding principal amount (and not less) of the aggregate Loan, together with (i) the Make-Whole Amount, and (ii) all other Supplemental Costs.

(b)     Upon receipt of notice of any prepayment, the Administrative Agent shall notify the Borrower of the Make-Whole Amount and any other Supplemental Costs to be paid in connection therewith.

SECTION 2.06      Interest.  (a) The Loan shall bear interest at a rate equal to 6.12% per annum, payable on each Payment Date; provided, however, that notwithstanding the foregoing, if the Borrower pays the Make-Whole Amount to the Lender, the Loan shall cease to accrue interest.

(b)     Upon demand by the Administrative Agent, the Borrower shall, on each applicable Payment Date, pay the Cost of Funds Adjustment Amount, if any, for such Payment Date.

(c)     Notwithstanding the foregoing, if any interest on any Loan or any fee or other amount (other than principal) payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, from the date on which such amount is due until such amount is paid in full, at a rate per annum equal to the sum of 2% per annum plus the interest rate per annum set forth in Section 2.06(a) applicable to the Loan.

(d)     Accrued interest on the Loan shall be payable in arrears on each Payment Date for the Loan and on the earlier of (i) the Maturity Date and (ii) the payment of the Make-Whole Amount.

(e)     All computations of interest and fees hereunder shall be made on the basis of a year of 360 days and shall be payable for the actual number of days (including the first day but excluding the last day) elapsed.  Each determination by the Administrative Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.  For the purposes of this Agreement, whenever interest to be paid hereunder is to be calculated on the basis of a year having a number of days other than the actual number of days in the relevant year, the yearly rate of interest to which the rate determined pursuant to such calculation is equivalent is the rate so determined multiplied by a fraction the numerator of which is the actual number of days in the year in which the same is to be ascertained and the denominator of which is the number of days deemed by the Agreement to be in such year.  The foregoing sentence is for disclosure purpose only and will not otherwise affect the terms of this Agreement or the Note as set forth herein or therein.  To the extent the Interest Act (Canada) is deemed applicable to this

Agreement and the Note, all interest that accrues under this Agreement or the Note will be calculated using the nominal rate method and not the effective rate method and the deemed reinvestment principle will not apply to such calculations.

(f) Subject to Section 2.08, to the extent the Borrower has paid or is obligated to pay any amount hereunder at a time that would result in interest payable under the Loan being ineligible for the exemption from withholding tax provided in Section 212(1)(b)(vii) of the *Income Tax Act* (Canada) by reason of the Borrower being obligated to pay principal, within the meaning of such provision, earlier than that which would not cause such withholding tax exemption not to apply, then, to the extent such amount has been paid, such amount shall be deemed not to have been paid and shall be deemed to have been advanced by the Borrower to the Lender, and, to the extent such amount has not yet been paid, the Borrower will be obligated to advance such amount to the Lender (collectively, the "Advance"). The Advance shall bear interest at any time at a rate identical to the applicable interest rate in respect of the Loan at that time. The recourse of the Borrower in respect of the Advance shall be limited to amounts owing by the Borrower to the Lender pursuant to the Loan and that, but for this provision, would be or would be considered to have been paid by the Borrower, and the Borrower shall have no recourse of any nature whatsoever against any other assets of the Lender. The Lender shall have the right to set off the Advance against amounts owing pursuant to the Loan.

SECTION 2.07 Increased Costs; Capital Adequacy, Etc. (a) If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof or (ii) the compliance with any guideline or request from any governmental authority, central bank or comparable agency (whether or not having the force of law), there shall be any increase in the cost to the Lender of agreeing to make or making, funding or maintaining the Loan (other than increased costs described in Section 2.07(b) and other than, in respect of payments to be made to the Lender or the Administrative Agent, any such increased costs resulting from taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (as to which Section 2.08 shall govern)), then the Borrower shall from time to time, upon demand by the Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of the Lender additional amounts sufficient to compensate the Lender for such increased cost.

(b) If the Lender shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Lender (or its lending office) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency (except to the extent such request or directive arises as a result of the individual creditworthiness of the Lender), has the effect of increasing the amount of capital required or expected to be maintained as a result of its Commitment hereunder, the Lender shall have the right to give prompt written notice and demand for payment thereof to the Borrower with a copy to the Administrative Agent (which notice and demand shall show in reasonable

detail the calculation of such additional amounts as shall be required to compensate the Lender for the increased cost to the Lender as a result of such increase in capital and shall certify that such costs are generally being charged by the Lender to other similarly situated borrowers under similar credit facilities), although the failure to give any such notice shall not, unless such notice fails to set forth the information required above, release or diminish any of the Borrower's obligations to pay additional amounts pursuant to Section this 2.07(b), the Borrower shall pay such additional amounts.

(c)    The Lender shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its lending office or change the jurisdiction of its lending office, as the case may be, so as to avoid the imposition of any increased costs under this Section 2.07 or to eliminate the amount of any such increased cost which may thereafter accrue; provided that no such selection or change of the jurisdiction for its lending office shall be made if, in the reasonable judgment of the Lender, such selection or change would be disadvantageous to the Lender.

(d)    The Lender shall not be entitled to recover increased costs pursuant to Section 2.07, (i) incurred or accruing more than 90 days prior to the date on which the Lender sent to the Borrower a written notice and demand for payment as specified in this Section 2.07, or (ii) to the extent that such increased costs have resulted from the failure of the Lender to have complied with Section 2.07(c).

SECTION 2.08    Taxes

(a)    (i)    Any and all payments or crediting of amounts by the Borrower hereunder or under any other agreement relevant to the payment or crediting of amounts hereunder to each Indemnitee shall be made, in accordance with Section 2.09, free and clear of and without deduction for all Indemnified Taxes. "Indemnified Taxes" shall mean any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, other than Excluded Taxes. "Excluded Taxes" shall mean, in respect of payments to the Lender or the Administrative Agent, (A) all taxes imposed on its net income (and capital and franchise taxes imposed on it in lieu thereof or otherwise applicable as of the date hereof) by the United States or by any state or foreign jurisdiction under the laws of which the Lender or the Administrative Agent is organized, domiciled, resident or doing business or any political subdivision thereof or by any jurisdiction in which such Indemnitee holds any interest in connection with this Agreement (including, without limitation, in the case of the Lender, the jurisdiction of the Lender's lending office) or any political subdivision thereof, to the extent such taxes arise by reason of such organization, domicile, residence, doing business or holding an interest (other than any net income taxes imposed by any jurisdiction with which the Indemnitee's connection arises solely from having executed, delivered or performed obligations or received a payment under, or enforced, this Agreement other than to the extent that such net income taxes would be applicable, on the date hereof, to a payment to be made to the Lender or the Administrative Agent) and (B) any taxes imposed by the United States by means of withholding at source if and to the

extent that such taxes shall be in effect and shall be applicable, on the date hereof, to payment to be made to the Lender or the Administrative Agent. If the Borrower shall be required by law to deduct any taxes from or in respect of any sum payable hereunder to any Indemnitee, (1) the sum payable shall be increased as may be necessary so that after making all required deductions in respect of Indemnified Taxes (including deductions applicable to additional sums payable under this Section 2.08) such Indemnitee receives an amount equal to the sum it would have received had no such deductions been made, (2) the Borrower shall make or cause to be made such deductions and (3) the Borrower shall pay or cause to be paid the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. For greater certainty, any taxes under Division D of Part I and Part XIII of the *Income Tax Act* (Canada) and corresponding provisions of applicable provincial income tax legislation (other than net income taxes from, or from dispositions of property used in, carrying on business in Canada for purposes of the *Income Tax Act* (Canada)) shall not be considered taxes by reason of holding an interest in Canada.

(ii)    If, upon filing of documentation prescribed by applicable law, any Indemnitee is entitled to an exemption from or reduction of United States withholding tax with respect to payments under this Agreement that would otherwise be subject to United States withholding tax or United States withholding tax at an increased rate, then, upon written request by the Borrower, such Indemnitee shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate. If any such Indemnitee fails to meet its obligation under this subsection (ii), the Borrower shall not be required to pay to such Indemnitee any additional amount relating to United States withholding tax (and shall be relieved of any liability with respect thereto) pursuant to Section 2.08(a)(i) and 2.08(c) that would not have been payable but for such failure.

(iii)    If payment required pursuant to Section 2.08(a)(i) is paid by the Borrower for the benefit of the Lender and the Lender determines in its reasonable, good faith discretion that it has received or been granted (and has derived full or partial use and benefit from) a credit against, a remission for, or a refund or a repayment of, any Indemnified Tax, then, if and to the extent that the Lender determines in its reasonable, good faith discretion that such credit, remission, refund or repayment is in respect of or calculated with reference to the deduction or withholding giving rise to the gross-up payment made pursuant to Section 2.08(a)(i), the Lender shall, to the extent that it determines in its reasonable, good faith discretion that it can do so without prejudice to the retention of the amount of such credit, remission, refund or repayment, pay to the Borrower such amount in respect of such credit, remission, refund or repayment as the Lender in its reasonable, good faith discretion shall have concluded to be attributable to such deduction or withholding (and which will leave the Lender in no better or worse position, after such payment, than it would have been in had no such deduction or withholding been required); provided that the Lender shall not be required to make any payment under this Section 2.08(a)(iii) until the Lender in its reasonable, good faith

discretion is satisfied that its tax affairs for its tax year in respect of which such credit, remission, refund or repayment was received have been finally settled to the satisfaction of the appropriate tax authorities. Any such payment to the Borrower shall be conclusive evidence of the amount due to the Borrower and shall be accepted in full and final settlement of the right of reimbursement hereunder, absent manifest error. Nothing herein contained shall require the Lender to disclose any information relating to its tax affairs (or any computations in respect thereof) or interfere with the right of the Lender to arrange its tax affairs in whatever manner it thinks fit; provided, however, that the Lender shall use reasonable, good faith efforts (consistent with legal and regulatory restrictions) to obtain any such benefit to which it may be entitled. The Lender shall be under no obligation to do anything that would prejudice its ability to benefit from any other credit, remission, refund, repayment or benefit to which it may be entitled.

(b)     In addition, the Borrower agrees to pay all Other Taxes that arise from any payment made or crediting of amounts hereunder or under any other agreement relevant to the payment or crediting of amounts hereunder or from the execution, delivery or performance of, or otherwise with respect to, any such agreement. "Other Taxes" shall mean any present or future transfer, ad valorem, registration, title, licensing, stamp or documentary taxes or any other excise or property taxes, charges or similar levies, and all liabilities with respect thereto.

(c)     The Borrower, to the fullest extent permitted by law, will indemnify each Indemnitee on an after-tax basis for the full amount of Indemnified Taxes or Other Taxes (including, without limitation, Indemnified Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.08) paid by such Indemnitee, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, that arise from any payment made or crediting of amounts hereunder or under any other agreement relevant to the payment or crediting of amounts hereunder or from the execution, delivery or performance of, or otherwise with respect to, any such agreement, except as a result of the gross negligence (which shall in any event include the failure of such Indemnitee to provide to the Borrower any form or certificate that it was required to provide pursuant to subsection (a)(ii) above) or willful misconduct of such Indemnitee, whether or not such Indemnified Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within 30 days from the date such Indemnitee makes written demand therefore. Except to the extent that it would be duplicative of tax indemnities in other Operative Documents, references in this Section 2.08(c) to the Lender and to this Agreement shall include the "Lenders" under the Flagstaff Credit Agreement and the Flagstaff Credit Agreement, respectively.

(d)     Without prejudice to the survival of any other agreement of the Borrower or the Lender hereunder, the agreements and obligations of the Borrower and each Indemnitee contained in this Section 2.08 shall survive the payment in full of principal of and interest on the Loan made hereunder.

SECTION 2.09     Payments Generally. (a) The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.07 or 2.08, or otherwise) prior to 11:00 a.m., New York City

time, on the date when due, in immediately available funds. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments (other than Excluded Payments) shall be made to the Administrative Agent at its offices at 270 Park Avenue, New York, New York. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day (provided, however, that if such extension would cause payment of interest on or principal of Loans to be made in the next following calendar month, such payment shall be made on the next preceding Business Day), and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lender hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment on such date in full in accordance herewith and may, in reliance upon such assumption, distribute to the Lender on such due date an amount equal to the amount due then due to the Lender. In such event, if the Borrower has not in fact made such payment, then the Lender agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to the Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(c)     If the Lender shall fail to make any payment required to be made by it pursuant to Section 2.03(b) or 2.09(b), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of the Lender to satisfy the Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.10     Reimbursement of Supplemental Costs. Upon demand by the Administrative Agent, or by (with a copy of such demand to be provided to the Administrative Agent) the Flagstaff Collateral Agent, or the Lender, the Borrower shall promptly pay to the Administrative Agent any and all Supplemental Costs owing hereunder. Failure or delay on the part of the Administrative Agent, the Flagstaff Collateral Agent, or the Lender to demand compensation for Supplemental Costs pursuant to this Section 2.10 shall not constitute a waiver of any such agent's or Lender's right to demand such Supplemental Costs.

SECTION 2.11     Certificate of the Lender. Without limitation to the requirements of Section 2.07(c), if the Lender demands or gives notice of Supplemental Costs due to the Lender under this Article II, the Lender shall, as part of each demand or notice for payment required under this Article II, deliver to the Borrower (with a copy to the Administrative Agent) a certificate setting forth in reasonable detail the amount and basis of the Supplemental

Costs payable to the Lender hereunder and such certificate shall be conclusive and binding on the Borrower, absent manifest error.

SECTION 2.12     Payments to the Operating Account.  Any payments to be made by the Borrower hereunder (other than Excluded Payments) shall be made to the Operating Account.  Payment to the Operating Account shall constitute payment to the Administrative Agent or the Lender, as applicable.

SECTION 2.13     Currency of Payment.  (a) All payments of principal, interest, fees, and Make-Whole Amount by Borrower under this Agreement and the other Loan Documents shall be made in United States Dollars.

(b)     Any expenses or other Supplemental Costs required to be reimbursed or indemnified by the Borrower pursuant to this Agreement or any other Loan Document, if incurred in Canadian Dollars, will be paid by the Borrower in Canadian Dollars, and if incurred in United States Dollars, will be paid by the Borrower in United States Dollars.

## ARTICLE III
## Representations and Warranties

The Borrower represents and warrants to the Lender on the Effective Date that:

SECTION 3.01     Organization; Powers.  The Borrower (a) has been duly formed and is validly existing and in good standing as an unlimited liability company under the Nova Scotia Companies Act with all requisite company power and authority under its Constituent Documents to execute, deliver and perform its obligations under this Agreement, each other Operative Document to which it is a party and to conduct its business as described in its Constituent Documents, and (b) is duly qualified and is authorized to do business and is in good standing in each other jurisdiction in which the conduct of its business requires it to be so qualified or authorized except where the failure to be so qualified or authorized is not reasonably likely to have a Material Adverse Effect.

SECTION 3.02     Authorization; Enforceability.

(a)     The execution, delivery and performance by the Borrower of this Agreement, each other Operative Document to which it is a party, and the transactions contemplated thereby, are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action of the Borrower, and do not (i) contravene, violate, breach or constitute a default under, the Borrower's Constituent Documents, (ii) violate any law (including, without limitation, the Securities Exchange Act of 1934, as amended), rule, regulation (including, without limitation, Regulations T, U or X of the Board), order, writ, judgment, injunction, decree, determination award, license, permit or consent of the United States or Canada, or any state, territory or province thereof, applicable to it or its assets, (iii) conflict with or result in the breach of, or constitute a default under, any Operative Document or (iv) except for the Liens created under any Operative Document to which the Borrower is a party, result in

or require the creation or imposition of any Lien upon or with respect to any of the properties of the Borrower.

(b)     This Agreement has been, and each other Operative Document to which it is a party when delivered hereunder will have been, duly executed and delivered by the Borrower. This Agreement is, and each other Operative Document to which it is a party when delivered hereunder will be, the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

SECTION 3.03     Consents and Approvals; No Conflicts. No consent of any other Person and no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other third party is required for (a) the due execution, delivery or performance by the Borrower of this Agreement, any other Operative Document to which it is a party, or for the consummation of the transactions contemplated thereby, or (b) the exercise by the Administrative Agent or the Lender of its respective rights under the Operative Documents pursuant hereto except such consents, authorizations, approvals, actions, notices, and filings as (i) have been obtained, made, taken or given, are in full force and effect and copies of which have been furnished to the Administrative Agent or (ii) are not yet required to be obtained, made, taken or given under the terms of the Operative Documents to which the Borrower is a party.

SECTION 3.04     No Activity; No Subsidiaries; Business Activity. (a) Since the date of its formation, the Borrower has not engaged in any activity, entered into any commitment or incurred any Indebtedness other than that contemplated by its Constituent Documents or by the Operative Documents. The Borrower has no obligation to declare or pay any Distributions (other than Distributions payable in its own equity) other than pursuant to the Operative Documents.

(b)     The Borrower has no Subsidiaries.

(c)     The Borrower does not own any Securities, other than the CPS Intercompany Note.

(d)     Since the date of its formation, there has been no event with respect to the Borrower that has resulted, or that could reasonably be expected to result, in a Material Adverse Effect.

(e)     The Borrower is a "private issuer" within the meaning of the Securities Act (Alberta).

(f)     The Borrower is not a non-resident of Canada within the meaning of the Income Tax Act (Canada).

(g)    Interest under this Agreement does not constitute United States source income.

SECTION 3.05    Properties.  The Borrower has good title to, or other valid interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

SECTION 3.06    Litigation.  There is (i) no action, suit, litigation or proceeding pending or, to the best of the Borrower's knowledge, threatened, and (ii), to the best of the Borrower's knowledge, no investigation pending or threatened, before any court, governmental agency or arbitrator that (A) purports to affect the Borrower or, to the best knowledge of the Borrower, any of its assets or properties or (B) purports to affect the legality, validity or enforceability of this Agreement, any other Loan Document or the consummation of the transactions contemplated hereby.

SECTION 3.07    Compliance with Laws and Agreements.  The Borrower is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all Operative Documents binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.08    Investment and Holding Company Status.

(a)    The Borrower is not an "investment company", or a company "controlled" by an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

(b)    The Borrower is not a "holding company" or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company" within the meaning of the Public Utility Holding Company Act of 1935, as amended

SECTION 3.09    Taxes.  The Borrower has filed, has caused to be filed or has been included in all tax returns (Federal, provincial, state, local and foreign) required to be filed by the Borrower and has paid or caused to be paid all taxes due for the periods covered thereby, including interest and penalties, other than any filings or payments the failure of which to file or pay would not result in a Material Adverse Effect.

SECTION 3.10    Disclosure.  No report, financial statement or other written information, exhibit or report furnished by the Borrower to the Lender or the Administrative Agent pursuant to the requirements of this Agreement or in connection with the transaction contemplated hereby, or in connection with the negotiation of, or compliance with, this Agreement contained any material misstatement of fact or omitted to state a material fact necessary to make the statements contained therein not misleading.

SECTION 3.11    Solvency.  As of the date hereof, and upon the closing of the transactions contemplated by the Operative Documents (after giving effect to such transactions), the Borrower shall (a) have an aggregate fair market value of assets that equals or exceeds liabilities (whether contingent, subordinated, unmatured, unliquidated or otherwise), (b) have sufficient cash flow to enable it to pay its liabilities as they mature, and (c) not have unreasonably small capital to conduct such Person's business.  In computing the amount of contingent liabilities at any time (for purposes of determining solvency) it is intended that such liabilities will be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual matured liability.

SECTION 3.12    No Other Obligations.  The Borrower is not a party to any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, other than those Operative Documents to which the Borrower is a party.

# ARTICLE IV
## Conditions

SECTION 4.01    Effective Date.  The obligation of the Lender to make the Loan hereunder shall not become effective until each of the following conditions is satisfied or waived:

(a)    Since the Borrower's formation, nothing shall have occurred that has resulted in a Material Adverse Effect.

(b)    The Administrative Agent shall have received the following documents, each dated as of the Closing Date and duly executed by the respective party or parties thereto, and  otherwise in form and substance reasonably satisfactory to the Lender and the Administrative Agent, and (except for the documents listed in clauses (i), (x), (xiii) and (xviii)) in the number of copies necessary to provide the Lender and the Administrative Agent each with original counterparts of such documents plus three additional original counterparts:

(i)      the Note;

(ii)     the Enron Agreement;

(iii)    the Warrant Agreement;

(iv)     the Put Option Agreement,

(v)      the Total Return Swap Agreement;

(vi)     a favorable opinion of Blake, Cassels & Graydon LLP, counsel to the Borrower, in substantially in the form of Exhibit B-1;

(vii)    a favorable opinion of McInnes Cooper, counsel to the Borrower, in substantially the form of Exhibit B-2;

(viii)    a favorable opinion of Bracewell & Patterson, L.L.P., counsel to Enron, in substantially the form of Exhibit B-3;

(ix)    the Interest Rate Swap Agreement;

(x)    the CPS Intercompany Note;

(xi)    a favorable opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower, in substantially the form of Exhibit B-4 hereto;

(xii)    a compliance certificate, in substantially the form of Exhibit C, properly executed by a Responsible Officer and dated as of the Effective Date;

(xiii)    a Borrowing Request as required by Section 2.02;

(xiv)    the Subscription Agreement;

(xv)    the Subscription Payment Assumption Agreement;

(xvi)    each other Operative Document;

(xvii)    the Enron Consent and the Hansen Consent;

(xviii)    with respect to each of CPS, Hansen and Newman, a certificate issued by the appropriate Governmental Authority of the jurisdiction of incorporation, organization or formation of such Person, certifying that the copies of the currently effective certificate of incorporation, certificate of formation or other applicable instrument or document evidencing the formation of each such Person, and all amendments thereto, are true, correct and complete (dated on, or a recent date prior to the Closing Date); and with respect to each of Enron, CPS, Hansen and Newman, a certificate issued by the appropriate Governmental Authority, if available, that such Person is in good standing and has paid all franchise taxes to the date of such certificate;

(xix)    certificates of each of Enron, CPS, Hansen and Newman, signed on behalf of each such Person by a Responsible Officer of each such Person (the statements made in which certificate shall be true and correct on and as of the Closing Date), certifying as to:

(A)    the absence of any amendments to the Constituent Documents of such Person since the date of the respective certificate referred to in Section 4.01(b)(xviii);

(B)    a true and correct copy of the Constituent Documents of such Person as in effect on the Closing Date;

(C)    the due incorporation or formation and good standing of such Person as a corporation, under the laws of the jurisdiction of its organization,

and the absence of any proceeding for the dissolution or liquidation of such Person;

(D)     that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors, executive (or other) committee of the board of directors, managing member or manager, as applicable, of such Person authorizing the execution, delivery and performance of the Operative Documents to which it is or is to be a party;

(E)     in the case of each such Person, that such resolutions have not been revoked, annulled or modified in any manner and are in full force and effect; and

(F)     in the case of each such Person, the incumbency and specimen signature of each Responsible Officer or an authorized representative of a managing member, as applicable, of such Person executing the documents described in clause (D) above, and a certification of another Responsible Office of each such Person as to the signature of the Responsible Officers signing certificates referred to in this Section 4.01(b)(xix).

(c)     The Lender shall have received the "Loan" under the Flagstaff Credit Agreement, and all conditions precedent to the making of such "Loan" set forth in Section 4.01 of the Flagstaff Credit Agreement have been (or simultaneously with the making of the Loan hereunder, will be) satisfied or waived.

(d)     All fees and reasonable out-of-pocket costs and expenses including, without limitation, reasonable legal fees and out-of-pocket expenses payable to the Lender or the Administrative Agent required to be paid by the Borrower that have been invoiced and are payable on or before the Effective Date shall have been paid to the extent due.

(e)     The Administrative Agent and the Lender shall be reasonably satisfied with all legal issues including tax and regulatory matters.

(f)     The Administrative Agent shall have received such other approvals, opinions or documents as the Administrative Agent or the Lender may reasonably request.

(g)     On the Effective Date the following statements shall be true (and each of the giving of the applicable Borrowing Request and the acceptance by the Borrower of the proceeds of the Loan shall constitute a representation and warranty by the Borrower that on the Effective Date such statements are true):

(i)     The representations and warranties of the Borrower contained in each Operative Document to which it is a party are correct in all material respects in each case by reference to the facts and circumstances then subsisting on and as of the Effective Date, before and immediately after giving effect to such Loan and to the application of the proceeds therefrom, as though made on and as of such date (except to the extent that

such representations and warranties relate solely to an earlier date (in which case such representations and warranties shall have been correct in all material respects on and as of such earlier date));

(ii)     No event has occurred and is continuing, or would result from the making of such Loan or from the application of the proceeds therefrom, that constitutes an Event of Default or a Default; and

(iii)     100% of the proceeds of the Loan shall be loaned by the Borrower pursuant to the CPS Intercompany Note.

(h)     The Lender and the Administrative Agent will have received and reviewed a copy, (i) with respect to the fiscal year ended December 2000 of Enron's annual report which it sends to its public security holders, and a copy of Enron's report on Form 10-K (or any comparable form), for such year, which annual report will include Enron's annual audited consolidated financial statements as of the end of and for such year and (ii) unaudited balance sheet of the Borrower as of the Effective Date after giving effect to the transactions contemplated by the Operative Documents.

(i)     Newman shall have paid to the Lender the full amount owed pursuant to Section 2.1 of the Subscription Payment Assumption Agreement.

SECTION 4.02     Determinations Under Section 4.01.     For purposes of determining compliance with the conditions specified in Section 4.01, the Lender at such time shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lender unless a Responsible Officer of the Administrative Agent responsible for the transactions contemplated by this Agreement shall have received notice from the Lender prior to the date specified in the Borrowing Request for the making of the Loan, specifying its objection thereto.

## ARTICLE V
## Affirmative Covenants

Until the Final Debt Collection Date, the Borrower will, at all times, unless consented to in writing by the Administrative Agent and the Lender:

SECTION 5.01     Reporting Requirements.     Furnish to the Administrative Agent:

(a)     Default Notice.     Promptly after a Responsible Officer of the Borrower obtains actual knowledge thereof, a notice setting forth details of any Default or Event of Default and the action that the Borrower has taken and proposes to take with respect thereto.

(b)     Annual Reports.     With respect to each calendar year, as soon as available, but not later than 120 days after the end of each calendar year, a copy of the audited balance

sheet of the Borrower as at the end of such year and the related audited statement of income, stockholders' equity and cash flows for such year, setting forth in each case in comparative form the figures for the previous year, and accompanied by the opinion of a nationally-recognized independent public accounting firm acceptable to the Administrative Agent, which opinion shall state that such financial statements present fairly the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years.

(c)     Quarterly Reports.  As soon as available, but not later than 60 days after the end of each of the first three calendar quarters of each calendar year, a copy of the unaudited balance sheet of the Borrower as of the end of such quarter and the unaudited related statement of income, stockholders' equity and cash flows for the period commencing on the first day and ending on the last day of such quarter, and certified by a Responsible Officer of the Borrower as fairly presenting, in accordance with GAAP (subject to ordinary, good faith year-end audit adjustments and the absence of footnotes), the financial position and the results of operations of the Borrower.

(d)     Litigation.  Promptly upon a Responsible Officer of the Borrower obtaining actual knowledge thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting the Borrower or any Operative Document.

(e)     Other Notices.  Promptly upon receipt thereof, copies of any other notices, requests, reports, financial statements and other information and documents received by the Borrower under or pursuant to any other Operative Document (other than those issued or sent by the Administrative Agent or the Lender) and, from time to time upon request by the Administrative Agent (other than those already required to be delivered by the Borrower to the Administrative Agent or the Lender), such information and reports required under such other Operative Documents as the Administrative Agent may reasonably request.

(f)     Other Information.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower in the possession or control of the Borrower promptly after the Administrative Agent's reasonable request in writing therefor.

SECTION 5.02     Compliance with Laws, Etc.  Comply with, and cause its properties to be maintained and used in accordance with, all laws, rules, regulations and orders applicable to it or its properties, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.03     Payment of Taxes, Etc.  Pay and discharge before the same shall become delinquent, (a) all taxes, assessments and governmental charges or levies imposed upon it or upon its property and (b) all lawful claims that, if unpaid, might by law become a Lien upon its property; provided, however, that the Borrower shall not be required to pay or discharge any such tax, assessment, charge or claim (i) that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained (in the reasonable judgment of the Borrower), unless and until any Lien resulting therefrom attaches to its property

ꜱ enforceable against its other creditors or (ii) that, if unpaid or undischarged, could ꜱonably be expected to have a Material Adverse Effect.

SECTION 5.04     Preservation of Existence, Etc.  Preserve and maintain its corporate existence, and its material rights (charter and statutory) and authority.

SECTION 5.05     Inspection Rights.  Upon reasonable prior written notice, at any reasonable time during normal business hours and not more often than is reasonable under the circumstances, permit the Administrative Agent or the Lender or any agents or representatives thereof to examine and make copies of and abstracts from the records and books of account of the Borrower; provided that the Administrative Agent and the Lender and any such agents or representatives shall keep confidential all nonpublic information obtained pursuant to the terms of Section 10.11. The Borrower shall assume or pay all reasonable costs and expenses associated with any such examination, discussion or copying.

SECTION 5.06     Keeping of Books.  Keep complete, proper and separate books of record and account, including a record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the operation of the business of the Borrower, all in accordance with GAAP, in each case to the extent necessary to enable the Borrower to comply with the periodic reporting requirements of this Agreement.

SECTION 5.07     Maintenance of Licenses and Permits.  Maintain all licenses and permits necessary to own its properties and to conduct its activities in accordance with all laws, rules, regulations and orders applicable to the Borrower or its properties, except for such failures as would not result in a Material Adverse Effect.

SECTION 5.08     Claims for Supplemental Costs and Make-Whole Amount.  Upon any Supplemental Cost or Make-Whole Amount becoming due pursuant to the terms hereof or otherwise upon demand from the Administrative Agent or the Lender (with a copy to the Administrative Agent) for the payment by the Borrower of any Supplemental Cost or Make-Whole Amount, make demand on CPS for payment of any such Supplemental Cost or Make-Whole Amount, as applicable.

SECTION 5.09     Tangible Net Worth.  The most recent financial statements delivered pursuant to Section 5.01(b) or (c) shall reflect a positive Tangible Net Worth.

## ARTICLE VI
### Negative Covenants

Until the Final Debt Collection Date, the Borrower will not, at any time, unless consented to in writing by the Administrative Agent and the Lender:

SECTION 6.01     Liens, Etc.  Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties of any character whether now owned or hereafter acquired, or sign or file, under the UCC or equivalent law of any jurisdiction, a financing statement that names the Borrower as debtor, excluding, however, from the operation of the

foregoing restrictions the following (such exclusions collectively being "Permitted Liens"): (a) bankers' rights of set-off for uncollected items and routine fees and expenses arising in the ordinary course of business, (b) Liens for taxes and other governmental charges and assessments (and other Liens imposed by law) not yet delinquent or being contested in good faith and by proper proceedings and as to which appropriate reserves (in the reasonable judgment of the Borrower) are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors, (c) restrictions on transfers of Securities under applicable laws and (d) Liens created by or permitted under any Operative Document.

SECTION 6.02    Indebtedness.  Create, incur, assume or suffer to exist, any Indebtedness other than (a) Indebtedness arising under the Operative Documents, or (b) immaterial Indebtedness incurred in connection with the maintenance of the existence of the Borrower and in the ordinary course of its activities permitted under this Agreement.

SECTION 6.03    Mergers, Etc.   Enter into amalgamation, continuance, arrangement, reconstruction or any transaction of consolidation or merger with or into any other Person or wind up, liquidate or dissolve its affairs or take any act, step or proceeding in furtherance of the foregoing.

SECTION 6.04    Sales, Etc., of Assets.   Enter into any partnership, joint venture or sale-leaseback transaction, or purchase or otherwise acquire (in one or a series of related transactions) all or any portion of the property or assets of any Person or make any expenditures (by long term or operating lease) or otherwise for capital assets (either real or personal property) or sell, lease, transfer, exchange, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, directly or indirectly (or agree to any of the foregoing at any future time), all or any material portion of its property or assets, except as permitted under any other provision of this Agreement or any other Operative Document.

SECTION 6.05    Investments in Other Persons.   Make or hold any Investment in any Person other than as contemplated by the Operative Documents.

SECTION 6.06    Amendment, Etc., of Operative Documents.  Cancel or terminate any Operative Document or consent to or accept any cancellation or termination thereof, amend, modify or change in any manner any term or condition of any Operative Document or give any consent, waiver or approval thereunder, waive any default under or any breach of any term or condition of any Operative Document, or agree in any manner to any other amendment, modification or change of any term or condition of any Operative Document, other than (i) any amendment, supplement, cancellation, termination, consent, approval, waiver or modification consented to or waived as provided in Section 10.02 hereof or (ii) any such amendment, supplement, consent, approval, change, waiver or modification that is ministerial or immaterial or non-substantive in nature, not adverse to the Lender and has been consented to by the Administrative Agent.

SECTION 6.07     <u>Negative Pledge</u>.   Enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets other than (a) any such agreement in favor of the Administrative Agent or the Lender and (b) as provided in Operative Documents.

SECTION 6.08     <u>Subsidiaries</u>.  Establish, create, acquire or permit to exist any Subsidiary.

SECTION 6.09     <u>Nature of Activities</u>.  Engage in any activity other than the management and protection of its rights under the Operative Documents to which it is a party and such other activities as are incidentally related thereto or as otherwise required or expressly contemplated in the Operative Documents to which it is a party.

SECTION 6.10     <u>Distributions; Securities</u>.   (a) Declare or pay any Distributions, (b) call for redemption, redeem, purchase, acquire or otherwise pay-off or retire for value any Securities or set aside or otherwise segregate any amounts for such purpose, (c) except as provided in the Operative Documents, create, allot or issue any additional Securities, or (d) make any payment or distribution out of any stated capital account of the Borrower or any reduction of any stated capital account of the Borrower in respect of any of its Securities or any similar payment, distribution or reduction in the stated capital of the Borrower, or, in each case in this Section 6.10, enter into any agreement or obligation with respect to the foregoing other than as provided in the Operative Documents.

SECTION 6.11     <u>Affiliate Transactions</u>.  Enter into any transaction or series of related transactions, with any of its Affiliates or Enron or any of its Affiliates, other than the transactions contemplated by the Operative Documents to which it is a party.

SECTION 6.12     <u>Bankruptcy</u>.   Commence voluntary proceedings for dissolution, liquidation or winding-up, or under the Companies Creditors Arrangement Act (Canada), the Bankruptcy and Insolvency Act (Canada), the Winding-up Act (Canada), or any other bankruptcy, insolvency or similar law now or hereafter in effect, or consent to the entry of an order in an involuntary proceeding under any such law, or give consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Borrower or for any substantial part of its assets, or make any general assignment for the benefit of creditors, or fail generally to pay its debts as such debts become due, or take any action in furtherance of any of the foregoing.

SECTION 6.13     <u>Prepayments</u>.  Accept any prepayment of the principal of the note issued by CPS under the CPS Intercompany Note, unless substantially contemporaneously therewith, Borrower prepays the entire amount of the Obligations of Borrower hereunder.

Anything herein to the contrary notwithstanding, the parties hereto agree that the execution, delivery and performance of the Operative Documents will not contravene the provisions of this Article VI.

# ARTICLE VII
## Events of Default

If any of the following events ("<u>Events of Default</u>") shall occur:

(a)    the Borrower shall fail to pay (i) any principal on the Loans when the same becomes due and payable, (ii) any interest on the Loans or Cost of Funds Adjustment Amount for more than five days after the same becomes due and payable, or (iii) or any other amount payable by it under this Agreement or under any other Loan Document for more than 15 days after the same becomes due and payable;

(b)    any written representation or warranty made or deemed made by the Borrower under or in connection with any Loan Document or any other certificate or report made by or on behalf of the Borrower hereunder shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing;

(c)    the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.01(a), (d) or (e) or Article VI;

(d)    the Borrower shall fail to perform any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for thirty days after written notice thereof shall have been given to the Borrower by the Administrative Agent or the Lender;

(e)    the Borrower or Newman shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of 60 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property) shall occur; or the Borrower shall take any action to authorize any of the actions set forth above in this subsection (e);

(f)    any judgment or order for the payment of money in excess of $50,000 (or the equivalent in any foreign currency) shall be rendered against the Borrower and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order and such proceedings shall not have been stayed within 30 days or (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(g)     the Borrower shall for any reason dissolve or its directors or its stockholder(s) shall have consented to the dissolution of the Borrower;

(h)     any material provision of any Operative Document at any time after its execution and delivery shall cease, in any material respect, to be in full force and effect in any material respect, or its validity or enforceability shall be contested by the Borrower, any other Designated Party or Enron, or the Borrower, any other Designated Party or Enron shall deny that it has any further liability or obligations under any Operative Document to which it is a party;

(i)     an Enron Event shall have occurred and be continuing; or

(j)     CPS shall fail for any reason to comply with any obligation under the CPS Intercompany Note;

then, (1) and in every such event (other than an event with respect to the Borrower described in clause (2) below), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Lender shall, by notice to the Borrower, declare the Loans then outstanding, accrued interest thereon, Supplemental Costs, the Make-Whole Amount and all fees and other Obligations of the Borrower accrued hereunder to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon, Supplemental Costs, the Make-Whole Amount and all fees and other Obligations of the Borrower accrued hereunder, shall become and be forthwith due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and (2) in case of any event with respect to the Borrower described in clause (e) of this Article or in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the United States Bankruptcy Code as then in effect, or in the event that the Borrower is adjudicated bankrupt under the Bankruptcy and Insolvency Act (Canada), the principal of the Loan then outstanding, together with accrued interest thereon and all fees, Supplemental Costs, the Make-Whole Amount and other Obligations of the Borrower hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. The Administrative Agent and the Lender shall have, in addition to all other rights and remedies under this Agreement or otherwise, all other rights and remedies provided under applicable laws, which rights shall be cumulative.

## ARTICLE VIII
### The Administrative Agent

The Lender hereby irrevocably appoints Chase as Administrative Agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Administrative Agent and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or other Affiliate thereof as if it were not the Administrative Agent.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing by the Lender, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Lender or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall not be deemed to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or the Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by giving 15 Business Days' prior written notice to the Lender, the Borrower, and Enron. Such resignation shall be effective upon the appointment of a successor Administrative Agent, as provided below. Upon any such notice of resignation, the Lender shall have the right, in consultation with the Borrower, to appoint a successor, which successor shall be a commercial bank or trust company reasonably acceptable to the Borrower and Enron. If no successor shall have been so appointed by the Lender and shall have accepted such appointment within such 15 Business Day period, then the retiring Administrative Agent, with the consent of the Borrower and Enron (which consent may not be unreasonably withheld) may, on behalf of the Lender, appoint a successor Administrative Agent, which agent shall be a bank with an office in New York, New York, or an Affiliate of any such bank, who shall serve as Administrative Agent until such time, if any, as the Lender appoints a successor Administrative Agent, as provided above. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring agent, and the retiring agent shall be discharged from its duties and obligations hereunder. The annual fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 10.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

The Lender acknowledges that it has, independently and without reliance upon the Administrative Agent and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. The Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

## ARTICLE IX
## Administration; Settlement; Collection

SECTION 9.01    The Operating Account. The Borrower acknowledges that (a) the Operating Account shall be subject to the dominion and control of the Flagstaff Collateral Agent and (b) except as set forth in the Flagstaff Credit Agreement, no amount shall be paid or released from the Operating Account to or for the account of, or withdrawn by or for the account of, the Borrower or any other Person. The Operating Account shall be subject to applicable laws, and applicable regulations of any Governmental Authority, as may now or hereafter be in effect. The Borrower agrees to be bound by the terms and provisions of Article X of the Flagstaff Credit Agreement with respect to the administration and ownership of the Operating Account and with respect to the disposition of funds therein as if it were a party thereto. Except as otherwise provided herein or in the other Operative Documents, the Borrower shall take no action inconsistent with the provisions of Article X of the Flagstaff Credit Agreement.

SECTION 9.02    Deposit of Funds into the Operating Account.  On or prior to the date hereof, the Borrower shall give to Enron and CPS written notice (such notice to be in form and substance satisfactory to the Flagstaff Collateral Agent) irrevocably instructing Enron and CPS that all payments (other than Excluded Payments) due to the Borrower from Enron or CPS, respectively, shall be deposited directly into the Operating Account.  The Borrower shall notify the Administrative Agent of any such deposit made pursuant to this Section 9.02.

SECTION 9.03    Investing of Amounts in the Operating Account.  The Borrower may give instructions to the Lender (and the Lender shall forward such instructions in the form received to the Flagstaff Collateral Agent as provided for in Section 10.03 of the Flagstaff Credit Agreement) with respect to the investment of amounts on deposit in the Operating Account pursuant to the terms and provision of Section 10.03 of the Flagstaff Credit Agreement.  The Borrower agrees to give no instruction to the Lender that would be inconsistent with the terms and provisions of the Flagstaff Credit Agreement.  If, but only to the extent, the Lender actually receives payment of any such investment yield, then, pursuant to Sections 10.04(a) or (b) of the Flagstaff Credit Agreement, it agrees that such amounts shall be for the account of the Borrower and will promptly pay such amounts to the Borrower.

SECTION 9.04    Deposit Constitutes Payment.  All funds deposited in the Operating Account by the Borrower (or by Enron or CPS on behalf of the Borrower) in consideration of Obligations of the Borrower hereunder or under any other Loan Document, shall constitute payment of such Obligations to the same extent as if any such payment were made directly to the Lender.

SECTION 9.05    Return of Excess Funds.  So long as no Default has occurred and is continuing, on each Payment Date after payment in full of all Obligations of the Borrower hereunder due and payable on such date, the balance of any funds in the Flagstaff Account shall be deposited in an account of the Borrower maintained with the Administrative Agent in New York City and designated by the Borrower in writing as the account into which deposits required pursuant to this Section 9.05 are to be made.

**ARTICLE X**
**Miscellaneous**

SECTION 10.01    Notices.  Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing (including telecopier communication) and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to the Borrower, to it at its address at 3500, 400-3rd Avenue S.W., Calgary, Alberta T2P 4H2, Attention: Vice President – Legal, facsimile no. (403) 974-6707; with copies to Enron Corp., 1400 Smith Street, Houston, Texas 77002, Attention: Deputy Treasurer, Corporate Finance, facsimile no. (713) 646-3422;

(b)     if to the Administrative Agent, at The Chase Manhattan Bank, 1 Chase Manhattan Plaza, 8th Floor, New York, New York, 10081, facsimile no. (212) 552-5777. Attention: Lisa Pucciarelli;

(c)     if to the Lender, to it at its address at Flagstaff Capital Corporation, 270 Park Avenue, 35th Floor, New York, New York 10017, Attention: Lisa Lee, facsimile no. (212) 270-2676; with copies to The Chase Manhattan Bank, 1 Chase Manhattan Plaza, 8th Floor, New York, New York, 10081, facsimile no. (212) 552-2261 Attention: Muniram Appanna.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by written notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be effective, if mailed, two Business Days after deposit in the mails; if sent by overnight courier, one Business Day after delivery to the courier company; and if sent by telecopier, when received by the receiving telecopier equipment, respectively.

SECTION 10.02     Waivers; Amendments.   (a) No failure or delay by the Administrative Agent or the Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lender hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have under applicable law.  No amendment or waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Without limiting the generality of the foregoing, the making of the Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or the Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Lender or by the Borrower and the Administrative Agent with the consent of the Lender; provided that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent.

SECTION 10.03     Expenses; Indemnity; Damage Waiver.  (a) The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees and out-of-pocket expenses of counsel for the Administrative Agent, in connection with the preparation and administration of this Agreement and the other Operative Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Administrative Agent

or the Lender, including the reasonable fees and out-of-pocket expenses of any counsel for the Administrative Agent or the Lender, in connection with (A) the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section 10.03, or in connection with the Loan made hereunder or in connection with any Loan Document, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, and (B) the negotiation, execution, delivery and performance of the Interest Rate Swaps, including, without limitation, the cost of entering into the Interest Rate Swaps, indemnity obligations and any and all other obligations of the Lender in connection therewith.

(b)     The Borrower shall, to the extent permitted by law and subject to the last sentence of this section 10.03(b), indemnify the Administrative Agent and the Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees and out-of-pocket expenses of any counsel for any Indemnitee (excluding Taxes which are dealt with in Section 2.08), incurred by or asserted against any Indemnitee (other than by another Indemnitee) arising out of, in connection with, or as a result of any investigation, litigation, or proceeding, whether or not such Indemnitee is a party thereto, arising out of, related to or in connection with (i) the execution or delivery of this Agreement, any other Loan Document, or the Operative Documents, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions, or (ii) any Loan or the use of the proceeds therefrom; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence, willful misconduct, bad faith of, or breach of contract by such Indemnitee. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, EXCEPT AS SET FORTH IN THE NEXT SUCCEEDING SENTENCE, THE BORROWER SHALL NOT BE LIABLE FOR, AND SHALL NOT BE OBLIGATED TO INDEMNIFY ANY INDEMNITEE FOR, LOSSES CONSTITUTING TREBLE, EXEMPLARY, OR PUNITIVE DAMAGES. IF (A) AN INDEMNITEE HAS BECOME LIABLE TO A THIRD PARTY (THAT IS NOT ANOTHER INDEMNITEE) FOR LOSSES CONSTITUTING DAMAGES SPECIFIED IN THE PRECEDING SENTENCE, AND (B) SUCH INDEMNITEE WOULD BE ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT BUT FOR THE LIMITATION SET FORTH IN THE PRECEDING SENTENCE, THEN SUCH INDEMNITEE SHALL NONETHELESS BE ENTITLED TO INDEMNIFICATION FOR SUCH LOSSES INCURRED TO SUCH THIRD PARTY.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or under paragraph (a) or (b) of this Section, the Lender severally agrees to pay to the Administrative Agent of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)     Except as set forth in the next succeeding sentence, and to the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any breach by such Indemnitee of this Agreement, any Operative Document, the Transactions

or the use of the proceeds thereof. If the Borrower becomes liable to a third party for amounts constituting special, indirect, consequential or punitive damages as a result of a breach of an obligation hereunder by an Indemnitee, the Borrower shall be entitled to a claim and to recover (and does not waive its rights to claim and recover) such amounts from such Indemnitee to the extent such Indemnitee would be liable to the Borrower for such amounts but for the limitation in the preceding sentence.

(e)     All amounts due under this Section shall be payable promptly after written demand therefore.

(f)     If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to the Note, this Agreement or any other Loan Document, it becomes necessary to convert into the currency of such jurisdiction (the "Judgment Currency") any amount due under the Note, this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "Currency Due"), then conversion will be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given. For this purpose, "rate of exchange" means the rate at which the Lender is able, on the relevant date, to purchase the Currency Due with the Judgment Currency at the head office of The Chase Manhattan Bank of Canada in Toronto, Ontario. In the event that there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Lender of the amount due, the Borrower will, on the date of receipt by the Lender, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by the Lender on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Lender is the amount then due under the Note, this Agreement or such other Loan Document in the Currency Due. If the amount of the Currency Due which the Lender is so able to purchase is less than the amount of the Currency Due originally due to it, the Borrower will indemnify and save the Lender harmless from and against all loss or damage arising as a result of such deficiency. This indemnity will constitute an obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by the Lender from time to time and will continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under the Note, this Agreement or any other Loan Document or under any judgment or order.

SECTION 10.04     Successors and Assigns.     Neither the Lender nor the Borrower may assign, participate or subparticipate any of its rights or obligations hereunder without the prior written consent of the other such Person and the Administrative Agent. Notwithstanding the foregoing, (a) the Borrower hereby consents to the granting and assignment by the Lender of a Lien in all of the Lender's right, title, and interest in this Agreement and the other Loan Documents pursuant to the Flagstaff Credit Agreement and to any additional assignments or transfers resulting from the exercise of remedies as provided in the Flagstaff Credit Agreement or any other Loan Document (as defined in the Flagstaff Credit Agreement), (b) the Borrower hereby consents to the assignment by the Lender of all of the Lender's right,

title, and interest in the Make-Whole Amount resulting from the exercise of its rights under the Put Option Agreement, and (c) any consent of the Borrower otherwise required under this paragraph shall not be required if an Event of Default has occurred and is continuing. ANY ATTEMPTED ASSIGNMENT OR GRANT OF A PARTICIPATION OR SUBPARTICIPATION IN VIOLATION OF THIS SECTION 10.04 SHALL BE VOID. TO THE EXTENT THE LENDER ASSIGNS OR PARTICIPATES ANY PORTION OF ITS ADVANCE IN VIOLATION OF THIS SECTION 10.04, THE LENDER AND THE PROPOSED PURCHASER OR PARTICIPANT, AS THE CASE MAY BE, SHALL UPON NOTICE BY THE ADMINISTRATIVE AGENT TAKE ALL STEPS NECESSARY OR ADVISABLE TO AVOID THE BORROWER BEING OR BECOMING AN "INVESTMENT COMPANY" WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT OF 1940, INCLUDING BUT NOT LIMITED TO, ALL STEPS NECESSARY TO TRANSFER SUCH ASSIGNED OR PARTICIPATED INTEREST THEREUNDER TO THE LENDER SELECTED BY THE BORROWER AND THE ADMINISTRATIVE AGENT. NO PURCHASER OR PARTICIPANT SHALL (UNLESS SUCH ASSIGNMENT OR PARTICIPATION HAS BEEN CONSENTED TO IN WRITING BY THE BORROWER) BE ENTITLED TO RECEIVE ANY GREATER BENEFIT PURSUANT TO SECTIONS 2.07, 2.08 AND 10.03 THAN THE LENDER WOULD HAVE BEEN ENTITLED TO RECEIVE WITH RESPECT TO THE RIGHTS TRANSFERRED.

SECTION 10.05     Survival; Continued Effectiveness.

(a)     All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of the Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitment has not expired or terminated. The provisions of Sections 2.07, 2.08 and 10.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan, the expiration of the Commitment or the termination of this Agreement or any provision hereof.

(b)     The Borrower's obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment by the Borrower in satisfaction of any of the obligations of the Borrower under this Agreement is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of the Borrower, or otherwise, all as though such payment had not been made.

SECTION 10.06     Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and

understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 10.07    Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 10.08    Right of Setoff. Subject to Section 4.2(b) of the Warrant Agreement and Section 2.4 of the Subscription Payment Assumption Agreement, (a) if an Event of Default shall have occurred and be continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by the Lender, irrespective of whether or not the Lender shall have made any demand under this Agreement and although such obligations may be unmatured and (b) the rights of the Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which the Lender may have.

SECTION 10.09    Governing Law; Consent to Service of Process. (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    The Borrower hereby irrevocably and unconditionally submits, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan and to the extent possible, the Commercial Division, Civil Branch thereof and of the United States District Court of the Southern District of New York sitting in the Borough of Manhattan, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment therefrom, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, the Flagstaff Collateral Agent or the Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c)     The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     The Borrower hereby irrevocably appoints National Registered Agents, Inc. with offices on the date hereof at 440 9th Avenue, 5th Floor, New York, NY 10001 (or any successor appointed by the Borrower, provided that such successor shall be located in New York City and engaged in the business of acting as a Process Agent and shall be a company of national recognition, and provided further that notice of such successor Process Agent shall be promptly given to the Administrative Agent by the Borrower, the "Process Agent") as its designee, appointee and agent to receive, accept and acknowledge on its behalf and its property service of copies of the summons and complaint and any other process that may be served in any action or proceeding under paragraph (b) of this Section. Such service may be made by delivering a copy of such process to the Borrower in care of the Process Agent at the Process Agent's address, and the Borrower hereby authorizes and directs the Process Agent to accept such service on its behalf.

(e)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 10.10     Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 10.11     Confidentiality. The Lender agrees that it will use reasonable efforts not to disclose without the prior consent of the Borrower (other than to the Lender's Affiliates in the ordinary course of business in connection with any Operative Document, the administration thereof or any transaction contemplated hereby, employees, auditors or counsel or to a Flagstaff Lender if the Lender or the Administrative Agent in its sole discretion determines that any such party should have access to such information) any information with respect to the Borrower or its Subsidiaries which is furnished pursuant to this Agreement or any other Operative Document and which is designated by the Borrower to the Lender in writing as confidential, provided that the Lender may disclose any such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over the Lender or the Administrative Agent or to the Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere), (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to the Lender, and (e) to the prospective transferee in connection with any contemplated transfer (permitted pursuant to the terms hereof) of the Note or any

interest therein by the Lender, provided, that such prospective transferee executes an agreement with the Borrower containing provisions substantially identical to those contained in this Section.

SECTION 10.12    <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lender.  Any excess shall be cancelled automatically and, if theretofore paid, shall be at the option of the Administrative Agent or the Lender, as the case may be, be applied on the principal amount of the obligations owed to the Administrative Agent or the Lender, as the case may be, by the Borrower or refunded by the Administrative Agent or the Lender, as the case may be, to the Borrower.

*[Signature Page to Credit Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

HANSEN INVESTMENTS CO.
as Borrower


By: _____
   Name: Peter C.M. Keohane
   Title: Vice President and Secretary


FLAGSTAFF CAPITAL CORPORATION,
as Lender



By:_____
   Bruce Hendrick
   President


THE CHASE MANHATTAN BANK,
as Administrative Agent



By:_____
   Robert W. Traband
   Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

HANSEN INVESTMENTS CO.
as Borrower


By:_____
    Name:
    Title:


FLAGSTAFF CAPITAL CORPORATION,
as Lender


By:_____
    Bruce Hendrick
    President


THE CHASE MANHATTAN BANK,
as Administrative Agent


By:_____
    Robert W. Traband
    Vice President

FORM OF PROMISSORY NOTE

$1,414,504,347                                                    June 22, 2001

HANSEN INVESTMENTS CO., a Nova Scotia company (the "Company"), for value received, promises and agrees to pay to FLAGSTAFF CAPITAL CORPORATION, a Delaware corporation (the "Lender"), or order, at the office of THE CHASE MANHATTAN BANK (the "Administrative Agent"), at 1 Chase Manhattan Plaza, 8th Floor, New York, New York 10081, the principal sum of ONE BILLION, FOUR HUNDRED FOURTEEN MILLION, FIVE HUNDRED FOUR THOUSAND, THREE HUNDRED FORTY SEVEN AND NO/100 DOLLARS, in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Hansen Credit Agreement referred to below, and to pay interest on the unpaid principal amount as provided in the Hansen Credit Agreement for such Advance made by the Lender to the Company under the Hansen Credit Agreement, at such office, in like money and funds, at the rates per annum and on the dates provided in the Hansen Credit Agreement.

In addition to and cumulative of any payments required to be made against this Note pursuant to the Hansen Credit Agreement, this Note, including all principal and accrued interest then unpaid, shall be due and payable on the Maturity Date and the Company shall repay to the Lender the principal amount of the Advance that remains outstanding on such date. All payments on this Note shall be applied in the manner set forth in the Hansen Credit Agreement.

This Note is the Note referred to in the Credit Agreement dated as of June 22, 2001, among the Company, as borrower, the Lender, and The Chase Manhattan Bank, as administrative agent (such Credit Agreement, together with all amendments or supplements thereto, being the "Hansen Credit Agreement"). This Note evidences the Advance made by the Lender thereunder and shall be governed by the Hansen Credit Agreement. Capitalized terms used but not defined in this Note and which are defined in the Hansen Credit Agreement shall have the respective meanings herein as are assigned in the Hansen Credit Agreement.

Except only for any notices which are specifically required by the Hansen Credit Agreement or the other Operative Documents, the Company and any and all co-makers, endorsers, guarantors and sureties severally waive notice (including but not limited to notice of intent to accelerate and notice of acceleration, notice of protest and notice of dishonor), demand, presentment for payment, protest, diligence in collecting and the filing of suit for the purpose of fixing liability, and consent that the time of payment hereof may be extended and re-extended from time to time without notice to any of them. Each such Person agrees that his, her or its liability on or with respect to this Note shall not be affected by any release of or change in any guaranty or security at any time existing or by any failure to perfect or maintain perfection of any lien against or security interest in any such security or the partial or complete enforceability of any guaranty or

other surety obligation, in each case in whole or in part, with or without notice and before or after maturity.

The Hansen Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events and for prepayment of the Advance upon the terms and conditions specified therein. Reference is made to the Hansen Credit Agreement for all other pertinent purposes.

This Note is issued pursuant to and is entitled to the benefits of the Hansen Credit Agreement.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

*[Signature Page Follows]*

*[Signature Page to Promissory Note]*

## HANSEN INVESTMENTS CO.

By:_____
    Name:
    Title:

FORM OF OPINION OF BLAKE, CASSELS & GRAYDON LLP,

COUNSEL FOR THE BORROWER

Each of the Addresses Listed
in the Attached Schedule 1

Ladies and Gentlemen:

We act as Canadian counsel to Hansen Investments Co. ("**Finco**"), a Nova Scotia company, and Newman Investments Co. ("**Subco**"), a Nova Scotia company, in connection with the transactions contemplated by the Credit Agreement (the "**Finco Credit Agreement**") of even date herewith among Finco, as borrower, Flagstaff Capital Corporation ("**Flagstaff**"), as lender, and The Chase Manhattan Bank, as administrative agent. This opinion is being rendered pursuant to Section 4.01(b)(vi) of the Finco Credit Agreement. Capitalized terms used herein and not otherwise defined herein shall have the same meanings herein as ascribed thereto in the Finco Credit Agreement, including those defined terms incorporated therein by reference to other documents.

In rendering the opinions set forth below, we have reviewed the documents set forth on Schedule II attached hereto and such other records, certificates and documents as we have deemed relevant for the purposes of such opinions. The term "**Transaction Documents**" shall mean: (a) the Finco Credit Agreement and the Note delivered pursuant thereto; (b) the Subscription Agreement; (c) the Subscription Payment Assumption Agreement and (d) the Warrant Agreement. We have also reviewed the documents set forth in Schedule III attached hereto (the "**U.S. Documents**").

As to any facts material to our opinion, we have made no independent investigation of such facts and have relied, to the extent that we deem such reliance proper, upon certificates of public officials and officers or other representatives of Finco and Subco and on the representations and warranties set forth in the Transaction Documents.

In rendering the opinions expressed below, we have assumed: (a) the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity to authentic original documents of all documents submitted to us as copies; (b) that the Transaction Documents and the U.S. Documents have been duly authorized, executed and delivered by each party thereto (other than Finco and Subco) and constitute legal, valid and binding obligations of such parties (other than Finco and Subco) enforceable against such parties in accordance with their terms and that the laws of any jurisdiction other than Alberta Laws (as defined below) do not affect the terms of the Transaction Documents; (c) there is nothing in the documents referred to in any of the Transaction Documents which would affect the opinions expressed herein; (d) insofar as any obligation under any of the Transaction

Documents is to be performed in any jurisdiction other than in the Province of Alberta, its performance will not be illegal or unenforceable under the laws of that jurisdiction; (e) the Finco Credit Agreement and the Note constitute or will on execution constitute legal, valid and binding obligations of the parties under the laws of the State of New York enforceable in competent courts of that jurisdiction; (f) the formalities for execution by each party required by the law of the place of execution of each of the Transaction Documents have been or will be complied with; and (g) physical delivery of each of the Transaction Documents on behalf of each of Finco and Subco has occurred free from escrow or any similar arrangement or restriction (other than any such escrow or similar arrangement that is set forth in the Transaction Documents).

The opinions expressed below in paragraphs 1 to 6 are based solely upon and in reliance upon the opinion of McInnes Cooper of even date hereto (the "**Nova Scotia Opinion**"), a copy of which has been delivered to you. We have examined the Nova Scotia Opinion and such opinion is in form and scope satisfactory to us and we believe we and you are justified in relying thereon. However, we have made no independent investigation in respect of such opinion and have assumed its accuracy and completeness. To the extent that the Nova Scotia Opinion is based upon an assumption or is made subject to any limitation, qualification or exception, our opinion given solely in reliance thereon is based upon such assumptions and is subject to such limitations, qualifications or exceptions. We do not, however, assume any liability for any opinion expressed in the Nova Scotia Opinion.

We are members of the Law Society of Alberta and are qualified to practice law in the Province of Alberta. Except to the extent that this opinion is rendered solely in reliance on the Nova Scotia Opinion, this opinion is rendered solely with respect to the laws of the Province of Alberta and the federal laws of Canada applicable therein.

Based upon and subject to the foregoing and subject to the qualifications hereinafter expressed, we are of the following opinion:

1.  Finco is an unlimited company duly formed and validly subsisting and in good standing as to the payment of annual fees and filing of annual returns under the laws of the Province of Nova Scotia with the corporate power to execute and deliver the Transaction Documents executed by it and perform its obligations thereunder.

2.  Subco is an unlimited company duly formed and validly subsisting and in good standing as to the payment of annual fees and filing of annual returns under the laws of the Province of Nova Scotia with corporate power to execute and deliver the Transaction Documents executed by it and perform its obligations thereunder.

3.  The execution and delivery by each of Finco and Subco of each Transaction Document to which it is a party and the performance by it of its obligations thereunder have been duly authorized by all necessary corporate action of each of Finco and Subco, as the case may be.

4. The execution and delivery by each of Finco and Subco of each Transaction Document to which it is a party and the performance by it of its obligations thereunder will not conflict with or result in the breach of any of the terms, conditions or provisions of their respective memorandum of association and articles of association.

5. The execution and delivery by each of Finco and Subco of each Transaction Document to which it is a party and the performance by it of its obligations thereunder do not result in a violation of "Applicable Laws" (as such term is defined in the Nova Scotia Opinion).

6. No Governmental Approval (as such term is defined in the Nova Scotia Opinion) is or will be required to authorize or is or will be required (a) in connection with the execution and delivery of any of the Transaction Documents by Finco or Subco or the performance of their obligations thereunder or (b) to ensure the validity, effectiveness or enforceability of the Transaction Documents.

7. The execution and delivery by each of Finco and Subco of each Transaction Document to which it is a party and the performance by it of its obligations thereunder do not result in a violation of Alberta Laws (as defined below).

> "**Alberta Laws**" means those laws, rules and regulations of the Provinces of Alberta and the federal laws, rules and regulations of Canada applicable therein and the rules and regulations adopted thereunder which, in our experience, are normally applicable to the transactions of the type contemplated by the Transaction Documents. Furthermore, the term "Alberta Laws" does not include, and we express no opinion in regard to: (a) any Alberta or federal law, rule or regulation relating to: (i) pollution or protection over the environment; (ii) zoning, land use, building or construction; (iii) occupational, safety and health or other similar matter; or (iv) labour, employment rights and benefits; (b) the regulation of utilities; (c) anti-trust laws; and (d) tax laws, rules or regulations.

8. No Governmental Approval (as defined below) is or will be required to authorize or is required (a) in connection with the execution and delivery of any of the Transaction Documents by Finco or Subco or the performance of their obligations thereunder or (b) to ensure the validity, effectiveness or enforceability of any of the Transaction Documents.

> "**Governmental Approval**" means any consent, approval, license, authorization or validation of, or filing, recording or registration with any Governmental Authority pursuant to any Alberta Laws (as defined in paragraph 7 above).

9. There is no registration or transfer tax, stamp duty or similar levy payable in respect of the execution, delivery, validity, performance or enforcement of any of the Transaction Documents under Alberta Laws.

10. Each of Finco and Subco is subject to civil and commercial law with respect to its obligations under the Transaction Documents to which it is a party, and the execution, delivery and performance by any such entity of any such Transaction Document constitutes private and commercial acts rather than public or governmental acts. None of Finco or Subco, nor any of their respective properties or assets, has any sovereign immunity or any other immunity from the jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in and of judgment, execution or otherwise).

11. Each of the Subscription Agreement, the Subscription Payment Assumption Agreement and the Warrant Agreement to which Finco or Subco is a party constitutes a legal, valid and binding obligation of Finco or Subco, as applicable, enforceable against each of Finco and Subco in accordance with its terms.

12. The choice of New York law as the governing law of the Finco Credit Agreement and the Note delivered pursuant thereto will be upheld as a valid choice of law by Alberta courts provided the choice of law is bona fide in the sense that it was not made with a view to avoiding the law of any other jurisdiction. In an action brought before a court of competent jurisdiction in Alberta to enforce and interpret the Finco Credit Agreement and the Note delivered pursuant thereto, the laws of New York would, to the extent specifically pleaded and proved as a fact by expert evidence, be recognized and applied by such court to all issues that, under the conflict of laws rules of Alberta, are to be determined in accordance with the proper or governing law of a contract. Notwithstanding any such valid choice of law, the courts of Alberta will not apply those laws of New York:

   (a) which it characterizes as being of a governmental revenue or penal law nature;

   (b) relating to matters of a procedural nature; or

   (c) the application of which would be inconsistent with "public policy", as such term is applied by the courts in Alberta.

   In addition, a court of competent jurisdiction in Alberta may reserve to itself an inherent power to decline to hear any such action if it is contrary to public policy for it to do so, or if it is not the proper forum to hear such action, or if concurrent proceedings in respect of such matter are being brought elsewhere.

13. It is not necessary under Alberta Law (i) in order to enable either of Flagstaff or the Administrative Agent to enforce its rights under any Transaction Document or (ii) by reason only of the execution, delivery or performance by any of Flagstaff or the Administrative Agent of any Transaction Document, that such Person for such purposes only should be licensed, qualified or entitled to carry on business in Alberta, provided that Flagstaff or the Administrative Agent, as applicable, has no other contact with Alberta.

14.    A judgment *in personam* against any of Finco or Subco by a court of the State of New York may be enforced in an Alberta court by an action or counterclaim for the amount due under such judgment provided that:

(a)    such court had jurisdiction over Finco or Subco, as applicable, as recognized by the courts of Alberta;

(b)    such judgment is for a sum certain and is not impeachable as void or voidable under the internal laws of New York;

(c)    such judgment was not obtained by fraud or any manner contrary to natural justice and the enforcement thereof would not be inconsistent with public policy, as that term is understood under Alberta law;

(d)    the enforcement of such judgment in Alberta does not constitute, directly or indirectly against Finco or Subco, as applicable, the enforcement of any law characterized by an Alberta court as being of a governmental revenue, penal, expropriatory or public law nature;

(e)    no new admissible evidence relevant to the action which is the subject matter of such judgment is discovered or arises prior to the rendering of such judgment by the Alberta court;

(f)    the application to enforce such judgment is made against Finco or Subco, as applicable, in Alberta within the applicable limitation period;

(g)    the action giving rise to such judgment is recognizable under Alberta law;

(h)    no order affecting the judgment has been made by the Attorney General of Canada under the *Foreign Extra-Territorial Measures Act* (Canada) based on his opinion as to the adverse effect of the judgment to significant Canadian interests in relation to international trade and commerce involving a Canadian business or the infringement of Canadian sovereignty;

(i)    no order has been made by the Competition Tribunal under the Competition Act (Canada) relating to the enforcement of the judgment as a result of its finding of an adverse effect, restraint or injury to competition in Canada or the domestic or foreign trade and commerce of Canada;

(j)    Finco or Subco, as applicable, was duly served with process in accordance with the laws of New York;

(k)    the judgment is not in respect of a cause of action that, for reasons of public policy or for some other similar reason, would not have been entertained by the courts of Alberta;

(l)    the judgment has not been satisfied and is a subsisting judgment; and

(m)    such judgment is final and conclusive.

15.    The choice of New York law as the governing law of the U.S. Documents will be upheld as a valid choice of law by Alberta courts provided the choice of law is bona fide in the sense that it was not made with a view to avoiding the law of any other jurisdiction. In an action brought before a court of competent jurisdiction in Alberta to enforce and interpret the U.S. Documents, the laws of New York would, to the extent specifically pleaded and proved as a fact by expert evidence, be recognized and applied by such court to all issues that, under the conflict of laws rules of Alberta, are to be determined in accordance with the proper or governing law of a contract. Notwithstanding any such valid choice of law, the courts of Alberta will not apply those laws of New York:

(i)    which it characterizes as being of a governmental revenue or penal law nature;

(ii)    relating to matters of a procedural nature; or

(iii)    the application of which would be inconsistent with "public policy", as such term is applied by the courts in Alberta; notwithstanding the foregoing, we are of the opinion that the courts of Alberta would not seek to apply "public policy", as such term is applied by the courts in Alberta, to invalidate any of the rights and remedies of the parties to the U.S. Documents.

In addition, a court of competent jurisdiction in Alberta may reserve to itself an inherent power to decline to hear any such action if it is contrary to public policy for it to do so, or if it is not the proper forum to hear such action, or if concurrent proceedings in respect of such matter are being brought elsewhere.

The opinion set forth in this paragraph 15 is based on the assumption that (a) none of the U.S. Documents relate to any Enron Corp. business of Enron Corp. carried on in Canada, if any, or to any establishment of Enron Corp., if any, in Canada; and (b) the U.S. Documents will be performed in the United States of America.

The opinions expressed herein are subject to the following qualifications:

(a)    the enforceability of the Subscription Agreement, the Subscription Payment Assumption Agreement and the Warrant Agreement (collectively, the "**Documents**") and the rights and remedies set out therein or any judgment arising out of or in connection therewith may be limited by any applicable bankruptcy, reorganization, winding-up, insolvency, arrangement, preference, moratorium or other laws and judicial decisions of general application affecting the enforcement of creditors' rights from time to time in effect, and is subject to general principles

of equity, whether considered in a proceeding in equity or at law (including the equitable or statutory powers of the courts to stay proceedings before them, to stay the execution of judgments and to grant relief against forfeiture), and in particular no opinion is expressed as to the availability of the remedy of specific performance, injunctive relief or other equitable or discretionary remedies in any particular instance;

(b)     provisions in the Documents providing for recovery of fees and expenses may be restricted by a court to a reasonable amount and counsel fees are subject to taxation;

(c)     the *Currency Act* (Canada) precludes a court in Canada from giving a judgment in any currency other than Canadian currency and such judgment may be based on a rate of exchange in existence on a day other than the day of payment of such judgment;

(d)     the *Interest Act* (Canada) and the *Judgment Interest Act* (Alberta) may limit the rate of interest which a judgment debt bears, and any waiver of the *Interest Act* (Canada) and the *Judgment Interest Act* (Alberta) may not be enforceable;

(e)     provisions in the Documents which purport to exclude unwritten variations, amendments, waivers or consents or exclude rights to receive notices may not be enforceable;

(f)     failure to exercise a right of action under any of the Documents within applicable limitation periods may act as a bar to the enforcement of such rights at any time thereafter;

(g)     the exercise of rights to accelerate the performance of obligations or otherwise seek the enforcement of the Documents based upon the occurrence of a default deemed immaterial may not be enforceable; and

(h)     provisions in the Documents which purport to effect waivers of the benefits or protection of doctrines, principles or statutory provisions viewed by a court as based on public policy may not be enforceable.

We disclaim any responsibility to update or supplement this opinion with respect to any changes in law or future events affecting the transactions contemplated by the Transaction Documents and the U.S. Documents. This opinion may be relied upon by you only in conjunction with the Transaction Documents and the U.S. Documents and may not be used or relied upon by you for any other purpose or by any other person for any purpose whatsoever, without in each instance our prior written consent.

Yours truly,

## SCHEDULE I

### to

## OPINION OF BLAKE, CASSELS & GRAYDON LLP

### ADDRESSEES

Flagstaff Capital Corporation

The Chase Manhattan Bank, as Administrative Agent under the Finco Credit Agreement

The Chase Manhattan Bank, as Administrative Agent (as defined in the Credit and Security Agreement dated as of the date here among Flagstaff Capital Corporation, the Lenders named therein, and The Chase Manhattan Bank, as administrative agent and collateral agent (the "**Flagstaff Credit Agreement**"))

The Chase Manhattan Bank, as Collateral Agent (as defined in the Flagstaff Credit Agreement)

Each Lender now or hereafter party to the Flagstaff Credit Agreement

The Swap Counterparty (as defined in the Flagstaff Credit Agreement)

## SCHEDULE II

### to

### OPINION OF BLAKE, CASSELS & GRAYDON LLP

1. the Finco Credit Agreement;
2. the Subscription Agreement;
3. the Subscription Payment Assumption Agreement;
5. the Warrant Agreement; and
6. the other Operative Documents.

## SCHEDULE III

**to**

## OPINION OF BLAKE, CASSELS & GRAYDON LLP

1.     the Enron Agreement;
2.     the Put Option Agreement;
3.     the Total Swap Confirmation Agreement.

FORM OF OPINION OF McINNES COOPER,

COUNSEL TO THE BORROWER

**[to be on letterhead of McInnes Cooper]**

June 22, 2001

Blake, Cassels & Graydon LLP
Suite 3500
East Tower, Bankers Hall
855 2nd Street Southwest
Calgary, Alberta, Canada
T2P 4J8

Each of the addressees
listed in Schedule I hereto

Ladies and Gentlemen:

Re: Compagnie Papiers Stadacona, Hansen Investments Co.
and Newman Investments Co.

We act as Nova Scotia counsel to Compagnie Papiers Stadacona, a Nova Scotia unlimited company ("CPS"), Hansen Investments Co. ("Finco"), a Nova Scotia unlimited company, and Newman Investments Co. ("Subco"), a Nova Scotia unlimited company, in connection with the transactions contemplated by the Credit Agreement (the "Finco Credit Agreement") of even date herewith among Finco, as borrower, Flagstaff Capital Corporation ("Flagstaff"), as lender, and The Chase Manhattan Bank, as administrative agent. This opinion is being rendered pursuant to Section 4.01(b)(vii) of the Finco Credit Agreement.

In rendering the opinions set forth below, we have reviewed the following documents:

(a) the Finco Credit Agreement and Note delivered pursuant thereto;

(b) the Subscription Agreement (as described in the Finco Credit Agreement);

(c) the Subscription Payment Assumption Agreement (as described in the Finco Credit Agreement);

(d)     the Warrant Agreement (as described in the Finco Credit Agreement);

(e)     the CPS Intercompany Note (as described in the Finco Credit Agreement);

(collectively, items (a) - (e) are hereinafter referred to as the "Transaction Documents"),

(f)     the memorandum of association and articles of association of each of CPS, Finco and Subco;

(g)     special resolutions of the shareholder of each of Finco and Subco approving amendments to the respective articles of association;

(h)     directors' resolutions of each of CPS, Finco and Subco authorizing the entering into of the Transaction Documents to which each is a party; and

(i)     such other records, certificates and documents as we have deemed relevant for the purposes of such opinions.

For purposes of this opinion we have assumed that:

A.     all signatures on all documents and agreements, including the Transaction Documents, submitted to us are genuine and all copies of such documents and agreements are complete, authentic and conform to the original instruments;

B.     each of the Transaction Documents is within the capacity and powers of, has been validly authorized by and have been duly executed and delivered by the parties to it other than CPS, Finco and Subco and that each of the Transaction Documents is binding on the parties thereto other than CPS, Finco and Subco;

C.     no party is, or will be, engaging in misleading or unconscionable conduct or seeking to conduct any relevant transaction or any associated activity in a manner or for a purpose that is not in compliance with of any of the Transaction Documents and that might render any of the Transaction Documents or any relevant transaction or associated activity illegal, void or voidable;

D.     insofar as any obligation under any of the Transaction Documents is to be performed in any jurisdiction other than in the Province of Nova Scotia, its performance will not be illegal or unenforceable under the laws of that jurisdiction;

E.     each of the Transaction Documents that is governed by either the laws of the State of New York or the laws of the Province of Alberta constitutes or will on execution constitute legal, valid and binding obligations of the parties under such respective laws enforceable in competent courts of that jurisdiction, provided

however this assumption does not assume due authorization, execution or delivery of the Transaction Documents by CPS, Finco and Subco;

F.      where a document has been submitted to us as a final copy it will be executed in the form of that copy;

G.      the formalities for execution by each party required by the law (other than the laws of Nova Scotia, if applicable) of the place of execution of each of the Transaction Documents have been or will be complied with;

H.      the information provided by government officials, agencies and authorities is complete and accurate;

I.      physical delivery of each of the Transaction Documents on behalf of each of CPS, Finco and Subco has occurred free from escrow or any similar arrangement or restriction (other than any such escrow or similar arrangement that is set forth in the Transaction Documents); and

J.      all facts set forth in the certificates supplied by the respective officers and directors of each of CPS, Finco and Subco including, without limitation, the Officers' Certificates are true and accurate.

As to any facts material to our opinion, we have made no independent investigation of such facts and have relied, to the extent that we deem such reliance proper, upon certificates of public officials and officers or other representatives of CPS, Finco and Subco, including certificates of William W. Brown and Peter C. Keohane dated June ·, 2001 (the "Officers' Certificates"), and on the representations and warranties set forth in the Transaction Documents.

In rendering the opinions expressed below, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity to authentic original documents of all documents submitted to us as copies. Except as stated above, we have not reviewed any of the documents referred to in any of the Transaction Documents and have assumed there is nothing in such documents which would affect the opinions expressed herein.

This opinion is rendered solely with respect to the laws of the Province of Nova Scotia.

Based upon and subject to the foregoing and subject to the qualifications hereinafter expressed, we are of the following opinion:

1.      CPS is an unlimited company duly incorporated and validly subsisting and in good standing as to the payment of annual fees and the filing of annual returns under the laws of the Province of Nova Scotia with the corporate power to execute and deliver the Transaction Documents executed by it and perform its obligations thereunder.

2. Finco is an unlimited company duly incorporated and validly subsisting and in good standing as to the payment of annual fees and the filing of annual returns under the laws of the Province of Nova Scotia with the corporate power to execute and deliver the Transaction Documents executed by it and perform its obligations thereunder.

3. Subco is an unlimited company duly incorporated and validly subsisting and in good standing as to the payment of annual fees and the filing of annual returns under the laws of the Province of Nova Scotia with the corporate power to execute and deliver the Transaction Documents executed by it and perform its obligations thereunder.

4. The authorized capital of Finco consists of Two Billion (2,000,000,000) Common Shares without nominal or par value, One Billion Five Hundred Million (1,500,000,000) Class A Preferred Shares without nominal or par value and Five Hundred Million (500,000,000) Class B Preferred Shares without nominal or par value, all with the rights, restrictions, conditions and limitations set forth in the articles of association of Finco. There is a total of one (1) Common Share, of Finco issued and outstanding, which is issued and registered in the name of CPS. There are · Class A Preferred Shares and · Class B. Preferred Shares of Finco issued and outstanding, all of which are issued and registered in the name of Subco.

5. The authorized capital of Subco consists of One Hundred Thousand (100,000) Common Shares without nominal or par value and One Billion Two Hundred Million (1,200,000,000) Debenture Shares without nominal or par value, all with the rights, restrictions, conditions and limitations set forth in the articles of association of Subco. There is a total of one (1) Common Share of Subco issued and outstanding, which is issued and registered in the name of CPS. There are · Debenture Shares of Subco issued and outstanding, all of which are issued and registered in the name of Enron Canada Power Corp.

6. The execution and delivery by each of CPS, Finco and Subco of the Transaction Documents to which it is a party and the performance by it of its obligations thereunder have been duly authorized by all necessary corporate action of each of CPS, Finco and Subco, as the case may be.

7. The execution and delivery by each of CPS, Finco and Subco of each Transaction Document to which it is a party and the performance by it of its obligations thereunder will not conflict with or result in the breach of any of the terms, conditions or provisions of their respective memorandum of association and articles of association.

8. The execution and delivery by each of CPS, Finco and Subco of each Transaction Document to which it is a party and the performance by it of its obligations thereunder do not result in a violation of Applicable Laws (as defined below).

"Applicable Laws" means those laws, rules and regulations of the Province of Nova Scotia and the rules and regulations adopted thereunder

which, in our experience, are normally applicable to the transactions of the type contemplated by the Transaction Documents. Furthermore, the term "Applicable Laws" does not include, and we express no opinion in regard to:

a.    any Nova Scotia law, rule or regulation relating to:

        (i)     pollution or protection over the environment;
        (ii)    zoning, land use, building or construction;
        (iii)   occupational, safety and health or other similar matter; or
        (iv)   labour, employment rights and benefits; and

b.    the regulation of utilities;

c.    anti-trust laws;

d.    tax laws, rules or regulations.

9.    No Governmental Approval (as defined below) is or will be required to authorize or is or will be required (a) in connection with the execution and delivery of any of the Transaction Documents by CPS, Finco or Subco or the performance of their obligations thereunder or (b) to ensure the validity, effectiveness or enforceability of the Transaction Documents.

        "Governmental Approval" means any consent, approval, license, authorization or validation of, or filing, recording or registration with any Governmental Authority (as defined in the Finco Credit Agreement) in the Province of Nova Scotia pursuant to any Applicable Laws (as defined in paragraph 8 above);

10.    There is no registration or transfer tax, stamp duty or similar levy or similar taxes, fees or charges payable in respect of the execution, delivery, validity, performance or enforcement of any of the Transaction Documents in the Province of Nova Scotia.

11.    Each of CPS, Finco and Subco is subject to civil and commercial law with respect to its obligations under the Transaction Documents to which it is a party, and the execution, delivery and performance by any such entity of any such Transaction Document constitutes private and commercial acts rather than public or governmental acts. None of CPS, Finco or Subco, nor any of their respective properties or assets, has any sovereign immunity or any other immunity from the jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in and of judgment, execution or otherwise).

12.    If any of the Transaction Documents are sought to be enforced in any action or proceeding in the Province of Nova Scotia in accordance with the laws applicable thereto

as chosen by the parties, namely the laws of the State of New York, one of the United States of America, in the case of the Finco Credit Agreement and Note delivered pursuant thereto, and the laws of the Province of Alberta for the other Transaction Documents (in each case, respectively the "Foreign Laws"), the Courts of the Province of Nova Scotia,

a.     would recognize the choice of laws provided that such choice of laws is bona fide (in the sense that it was not made with a view to avoiding the consequences of the laws of any other jurisdiction) and is not contrary to public policy, as such term is applied by the Province of Nova Scotia, and

b.     would apply the Foreign Laws in any such action or proceeding, to the extent specifically pleaded and proved as a fact by expert evidence, to all issues which, under the conflicts of laws rules of the Province of Nova Scotia, are to be determined in accordance with the proper or governing law of contract, except that in any such proceedings, such court:

    (i)    will apply those laws of the Province of Nova Scotia which it characterizes as procedural and will not apply those Foreign Laws as such court characterizes as procedural; and

    (ii)   will not apply those Foreign Laws which a court of the Province of Nova Scotia would characterize as expropriatory, penal, governmental revenue or similar laws or the application of which would be inconsistent with public policy, as such term is applied by such court.

    (iii)  A court in the Province of Nova Scotia has, however, an inherent power to decline to hear such an action if it is not the proper forum to hear such action or if concurrent proceedings are being brought elsewhere.

13.    It is not necessary under the laws of the Province of Nova Scotia (i) in order to enable either of Flagstaff or the Administrative Agent to enforce its rights under any Transaction Document or (ii) by reason only of the execution, delivery or performance by any of Flagstaff or the Administrative Agent of any Transaction Document, that such Person for such purposes only should be licensed, qualified or entitled to carry on business in Nova Scotia, provided that Flagstaff or the Administrative Agent, as applicable, has no other contact with Nova Scotia.

14.    The laws of the Province of Nova Scotia permit an action to be brought based upon a final and conclusive in personam judgment for a definite sum of money rendered by any court of the State of New York or of the United States located in the State of New York having jurisdiction under its own domestic laws (the "Foreign Jurisdiction") in respect of any suit, action or proceeding against CPS, Finco or Subco based upon any instruments or agreements entered into for the consummation of the transactions contemplated in the Finco Credit Agreement, without re-examination, review of the merits of the cause of action in respect of which the judgment was given or relitigation of the matters

adjudicated upon or payment of any stamp, registration or similar tax or duty, provided that

a. the judgment is neither void or voidable under the laws of the Foreign Jurisdiction,

b. the judgment was not given or obtained by fraud or in a manner contrary to natural justice;

c. the enforcement of the judgment would not be inconsistent with

(i) public policy, as such term is understood under the laws of the Province of Nova Scotia and the federal laws of Canada, or

(ii) contrary to any order made by

(A) the Attorney General of Canada under the Foreign Extraterritorial Measures Act (Canada) or

(B) the Competition Tribunal under the Competition Act (Canada) in respect of certain judgments referred to therein,

d. the judgment was not based on a clear mistake of law or fact,

e. the judgment was not directly or indirectly for the payment of taxes or other charges of a like nature or of a fine or other penalty,

f. there has been no prior judgment in another court between the same parties concerning the same issues as are dealt with in the judgment to be enforced in the Province of Nova Scotia,

g. the enforcement of such judgment does not involve the enforcement of any laws of the Foreign Jurisdiction which a Nova Scotia court would characterize as expropriatory, penal, governmental revenue or similar laws, and

h. there has been compliance with the Limitation of Actions Act (Nova Scotia) which requires that any action to enforce a foreign judgment must be commenced within six years of the date of the foreign judgment.

The opinions expressed above are subject to the following qualifications:

a. Enforceability of the Transaction Documents may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws now or hereafter in effect relating to or affecting creditors' rights generally;

b.      Enforcement of rights and remedies may be limited by general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law, and in this regard we have assumed that every party will exercise its rights and remedies under the Transaction Documents in good faith and in circumstances and in a manner which is commercially reasonable;

c.      Enforceability of the Transaction Documents is subject to the discretion of a court of competent jurisdiction to apply principles of equity or public policy, as such term is understood under the laws of the Province of Nova Scotia;

d.      A court in the Province of Nova Scotia may exercise discretion in the granting of equitable remedies such as specific performance and injunction;

e.      A court in the Province of Nova Scotia may decline to enforce those provisions of the Transaction Documents which purport to allow a determination, calculation or certificate of a party thereto as to any matter provided for therein to be final, conclusive and binding upon any other party thereto if such determination is found to be inaccurate on its face or to have been reached or made on an arbitrary or fraudulent basis;

f.      A court in the Province of Nova Scotia may consider the conduct or course of conduct of a party and require that it act with reasonableness. By way of example, and notwithstanding that any provision of the Transaction Documents purports to be due on demand, a party may be required to give reasonable time to a debtor to meet any demand for payment of its obligations before enforcing such provision;

g.      A court in the Province of Nova Scotia might not allow a party to exercise rights to accelerate the performance of obligations or otherwise seek the enforcement of the Transaction Documents based upon the occurrence of a default deemed immaterial;

h.      We express no opinion as to the enforceability of any provision of the Transaction Documents providing for the severance of illegal or unenforceable provisions from the remaining provisions of the Transaction Documents;

i.      We express no opinion as to the enforceability of any provision of the Transaction Documents which requires a party to pay, or to indemnify any person for, the costs and expenses in connection with judicial proceedings, since those provisions may derogate from a court's discretion to determine by whom and to what extent those costs should be paid;

j.      We express no opinion as to the enforceability of any provision of any of the Transaction Documents which states that modifications, amendments or waivers are not binding unless in writing.

k.  We express no opinion as to the enforceability of provisions of the Transaction Documents which may be characterized by a Court as an unenforceable penalty and not as a genuine pre-estimate of damage, or as an unenforceable forfeiture;

l.  We express no opinion as to the enforceability of any provisions in the Transaction Documents authorizing the exercise of "self help" remedies, or to any provisions therein constituting a waiver of constitutional or non-waivable statutory rights; and

m.  The Currency Act (Canada) precludes a court in the Province of Nova Scotia from giving judgment in any currency other than lawful money of Canada and such judgment may be based on a rate of exchange in existence on a date other than the date of payment.

We disclaim any responsibility to update or supplement this opinion with respect to any changes in law or future events affecting the transactions contemplated by the Finco Credit Agreement. This opinion may be relied upon by you (and any of your successors and assignees pursuant to an assignment by you of any rights under any Transaction Document pursuant to the terms thereof) only in conjunction with the Finco Credit Agreement and the Transaction Documents and may not be used or relied upon by you for any other purpose or by any other person for any purpose whatsoever, without in each instance our prior written consent.

Yours truly,

**SCHEDULE I**
**TO THE**
**NOVA SCOTIA OPINION**

**ADDRESSEES**

Flagstaff Capital Corporation

The Chase Manhattan Bank, as Administrative Agent under the Finco Credit Agreement

The Chase Manhattan Bank, as Administrative Agent (as defined in the Credit and Security Agreement dated as of the date here among Flagstaff Capital Corporation, the Lenders named therein, and The Chase Manhattan Bank, as administrative agent and collateral agent, (the "Flagstaff Credit Agreement"))

The Chase Manhattan Bank, as Collateral Agent (as defined in the Flagstaff Credit Agreement)

Each Lender now or hereafter party to the Flagstaff Credit Agreement

The Swap Counterparty (as defined in the Flagstaff Credit Agreement)

FORM OF OPINION OF BRACEWELL & PATTERSON, L.L.P.

COUNSEL TO ENRON

[LETTERHEAD OF BRACEWELL & PATTERSON, L.L.P.]

Each of the Addressees Listed in
the Attached Schedule I

Ladies and Gentlemen:

We have acted as New York counsel for Enron Corp., an Oregon corporation (the "Company"), for Hansen Investments Co., a Nova Scotia unlimited liability company ("Hansen"), and for Newman Investments Co., a Nova Scotia unlimited liability company ("Newman"), in connection with the transactions contemplated by the Credit Agreement (the "Hansen Credit Agreement") of even date herewith among Hansen, as borrower, Flagstaff Capital Corporation, as lender, and The Chase Manhattan Bank, as administrative agent. This opinion is being rendered pursuant to Section 4.01(b)(vii) of the Hansen Credit Agreement. Capitalized terms used herein and not otherwise defined herein shall have the same meanings herein as ascribed thereto in the Hansen Credit Agreement.

In rendering the opinions set forth below, we have reviewed the documents set forth on Schedule II attached hereto (collectively referred to herein as the "Transaction Documents", and items 1 through 7 on Schedule II are referred to herein as the "New York Documents") and such other records, certificates and documents as we have deemed relevant for the purposes of such opinions.

As to any facts material to our opinion, we have made no independent investigation of such facts and have relied, to the extent that we deem such reliance proper, upon certificates of public officials and officers or other representatives of the Company and on the representations and warranties set forth in the Transaction Documents, all of which we assume to be true, correct and complete.

In rendering the opinions expressed below, we have assumed (i) the legal capacity of all natural persons, (ii) the genuineness of all signatures, (iii) the authenticity of all documents and records submitted to us as originals, and (iv) the conformity to authentic original documents and records of all documents and records submitted to us as copies. In addition we have assumed that the Transaction Documents have been duly authorized, executed and delivered by each party thereto (other than the Company, Hansen and Newman) and constitute valid, binding and enforceable obligations of such parties (other than the Company, Hansen and Newman) and that (i) the laws of any jurisdiction other than the jurisdictions that are the subject of this opinion do not affect the terms of the Transaction Documents and (ii) each party thereto (other than the Company, Hansen and Newman) have complied with all legal requirements that are applicable to

them to the extent necessary to make the Transaction Documents enforceable. We have also assumed that each party to the Transaction Document (other than the Company, Hansen and Newman) was duly organized and is validly existing under the laws of such party's jurisdiction of formation, has full power and authority to execute, deliver and perform the Transaction Documents to which it is a party and has taken all necessary legal action to authorize the execution, delivery and performance of each Transaction Document to which it is a party, and that each such Transaction Document does not contravene the constitutive documents of such party.

The opinions expressed below in paragraphs 4 and 5 are based upon and in reliance upon the opinion of James V. Derrick, Jr. of even date hereto (the "Enron Opinion"), a copy of which has been delivered to you. We have examined the Enron Opinion and such opinion is in form and scope satisfactory to us and we believe we and you are justified in relying thereon. However, we have made no independent investigation in respect of such opinion and have assumed its accuracy and completeness. To the extent that the Enron Opinion is based upon an assumption or is made subject to any limitation, qualification or exception, our opinion given in reliance thereon is based upon such assumptions and is subject to such limitations, qualifications or exceptions. We do not, however, assume any liability for any opinion expressed in the Enron Opinion.

Based upon the foregoing, and subject to the assumptions, qualifications, exceptions and limitations set forth herein, it is our opinion that:

1.      The execution and delivery by the Company, Newman and Hansen of each Transaction Document to which it is a party and the performance by each of the Company, Hansen and Newman of its respective obligations thereunder, do not result in a violation of Applicable Laws (as defined below).

"Applicable Laws" means those laws, rules and regulations of the State of New York and the United States of America and the rules and regulations adopted thereunder, which, in our experience, are normally applicable to transactions of the type contemplated by, as applicable, the Transaction Documents. Furthermore, the term "Applicable Laws" does not include, and we express no opinion with regard to (a) any New York or federal law, rule or regulation relating to (i) pollution or protection of the environment, (ii) zoning, land use, building or construction, (iii) occupational, safety and health or other similar matters, or (iv) labor, employee rights and benefits, including the Employment Retirement Income Security Act of 1974, as amended, (v) intellectual property laws, (vi) the regulation of utilities, (vii) antitrust laws, (viii) tax laws, rules or regulations, (ix) state or federal securities laws, and (b) laws of any counties, cities, towns, municipalities and special political subdivisions and agencies thereof.

2.    No Governmental Approval (as defined below) which has not been obtained or taken and is not in full force and effect, is required to authorize or is required in connection with the execution, delivery or performance of any of the Transaction Documents by the Company, Hansen or Newman.

"Governmental Approvals" means any consent, approval, license, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to any Applicable Laws (as defined in paragraph 1 above).

3.    Each New York Document to which the Company, Hansen or Newman is a party constitutes the legal, valid and binding obligation of the Company, Hansen or Newman, as applicable, enforceable against such Person in accordance with its respective terms.

4.    Neither of Hansen nor Newman is a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company" within the meaning of the Public Utility Company Act of 1935, as amended.

5.    Neither the Hansen nor Newman is an "investment company" or a company "controlled" by an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

6.    The choice of New York law as the governing law that is contained in any New York Document will be recognized by the courts of the State of New York, the State of Texas and federal courts applying New York law as a valid choice of law in any action to enforce such New York Document.

7.    The execution and delivery by Hansen and Newman of each of the Transaction Documents to which it is a party do not, and the performance by Hansen and Newman of their respective obligations thereunder will not (a) breach or result in a default of under any of the Transaction Documents, (b) to our knowledge, result in any violation of any order, writ, judgment or decree or (c) to our knowledge, result in the creation or imposition of any lien on any properties of either Hansen or Newman, other than as may be contemplated by the Transaction Documents.

8.    To our knowledge, neither Hansen nor Newman is a party to any pending or overtly threatened in writing action or proceeding that (a) may adversely affect the transactions contemplated by the Transaction Documents or (b) if determined adversely, involve a reasonable possibility of materially and adversely affecting the business, condition or operations of either Hansen or Newman.

The opinions set forth above are subject to the following qualifications and exceptions:

(a)    The enforceability of each Transaction Document and the provisions thereof may be limited by (i) bankruptcy, insolvency, reorganization, fraudulent transfer and conveyance, preferential transfer, moratorium or other laws now or hereinafter in effect relating to or affecting enforcement of creditors' rights and remedies generally; (ii) general principles of equity (including without limitation, concepts of materiality, reasonableness, good faith and fair dealing), regardless of whether such enforcement is considered in a proceeding in equity or at law; (iii) commercial reasonableness and unconscionability and an implied covenant of good faith and fair dealing; (iv) the power of the courts to award damages in lieu of equitable remedies; (v) public policy underlying Applicable Laws with respect to rights to indemnification and contribution and (vi) possible unavailability of specific performance or injunctive relief.

(b)    With respect to our opinion set forth in paragraph 3 above, we express no opinion with respect to the validity or enforceability of the following provisions to the extent that they are contained in the Transaction Documents: (i) provisions releasing, exculpating or exempting a party from, or requiring indemnification or contribution of a party for, liability for its own negligence or to the extent that the same are inconsistent with the public policy underlying any law, rule or regulation; (ii) enforceability of provisions purporting to restrict access to legal or equitable remedies or purporting to establish evidentiary standards; (iii) provisions relating to subrogation rights, delay or omission of enforcement of rights or remedies, waivers or ratifications of future acts, the rights of third parties, prohibitions against the transfer, alienation, or hypothecation of property, indemnity, severance, marshalling of assets, transferability of assets which by their nature are non-transferable, or sales in inverse order of alienation; (iv) provisions restricting access to courts or to legal or equitable remedies or purporting to affect the jurisdiction or venue of courts, including the waiver of a right to a hearing on forum non conveniens (other than the courts of the State of New York with respect to the New York Documents); (v) provisions setting out methods or procedures for service of process; (vi) provisions purporting to vest jurisdiction over any property in any court to the extent that such property is not in such jurisdiction; (vii) provisions purporting to waive, subordinate or not give effect to rights to notice, demands, legal defenses, immunities, statutes of limitations, trial by jury or other laws, rights or benefits that cannot be waived, subordinated or rendered ineffective under applicable law; (viii) provisions relating to powers of attorney, severability, subrogation or set-offs; (ix) provisions providing that decisions by a party are conclusive or based on its sole or absolute discretion; and (x) provisions that require the payment of liquidated damages, if and to the extent actual damages are not difficult to determine or the liquidated damages stipulated are disproportionate to the actual loss of the party claiming such damages or which would otherwise constitute a penalty.

(c)    We have assumed that no undue influence, deceit, fraud, dishonesty, forgery, coercion, duress or breach of fiduciary duty exists or will exist with respect to matters relevant to the transactions contemplated by the Transaction Documents.

(d)     We express no opinion as to (i) the compliance of the transactions contemplated by the Transaction Documents with any regulations or governmental requirements applicable to any party other than the Company, Hansen or Newman; (ii) the financial condition or solvency of the Company, Hansen or Newman; (iii) the ability (financial or otherwise) of the Company, Hansen or Newman or any other party to meet their respective obligations under the Transaction Documents; (iv) the value of any security provided to secure the payment of obligations contemplated by the Credit Agreement; and (v) the conformity of the Transaction Documents to any term sheet or commitment letter.

(e)     With respect to the enforceability of the Transaction Documents, we have assumed that value has been given by the parties thereto.

(f)     With respect to our opinion set forth in paragraph 3 above (insofar as such opinion relates to the enforceability under New York law of the choice-of-law provision of any Transaction Document choosing New York law as the governing law thereof) is rendered in reliance upon the Act of July 19, 1984, ch. 421, 1984 McKinney's Sess. Law of N.Y. 1406 (codified at N.Y. Gen. Oblig. Law §§5-1401, 5-1402 (McKinney 1989) and N.Y. CPLR 327(b) (McKinney (1990)) (the "Act")) and is subject to the qualification that such enforceability (i) as specified in the Act, does not apply to the extent provided to the contrary in subsection two of Section 1-105 of the New York Uniform Commercial Code and (ii) as specified in the Act, does not apply to a contract for labor or personal services.

(g)     Our opinion in paragraph 6 above is based upon Section 35.51 of the Texas Business and Commerce Code. To our knowledge, Section 35.51 of the Texas Business and Commerce Code has never been judicially construed, and we are relying on the literal working of such statute.

(h)     To the extent our opinion in paragraph 6 regarding the choice of New York law under the Transaction Documents relates to our opinions in paragraph 3 above with respect to Applicable Laws of the State of Texas and Governmental Approvals of Texas state courts or governmental bodies or authorities of the State of Texas, are rendered based upon, and are qualified in all respects by, such opinion in paragraph 6.

In addition, we wish to point out that courts applying New York conflict of law rules may determine that the following matters are governed by laws of jurisdictions other than the State of New York: (i) the due formation and existence of the parties to the Transaction Documents, their respective power to enter into the Transaction Documents, their respective authorization, execution and delivery of the Transaction Documents, and similar matters governed by the applicable laws of the jurisdictions under which such parties were formed; (ii) whether a transaction transfers or creates and interest in property for security purposes or otherwise, the nature of an interest in property that is transferred or created by a transaction, the manner and effect of recording or failing to record evidence of a transaction that transfers or creates an interest in property, and similar matters relating to title to property or the creation, assignment,

conveyance, foreclosure or other transfer of interests in property, which matters may be governed by the laws of jurisdictions where such property (or the holder thereof) is or is deemed to be located (including, without limitation, Section 9-103 of the New York Uniform Commercial Code); and (iii) remedies as against principals, rights of subrogation, and similar matters that may be considered to be governed by procedural laws.

We express no opinion as to the laws of any jurisdiction other than: (i) the laws of the State of New York; (ii) the General Corporation Law of the State of Delaware; (iii) the federal laws of the United States of America and (iv) as indicated in paragraph 6 above and the related qualifications, the laws of the State of Texas.

This law firm is a registered limited liability partnership organized under the laws of the State of Texas.

This opinion letter is rendered as of the date set forth above and we expressly disclaim any obligation to update this letter after the date hereof.

This opinion letter is given solely for your benefit in connection with the transactions contemplated by the Transaction Documents and may not be relied upon by any person other than you or for any other purpose without our prior written consent. This opinion letter may not be furnished, without our prior consent, to any person other than you. The opinions expressed herein are of the date hereof only, and we specifically disclaim any responsibility to update such opinions or to advise you of subsequent developments affecting such opinions that hereafter may come to our attention.

Very truly yours,

BRACEWELL & PATTERSON, L.L.P.

**SCHEDULE I**
**to**
**OPINION OF BRACEWELL & PATTERSON, L.L.P.**

**ADDRESSEES**

Flagstaff Capital Corporation

The Chase Manhattan Bank, as Administrative Agent under the Hansen Credit Agreement

The Chase Manhattan Bank, as Administrative Agent under and as defined in the Flagstaff Credit Agreement

The Chase Manhattan Bank, as Collateral Agent under and as defined in the Flagstaff Credit Agreement

Each Lender now or hereafter party to the Flagstaff Credit Agreement

The Swap Counterparty

**SCHEDULE II**
**to**
**OPINION OF BRACEWELL & PATTERSON, L.L.P.**

**TRANSACTION DOCUMENTS**

We have reviewed executed copies of the following, each dated of even date herewith:

1.    the Hansen Credit Agreement;
2.    the Note delivered pursuant to the Hansen Credit Agreement;
3.    the Hansen Consent;
4.    the Enron Consent;
5.    the Put Option Agreement;
6.    the Total Return Swap Agreement;
7.    the Enron Agreement;
8.    the Subscription Agreement;
9.    the Subscription Payment Assumption Agreement; and
10.    the Warrant Agreement.

EXHIBIT B-4

## FORM OF OPINION OF JAMES V. DERRICK, JR.

[TO COME]

June __, 2001

To the addressees listed on
Schedule I hereto

Ladies and Gentlemen:

As Executive Vice President and General Counsel of Enron Corp., an Oregon corporation ("Enron"), I am familiar with the documents listed in Schedule II hereto (the "Transaction Documents"). This opinion is being furnished to you pursuant to Section 4.01(b)(xi) of the Credit Agreement dated June __, 2001 among Hansen Investments Co., as Borrower, Flagstaff Capital Corporation, as Lender, and The Chase Manhattan Bank, as Administrative Agent (the "Credit Agreement").

In rendering the opinions hereinafter set forth, I (or other attorneys in the Enron legal department) examined the Transaction Documents and relied upon original, photostatic or certified copies of such agreements, documents, instruments, corporate records, and certificates of officers of Enron and of public officials as I (or such attorneys) deemed relevant and necessary as the basis for the opinions hereinafter expressed. In such examination, I (or such attorneys) assumed the genuineness of all signatures (other than signatures of officers of Enron on the Transaction Documents), the authenticity of all documents submitted to me (or such attorneys) as originals, and the conformity to original documents of all documents submitted to me (or such attorneys) as photostatic or certified copies.

Based on the foregoing, and subject to the assumptions, qualifications and explanations set forth herein, I am of the opinion that:

1.       Enron is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Oregon.

2.       The execution, delivery and performance by Enron of the Transaction Documents to which it is a party are within its corporate powers. The Transaction Documents to which Enron is a party have been duly authorized by all necessary corporate action of Enron, and have been duly executed and delivered by Enron.

3. The execution, delivery and performance by Enron of the Transaction Documents to which it is a party, and the consummation by Enron of the transactions evidenced thereby do not constitute a contravention or default by Enron under (a) Enron's Amended and Restated Articles of Incorporation or Bylaws, each as amended, (b) any judgment, injunction, order or decree known to me to be binding upon Enron, or (c) any contractual restriction contained in any material (meaning for the purposes of this opinion those creating a monetary liability of $100,000,000 or more) contract, agreement, indenture, mortgage, bond, note or any guaranty of any of such obligations, in each case known to me and to which Enron is subject.

4. The execution, delivery and performance by Enron of the Transaction Documents to which it is a party will not result in the creation or imposition of any lien, security interest, or other charge or encumbrance on any asset of Enron, other than (a) pursuant to the Transaction Documents or (b) those that would not materially and adversely affect (i) the business, consolidated financial position or consolidated results of operations of Enron and its subsidiaries taken as a whole, or (ii) the ability of Enron to perform its obligations under the Transaction Documents.

5. Except as disclosed in Enron's (i) Annual Report to Shareholders for the year ended December 31, 2000, (ii) Annual Report on Form 10-K for the year ended December 31, 2000, (iii) Quarterly Report on Form 10-Q for the period ended March 31, 2001 (iv) definitive proxy statement with respect to its Annual Meeting of Stockholders held May 1, 2001, to my knowledge there is no action, suit or proceeding pending or threatened against Enron or any of its subsidiaries before any court or arbitrator, or any governmental body, agency or official (a) with respect to the Transaction Documents, or (b) in which there is a reasonable possibility of an adverse decision that would materially and adversely affect (i) the business, consolidated financial position or consolidated results of operations of Enron and its subsidiaries taken as a whole, or (ii) the ability of Enron to perform its obligations under the Transaction Documents.

6. Enron is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

7. Enron is not subject to, or is exempt from regulation as a "holding company", or a "subsidiary company" of a "holding company", in each case under the Public Utility Holding Company Act of 1935, as amended.

The opinions set forth above are subject in all respects to the following qualifications:

(a) In rendering the opinion expressed in paragraph 3 above, neither I nor any other attorney in the Enron legal department has made any examination of any accounting or financial matters related to covenants contained in certain documents to which Enron may be subject, and I express no opinion with respect thereto.

(b)     In rendering the opinion expressed in paragraph 5 above, I (or other attorneys in the Enron legal department) have only reviewed the files and records of Enron, and have consulted with such senior Enron officers as I (or such attorneys) have deemed necessary.

(c)     The opinions expressed herein are as of the date hereof only, and I assume no obligation to update or supplement such opinions to reflect any fact or circumstance that may hereafter come to my attention, or any changes in law that may hereafter occur or become effective.

(d)     I am a member of the bar of the State of Texas.  This opinion relates solely to matters of Texas law, federal law and the Oregon Business Corporation Act.

This opinion is furnished in connection with the transactions contemplated by the Transaction Documents and may not be relied upon in connection with any other transaction or by any person other than you; provided, however, Bracewell & Patterson, L.L.P. may rely upon this opinion for purposes of rendering its opinion in connection with the Transaction Documents.

Very truly yours,

**Schedule I**
**Addressees**

The Chase Manhattan Bank, as Administrative Agent under the Credit Agreement

The Chase Manhattan Bank, as Administrative Agent (as defined in the Credit and Security Agreement dated as of June ___, 2001, among Flagstaff Capital Corporation, as borrower, the financial institutions named as Lenders therein, and The Chase Manhattan Bank, as administrative agent and as collateral agent, (the "Flagstaff Credit Agreement))

The Chase Manhattan Bank, as Collateral Agent (as defined in the Flagstaff Credit Agreement)

Each Lender now or hereafter party to the Flagstaff Credit Agreement

The Swap Counterparty (as defined in the Flagstaff Credit Agreement)

## Schedule II

ISDA Master Agreement dated June __, 2001 between Enron Corp. and Flagstaff Capital Corporation;

Schedule to the ISDA Master Agreement dated June __, 2001 between Enron Corp. and Flagstaff Capital Corporation;

Total Return Swap Confirmation dated June __, 2001 between Enron Corp. and Flagstaff Capital Corporation;

Put Option Agreement dated June __, 2001 between Enron Corp. and Flagstaff Capital Corporation;

Enron Consent dated June __, 2001 executed by Enron Corp.; and

Enron Agreement dated June __, 2001 by Enron Corp. in favor of Flagstaff Capital Corporation and the Indemnified Persons referred to therein.

EXHIBIT C

FORM OF

## COMPLIANCE CERTIFICATE

This Certificate is furnished pursuant to Section 4.01(b)(xii) of the Credit Agreement, dated as of June 22, 2001 (as amended, modified, renewed or extended from time to time, the "Hansen Credit Agreement"), among Hansen Investments Co., as borrower (the "Borrower"), Flagstaff Capital Corporation, as lender, and The Chase Manhattan Bank, as administrative agent. Capitalized terms used but not otherwise defined herein shall have the meanings given such terms in the Hansen Credit Agreement.

The undersigned hereby certifies that he is the Vice President and Secretary of the Borrower, and that as such he is authorized to execute this certificate on behalf of the Borrower. The undersigned represents and warrants, to the best of his knowledge, in such capacity, as follows:

        (a)    As of the date hereof, the Borrower is in compliance with all terms, conditions and agreements applicable to it in the Operative Documents.

        (b)    As of the date hereof, there exists no Default or Event of Default.

Executed and delivered this 22nd day of June, 2001.

*[Signature Page Follows]*

*[Signature Page to Compliance Certificate]*

HANSEN INVESTMENTS CO.

By:_____
    Name:
    Title:

# Exhibit
# C

# HANSEN INVESTMENTS CO.

## Warrant Agreement

Date: June 22, 2001

1. **Grant of Warrant**. For value received, Hansen Investments Co., a company formed under the laws of the Province of Nova Scotia (together with any successor thereto, the "Corporation") hereby grants and issues to Flagstaff Capital Corporation, a Delaware corporation (together with any successor thereto, the "Holder"), a Class B Preferred Share purchase warrant (the "Warrant"). The Warrant is exercisable as set out in Part 4 hereof and is exercisable into that number of fully paid and assessable Class B voting redeemable, retractable preferred shares (the "Class B Preferred Shares") of the Corporation as is determined in accordance with Part 4 hereof at a price of $U.S. 1.00 per Class B Preferred Share (the "Exercise Price").

2. **Definitions**. References contained herein to any statute, rule or regulation shall be deemed to refer to such statute, rule or regulation as in effect as of the date of this Warrant and any subsequent provisions amendatory thereof, supplemental thereto or substituted therefor. As used herein, the following terms shall have the following respective meanings:

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank Eurodollar market.

"Class A Preferred Shares" has the meaning set out in that certain Share Subscription Agreement between the Corporation and Newman Investments Co. dated June 22, 2001.

"Designated Holder" means any Holder of this Warrant other than Flagstaff Capital Corporation.

"Exercise Price" has the meaning ascribed thereto in Section 1 hereof.

"Expiry Time" has the meaning ascribed thereto in Section 4.1(c) hereof.

"Hansen Credit Agreement" means the Credit Agreement dated the date hereof, executed by the Corporation, as borrower, The Chase Manhattan Bank, as administrative agent and Flagstaff Capital Corporation, as lender, and any other document expressed to be made supplemental to, amending or modifying the forgoing or entered into pursuant thereto.

"Make-Whole Amount" has the meaning set out in the Hansen Credit Agreement.

"person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Redemption Amount" in respect of a Class B Preferred Share means $U.S. 1.00.

"Subscription Price" has the meaning ascribed thereto in Section 4.1(a) hereof.

"Trigger Date" has the meaning ascribed thereto in Section 4.1(b) hereof.

"Warrant Shares" has the meaning ascribed thereto in Section 4.2 hereof.

3. **Anti-Dilution Provisions**

    3.1   Dilution Events. At any time while the Warrant remains outstanding the Corporation shall not:

    (a)   issue or agree to issue Class B Preferred Shares except pursuant to the exercise of this Warrant;

    (b)   issue rights or warrants to its shareholders entitling the holders thereof to subscribe for or purchase Class B Preferred Shares; or

    (c)   except for the issuance of the Class A Preferred Shares pursuant to the Subscription Agreement (as such term is defined in the Hansen Credit Agreement), issue or agree to issue any shares of capital stock (or rights to acquire any such shares) that rank senior in priority to the Class B Preferred Shares.

4. **Exercise of Warrants**.

    4.1   Exercise.

    (a)   At any time prior to the occurrence of an Event of Default (as defined in the Hansen Credit Agreement), the Holder of this Warrant shall be entitled to acquire that number of Class B Preferred Shares which have an aggregate Redemption Amount equal to the amount of the Make-Whole Amount that would be payable by Hansen pursuant to the Hansen Credit Agreement as of the date of the exercise of this Warrant if such Make-Whole Amount were due on that date. The purchase price (the "Subscription Price") for the Class B Preferred Shares acquired shall be the Exercise Price multiplied by the number of Class B Preferred Shares acquired. The Warrant shall be exercisable at any time prior to the occurrence of an Event of Default by the Holder (i) delivering to the Corporation a subscription form, in the form attached hereto as Schedule "A-1" (the "Subscription Form"), duly completed and executed, and (ii) paying the Subscription Price in immediately available funds.

    (b)   In addition to the foregoing, on the occurrence and during the continuation of an Event of Default (the "Trigger Date") the Designated Holder shall be entitled to acquire, for a purchase price equal to the Subscription Price, that number of Class B Preferred Shares which have an aggregate Redemption Amount equal to the amount of the Make-Whole Amount

payable by Hansen pursuant to the Hansen Credit Agreement as a result of said Event of Default. For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, the parties to this Warrant intend that for so long as Flagstaff Capital Corporation is the Holder of this Warrant, Flagstaff Capital Corporation shall not have or be entitled to exercise the rights granted under this Section 4.1(b). The Warrant shall be exerciseable by the Designated Holder at any time after the occurrence of an Event of Default by delivering to the Corporation the Subscription Form, duly completed and executed, and by the fulfilment of the Designated Holder's obligation to pay the Subscription Price. The Designated Holder is hereby authorized, to the fullest extent permitted by law, upon the exercise of its rights under this Warrant, to set off and apply any obligations owing by the Designated Holder to or for the credit or account of the Corporation (including, without limitation, the obligation of the Designated Holder to pay the Subscription Price hereunder) against any and all obligations of the Corporation now or hereafter existing under the Hansen Credit Agreement held by the Designated Holder, including, without limitation, the Make-Whole Amount, irrespective of whether or not the Designated Holder shall have made any demand under the Hansen Credit Agreement and although such obligations may be unmatured. The Designated Holder agrees to promptly notify the Corporation after any such set off and application made by the Designated Holder.

(c)    This Warrant shall expire upon the payment in full of all obligations due under the Hansen Credit Agreement (the "Expiry Time").

4.2    Issue of Shares. Upon exercise of the Warrant in accordance with the terms hereof, the Corporation shall contemporaneously therewith issue to the Holder, in accordance with the delivery and registration instructions set out in the Subscription Form, certificates representing such number of Class B Preferred Shares (the "Warrant Shares") as are issuable in accordance with the provisions hereof.

4.3    Reservation of Shares. The Corporation shall at all times so long as the Warrant issued hereunder remains outstanding ensure that there remains available out of its authorized but unissued Class B Preferred Shares, for the purpose of effecting the exercise of the Warrant, such number of unissued Class B Preferred Shares as shall from time to time be sufficient to effect the exercise of the Warrant. The Corporation covenants that all unissued Class B Preferred Shares which shall be issued on exercise of the Warrant in accordance with the terms and conditions hereof shall be duly and validly issued as fully paid and assessable shares.

4.4    No Impairment. The Corporation will not, by amendment of its memorandum or articles or through any reorganization, recapitalization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions hereof and in

the taking of all such action as may be necessary or appropriate in order to protect the exercise rights of the Holder against impairment.

5. **Partial Exercises Not Permitted.** The Holder may not exercise the right to purchase fewer Class B Preferred Shares than are represented by this Warrant Agreement.

6. **Section 116 Certificate.** The Corporation hereby acknowledges that the Holder will file a notification under section 116 of the *Income Tax Act* (Canada) and any corresponding provisions of applicable provincial income tax legislation in respect of (a) any disposition, for the purposes of the *Income Tax Act* (Canada), of the Warrant as permitted under and in accordance with its terms, and (b) the expiry of the Warrant. Such notification will be made in such form and manner and within the time prescribed in the *Income Tax Act* (Canada) or otherwise as the Holder considers appropriate and may be made either up to 30 days prior to or after such disposition or expiry. The parties agree that for the purposes of such notice the proceeds of disposition of the Warrant shall (i) in the case of expiry of the Warrant, be nil and (ii) in the case of a disposition of the Warrant, not exceed the amount by which the value of the Warrant Shares to be issued on the exercise of the Warrant exceeds the Exercise Price in respect of such exercise.

7. **Ownership of Warrant.** The Corporation shall be entitled to treat the Holder as the absolute holder and owner of the Warrant represented hereby and as the person exclusively entitled to vote and otherwise to exercise all the rights and powers of an owner of the Warrant represented hereby and the Corporation shall not be required to inquire into the existence of, or see to the performance or observance of, any duty owed to a third person by a Holder. The holding of this Warrant Agreement does not make the Holder a shareholder of the Corporation, nor does it entitle the Holder to any right or interest except as is expressly provided in this Warrant Agreement.

8. **Transfer Restricted.** All right, title and interest in the Warrant represented hereby is held exclusively by the Holder and except as is provided below, the Warrant and the Warrant Shares may not be transferred or assigned, in whole or in part, directly or indirectly, without the prior written approval of the Corporation, in its sole discretion. Notwithstanding the foregoing, the Holder has the right without the consent of the Corporation to assign this Warrant in whole, but not in part, (a) as collateral security for the obligations provided for in the Flagstaff Credit Agreement (as defined in the Hansen Credit Agreement) or upon any exercise by any secured party thereunder or (b) to Enron Corp. This Warrant Agreement shall inure to the benefit of and be binding upon the Holder and the Corporation and their respective successors and permitted assigns.

9. **No Filing Obligations.** The Corporation has not and will not be obligated under any circumstances to file a prospectus, registration statement or other similar document in any jurisdiction qualifying any of the Warrant or Warrant Shares issuable on exercise thereof (collectively the "Securities") for distribution or resale and the Holder shall have no right to require the Corporation to repurchase any Securities.

10. **U.S. Securities Act.** This Warrant has not been registered under the Securities Act of 1933, as amended, or any applicable State securities laws, and may not be sold, offered for sale, pledged or hypothecated in the absence of either a registration statement in effect

with respect to the Warrant under such Act and applicable laws or an exemption from the registration requirements of such Act and applicable laws. The Corporation hereby represents and warrants to the Holder that no such registration is required. Holder is an "accredited investor" as such term is defined in Rule 501 (a)(1), (a)(2), (a)(3), or (a)(7) of Regulation D promulgated under the Securities Act of 1933, as amended.

11.  **Replacement of Warrant**.  On receipt of evidence reasonably satisfactory to the Corporation of the loss, theft, destruction or mutilation of this Warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and substance to the Corporation or, in the case of mutilation, on surrender and cancellation of this Warrant, the Corporation at its expense shall execute and deliver, in lieu of this Warrant, a new warrant of like tenor and amount.

12.  **Governing Law**.  This Warrant Agreement shall be governed by the laws of the Province of Alberta.

13.  **Currency**.  All dollar amounts herein are expressed in United States dollars.

14.  **Headings**.  The headings of the sections of this Warrant Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

15.  **Entire Agreement**.  This Warrant Agreement constitutes the entire agreement and supercedes all other prior agreements and undertakings, both written and oral, among the parties with respect of the subject matter hereof.

16.  **Notices**.

Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing (including telecopier communication) and shall be delivered by hand or overnight courier service, mailed or sent by telecopy as follows:

        If to the Holder:

        Flagstaff Capital Corporation
        270 Park Avenue
        35th Floor
        New York, New York 10017
        Attention: Lisa Lee
        Facsimile no. (212) 270-2676

If to the Corporation:

Hansen Investments Co.
3500, 400- 3rd Avenue S.W.
Calgary, Alberta T2P4H2
Attention: Vice President- Legal
Facsimile no. (403) 974-6707

Any party hereto may change its address or telecopy number for notices and other communications hereunder by written notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Warrant Agreement shall be effective, if mailed, two Business Days after deposit in the mails; if sent by overnight courier, one Business Day after delivery to the courier company; and if sent by telecopier, when received by the receiving telecopier equipment, respectively.

17. **Counterparts**. This Warrant may be executed in several counterparts, which taken together shall constitute a single document.

*[Signature Page Follows]*

**IN WITNESS WHEREOF** each party hereto has caused this Warrant to be signed under its corporate seal by a duly authorized officer and to be dated as of the day and year first above written.

**HANSEN INVESTMENTS CO.**

By:_____

    Name:   Peter C.M. Keohane
    Title:    Vice President and Secretary


**FLAGSTAFF CAPITAL CORPORATION**

By:_____

    Name:
    Title:

IN WITNESS WHEREOF each party hereto has caused this Warrant to be signed under its corporate seal by a duly authorized officer and to be dated as of the day and year first above written.

**HANSEN INVESTMENTS CO.**

By:_____
    Name:
    Title:

**FLAGSTAFF CAPITAL CORPORATION**

By:_____
    Bruce Hendrick
    President

## SCHEDULE "A-1"

## SUBSCRIPTION FORM

**TO:   HANSEN INVESTMENTS CO. (the "Corporation")**

• (the "Holder") hereby subscribes for _____ Class B Preferred Shares pursuant to the provisions of a warrant agreement between the Corporation and the Holder dated June 22, 2001 (the "Warrant Agreement") for the consideration and on the terms specified in the Warrant Agreement.

Capitalized terms used in this Subscription Form have the same meanings as in the Warrant Agreement.

In the case of an exercise of the Warrant under Section 4.1(a) of the Warrant, the Holder has paid the Subscription Price in immediately available funds. In the case of an exercise of the Warrant under Section 4.1(b) of the Warrant, the Designated Holder has fulfilled the Designated Holder's obligation to pay the Subscription Price.

The Holder hereby directs that the Class B Preferred Shares be registered and delivered as follows:

The Holder hereby acknowledges that, upon the delivery of the securities subscribed for herein, the Warrant Agreement is hereby terminated.

**DATED** this _____ day of _____, _____.

•

By:_____

# Exhibit
# D

# PUT OPTION AGREEMENT

This Put Option Agreement, dated as of June 22, 2001 (this "Agreement"), is executed by and between Enron Corp., an Oregon corporation ("Enron"), and Flagstaff Capital Corporation, a Delaware corporation ("Flagstaff").

## Recital

Pursuant to a Warrant Agreement ("Warrant Agreement") dated the date hereof and executed by and between Hansen Investments Co., a Nova Scotia company ("Hansen"), and Flagstaff, Hansen has granted to Flagstaff the right to purchase a specified number of its Class B Preferred Shares. Subject to and upon the terms and conditions set forth herein, Enron has agreed to purchase the Warrant and certain related rights from Flagstaff.

## Operative Provisions

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Enron and Flagstaff hereby agree as follows:

**Section 1.    Definitions.**    Capitalized terms used and not defined herein shall have the meaning given to those terms in the Hansen Credit Agreement (including by way of incorporation by reference to other documents). References contained herein to any statute, rule or regulation shall be deemed to refer to such statute, rule or regulation as in effect as of the date of this Agreement and any subsequent provisions amendatory thereof, supplemental thereto or substituted therefor. As used in this Agreement, the following terms have the respective meanings set forth below:

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to remain closed.

"Event of Default" shall have the meaning given to such term in the Hansen Credit Agreement.

"Fair Market Value of the Warrant and the Warrant Rights" shall mean, subject to adjustment as provided for in Section 4.2, the value of the Warrant and the Warrant Rights as determined by Enron.

"Hansen Credit Agreement" means that certain Credit Agreement dated the date hereof, executed by Hansen, as borrower, The Chase Manhattan Bank, as administrative agent and Flagstaff, as lender, and any other document expressed to be made supplemental to, amending or modifying the foregoing or entered into pursuant thereto.

560780

"Lender" shall have the meaning given to such term in the Hansen Credit Agreement.

"Make-Whole Amount" has the meaning set out in the Hansen Credit Agreement.

"Make-Whole Collection Rights" means the rights held by Flagstaff under the terms of the Hansen Credit Agreement to the Make-Whole Amount including all rights to receive the Make-Whole Payment and all rights to pursue the collection of the Make-Whole Amount relying on the rights and remedies provided for in the Hansen Credit Agreement.

"Payment Date" shall mean any Business Day on which an Event of Default has occurred and is continuing.

"Purchase Price" shall have the meaning given to such term in Section 4.1 hereof.

"Put Notice" means a notice duly executed on behalf of Flagstaff in substantially the form of Schedule I hereto, whereby Flagstaff notifies Enron of its election to cause Enron to purchase the Warrant and the Warrant Rights from Flagstaff pursuant to the terms of this Agreement.

"Warrant Rights" means the rights held by Flagstaff in respect of (a) the Warrant, and (b) the Make-Whole Collection Rights.

**Section 2.     Election to Exercise Put Rights.**  Flagstaff may at any time exercise the right to require Enron to purchase the Warrant and the Warrant Rights from Flagstaff upon the occurrence and during the continuance of an Event of Default.  To exercise such election, Flagstaff shall deliver to Enron the Put Notice at any time after the occurrence and during the continuance of an Event of Default.  Once delivered, the Put Notice shall be irrevocable.

**Section 3.     Put Notice; Payment of Purchase Price.**   Once Flagstaff delivers a Put Notice, Enron shall determine the Purchase Price of the Warrant and the Warrant Rights and notify Flagstaff of such Purchase Price all in accordance with Section 4 below.  Upon either (a) Flagstaff's receipt of notification of the Purchase Price or (b) the Purchase Price having been deemed to have been determined pursuant to the last sentence of Section 4.1, Flagstaff shall either promptly tender delivery to Enron of the Warrant and Warrant Rights pursuant to an assignment ("Put Assignment") in the form attached hereto as Schedule II or notify Enron of its election to challenge the Purchase Price in accordance with the terms of Section 4.2 below.  If Enron has previously notified Flagstaff of the Purchase Price or the Purchase Price has been deemed to have been determined pursuant to the last sentence of Section 4.1 and if Flagstaff tenders delivery of the Warrant, the Warrant Rights and the Put Assignment prior to 10:00 a.m. (Houston time) on a Business Day, then Enron shall pay the Purchase Price to Flagstaff prior to 2:00 p.m. (Houston time) on such date.  Flagstaff may only exercise the put rights provided for herein prior to its exercise of the Warrant.

560780

**Section 4.**     **Purchase Price.**

       **Section 4.1**    The purchase price ("Purchase Price") for the Warrant and the Warrant Rights in respect of which a Put Notice has been delivered shall be the Fair Market Value of the Warrant and the Warrant Rights. The initial determination of the Fair Market Value of the Warrant and the Warrant Rights shall be determined by Enron on the date on which Flagstaff delivers to Enron the Put Notice. Enron shall notify Flagstaff of the Purchase Price on the Business Day on which Flagstaff delivers the Put Notice to Enron. Such notification shall be accompanied with reasonable documentation supporting Enron's calculation of the Fair Market Value of the Warrant and the Warrant Rights. In the event Enron fails to deliver notification of the Purchase Price on the Business Day on which Flagstaff delivers the Put Notice to Enron, the Fair Market Value of the Warrant and the Warrant Rights shall be deemed to be equal to Hansen's Tangible Net Worth as set forth in the then most recent financial statements delivered pursuant to Section 4.01(h)(ii), Section 5.01(b) or Section 5.01(c) of the Hansen Credit Agreement.

       **Section 4.2**    If Flagstaff disagrees with the determination of the Fair Market Value of the Warrant and the Warrant Rights, it shall have the right to provide written notice to Enron ("Objection Notice") within three Business Days of receipt of Enron's determination of the Purchase Price. Upon the receipt of the Objection Notice, Enron and Flagstaff shall negotiate in good faith to agree on the Fair Market Value of the Warrant and the Warrant Rights. Following the delivery of the Objection Notice and until the final Fair Market Value of the Warrant and the Warrant Rights is determined, Flagstaff shall refrain from taking any action or exercising any right with respect to the Warrant or the Warrant Rights that could adversely affect the Warrant Rights. Once the parties agree on the Fair Market Value of the Warrant and the Warrant Rights, the Warrant and the Warrant Rights shall be conveyed in accordance with Section 3 above.

       **Section 5.**    **Warranty and Covenants.** (a)    By delivering the Put Assignment, Flagstaff shall be deemed to warrant to Enron that, as of the date of the Put Assignment, Flagstaff holds good title to the Warrant and that, contemporaneously with the payment of the Purchase Price, there exists no Lien granted by Flagstaff, or any Person claiming by, through or under Flagstaff, on such Warrant.

       (b)    In consideration of the covenants and agreements contained herein, Flagstaff covenants and agrees on behalf of itself and its successors and assigns as follows:

       (i) if, after the occurrence and during the continuance of an Event of Default under the Hansen Credit Agreement, Flagstaff or its successors or assigns acquire, through an exercise of remedies against Hansen, any rights to assert any direct or indirect claim or cause of action against or bring any legal or equitable proceedings against CPS or any of its property or assets, including, without limitation, any such claims, causes of action or legal or equitable proceedings against CPS based on the CPS Intercompany Note or based on CPS's capacity as a shareholder of Hansen, then Flagstaff and its successors and assigns hereby and

- 3 -

forever expressly waive any right to assert any such direct or indirect claim or cause of action or to bring any such legal or equitable proceedings against CPS or any of its property or assets, irrespective of whether any such claim, cause of action, or legal or equitable proceedings (A) are based on common law, principles of equity, or on any constitution, law, statute, regulation, or rule, or (B) now exist or hereafter arise; and

(ii) Flagstaff, acting on behalf of itself and its successors and assigns, agrees that, notwithstanding anything to the contrary contained in the Hansen Credit Agreement, Flagstaff shall not sell, transfer, assign or convey the Note (as such term is defined in the Hansen Credit Agreement) or cause any such sale, transfer, assignment or conveyance of the Note, to any person unless such person agrees in writing to be bound by the terms of Section 5(b)(i) of this Agreement.

**Section 6.** <u>**Section 116 Certificate**</u>. Enron hereby acknowledges that Flagstaff will file a notification under section 116 of the *Income Tax Act* (Canada) and any corresponding provisions of applicable provincial income tax legislation in respect of any disposition, for the purposes of the *Income Tax Act* (Canada), of the Warrant in accordance with the terms hereof. Such notification will be made in such form and manner and within the time prescribed in the *Income Tax Act* (Canada) or otherwise as Flagstaff considers appropriate and may be made either up to 30 days prior to or after such disposition or expiry. The parties agree that for the purposes of such notice the proceeds of disposition of the Warrant shall not exceed the amount by which the value of the Warrant Shares to be issued on the exercise of the Warrant exceeds the Exercise Price in respect of such exercise.

**Section 7.** <u>**Termination**</u>. This Agreement shall terminate upon the earlier of (i) the exercise of the Warrant pursuant to Section 4.1(a) of the Warrant or (ii) the Expiry Time (as defined in the Warrant); <u>provided</u>, <u>however</u>, each party's obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment by Enron or any Designated Party in satisfaction of any of the Obligations of Enron or any Designated Party under the Operative Documents is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Enron or any Designated Party, or any Subsidiary of such Person, or otherwise, all as though such payment had not been made.

**Section 8.** <u>**Notices**</u>. All notices, tenders and other communications provided for herein shall be in writing (including telecopier communication) and shall be delivered by hand or overnight courier service, mailed or sent by telecopy, as follows:

(a) if to Flagstaff, to it at its address at Flagstaff Capital Corporation, 270 Park Avenue, 35th Floor, New York, New York 10017, Attention: Lisa Lee, facsimile no. (212) 270-2676; with copies to The Chase Manhattan Bank, 1 Chase Manhattan Plaza, 8th Floor, New York, New York, 10081, facsimile no. (212) 552-2261, Attention: Muniram Appanna;

(b) if to Enron, to it at its address at Enron Corp., 1400 Smith Street, Houston, Texas 77002, Attention: Treasurer, Corporate Finance; facsimile no. (713) 646-3422;

- 4 -

560780

Any party hereto may change its address or telecopy number for notices and other communications hereunder by written notice to the other parties hereto. All notices, tenders and other communications given to any party hereto in accordance with the provisions of this Agreement shall be effective, if mailed, two Business Days after deposit in the mails; if sent by overnight courier, one Business Day after delivery to the courier company; if by hand, upon delivery, and if sent by telecopier, when received by the receiving telecopier equipment, respectively.

**Section 9.** **Assignment.** Enron may not assign its rights in this Agreement without the prior written consent of Flagstaff. Flagstaff may only assign its rights in this Agreement (i) in connection with an assignment of its rights in the Warrant and then only as permitted under the terms of the Warrant, (ii) as collateral security under the Flagstaff Credit Agreement (as defined in the Hansen Credit Agreement), or (iii) with the prior written consent of Enron. Upon any permitted assignment by Flagstaff of all of its rights and obligations hereunder, Flagstaff shall be relieved on any further obligations under the terms of this Agreement.

**Section 10.** **Amendment; Third Party Beneficiary.** No amendment or waiver of any provision of this Agreement shall be effective unless the same shall be executed in writing by the parties hereto. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto and their respective permitted successors and assigns) any legal or equitable right, remedy or claim under or by reason of this Agreement.

**Section 11.** **Currency.** All references to currency herein are to lawful money of the United States of America.

**Section 12.** **Business Days.** If any payment is required to be made or other action is required to be taken pursuant to this Agreement on a day which is not a Business Day, then such payment or action shall be made or taken on the next Business Day.

**Section 13.** **Law; Submission to Jurisdiction.** (a) This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(b) Enron hereby irrevocably and unconditionally submits, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan and to the extent possible, the Commercial Division, Civil Branch thereof and of the United States District Court of the Southern District of New York sitting in the Borough of Manhattan, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment therefrom, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that Flagstaff may otherwise have to

- 5 -

bring any action or proceeding relating to this Agreement against Enron or its properties in the courts of any jurisdiction.

(c)     The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

- 6 -

IN WITNESS WHEREOF, the parties named herein have caused this Agreement to be duly executed by its officer hereunto duly authorized, on the day and year first above written.

**ENRON CORP.**
an Oregon corporation

By: _Douglas L. McDowell_
    Douglas L. McDowell
    Attorney-in-Fact


**FLAGSTAFF CAPITAL CORPORATION**
a Delaware corporation

By: _Bruce Hendrick_
    Bruce Hendrick
    President

**SCHEDULE I**

**FORM OF PUT NOTICE**

This Put Notice is being delivered in connection with the Put Option Agreement dated June 22 2001, (the "Agreement"), among Enron Corp. ("Enron") and Flagstaff Capital Corporation ("Flagstaff"). Flagstaff hereby gives notice pursuant to the Agreement of its irrevocable election to require Enron to purchase from Flagstaff the Warrant and the Warrant Rights, as defined in the Agreement, in accordance with the terms of the Agreement

IN WITNESS WHEREOF, Flagstaff has executed this Put Notice on _____, 20__.

FLAGSTAFF CAPITAL CORPORATION
a Delaware corporation

By: _____

    Name:

    Title:

## SCHEDULE II

## FORM OF PUT ASSIGNMENT

This Put Assignment ("Assignment"), is executed and delivered by Flagstaff Capital Corporation, a Delaware corporation ("Flagstaff"), to Enron Corp., an Oregon corporation ("Enron"), pursuant to the Put Option Agreement ("Agreement"), dated June 22, 2001. All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

Flagstaff, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby assign and convey to Enron all of Flagstaff's interest in and under, and rights to, the Warrant and Warrant Rights.

TO HAVE AND TO HOLD all and singular the Warrant and Warrant Rights, together with all rights, titles, interests, estates, remedies, powers and privileges thereunto appertaining unto Enron and its respective successors, legal representatives and assigns forever.

Flagstaff agrees to execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action as may be reasonably necessary or convenient to carry out the transactions contemplated hereby.

This Assignment may be executed in any number of counterparts and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts shall together constitute one and the same Assignment.

IN WITNESS WHEREOF, Flagstaff has caused this Assignment to be duly executed on this, the ___ day of _____, 20__.

FLAGSTAFF CAPITAL CORPORATION
a Delaware corporation

By: _____
    Name:
    Title:

# Exhibit E

(Multicurrency—Cross Border)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ......June 22, 2001....

Enron Corp.                                        Flagstaff Capital Corporation
.................................................................. and ..............................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will
be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents
and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those
Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein
specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the
other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency
between the provisions of any Confirmation and this Master Agreement (including the Schedule), such
Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master
Agreement and all Confirmations form a single agreement between the parties (collectively referred to as
this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by
it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place
of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in
freely transferable funds and in the manner customary for payments in the required currency. Where
settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on
the due date in the manner customary for the relevant obligation unless otherwise specified in the
relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent
that no Event of Default or Potential Event of Default with respect to the other party has occurred
and is continuing, (2) the condition precedent that no Early Termination Date in respect of the
relevant Transaction has occurred or been effectively designated and (3) each other applicable
condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii) *Liability.* If:—

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.      **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations.*

(i)  *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)  *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)   any other documents specified in the Schedule or any Confirmation; and

(iii)  upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA● 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5. **Events of Default and Termination Events**

(a) *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

    (i) *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii) *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii) *Credit Support Default.*

        (1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

    (iv) *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

    (v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

    (vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

    (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

    (1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

    (2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)  *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effecive as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If:—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  *Effect of Designation.*

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)  *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)  *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)  *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)  *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)  *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties.* If there are two Affected Parties:—

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

## 7.  Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)     a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)     a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.  Contractual Currency

(a)     *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)     *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)     *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)     *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA© 1992

## 9.    Miscellaneous

**(a)**    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

**(b)**    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

**(c)**    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

**(d)**    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

**(e)**    *Counterparts and Confirmations.*

  **(i)**    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

  **(ii)**    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

**(f)**    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

**(g)**    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10.    Offices; Multibranch Parties

**(a)**    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

**(b)**    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

**(c)**    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.    **Notices**

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

>    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

>    (ii)    if sent by telex, on the date the recipient's answerback is received;

>    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

>    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted· or

>    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

13.    **Governing Law and Jurisdiction**

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

>    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

>    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| Enron Corp. | Flagstaff Capital Corporation |
|---|---|
| ........................................ | ........................................ |
| **(Name of Party)** | **(Name of Party)** |

By: ...Douglas L. McDowell...    By: ...Bruce Kendrick...
Name: Douglas L. McDowell        Name: Bruce Kendrick
Title: Attorney-in-Fact          Title: President
Date: June 22, 2001              Date: June 22, 2001

18                                                          ISDA● 1992

# TOTAL RETURN SWAP CONFIRMATION

June 22, 2001

Enron Corp.
1400 Smith Street
Houston, Texas 77002

Ladies and Gentlemen,

The purpose of this letter is to confirm the terms and conditions of the Transaction (the "Transaction") entered into between us as of the date of this letter (the "Trade Date"). This letter constitutes a "Confirmation" (this "Confirmation") and incorporates by reference the definitions and provisions of the 2000 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.), as such definitions may be amended, supplemented, replaced or modified from time to time (the "2000 Definitions"). In the event of any inconsistency between the 2000 Definitions and provisions and this Confirmation, this Confirmation will prevail.

This Confirmation forms part of, and is subject to, the Master Agreement between us dated as of June 22, 2001 (the "Master Agreement"). All the provisions contained in the Master Agreement govern this Confirmation except as expressly modified below. This Confirmation will be governed by and construed in accordance with the laws of the State of New York.

It is our intention to have this Confirmation serve as the final documentation for this Transaction and, accordingly, no letter confirmation will follow.

The terms of the Transaction to which this Confirmation relates are as follows:

1.  **DEFINITIONS**

    1.1  The parties are:

        (a)  Enron Corp., an Oregon corporation ("Party A"); and

        (b)  Flagstaff Capital Corporation, a Delaware corporation ("Party B").

1.2

    (a)    In this Confirmation, capitalized terms used but not defined herein shall have the meanings given to those terms in the Credit Agreement.

    (b)    In this Confirmation:

"Administrative Agent" shall have the meaning given to such term in the Credit Agreement.

"Alternate Base Rate" shall have the meaning given to such term in the Credit Agreement.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to remain closed.

"Calculation Agent" means the Administrative Agent. All determinations and calculations by the Calculation Agent shall be made in good faith and in the exercise of its commercially reasonable judgment. All such determinations and calculations shall be binding on the parties hereto in the absence of manifest error.

"Collateral Agent" shall have the meaning given to such term in the Credit Agreement.

"Credit Agreement" means that certain Credit and Security Agreement dated the date hereof, executed by Party B, as borrower, the Lenders, the Administrative Agent, and the Collateral Agent, and any other document expressed to be made supplemental to, amending or modifying the foregoing or entered into pursuant thereto.

"Fair Market Value" means the purchase price in connection with (a) the tendered sale or assignment of the Warrant as permitted in accordance with the terms of Section 8(b) of the Warrant and (b) the sale or assignment of any Warrant Rights that may be sold or assigned in connection with the sale or assignment described in clause (a).

"Hansen" shall mean, Hansen Investments Co., a Nova Scotia company.

"Hansen Credit Agreement" means that certain Credit Agreement dated the date hereof, executed by Hansen, as borrower, the administrative agent and Party B, as Lender and any other document expressed to be made supplemental to, amending or modifying the foregoing or entered into pursuant thereto.

"Lenders" shall have the meaning given to such term in the Credit Agreement.

"Make-Whole Amount" has the meaning set out in the Hansen Credit Agreement.

"Make-Whole Collection Rights" means the rights held by Party B under the terms of the Hansen Credit Agreement to the Make-Whole Amount including all rights to receive the

Make-Whole payment and all rights to pursue the collection of the Make-Whole Amount relying on the rights and remedies provided for in the Hansen Credit Agreement.

"Warrant" shall have the meaning given to such term in the Credit Agreement.

"Warrant Agreement" shall have the meaning given to such term in the Credit Agreement.

"Warrant Rights" means the rights held by Party B in respect of (a) the Warrant and (b) the Make-Whole Collection Rights.

2. **PAYMENTS**

   2.1  General Terms for Payments

       (a)    Trade Date: June 22, 2001.

       Effective Date: June 22, 2001.

       Fixed Rate Payer:  Party A

       Floating Rate Payer: Party B

       Business Day Convention: Modified Following

       (b)    The provisions of Section 2(c) (Netting) of the Master Agreement will apply to this Confirmation.

## 2.2    Floating Payments

Floating Payment Date:  The earlier of (i) any Business Day on which Party B tenders the Warrant for transfer as permitted in accordance with the terms of Section 8(b) of the Warrant Agreement or (ii) any Business Day on which Party B exercises the right to purchase Class B Preferred Shares pursuant to the terms of the Warrant.

Floating Amount:  In the case of a Floating Payment Date described in clause (i) of the immediately preceding paragraph, the Floating Amount shall be equal to the Fair Market Value if Party B tenders the Warrant for transfer as permitted by Section 8(b) of the Warrant Agreement.  In the case of a Floating Payment Date described in clause (ii) of the immediately preceding paragraph, the Floating Amount shall be equal to the sum of (a) the aggregate Subscription Price (as defined in the Warrant Agreement) paid by Party B for the Class B Preferred Shares acquired pursuant to the terms of the Warrant plus (b) the present value (using a discount rate of 5% per annum) of the cumulative preferred dividend that has accrued or will accrue with respect to such Class B Preferred Shares.

## 2.3    Fixed Payments

Fixed Payment Date: The Floating Payment Date.

Fixed Amount:  In the case of a Fixed Payment Date that occurs on a Floating Payment Date described in clause (i) of the definition of Floating Payment Date in Section 2.2 of this Confirmation, the Fixed Amount shall be equal to the Make-Whole Amount due and payable by Hansen pursuant to the Hansen Credit Agreement immediately prior to giving effect to the tender for the transfer described in such clause (i) of Section 2.2 as if such Make-Whole Amount were due on such Fixed Payment Date.  In the case of a Fixed Payment Date that occurs on a Floating Payment Date described in clause (ii) of the definition of Floating Payment Date in Section 2.2 of this Confirmation, the Fixed Amount shall be equal to the Make-Whole Amount that would be payable by Hansen pursuant to the Hansen Credit Agreement immediately prior to giving effect to the exercise of rights described in such clause (ii) of Section 2.2. as if such Make-Whole Amount were due on such Fixed Payment Date.

## 2.4    Interest on Unpaid Sums.

(a)    If Party A fails to pay any sum due from it under the Transaction on its due date (an "unpaid sum"), Party A will pay default interest on such unpaid sum from its due date to the date of actual payment (after as well as before judgment) at a rate (the "Default Rate") determined by the Calculation Agent to be 2% per annum above the Alternate Base Rate for the period of non-payment (a "Default Interest Period").

(b)    Default interest will be payable by the applicable party automatically and will be, to the extent permitted by law, compounded at the end of each Default Interest Period.

(c)    The Calculation Agent will promptly notify the applicable party of each determination of the Default Rate and each selection of a Default Interest Period.

2.5    Account Details.

Account for Payments to Party B:

| | |
|---|---|
| Credit Bank: | The Chase Manhattan Bank |
| Address: | 1 Chase Manhattan Plaza, 8th Floor |
| | New York, New York 10081 |
| ABA #: | 021 000 021 |
| Account No.: | 507 953 819 |
| Attention: | Valerie Dunbar |
| Reference: | Flagstaff Capital Corporation |

or to such other account or accounts as Party B (with the consent of the Administrative Agent) or the Collateral Agent may direct in writing.

Account for Payments to Party A:

| | |
|---|---|
| Credit Bank: | Citibank, New York |
| Address: | 1400 Smith |
| | Houston, Texas 77002 |
| ABA#: | 201000089 |
| Account No.: | 00076486 |
| Attention: | Treasurer |
| Reference: | Flagstaff Capital Corporation |

or to such other account or accounts as Party A may direct in writing.

## 3.    **CONTINUED EFFECTIVENESS**

Party A's obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment by Party A or any Designated Party (as defined in the Hansen Credit Agreement) in satisfaction of any of the obligations of Party A or any Designated Party under the Operative Documents (as defined in the Credit Agreement) is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Party A or any Designated Party, or any Subsidiary of such Person, or otherwise, all as though such payment had not been made.

Party B's obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment by Party B in satisfaction of any of the obligations of Party B under the Operative Documents (as defined in the Credit Agreement) is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Party B, or otherwise, all as though such payment had not been made.

Yours very truly,

ENRON CORP.

By: ⟨signature⟩ _____
     Name: Douglas L. McDowell
     Title: Attorney-in-Fact

Agreed and Accepted,

FLAGSTAFF CAPITAL CORPORATION

By: ⟨signature⟩ _____
  Bruce Hendrick
  President

SCHEDULE

to the

ISDA Master Agreement

(Multicurrency - Cross Border)

dated as of

June 22, 2001

between

Enron Corp.

("Party A")

and

Flagstaff Capital Corporation

("Party B")

## Part 1

**General Provisions**

(a)  **ISDA Definitions.** This Agreement, each Confirmation and each Transaction are subject to the 2000 ISDA Definitions (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., and will be governed in all respects by the provisions set forth in the Definitions with references to "Swap Transaction" therein being a reference to "Transaction" for purposes of this Agreement. The provisions of the Definitions are incorporated by reference in, and made part of, this Agreement as if set forth in full in this Agreement and each Confirmation. In the event of any inconsistency between the provisions of the Schedule, the printed form of the Agreement of which it is

a part or the Definitions, the provisions set forth in this Schedule will prevail; and in the event of any inconsistency between the provisions of a Confirmation and this Schedule. the printed form of the Agreement or the Definitions, the provisions set forth in the Confirmation will prevail.

(b)     **Representations, Warranties and Covenants**.

    (1)     Party A and Party B each represents and warrants to the other on the date of this Schedule that:

        (A)     its payment obligations hereunder rank and will rank at all times at least pari passu in all respects with all of its other unsecured obligations (except for those which are preferred by operation of law or equitable principles);

        (B)     it is an "eligible contract participant" as such term is defined in Section 1a(12) of the Commodity Exchange Act, as amended (7 U.S.C. 1a(12)); and

    (2)     its decisions regarding the merits of each Transaction are the results of arms-length negotiations.

(c)     **Additional Definitions**.

"Calculation Agent" means the Administrative Agent (as defined in the Credit Agreement). All determinations and calculations by the Calculation Agent shall be made in good faith and in the exercise of its commercially reasonable judgment. All such determinations and calculations shall be binding on the parties hereto in the absence of manifest error.

"Credit Agreement" shall mean that certain Credit and Security Agreement dated the date hereof executed by Party B as the Borrower, The Chase Manhattan Bank, as

Administrative Agent and Collateral Agent, and the other financial institutions named therein, as the same may be amended, modified, restated or novated from time to time.

"Maturity Date" shall have the meaning set forth in the Credit Agreement.

(d)   **Relationship Between Parties.**  Each party will be deemed to represent and warrant to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties which expressly provides to the contrary for that Transaction):

(1)   Non-Reliance. It is acting for its own account and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(2)   Assessment and Understanding. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice) and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(3)   Status of Parties. The other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

(e)   **LIMITATION OF LIABILITY.**  NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES (WHETHER OR NOT ARISING

FROM ITS NEGLIGENCE TO ANY OTHER PARTY; PROVIDED, HOWEVER, THAT NOTHING IN THIS PROVISION SHALL AFFECT THE ENFORCEABILITY OF SECTION 6(e) OF THIS AGREEMENT. IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY.

(f) **Applicable Rate.** The definition of "Applicable Rate" set forth in Section 14 is hereby amended by adding to the end of Section (b) of the definition after the word "Rate" the following provision: "; provided, however, that if the payee is a Defaulting Party for purposes of Section 6(e), then the rate shall be the Non-default Rate".

(g) **Confidentiality.** The contents of this Agreement and all other documents relating to this Agreement, and any information made available by one party or its Credit Support Provider to the other party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party, except to the parties to the Credit Agreement (nor shall any public announcement relating to this Agreement be made by either party), except for such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any regulatory body having or claiming to have jurisdiction over the relevant party or to the Federal Reserve Board or the FDIC or similar organizations, (c) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation or proceedings, (d) in order to comply with any law, order, regulation or ruling applicable to the relevant party, and (e) to the prospective transferee or participant in connection with any contemplated transfer or participation of any of the Loans (as defined in the Credit Agreement) or any interest therein by Party B; provided that such prospective assignee agrees to be bound by the confidentiality provisions set forth in this Part 1(g).

(h)   **Recording.** Each party consents to the recording, at any time and from time to time, by the other party of any and all communications between officers or employees of the parties, and waives any further notice of such recording.

(i)   **Limitation of Rate.** Notwithstanding any provision to the contrary contained in this Agreement, in no event shall the Default Rate, Non-default Rate, or Termination Rate exceed the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged, or received on the subject indebtedness under the law applicable to such party.

(j)   **Application of Uniform Commercial Code.** The parties agree that to the fullest extent permitted by applicable law, Section 2-609 of the New York Uniform Commercial Code and any equivalent rights existing at common law shall not apply to this Agreement or any Transaction.

(k)   **Credit Agreement.** Party B represents and warrants to Party A that attached hereto as Exhibit B is a true and complete copy of the Credit Agreement as in effect on the date hereof.

(l)   **Set-off, etc.** Notwithstanding Section 6(e) or any other provision of this Agreement, all payments made by Party A under this Agreement shall be paid in full without set-off or counterclaim and not subject to any condition.

(m)   **Severability.** If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants, and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement; provided, however, that this

severability provision shall not be applicable if any provision of Section 1, 2, 5 or 6 (or any definition or provision in Section 14 to the extent it relates to, or is used in or in connection with any such Section) shall be so held to be invalid or unenforceable.

## Part 2
## Tax Representations

(a)    For the purpose of Section 3(e), each party makes the following representation:

    (1)    It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction, to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

        (i)    the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement;

        (ii)    the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

        (iii)    the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement.

(b)    For the purpose of Section 3(f), each party makes the following representation:

Party A represents:

It is an Oregon corporation and has a Federal Taxpayer ID No. of 47-0255140.

It is not a bank (as such term is used in Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended), and it is not licensed or regulated as a bank by the banking authorities of any jurisdiction.

Party B represents:

It is a Delaware corporation and has a Federal Taxpayer ID No. of 13-4157727.

It is not a bank (as such term is used in Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended), and it is not licensed or regulated as a bank by the banking authorities of any jurisdiction.

## Part 3
## Agreement to Deliver Documents

(a)    For the purpose of Section 4(a), the Tax forms, documents, or certificates to be delivered are:

Party A:        None

Party B:        None

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
| --- | --- | --- |
| Party A | Legal opinion substantially in the form attached as Exhibit A-1 | Execution of Agreement |
| Party B | Legal opinion substantially in the form attached as Exhibit A-2 | Execution of Agreement |
| Party A and Party B | Evidence of authority of signatories substantially in the form attached as Exhibit C | Execution of Agreement |

**Part 4**

**Miscellaneous**

(a)    **Address for Notices.**  For the purpose of Section 12(a) of this Agreement: Address for notices or communications (other than with respect to payments) to Party A:

| | | |
|---|---|---|
| Address | : | Enron Corp. |
| | | P. O. Box 4428 |
| | | Houston, Texas 77210-4.428 |
| Street Address | : | 1400 Smith Street |
| (for courier delivery) | : | Houston, Texas 77002 |
| Attention | : | Vice President, Finance and Treasury |
| Facsimile No. | : | (713) 646-5930 |
| Telephone | : | (713) 853-5359 |

A copy of any notice sent to Party A pursuant to Section 5 or 6 must also be sent to (i) Enron Corp., Attention: Corporate Secretary at the above address and facsimile no. (713) 853-2534, and (ii) Enron North America Corp., Attention: Assistant General Counsel, Trading Group at the above address and facsimile no. (713) 646-4818.

Address for notices or communications (other than with respect to payments) to Party B:

| | | |
|---|---|---|
| Address | : | Flagstaff Capital Corporation |
| | | 270 Park Avenue, 35th Floor |
| | | New York, New York 10017 |
| Attention | : | Lisa Lee |
| Facsimile No | : | (212) 270-2966 |
| Telephone | : | (212) 270-2676 |

(b)    **Process Agent.**  For the purpose of Section 13(c) of this Agreement:

| | | |
|---|---|---|
| Party A appoints as its Process Agent | : | Not Applicable |
| Party B appoints as its Process Agent | : | Not Applicable |

(c)    **Offices.**  The provisions of Section 10(a) of this Agreement will apply to this Agreement.

(d)  **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.
Party B is not a Multibranch Party.

(e)  **Calculation Agent.** The Calculation Agent shall be as specified in Part 1(c) of this Schedule.

(f)  **Credit Support Document.** Not Applicable

(g)  **Credit Support Provider.** Not Applicable

(h)  **Specified Entity.** Not Applicable

(i)  **Governing Law; Submission to Jurisdiction.**

(i)  THE RIGHTS AND OBLIGATIONS OF EACH OF THE PARTIES UNDER THIS AGREEMENT SHALL, PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(ii)  Party A hereby irrevocably and unconditionally submits, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan and to the extent possible, the Commercial Division, Civil Branch thereof and of the United States District Court of the Southern District of New York sitting in the Borough of Manhattan, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment therefrom, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a

final judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that Party B may otherwise have to bring any action or proceeding relating to this Agreement against Party A or its properties in the courts of any jurisdiction.

(iii)    Party A hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (ii) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(iv)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Paragraph 4(a) of this Schedule. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(j)    "Affiliate" will have the meaning specified in Section 14 of this Agreement.

## Part 5
## Termination Provisions

(a)    The provisions of Section 5(a)(iii), (iv), (v), (vi), (vii) and (viii) will not apply to Party A or to Party B.

(b)    The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will not apply.

(c)    The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A or Party B.

(d)    **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement: -

The Second Method and Loss will apply.

(e)     "Termination Currency" means USD.

        "Additional Termination Event" will not apply.

(f)     The "Contract Currency" shall be USD.

**FLAGSTAFF CAPITAL CORPORATION**

By: _____

Bruce Hendrick
President

**ENRON CORP.**

By: _____
Name: Douglas L. McDowell
Title: Attorney-in-Fact

# Exhibit
# F

| United States Bankruptcy Court<br>Southern District of New York | PROOF OF CLAIM | |
|---|---|---|

In re (Name of Debtor)
**Enron Corp.**

Case Number:
**01-16034 (AJG)**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor
*(The person or entity to whom the debtor owes money or property)*

**Flagstaff Capital Corporation**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Name and Addresses Where Notices Should be Sent

☐ Check box if you have never received any notices from the bankruptcy court in this case.

**Flagstaff Capital Corporation**
c/o JPMorgan Chase Bank
712 Main Street – 24 East
Houston, Texas 77002
Attn: F. Hall Webb

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attn: Mark I. Bane

☐ Check box if the address differs from the

Filed: USBC - Southern District of New York
ENRON, Et Al.
01-16034 (CA)     0000011152

**THIS SPACE IS FOR COURT USE ONLY**

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:

**SEE ATTACHMENT**

:d claim, dated: _____

**1. BASIS FOR CLAIM:**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other (Describe briefly)  **SEE ATTACHMENT**

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)
   Your social security number _____
   Unpaid compensations for services performed
   From _____ to _____
       (date)       (date)

**2. DATE DEBT WAS INCURRED:**
**SEE ATTACHMENT**

**3. IF COURT JUDGMENT, DATE OBTAINED:**

4.  CLASSIFICATION OF CLAIM. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another.
CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM.

☐ SECURED CLAIM $
Attach evidence of perfection of security interest.
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other (Describe briefly)
Amount of arrearage and other charges included in secured claim above, if any $

☒ UNSECURED NONPRIORITY CLAIM  **at least $367,621,000\***

*\*Plus such other amounts as listed on the attachment hereto.*
   **SEE ATTACHMENT**

A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM $_____

Specify the priority of the claim.

☐ Wages, salaries, or commissions (up to $4,300), earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier—11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan—U.S.C. § 507(a)(4)
☐ Up to $1,950 of deposits toward purchase, lease, or rental of property or services of personal, family, or household use—11 U.S.C. § 507(a)(6)
☐ Taxes or penalties of governmental units—11 U.S.C. § 507(a)(8)
☐ Other—11 U.S.C. §§ 507(a)

5.  TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:  **at least $367,621,000\***  _____  _____  **at least $367,621,000\***
    (Unsecured)      (Secured)      (Priority)      (Total)

*\*Plus such other amounts as listed on the attachment hereto.* **SEE ATTACHMENT**

☐ Check this box if claim includes prepetition charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

6.  CREDITS AND SETOFFS: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

**THIS SPACE IS FOR COURT USE ONLY**

7.  SUPPORTING DOCUMENTS: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8.  TIME-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

Date
October 10, 2002

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)

**F. Hall Webb, President**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

ATTACHMENT TO PROOF OF CLAIM OF
FLAGSTAFF CAPITAL CORPORATION, AGAINST ENRON CORP.

I.    BASIS FOR CLAIM

A.    Background[1]

Pursuant to the Credit and Security Agreement, dated as of June 22, 2001 (the "Flagstaff

Credit Agreement"), among Flagstaff Capital Corporation ("Flagstaff"), as Borrower, the lenders

party thereto (the "Lenders"), as Lenders, JPMorgan Chase Bank (formerly known as The Chase

Manhattan Bank; hereinafter, "JPMCB"), as Administrative Agent and Collateral Agent, J. P.

Morgan Securities Inc., as Lead Arranger, The Royal Bank of Scotland, as Co-Arranger and

Syndication Agent, and The Bank of Tokyo-Mitsubishi Ltd. and Mizuho Bank (formerly known

as The Industrial Bank of Japan, Limited, New York Branch), as Co-Documentation Agents, the

Lenders extended to Flagstaff a $375,000,000 term loan (the "Flagstaff Term Loan").  As

security for the Flagstaff Term Loan, Flagstaff granted to Lenders a security interest in

substantially all Flagstaff's assets, including any and all of Flagstaff's rights with respect to the

Hansen Loan, the Warrant and Warrant Rights, the Put Option Agreement, the Total Return

Swap Agreement, and the Enron Agreement (each as defined below).

Pursuant to the Credit Agreement, dated as of June 22, 2001 (the "Hansen Credit

Agreement"), among Hansen Investments Co. ("Hansen"), as Borrower, Flagstaff, as Lender,

and JPMCB, as Administrative Agent, Flagstaff loaned the proceeds from the Flagstaff Term

Loan, and other moneys, to Hansen (the "Hansen Loan").  The Hansen Credit Agreement

provides that, if the Hansen Loan is prepaid for any reason, including upon acceleration, Hansen

is obligated to pay the Make Whole Amount (as defined in the Hansen Credit Agreement), which

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the relevant
referenced documents.

is an amount equal to any accrued but unpaid interest due on the Hansen Loan on or before the date of prepayment, plus the present value of all payments of interest under the Hansen Loan that would have been payable thereafter if the Hansen Loan had been paid on the Maturity Date (as defined in the Hansen Credit Agreement). The Hansen Loan is evidenced by the note from Hansen to Flagstaff, dated as of June 22, 2001 (the "Hansen Note").

Pursuant to the ISDA Master Agreement and Confirmation, dated as of June 22, 2001, (the "ISDA Master Agreement"), between JPMCB and Flagstaff, Flagstaff entered into an interest rate swap with JPMCB under which Flagstaff was the fixed rate payer on a notional amount equal to the scheduled outstanding principal balance of the Flagstaff Loan, and JPMCB was the floating rate payer.

As evidenced by the Intercompany Note, dated as of June 22, 2001 (the "Intercompany Note"), between Hansen and Compagnie Papiers Stadacona ("CPS"), Hansen loaned the entire proceeds of the Hansen Loan to CPS.

Pursuant to the Warrant Agreement, dated as of June 22, 2001 (the "Warrant Agreement"), Hansen issued a warrant entitling Flagstaff to purchase Class B Preferred Shares of Hansen (the "Warrant").

Enron Corp. ("Enron") and Flagstaff entered into a Put Option Agreement, dated as of June 22, 2001 (the "Put Option Agreement"), pursuant to which, upon an Event of Default (as defined under the Hansen Credit Agreement), Flagstaff could require Enron to purchase from Flagstaff the Warrant and the Warrant Rights (as defined in the Put Option Agreement), which Warrant Rights include the rights to receive the Make Whole Amount.

Enron and Flagstaff entered into the ISDA Master Agreement and Total Return Swap Confirmation, dated as of June 22, 2001 (the "Total Swap Return Agreement"), pursuant to

which, on the date Flagstaff exercises its rights under the Put Option Agreement, Flagstaff would pay to Enron an amount equal to the Fair Market Value (as defined under the Put Option Agreement) of the Warrant and Warrant Rights and, in return, Enron would pay to Flagstaff an amount equal to the Make Whole Amount.

Pursuant to the Enron Agreement, dated as of June 22, 2001 (the "Enron Agreement"), by Enron in favor of Flagstaff and the Indemnified Persons identified therein, Enron agreed to indemnify the Lenders, the Administrative Agent, the Collateral Agent, the Swap Counterparties and Flagstaff against (a) a breach by Enron or Hansen of representations or covenants in the Enron Agreement or in the other documents described above or (b) certain other matters related to the transactions described above.

On or about November 30, 2001, Flagstaff delivered to Enron a Put Notice and Put Assignment (collectively, the "Put Notice") in accordance with the terms of the Put Option Agreement. Enron has not, to date, acknowledged the receipt of the Put Notice nor has Enron taken any action that would be required under the Put Option Agreement or the Total Return Swap Agreement upon delivery of the Put Notice. It is unresolved whether the Put Option is exercised.

B.    Basis for Claim

This proof of claim (the "Proof of Claim") is filed by Flagstaff (the "Claimants"), against Enron for debts and obligations of, and claims against, Enron arising out of, in connection with, or related to (1) the Put Option Agreement, the Total Return Swap Agreement, the Enron Agreement, any other documents described in Section I.A. hereto, and any related documents (collectively, the "Flagstaff Agreements"), (2) any direct or indirect benefit gained by Enron from the Flagstaff Term Loan and the transactions undertaken pursuant to the Flagstaff

Agreements, and (3) any acts or omissions of Enron which may have harmed or caused damage to the Claimants, in connection with the Flagstaff Agreements, and any transactions undertaken pursuant, or related, thereto, or otherwise.

## II. TOTAL AMOUNT OF CLAIM

### A. Amount of Claim

On December 2, 2001 (the "Petition Date"), and thereafter, Enron (the "Debtor") and certain of its affiliates (such affiliates together with Enron, the "Debtors") each filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). As of the Petition Date, Debtor was, and still is, indebted to Claimants in, at least, the following amounts:

(a) if it is determined that Flagstaff's rights under the Put Option Agreement were effectively exercised, an amount, not less than $367,621,000, equal to the Make Whole Amount, in accordance with the Put Option Agreement and the Total Return Swap Agreement;

(b) if it is determined that Flagstaff's rights under the Put Option Agreement were not effectively exercised, any amounts that Flagstaff may be entitled to by virtue of Flagstaff's ownership of the Put Option Agreement (which amounts would include, an amount, not less than $367,621,000, equal to the Make Whole Amount, in accordance with the Put Option Agreement and the Total Return Swap Agreement);

(c) if it is determined that Flagstaff's rights under the Put Option Agreement were not effectively exercised, and it is further determined that the Put Option Agreement is an executory contract which has already been rejected by the Debtor, any amounts that Flagstaff may be entitled to for damages for the rejection of the Put Option Agreement (which amounts

would include, an amount, not less than $367,621,000, equal to the Make Whole Amount, in accordance with the Put Option Agreement and the Total Return Swap Agreement). If the Put Option Agreement is determined to be an executory contract capable of being rejected by the Debtor, but nonetheless, not yet rejected, Claimants reserve all rights to assert any damage claims upon rejection of the Put Option Agreement;

      (d)      any and all amounts due and owing under the Enron Agreement;

      (e)      any and all amounts for claims against the Debtor for unjust enrichment, or for receipt of a direct or indirect fraudulent conveyance or transfer on account of any benefits, whether direct or indirect, enjoyed by the Debtor from the proceeds of the Flagstaff Term Loan or any other transaction undertaken pursuant to the Flagstaff Agreements; and

      (f)      any and all additional amounts owed by Debtor to Claimants under the Flagstaff Agreements, including, without limitation, amounts owed in respect of claims arising both prior to the Petition Date and subsequent to the Petition Date that remain outstanding in an undetermined amount or are otherwise unliquidated and/or contingent as of the date hereof. These claims include, without limitation, misrepresentations and/or breaches of covenants and defaults under the Flagstaff Agreements, claims for expenses, fees (including attorneys' fees), indemnities and termination costs of, or damages relating to, the Flagstaff Agreements, whether arising prior to or subsequent to the Petition Date.

B.    <u>Other Claims</u>

This Proof of Claim also expressly includes all rights to assert a constructive trust against assets or cash held by the Debtor, and also includes any and all amounts owed, for damages or otherwise, on account of any and all claims that Claimants have or may have, whether known or unknown, against the Debtor, the other Debtors, and all those purporting to act on their behalf,

whether presently asserted or to be asserted, including, without limitation, claims for or based upon (1) common law fraud, (2) misrepresentation, (3) subrogation, (4) indemnity, (5) contribution, (6) unjust enrichment, (7) constructive trust, (8) fraudulent conveyance, (9) failure to fulfill contractual and fiduciary obligations, (10) breach of implied covenants of good faith and fair dealing, (11) negligent undertaking, (12) making, causing or permitting to be made misleading statements regarding the businesses of Debtor and the Debtors, (13) failure to take prudent and appropriate action regarding adverse business conditions affecting the business operations of the Debtor and the Debtors, (14) failure to require adequate financial and accounting controls for the Debtor and the Debtors, all of which, singularly or collectively, may have caused any of the Claimants to suffer damages.

## III.  RESERVATION OF RIGHTS

Claimants do not waive, and expressly reserve, all of the rights and remedies at law and in equity that Claimants have or may have against the Debtor, the other Debtors, and/or any of Debtor's affiliates and subsidiaries, or any other person or entity.

By filing this Proof of Claim, Claimants do not submit to the jurisdiction of this Court for any purpose other than with respect to the Proof of Claim. This Proof of Claim is not intended to be, and shall not be construed as (1) an election of remedies, (2) a waiver of any defaults, or (3) a waiver or limitation of any rights, remedies, claims or interests of any of the Claimants.

Claimants reserve the right to amend or supplement this Proof of Claim at any time and, in any respect, including but not limited to, for purposes of fixing, increasing or amending in any respect the amounts referred to herein, asserting secured status, administrative claim status or super-priority administrative claim status for all or any portion of the amounts claimed herein, and adding or amending documents and other information and further describing the Proof of

Claim. The information regarding certain amounts claimed herein may have been provided to Claimants by the Debtors and such amounts remain subject to further verification. Claimants do not waive any right to amounts due for any claim asserted herein by not stating a specific amount due for any such claim at this time, and Claimants reserve the right to amend or supplement this Proof of Claim, if Claimants should deem it necessary and appropriate, to assert and state an amount for any such claim.

This Proof of Claim is made without prejudice to any of the Claimants' rights under the Bankruptcy Code or otherwise, including, but not limited to, any and all rights of setoff and recoupment, and the right to vote on any chapter 11 plan for any of the Debtors in these bankruptcy cases. Furthermore, Claimants expressly preserve all of their rights and claims against each of the Debtors and their respective creditors under the Bankruptcy Code.

This Proof of Claim is in addition to any other request for payment or proofs of claim filed or to be filed by any of the Claimants, and shall in no way prejudice the rights of any of the Claimants to file any other request for payment or proofs of claim, including claims for the same, or additional, amounts as claimed herein. Claimants expressly reserve the right to supplement any claims against the Debtor and each of the Debtors, including the right to identify additional Debtors against whom Claimants may have claims, after full disclosure of all relevant facts in these bankruptcy cases.

IV.     SUPPORTING DOCUMENTS

Due to the voluminous nature of the documents supporting the claims asserted herein, Claimants have not attached copies hereto. Copies of all documents referenced herein may be in the Debtors' possession and are also available upon request to counsel to Claimants.

# Exhibit
# G

| United States Bankruptcy Court<br>Southern District of New York | PROOF OF CLAIM |
|---|---|

| In re (Name of Debtor)<br>**Enron North America Corp.** | Case Number:<br>**01-16035 (AJG)** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| | |
|---|---|
| Name of Creditor<br>*(The person or entity to whom the debtor owes money or property)*<br><br>**Flagstaff Capital Corporation** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| Name and Addresses Where Notices Should be Sent<br><br>**Flagstaff Capital Corporation**<br>c/o JPMorgan Chase Bank      **Kelley Drye & Warren LLP**<br>712 Main Street – 24 East      **101 Park Avenue**<br>Houston, Texas 77002      **New York, New York 10178**<br>Attn: F. Hall Webb      **Attn: Mark I. Bane** | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Chec_____ addr_____ the c_____ |

Filed: USBC - Southern District of New York
ENRON, Et Al.
01-16034 (CA)     0000011155

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:<br><br>**SEE ATTACHMENT** | Check here ☐ amends |
|---|---|

| 1. BASIS FOR CLAIM: | |
|---|---|
| ☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other (Describe briefly)   **SEE ATTACHMENT** | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensations (Fill out below)<br>Your social security number _____<br>Unpaid compensations for services performed<br>From _____ to _____<br>    (date)      (date) |

| 2. DATE DEBT WAS INCURRED:<br>**SEE ATTACHMENT** | 3. IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|

4. CLASSIFICATION OF CLAIM. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another.
CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM.

| | |
|---|---|
| ☐ SECURED CLAIM $<br>Attach evidence of perfection of security interest.<br>Brief Description of Collateral:<br>☐ Real Estate   ☐ Motor Vehicle   ☐ Other (Describe briefly)<br>Amount of arrearage and other charges included in secured claim above, if any $<br>☒ UNSECURED NONPRIORITY CLAIM   **$Unliquidated \***<br>    **\*Plus such other amounts as listed on the attachment hereto.**<br>    **SEE ATTACHMENT**<br><br>A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim. | ☐ UNSECURED PRIORITY CLAIM $_____<br><br>Specify the priority of the claim.<br><br>☐   Wages, salaries, or commissions (up to $4,300), earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier—11 U.S.C. § 507(a)(3)<br>☐   Contributions to an employee benefit plan—U.S.C. § 507(a)(4)<br>☐   Up to $1,950 of deposits toward purchase, lease, or rental of property or services of personal, family, or household use—11 U.S.C. § 507(a)(6)<br>☐   Taxes or penalties of governmental units—11 U.S.C. § 507(a)(8)<br>☐   Other—11 U.S.C. §§ 507(a) |

| 5.   TOTAL AMOUNT OF<br>CLAIM AT TIME<br>CASE FILED: | **$Unliquidated \***<br>(Unsecured) | _____<br>(Secured) | _____<br>(Priority) | **$Unliquidated \***<br>(Total) |
|---|---|---|---|---|

    **\*Plus such other amounts as listed on the attachment hereto. SEE ATTACHMENT**

☐   Check this box if claim includes prepetition charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

| 6.   CREDITS AND SETOFFS: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor. | THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|

7.   SUPPORTING DOCUMENTS: *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8.   TIME-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date<br>October 10, 2002 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br><br>                            **F. Hall Webb, President** |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

ATTACHMENT TO PROOF OF CLAIM OF FLAGSTAFF CAPITAL CORPORATION
AGAINST ENRON NORTH AMERICA CORP. AND OTHER UNIDENTIFIED DEBTORS

I.     BASIS FOR CLAIM

A.     Background[1]

Pursuant to the Credit and Security Agreement, dated as of June 22, 2001 (the "Flagstaff

Credit Agreement"), among Flagstaff Capital Corporation ("Flagstaff"), as Borrower, the lenders

party thereto (the "Lenders"), as Lenders, JPMorgan Chase Bank (formerly known as The Chase

Manhattan Bank; hereinafter, "JPMCB"), as Administrative Agent and Collateral Agent, J. P.

Morgan Securities Inc., as Lead Arranger, The Royal Bank of Scotland, as Co-Arranger and

Syndication Agent, and The Bank of Tokyo-Mitsubishi Ltd. and Mizuho Bank (formerly known

as The Industrial Bank of Japan, Limited, New York Branch), as Co-Documentation Agents, the

Lenders extended to Flagstaff a $375,000,000 term loan (the "Flagstaff Term Loan").  As

security for the Flagstaff Term Loan, Flagstaff granted to Lenders a security interest in

substantially all Flagstaff's assets, including any and all of Flagstaff's rights with respect to the

Hansen Loan, the Warrant and Warrant Rights, the Put Option Agreement, the Total Return

Swap Agreement, and the Enron Agreement (each as defined below).

Pursuant to the Credit Agreement, dated as of June 22, 2001 (the "Hansen Credit

Agreement"), among Hansen Investments Co. ("Hansen"), as Borrower, Flagstaff, as Lender,

and JPMCB, as Administrative Agent, Flagstaff loaned the proceeds from the Flagstaff Term

Loan, and other moneys, to Hansen (the "Hansen Loan").  The Hansen Credit Agreement

provides that, if the Hansen Loan is prepaid for any reason, including upon acceleration, Hansen

is obligated to pay the Make Whole Amount (as defined in the Hansen Credit Agreement), which

---

[1]     Capitalized terms used but not defined herein shall have the meanings set forth in the relevant
referenced documents.

is an amount equal to any accrued but unpaid interest due on the Hansen Loan on or before the date of prepayment, plus the present value of all payments of interest under the Hansen Loan that would have been payable thereafter if the Hansen Loan had been paid on the Maturity Date (as defined in the Hansen Credit Agreement). The Hansen Loan is evidenced by the note from Hansen to Flagstaff, dated as of June 22, 2001 (the "Hansen Note").

Pursuant to the ISDA Master Agreement and Confirmation, dated as of June 22, 2001, (the "ISDA Master Agreement"), between JPMCB and Flagstaff, Flagstaff entered into an interest rate swap with JPMCB under which Flagstaff was the fixed rate payer on a notional amount equal to the scheduled outstanding principal balance of the Flagstaff Loan, and JPMCB was the floating rate payer.

As evidenced by the Intercompany Note, dated as of June 22, 2001 (the "Intercompany Note"), between Hansen and Compagnie Papiers Stadacona, Hansen loaned the entire proceeds of the Hansen Loan to CPS.

Pursuant to the Warrant Agreement, dated as of June 22, 2001 (the "Warrant Agreement"), Hansen issued a warrant entitling Flagstaff to purchase Class B Preferred Shares of Hansen (the "Warrant").

Enron Corp. ("Enron") and Flagstaff entered into a Put Option Agreement, dated as of June 22, 2001 (the "Put Option Agreement"), pursuant to which, upon an Event of Default (as defined under the Hansen Credit Agreement), Flagstaff could require Enron to purchase from Flagstaff the Warrant and the Warrant Rights (as defined in the Put Option Agreement), which Warrant Rights include the rights to receive the Make Whole Amount.

Enron and Flagstaff entered into the ISDA Master Agreement and Total Return Swap Confirmation, dated as of June 22, 2001 (the "Total Swap Return Agreement"), pursuant to

2

which, on the date Flagstaff exercises its rights under the Put Option Agreement, Flagstaff would pay to Enron an amount equal to the Fair Market Value (as defined under the Put Option Agreement) of the Warrant and Warrant Rights and, in return, Enron would pay to Flagstaff an amount equal to the Make Whole Amount.

Pursuant to the Enron Agreement, dated as of June 22, 2001 (the "Enron Agreement"), by Enron in favor of Flagstaff and the Indemnified Persons identified therein, Enron agreed to indemnify the Lenders, the Administrative Agent, the Collateral Agent, the Swap Counterparties and Flagstaff against (a) a breach by Enron or Hansen of representations or covenants in the Enron Agreement or in the other documents described above or (b) certain other matters related to the transactions described above.

On or about November 30, 2001, Flagstaff delivered to Enron a Put Notice and Put Assignment (collectively, the "Put Notice") in accordance with the terms of the Put Option Agreement. Enron has not, to date, acknowledged the receipt of the Put Notice nor has Enron taken any action that would be required under the Put Option Agreement or the Total Return Swap Agreement upon delivery of the Put Notice. It is unresolved whether the Put Option is exercised.

B.    Basis for Claim

This proof of claim (the "Proof of Claim") is filed by Flagstaff (the "Claimants"), against Enron North America Corporation ("ENA") and other unidentified Debtors, for debts and obligations of, and claims against, ENA and other unidentified Debtors arising out of, in connection with, or related to (1) any direct or indirect benefit gained by ENA and/or other unidentified Debtors from the Flagstaff Term Loan and the transactions undertaken pursuant to the Flagstaff Agreements, and (2) any acts or omissions of ENA and/or other unidentified

Debtors which may have harmed or caused damage to the Claimants, in connection with the Flagstaff Agreements, and any transactions undertaken pursuant, or related, thereto, or otherwise.[2]

## II.     TOTAL AMOUNT OF CLAIM

### A.     Amount of Claim

On December 2, 2001 (the "Petition Date"), and thereafter, Enron and certain of its affiliates, including ENA (the "Debtor")(such affiliates together with Enron and ENA, the "Debtors") each filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). As of the Petition Date, Debtor was, and still is, indebted to Claimants in, at least, the following amounts:

(a)     any and all amounts for claims against the Debtor or any of the Debtors, including, but not limited to, those Debtors who enjoy a direct or indirect interest in Hansen or CPS, for unjust enrichment, or for receipt of a direct or indirect fraudulent conveyance or transfer on account of any benefits, whether direct or indirect, enjoyed by the Debtor or any of such Debtors from the proceeds of the Flagstaff Term Loan or any other transaction undertaken pursuant to the Flagstaff Agreements; and

(b)     any and all additional amounts owed by Debtor or any of the Debtors to Claimants under or in connection to the Flagstaff Agreements, including, without limitation, amounts owed in respect of claims arising both prior to the Petition Date and subsequent to the Petition Date that remain outstanding in an undetermined amount or are otherwise unliquidated

---

[2]     Claimants believe, but cannot at this time evidence, that other Debtors may have benefited, directly or indirectly, from the Flagstaff Term Loan or the transactions undertaken pursuant to the Flagstaff Agreements. To the extent that there were such benefits by other Debtors, this claim should be deemed to be asserted against such Debtors, and Claimants expressly reserve their rights to assert claims directly against individual Debtors as additional facts are revealed in these cases.

and/or contingent as of the date hereof. These claims include, without limitation, misrepresentations and/or breaches of covenants and defaults under the Flagstaff Agreements, claims for expenses, fees (including attorneys' fees), indemnities and termination costs of, or damages relating to, the Flagstaff Agreements, whether arising prior to or subsequent to the Petition Date.

      B.    <u>Other Claims</u>

This Proof of Claim also expressly includes all rights to assert a constructive trust against assets or cash held by the Debtor or the other Debtors, and also includes any and all amounts owed, for damages or otherwise, on account of any and all claims that Claimants have or may have, whether known or unknown, against the Debtor, the other Debtors, and all those purporting to act on their behalf, whether presently asserted or to be asserted, including, without limitation, claims for or based upon (1) common law fraud, (2) misrepresentation, (3) subrogation, (4) indemnity, (5) contribution, (6) unjust enrichment, (7) constructive trust, (8) fraudulent conveyance, (9) failure to fulfill contractual and fiduciary obligations, (10) breach of implied covenants of good faith and fair dealing, (11) negligent undertaking, (12) making, causing or permitting to be made misleading statements regarding the businesses of Debtor and the Debtors, (13) failure to take prudent and appropriate action regarding adverse business conditions affecting the business operations of the Debtor and the Debtors, (14) failure to require adequate financial and accounting controls for the Debtor and the Debtors, all of which, singularly or collectively, may have caused any of the Claimants to suffer damages.

III.   RESERVATION OF RIGHTS

Claimants do not waive, and expressly reserve, all of the rights and remedies at law and in equity that Claimants have or may have against the Debtor, the other Debtors, and/or any of Debtor's affiliates and subsidiaries, or any other person or entity.

By filing this Proof of Claim, Claimants do not submit to the jurisdiction of this Court for any purpose other than with respect to the Proof of Claim. This Proof of Claim is not intended to be, and shall not be construed as (1) an election of remedies, (2) a waiver of any defaults, or (3) a waiver or limitation of any rights, remedies, claims or interests of any of the Claimants.

Claimants reserve the right to amend or supplement this Proof of Claim at any time and, in any respect, including but not limited to, for purposes of fixing, increasing or amending in any respect the amounts referred to herein, asserting secured status, administrative claim status or super-priority administrative claim status for all or any portion of the amounts claimed herein, and adding or amending documents and other information and further describing the Proof of Claim. The information regarding certain amounts claimed herein may have been provided to Claimants by the Debtors and such amounts remain subject to further verification. Claimants do not waive any right to amounts due for any claim asserted herein by not stating a specific amount due for any such claim at this time, and Claimants reserve the right to amend or supplement this Proof of Claim, if Claimants should deem it necessary and appropriate, to assert and state an amount for any such claim.

This Proof of Claim is made without prejudice to any of the Claimants' rights under the Bankruptcy Code or otherwise, including, but not limited to, any and all rights of setoff and recoupment, and the right to vote on any chapter 11 plan for any of the Debtors in these

bankruptcy cases. Furthermore, Claimants expressly preserve all of their rights and claims against each of the Debtors and their respective creditors under the Bankruptcy Code.

This Proof of Claim is in addition to any other request for payment or proofs of claim filed or to be filed by any of the Claimants, and shall in no way prejudice the rights of any of the Claimants to file any other request for payment or proofs of claim, including claims for the same, or additional, amounts as claimed herein. Claimants expressly reserve the right to supplement any claims against the Debtor and each of the Debtors, including the right to identify additional Debtors against whom Claimants may have claims, after full disclosure of all relevant facts in these bankruptcy cases.

IV.    SUPPORTING DOCUMENTS

Due to the voluminous nature of the documents supporting the claims asserted herein, Claimants have not attached copies hereto. Copies of all documents referenced herein may be in the Debtors' possession and are also available upon request to counsel to Claimants.

# PROPOSED ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------x
                                               :
In re                                          :        Chapter 11
                                               :        Case No. 01-16034 (AJG)
ENRON CORP., et al.,                           :
                                               :        Jointly Administered
                          Debtors.             :
--------------------------------------------------------x
                                               :
MIZUHO CORPORATE BANK, LTD., et al.,           :        Adv. Pro. No. 03-2288
                                               :
                          Plaintiffs,          :
                                               :
              v.                               :
                                               :
ENRON CORP., et al.                            :
                          Defendants.          :
--------------------------------------------------------x
```

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 7012(B)(6) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

Having considered the Motion of Defendants Enron Corp., Hansen Investments Co. and Compagnie Papiers Stadacona (now known as 4138198 Canada, Inc.) to Dismiss the Complaint of Mizuho Corporate Bank, Ltd. and Banco Bilbao Vizcaya Argentaria S.A.'s (the "Complaint") pursuant to Rule 7012(B)(6) of the Federal Rules of Bankruptcy Procedure (the "Motion"), and a hearing on the Motion having been held on July 17, 2003, and having considered the pleadings filed in support thereof, and the opposition thereto, and due and adequate notice of the Motion having been given, and no further notice being necessary, the Court is of the opinion that Plaintiffs can plead no set of facts upon which the relief requested in the Complaint can be granted and, therefore, it is hereby

ORDERED that Defendants' Motion to Dismiss is GRANTED. It is further,

ORDERED that Plaintiffs' Complaint be and hereby is DISMISSED WITH

PREJUDICE without leave to amend.

_____
Arthur J. Gonzalez
United States Bankruptcy Court Judge

Dated: _____, 2003