WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock, Esq. (MB 3001)
Melanie Gray (admitted *pro hac vice*)
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax (212) 310-8007

-and-

David R. Berz, Esq. (DB 4517)
David A. Hickerson
Peter M. Friedman (admitted *pro hac vice*)
1501 K Street, NW Suite 100
Washington, DC 20005
Tel: (202) 682-7000
Fax: (202) 857-0939

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | Case No. 01-16034 (AJG) |
| ENRON CORP., et al., | : | |
| | : | Jointly Administered |
| Debtors. | : | |

| | | |
|---|---|---|
| MIZUHO CORPORATE BANK, LTD., et al., | : | Adv. Pro. No. 03-2288 |
| Plaintiffs, | : | |
| v. | : | |
| ENRON CORP., et al. | : | |
| Defendants. | : | |

# DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO BANKRUPTCY RULE OF PROCEDURE 7012(B)

# PRELIMINARY STATEMENT

Defendants Enron Corporation ("Enron"), Hansen Investments Co. ("Hansen") and Compagnie Papiers Stadacona (now known as 4138198 Canada, Inc.) submit this reply brief in support of their motion to dismiss the Complaint (the "Complaint") of Plaintiffs Mizuho Corporate Bank, Ltd. and Banco Bilbao Vizcaya Argentaria S.A. ("Plaintiffs"). For the reasons set forth below, as well as in the Defendants' Memorandum in Support of the Motion to Dismiss, Plaintiffs' claims should be dismissed for failure to state a claim upon which relief can be granted.

As set forth in Plaintiffs' Complaint and the contracts referenced therein[1], the relationship between the parties arises from a complex series of financial transactions. These transactions are described in detail in the earlier filings in this case. The facts alleged by Plaintiffs' most relevant to this Motion to Dismiss are:

1. A group of banks, including the predecessors-in-interest of Plaintiffs (the "Lenders") lent $375 million to Flagstaff Capital Corporation ("Flagstaff"), a subsidiary of JP Morgan Chase ("Chase"), under the "Flagstaff Loan Agreement."

2. Flagstaff then lent approximately $1.4 billion to Hansen through the "Hansen Loan Agreement."

---

[1] As noted by Defendants in their opening brief at page 2 n.2, these contracts, which are referenced in the Complaint may be considered by this Court upon a motion to dismiss. Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001)

3. Under the Flagstaff Loan Agreement, the Lenders received an interest in the rights Flagstaff received from Hansen in the Hansen Loan Agreement known as the "Pledged Collateral."

4. Under the Flagstaff Loan Agreement, the Lenders appointed Chase as their Administrative Agent and Collateral Agent.

5. In the Flagstaff Loan Agreement, Flagstaff appointed the Collateral Agent as the Attorney-in-Fact to act in its name or in the name of anyone else to file any claims or take any actions or institute any proceeds necessary for the collection of any of the Pledged Collateral.

These core facts demonstrate that the Complaint should be dismissed because Plaintiffs lack standing to bring this suit. Plaintiffs' complaint should also be dismissed because allegations are inadequate to impose a constructive trust over the Pledged Collateral or any other property held by Defendants.

## ARGUMENT

**I. PLAINTIFFS LACK STANDING TO BRING THIS SUIT**

  a. The Plain Language Of The Flagstaff Loan Agreement Bars Plaintiffs From Maintaining This Lawsuit.

In their opening memorandum in support of Defendants' Motion to Dismiss ("Def. Mem."), Defendants argued that Plaintiffs lack standing to bring this lawsuit because that exclusive right was given to the Collateral Agent under the Flagstaff Loan Agreement. Def. Mem. at 9-16. Under the Flagstaff Loan Agreement, Chase, as the Collateral Agent has complete and exclusive power to bring this cause of action. In Section 8 of the Flagstaff Loan Agreement, the Lenders appointed Chase as their

Collateral Agent with respect to the Pledged Collateral. The Lenders' interest in the Pledged Collateral was created once Flagstaff loaned money to Hansen under the Hansen Loan Agreement. Their rights to the Pledged Collateral, and specifically their right to maintain any cause of action against the Defendants, derive from Flagstaff's rights. Section 9.06 of the Flagstaff Loan Agreement states that the Collateral Agent has "full authority in the place and stead of [Flagstaff as direct lender to Hansen] and in the name of [Flagstaff] <u>or otherwise</u> . . . to file <u>any</u> claims or take <u>any</u> action or institute <u>any</u> proceedings that the Collateral Agent . . . may deem necessary for the collection of any of the Pledged Collateral." (emphasis added). This unambiguous contractual provision makes it clear that only the Collateral Agent can pursue the Pledged Collateral on behalf of the Lenders at-large. Where provisions of a contract are clearly and unambiguously set forth, effect "must be given to the intent as indicated by the language used." <u>Slatt v. Slatt</u>, 64 N.Y.2d 966, 967 (1985).

In their Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp."), Plaintiffs choose not to address this key contractual language. Indeed, Plaintiffs totally ignore Section 9.06 in their papers, thereby tacitly conceding that the construction given to the language of that section by Defendants is correct. Instead, Plaintiffs point to other provisions of the Flagstaff Loan Agreement that are irrelevant or inapposite to whether they have standing to sue, and cite to caselaw that is clearly distinguishable because the relevant agreements of the parties to the contracts at issue in those cases were fundamentally different.

Plaintiffs argue that even if the Collateral Agent has sole authority to act under the Flagstaff Loan Agreement, their claims are not barred because the recoveries

they seek are pursuant to theories of "unjust enrichment," rather than for an event of default under the contracts. Opp. at 5-6. Plaintiffs cite to no legal authority for this dubious proposition, which, in any event, is inconsistent with their attempt to recover the Pledged Collateral in their Complaint. Plaintiffs' argument also ignores the plain language of Section 9.06 which grants the Collateral Agent full authority to take <u>any</u> actions and file <u>any</u> claims "necessary for the collection of any of the Pledged Collateral." Thus, Section 9.06 governs any cause of action brought by a representative of the Lenders which seeks to recover the Pledged Collateral. To accept Plaintiffs' proposed reading would eviscerate Section 9.06 and render it meaningless by allowing any individual lender to circumvent Section 9.06's plain language.

b. Plaintiffs' Argument That Other Provisions Of The Flagstaff Loan Agreement Provide Standing Is Meritless.

Defendants also argue that various provisions of the Flagstaff Loan Agreement give them "direct rights against Flagstaff." Opp. at 6. Whatever rights Plaintiffs may have against Flagstaff are irrelevant here, because Plaintiffs have not sued Flagstaff, Flagstaff is not a party to this lawsuit, and Flagstaff does not hold the property Plaintiffs seek to recover in this lawsuit. Tellingly, Plaintiffs cite no provisions in any agreement giving them a direct right against <u>Hansen</u> or any other Defendant. Plaintiffs cannot, because to the extent they ever had any rights against Hansen or any other Defendant in the first instance (which Defendants do not concede), they ceded those rights to the Collateral Agent through Sections 8 and Section 9.06 of the Flagstaff Loan Agreement.

Moreover, the provisions of the contracts cited by Plaintiffs do not give them any right to bring a cause of action against the Defendants. Plaintiffs point to Section 8 of the Flagstaff Loan Agreement, which states:

> Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

This provision does not undermine or even address Section 9.06's grant of full enforcement authority against the Pledged Collateral to the Collateral Agent. Rather, in Section 8, the contracting parties merely acknowledge that to the extent the Lenders are empowered to take actions or make decisions, they must make their own decisions and form their own opinions and without reliance upon the Collateral or Administrative Agent. Under Section 8 of the Flagstaff Loan Agreement, 50.1% of the Lenders (known as the "Required Lenders") can force the Collateral Agent to take a specific action, including, presumably, bring suit under Section 9.06. The language quoted by Plaintiffs above merely underscores that in exercising that power, an individual Lender must act upon its own and without reliance on the Administrative or Collateral Agent. In no way does this general language supplant or supercede the specific language of Section 9.06. The language of Section 9.06 the Flagstaff Loan Agreement clearly expresses the intent of the parties with respect to enforcement against the Pledged Collateral. It provides no support for Plaintiffs' argument that it has standing.

Further, if the Collateral Agent chooses not to act, the Flagstaff Loan Agreement does not give individual lenders the right to take direct action against the Defendants. Rather, if the Lenders are dissatisfied with the Collateral Agent's decision not to act, they can take action to force the Collateral Agent to act on their behalf. See Section 8 (the Collateral Agent shall take any action as it is "required to exercise in writing by the Required Lenders"). This contractual provision would be rendered superfluous if each individual lender could sue on the Defendants on their own. Such a result is "unsupportable under standard principles of contract interpretation." See Lawyers Fund for Client Protection of New York v. Bank Leumi Trust Co., 706 N.Y.S.2d 66, 69-70 (N.Y. 2000); Manley v. Ambase Corp., 337 F.3d 237, 250 (2d Cir. 2003).

    c.    Caselaw Cited By Plaintiffs In Support Of Its Standing Argument Is Inapposite.

Plaintiffs' citation to case law is equally unpersuasive. In Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238 (2d Cir. 1994), Plaintiffs' Mem. at 7-8, the relevant loan agreement allowed the collateral agent to act "only if requested to do so by the Majority Banks." 15 F.3d at 243. Based upon this contractual language, the court held that this provision did not abrogate the rights of the participating banks to sue on their own. Id. The provision in the contract at issue in Commercial Bank simply bears no resemblance to Section 9.06, which empowers the Collateral Agent to pursue the Pledged Collateral, without instruction or permission of a majority of the banks, and "with full authority" on behalf of Plaintiffs or any other entity. Consumed by their efforts to make this square peg fit, Plaintiffs ignore the significant distinction that the

Commercial Bank provision created a limitation on the powers of the Collateral Agent, whereas here, Section 9.06 places the limitation on the Lenders.

Moreover, in Commercial Bank, the plaintiffs were direct parties to the lending agreement with the defendant, unlike here, where Flagstaff is the direct lender to Defendants. The much broader power given to the Collateral Agent here parallels the power given to the collateral agent in Credit Francais Int'l S.A. v. Sociedad Financiera de Comercio, C.A., 490 N.Y.S.2d 670, 681 (N.Y. Sup. Ct. 1985), where the court held the plaintiff lacked standing based on a specific provision in the relevant lending agreement under which the members of that bank group irrevocably appointed an "Agent" to act on their behalf in the "event of an acceleration" with regard to the borrower, who was the defendant in that case. 490 N.Y.S.2d at 681.

Furthermore, in their opening brief, Defendants also relied on In re Okura & Co., 249 B.R. 596, 603-05 (Bankr. S.D.N.Y. 2000) for the proposition that where it is clear from the terms of a lending agreement that a lead lender or agent has a right to enforcement against a borrower, only that lead lender has standing to sue. Def. Mem. at 10. Plaintiffs, in their opposition, do not respond to Defendant's argument, and do not address the Okura case at all. Okura makes clear that in lending transactions with "two independent bilateral relationships[,] the first between the borrower and the lead bank and the second between the lead bank and the participants. . . the participants do not have privity of contract with the underlying borrower," and therefore lack standing to sue the borrower. Id. at 608 (citations omitted). Here, there are two related, but nevertheless independent lending agreements, one between Hansen and Flagstaff, and one between

Flagstaff and the Lenders; thus, as in Okura, the Lenders, including the two Plaintiffs in this case, lack standing to sue.

Additionally, Plaintiffs' citation to Leon Bernstein Comm. Corp. v. Pan American World Airways, 421 N.Y.S.2d 587 (N.Y. Ct. App 1979) for the unexceptional proposition that an undisclosed principal has the right to sue on a contract made in the name of its agent, is inapposite. The issue here is not whether an undisclosed principal is barred from bringing suit. Rather, the issue in this case is the parties' agreement in the Flagstaff Loan Agreement and the related agreements.[2] As set forth in the unambiguous language of a contract (i.e., the Flagstaff Loan Agreement), a group of principals, (i.e., the Lenders), all agreed to act only through a single agent (i.e., the Collateral Agent) against these Defendants. Thus, this is not a question of agency, but of contract, and the contract here bars Plaintiffs from maintaining this suit.[3]

---

[2] The Hansen Loan Agreement and Flagstaff Loan Agreement were integrated set of contracts, and thus, as Defendants' previously argued, Defendants have an interest in enforcing Section 9.06's standing requirements. See Def. Mem. at 16 n.6. Plaintiffs do not dispute this in their Opposition.

[3] Moreover, Leon Bernstein recognized that where the party being sued can cite prejudice, an undisclosed principal cannot sue on a contract made in the name of its agent. Id. at 589. The prejudice to Defendants here is the threat of multiple lawsuits by multiple parties with claims to the Pledged Collateral. As the court in Credit Francais explained: if an individual bank is permitted to sue, "the other banks would be required, as a matter of self-protection, to bring their own lawsuits, confronting the defendant with disparate and mutually antagonistic claims and making impossible an orderly approach. . . members of the consortium . . . must stand 'all for one, and one for all.'" 490 N.Y.S.2d at 683-684.

## II. NO CONSTRUCTIVE TRUST IS AVAILABLE TO PLAINTIFFS

### a. Plaintiffs Cannot Obtain A Constructive Trust Because They Have A Legal Remedy Under The Contracts.

Plaintiffs' argument that they can seek the equitable remedy of a constructive trust to obtain the Pledged Collateral, which only exists by virtue of the Flagstaff and Hansen Loan Agreements and other related agreements, is meritless. As Defendants argued in their opening brief, a fundamental principle of equity is that a party may not obtain an equitable remedy where it has a legal remedy. That principle requires the dismissal of Plaintiffs' constructive trust claim. Def. Mem. at 29-31. Plaintiffs' response to this argument -- that Plaintiffs are entitled to plead in the alternative both a claim under the contract and an equitable claim -- misses the mark. Opp. at 34-35. It is the existence of a legal remedy under the contract that bars equitable relief in this case. Principles regarding alternative pleading have no application in this case.

Plaintiffs' need look no further than their own description of the Connecticut Resources Recovery Auth. v. Enron Corp., 2003 WL 1571719 (March 17, 2003, Bankr. S.D.N.Y.) to see the flaw in their argument. Opp. at 15. Plaintiffs argue that the reason this Court dismissed CRRA's claim for a constructive trust was that the claim there was "self-contradictory" -- that the CRRA was simultaneously seeking to declare a contract void *ab initio* and recover on a property right directly from that contract. The same is true here. Plaintiffs cannot seek a constructive trust based on the fraudulent inducement of a contract (which, if true, would void the contract) and then

seek to use an equitable proceeding to obtain property -- the Pledged Collateral[4] -- when the property they seek exists only as a result of that contract.

      b.      Plaintiffs' Allegations That Chase Has Unclean Hands Requires Dismissal Of This Lawsuit.

In its Opposition, Plaintiffs suggest that Defendants' argument that Chase has sole authority to pursue claims against the Pledged Collateral is somehow undermined because of Chase's recent settlement of claims by SEC and state regulators "that it knowingly participated in or abetted Enron's fraud." See Opp. at 4-5. But even assuming these allegations Plaintiffs make in its Opposition are true, this would only provide another reason to dismiss Plaintiffs' Complaint: if Chase is a fraud-feasor with unclean hands, no constructive trust can be imposed over the Pledged Collateral, because the Pledged Collateral was created by the Hansen Loan Agreement -- a loan made by Flagstaff, a Chase subsidiary. It is hornbook law that where a party to a transaction has unclean hands, equitable remedies, such as the constructive trusts sought by Plaintiffs here, are unavailable. See Dan B. Dobbs, *The Law Of Remedies: Damages-Equity-Restitution* § 2.4(2) at 92-93 (2d ed. 1993). This Court dealt with this situation in CRRA, where there was also an intermediary (Connecticut Light and Power ("CL&P")) between the plaintiff and defendant that lent the money to the defendant, and noted that "to the extent CRRA could step into CL&P's shoes, it would only have the causes of action and

---

[4] The Pledged Collateral consists of Flagstaff's rights in: (i) the Hansen Loan Agreement, (ii) the Warrant Agreement, (iii) the Put Option Agreement, (iv) the Swap Agreement, and (v) Flagstaff's rights to receive payments or property that may become due under any of those agreements. Compl. at ¶ 13; see FLA § 9.01. All of this property was created by the series of contracts entered into by the parties relating to the Flagstaff and Hansen Loan Agreements.

defenses available to CL&P." CRRA, 2003 WL 1571919 at *7. This Court stated that because the plaintiff there alleged that CL&P had unclean hands, principles of equity would not permit a constructive trust over the contested funds. Thus, a constructive trust would not be available to CL&P, and by extension, CRRA. Id. This reasoning should apply equally here: because the Pledged Collateral was directly created by a loan made by an entity that Plaintiffs allege had unclean hands, no constructive trust may be imposed on that property.

      c.      <u>Plaintiffs' Tracing Arguments Are Meritless.</u>

Plaintiffs' argument, see Opp. at 11-16, that a claim for a constructive trust cannot be dismissed at the pleading stage for failure to allege a traceable res, is meritless. A traceable res is a fundamental and necessary element which must be adequately alleged in order to establish a constructive trust. Indeed, this Court recently dismissed a plaintiff's claim in <u>Connecticut Resource Recovery Auth. v. Enron</u>, because CRRA failed to meet its burden "to plead and prove that there is an identifiable trust res <u>and that it can trace the property</u> from CRRA to EPMI." 2003 WL 1571719 at *7 (March 17, 2003, Bankr. S.D.N.Y.)[5]; <u>see also</u> <u>In re Handy & Harman Refining Grp.</u>, 266 B.R. 24, 28 (D. Conn. 2001) (rejecting claim for constructive trust because, even assuming claimant's allegations were true, claimant had not sufficiently alleged a traceable res).

With respect to Plaintiffs' substantive response to Defendants' argument that Plaintiffs have not adequately alleged it can trace the proceeds, Plaintiffs argue that the bank loan proceeds were used to refinance the property. See Opp. at 17-21. As an

---

[5] Given this language, Plaintiffs' characterization of <u>CRRA</u> as not involving tracing is incorrect.

C:\DOCUMENTS AND SETTINGS\VACEK\LOCAL SETTINGS\TEMP\C.DATA.NOTES\REPLY BRIEF TO MIZUHO MTD_#155526.DOC    12

initial matter, Plaintiffs make no claim they can trace the proceeds of the Bank Loan to most of the property over which they seek a constructive trust, including the Class B Warrant and Warrant Rights, the assets of Hansen including the CPS Note, the assets of CPS, the direct or indirect equity interest of Enron in CPS, and "such other assets as are appropriate to prevent unjust enrichment and to compensate Plaintiffs." Complaint ¶ 52. As Plaintiffs make no allegation or argument that the proceeds of the Bank Loan can be traced to any of this property, its claims for constructive trusts over this property must be dismissed.

Plaintiffs do argue that they can trace the loan proceeds to the Property (defined by Plaintiffs as a paper mill in Canada owned by CPS), because "the loan proceeds were used to refinance the Property." Opp. at 17. [6] Plaintiffs own pleading shows why this allegation is insufficient. Plaintiffs state, "it is indisputable that CPS used $375 Million Bank Loan to refinance an existing loan by which CPS acquired the Property." Opp. at 18. As Plaintiffs further point out, "CPS paid $375 million to Enron: $360 million repaid the Stadacona/SATCO bridge financing, and the remaining $15 million was a financing fee." Opp. at 19 (quoting Examiner's Second Interim Report, Ex. K to Plaintiffs' Opp. at 94). Thus, according to Plaintiffs' own allegations, tracing the proceeds of the Bank Loan shows that the cash proceeds of the Bank Loan was paid to Enron. Plaintiffs make no allegation that this cash, which is fungible, was segregated

---

[6] As Defendants noted in their Opening Brief at n.8, under section 5(b)(i) of the Put Option Agreement, Flagstaff and its "successors and assigns" agreed if, upon the event of a default, as occurred here, Flagstaff acquired through legal or equitable proceedings against Hansen any direct or indirect claim against CPS or any of its property, Flagstaff and its assigns and successors would waive their rights to bring any "legal or equitable proceedings" against CPS "or any of its property or assets."

into any separate account, rather than commingled with Enron's general cash assets. Thus, Plaintiffs' lengthy argument that tracing rules related to commingled property are inapplicable in this case is belied by its own factual contentions. Opp. at 11-15. Accordingly, Plaintiffs fail to meet their pleading burden that they can trace their property to specific property in the Defendants' hands, and, therefore, all of Plaintiffs constructive trust claims must be dismissed.

        d.        Plaintiffs' Generalized Allegations Of Fraud Are Insufficient To Maintain This Lawsuit.

Plaintiffs' attempt to distinguish SEC v. Credit Bancorp, 290 F.3d 80 (2d Cir. 2002) is unpersuasive. Credit Bancorp and In re Lemons & Assocs., 67 B.R. 198, 214 (Bankr. D. Nev. 1986) stand for the proposition that where, as here, a claimant relies on generalized allegations of fraud, this would not support imposition of a constructive trust against an insolvent entity. While Credit Bancorp involved a Ponzi scheme, its rationale is not limited to that set of facts. Indeed, the line of cases barring constructive trusts in the case of generally applicable fraud are premised on the notion that in bankruptcy "equality is equity," not on the specific conduct the debtor was alleged to have engaged in. See Lemons, 67 B.R. at 214 (Cunningham v. Brown, 265 U.S. 1, 13 (1924)). Here, Plaintiffs allege only that they relied upon Enron Corp.'s widely disseminated, generally available and publicly released financial statements. To permit a claim for constructive trust based on such broadly applicable grounds would deny equal treatment to unsecured creditors who are similarly situated as Plaintiffs. Such inequitable treatment would run afoul of the Bankruptcy Code's fundamental principle of treating similarly situated creditors similarly, and subvert the Code's goal of ratable distribution, a

point made in Defendants' Opening Brief at 23-24 and the cases cited therein.  See, e.g., PlasmaNet, Inc. v. Phase2Media Inc., (In re Phase2Media, Inc.), 2002 Bankr. LEXIS 1457, at *33 (Bankr. S.D.N.Y. Dec. 20, 2002).

   e. Count II Of The Plaintiffs' Complaint Must Be Dismissed.

Finally, with respect to Count II of Plaintiffs' Complaint, Plaintiffs assert that "a constructive trust is an appropriate remedy for the fraudulent conveyance of the 'make whole rights' that were transferred from Flagstaff to Enron via the Put Notice and Put Assignment."  Opp. at 21.  Plaintiffs' Count II rests, in part, on Plaintiffs' allegation that "in transferring the right to recover the make-whole amount to Enron, Flagstaff received only the right to file a proof of claim against Enron . . . ."  Compl. at ¶ 38.  As Plaintiffs also allege, however, Flagstaff was entitled, under the contracts, to receive certain payments from Enron upon Flagstaff's delivery of the Put Notice to Enron.  Compl. ¶¶ 16-17.

What Plaintiffs fail to point out is that, according to the terms of the Put Option Agreement, absent the delivery of the Put Notice to Enron, Flagstaff had no method of repayment under the Hansen Loan Agreement upon the event of a default by Hansen.  In the event of a default under the Hansen Loan Agreement, if Flagstaff exercised the Put, it could require Enron to pay to it the "Make-Whole Amount."  See Put Option Agreement at § 2.  In return for the benefit of the Put Option Agreement, Flagstaff agreed, at the time of the execution of the Put Option Agreement, on its own behalf and on behalf of its successors and assigns, that it would waive any right to assert "a direct or indirect claim or cause of action or to bring any . . . legal or equitable proceeding against

CPS or any of its property or assets, irrespective of whether any such claim . . . is based on common law [or] principles of equity." Put Option Agreement at § 5(b)(i)

Plaintiffs allege this restriction of actions against CPS and its assets was fraudulently induced, and cannot be enforced against them. Compl. ¶ 19. However, Plaintiffs cannot have it both ways: if the Put Option Agreement was fraudulently induced and the limitations on seeking relief against CPS' property invalid, the entire Put Option Agreement is invalid, and cannot be "returned" to Flagstaff through means of a fraudulent conveyance action.

Moreover, as the Put Option Agreement makes clear, Flagstaff and the Lenders anticipated recovery via a payment from Enron in the event of a default under the Hansen Loan Agreement. To the extent they have not received anticipated money payments from Enron under a contract, Flagstaff and Plaintiffs are no differently situated than any other contract creditor who did not receive payment in full from the Debtors pre-petition, and filed proofs of claims. That does not mean such creditors did not receive fair or equivalent value for transfers made pursuant to pre-petition contracts, as Plaintiffs alleges in Count II. Compl. at 39. Indeed, if this were the case, then all contract creditors of all debtors would be able to seek constructive trusts (and receive priority status in front of other similarly situated creditors) with respect to contracts for which they had not received full payment pre-petition. This is obviously not the law, and demonstrates an additional reason why Count II of the Complaint must be dismissed.

## CONCLUSION

For the reasons stated herein, as well as those stated in the Defendants' Opening Brief, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice pursuant to Bankruptcy Rule 7012(b).

Respectfully submitted,

Dated: New York, New York
      August 29, 2003

WEIL, GOTSHAL & MANGES LLP

By: ___/s/ Melanie Gray_____
Martin J. Bienenstock (MB 3001)
Melanie Gray
767 Fifth Avenue
New York, New York 10153
(212) 853-8000

-and-

David R. Berz (DB 4517)
David A. Hickerson
Peter M. Friedman
1501 K Street, NW Suite 100
Washington, DC 20005
(202) 682-7000